Susan Martin (AZ#014266)
Jennifer Kroll (AZ#019859)
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Avenue
Suite 2010
Phoenix, Arizona  85004
Tel:   (602) 240-6900
Fax:  (602) 240-2345
susan@martinbonnett.com
jennifer@martinbonnett.com

Patrick V. Dahlstrom (*admitted pro hac vice*)
**POMERANTZ HAUDEK
   GROSSMAN & GROSS LLP**
Ten South LaSalle Street
Suite 3505
Chicago, Illinois  60603
Tel:   (312) 377-1181
Fax:  (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Lead Plaintiff Steve Rand and the Class*

| | |
|---|---|
| **IN RE MEDICIS PHARMACEUTICAL CORPORATION SECURITIES LITIGATION** | **Master File No. CV-08-01821-PHX-GMS** |
| | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT MEDICIS PHARMACEUTICAL CORPORATION'S AND ERNST & YOUNG'S MOTIONS TO DISMISS** |
| | **(Oral Argument Requested)** |

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ....................................................................................1

**BACKGROUND** ............................................................................................ 2

**ARGUMENT** ............................................................................................ 9

    THE AMENDED COMPLAINT SHOULD BE SUSTAINED AS LEAD PLAINTIFF HAS
ADEQUATELY PLED *SCIENTER* ............................................................9

    A.    Standards for Pleading *Scienter* Under Section 10(b) of the Exchange
Act ....................................................................................... 9

    B.    The Amended Complaint Satisfies the Ninth Circuit's Individual
Analysis for *Scienter* and the Holistic Approach Mandated by the
Supreme Court....................................................................... 11

        1.  Individual Analysis ........................................................ 11

        2.  The Holistic Approach .................................................. 15

    C.    Medicis's Restatement Supports a Strong Inference of *Scienter* ......... 18

    D.    Pleading Motive is not Required to Establish *Scienter*...................... 21

    E.    The Allegations Support Ernst & Young's *Scienter* ............................ 23

    F.    Confidential Witness's Testimony Supports the Inference of
*Scienter*................................................................................ 25

    G.    The Amended Complaint Adequately Alleges Section 20(a)
Liability ............................................................................... 26

**CONCLUSION** ........................................................................... 27

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d cir. 1995) ...................................... 27

*Chill v. Gen. Elec. Co.,* 101 F.3d 263, 269 (2d Cir. 1996)........................................... 24

*Doe v. United States*, 58 F.3d 494,497 (9th Cir. 1995)................................................ 27

*Foman v. Davis*, 371 U.S. 178, 182 (1962)................................................................. 27

*In re Adaptive Broadband Sec. Litig.,* 2002 U.S. Dist. LEXIS 5887 at *49 (N.D. Cal. Apr.
2, 2002) ..................................................................................................................... 22

*In re Alstom S.A., Secs. Litig.*, 406 F.Supp.2d 433, 505 (S.D.N.Y. 2005) ...................... 25

*In re Amylin Pharms., Inc. Sec. Litig*., 2003 WL 21500525, at *5 (S.D. Cal. Oct. 10,
2002) ......................................................................................................................... 22

*Berson v. Applied Signal Technology, Inc.,* 527 F.3d 982 (9th Cir. 2008) ....................... 18

*In re Cirrus Logic Sec. Litig* ........................................................................................ 18

*In re Connetics Corp. Secs. Litig.*, 2008 U.S. Dist. LEXIS 62515 (N.D. Ca. 2008) ........ 16

*In re Countrywide Deriv. Litig.*, 554 F. Supp. 2d at 1066............................................... 14

*In re Countrywide Financial Corp. Secs. Litig.*, 588 F. Supp. 2d 1132
(C.D. Cal. 2008). .................................................................................................. 13, 23

*In re Daou Systems, Inc.*, 411 F.3d 1006 (9th Cir. 2005)...................................... 14, 18, 19

*In re Hypercom Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 45482 (D. Az. July 5, 2006) . 21

*In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002)............................... 12

*In re New Century*, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008) ................................... 3

*In re Nuko Information Systems Sec. Litig,* 199 F.R.D. 338(N.D. Cal. 2000) ................. 22

*In re Petsmart Sec. Litig.*, 61 F.Supp.2d 982 (D. Ariz. 1999)........................................ 23

*In re Royal Ahold N.V. Sec. & ERISA Litig.,* 351 F. Supp. 2d 334, 390 (D. Md. 2004)... 26

*In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615,627 (9th Cir. 1994)..................... 21

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.,* 2:08-MD-1919 MJP, 2009 WL
1393679 (W.D. Wash. May 15, 2009) ....................................................................... 26

*In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407 (9th Cir. 1994)............................. 14, 20

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ................................................................................................................ 12,14, 25

*Omnivision Techs.*, 2005 U.S. Dist. LEXIS 16009 (N.D. Cal. July 29, 2005 ................... 17

*Raychem Corp. v. Federal Inc. Co.*, 853 F. Supp. 1170, 1180 (N.D. Cal. 1994) ............. 22

*Rudolph v. UT Starcom*, 2008 U.S. Dist. LEXIS 63990 (N.D. Cal. Aug.21, 2008)) ........ 26

*South Ferry* and *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008) ........................................................................................................................... 11

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 2009 U.S. Dist. LEXIS 31832 (D. Az. Mar. 27, 2009) .......................................................... 21

*Weiss v. Amkor Technologies*, 527 F.Supp.2d 938 ...................................................... 21

*Zucco Partners, LLC. v Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ........................ 10

# **PRELIMINARY STATEMENT**

Lead Plaintiff, Steve Rand, has alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Medicis Pharmaceutical Corporation ("Medicis" or the "Company"), the Individual Defendants Jonah Shacknai ("Shacknai"), Richard D. Peterson ("Peterson"), and Mark A. Prygocki ("Prygocki"), as well as defendant Ernst & Young LLP ("E&Y"), with particularized allegations of false statements, materiality, and *scienter*, and a short plain statement of the grounds for reliance and damages.  Medicis, the Individual Defendants and E&Y do not seek dismissal of the Amended Federal Securities Class Action Complaint (the "Amended Complaint")[1] on the grounds that plaintiffs have not adequately pled the elements of falsity, materiality, reliance, causation or damages.  The only element that the defendants allege has not been adequately pled in the Amended Complaint is *scienter*.

This action arises from the dissemination of materially false and misleading quarterly and year-end financial statements by Medicis over a five-year period in violation of Generally Accepted Accounting Principles ("GAAP").  Specifically, Medicis falsely reported its revenue by failing to properly account for exchanges of expired or about-to-expire ("short-dated") products by failing to comply with Statement of Financial Accounting Standards No. 48 ("SFAS 48").  ¶ 29.  On September 24, 2008, the Company stunned the market when it reported that it would be required to restate its financials for fiscal years 2003 through 2007 and the first and second fiscal quarters of 2008, because it had failed to adequately reserve for exchanges of short-dated products, and instead accounted for returns using a "replacement cost" methodology in violation of SFAS 48. ¶ 8.  The disclosure on September 24, 2008 caused the price of Medicis common stock to tumble 13%, $2.34 per share, on extremely high trading volume.  This statistically

---

[1] Citations to the Amended Complaint are denoted as "¶ _."

significant decline erased approximately $125 million of shareholder equity.  ¶ 10.

### BACKGROUND

Medicis is a specialty pharmaceutical company that markets perishable dermatological, aesthetic and podiatric drugs, *i.e.*, pharmaceuticals with limited shelf life, to wholesale distributors.  ¶¶ 24-26.  Manufacturing perishable products entails the inherent risk that unsold products will be returned as the date of expiration nears.  Thus, pursuant to SFAS 48, Medicis was required to estimate likely returns and to exclude that portion from revenue recognized on the sale of products to wholesalers, and to book reserves for the expected sales returns.  ¶ 3.

To induce wholesalers to purchase greater quantities of Medicis products, *i.e.*, stuff the distribution channel, the Company offered generous return policies.  *Id.*  This channel stuffing required Medicis to increase its reserves accordingly; however, as wholesalers' bloated inventories neared expiration, the Company exchanged product without properly taking a charge to reserves for the full cost of returned product.  ¶ 4. The requirement regarding reserving for returns under SFAS 48 was not a new concept under GAAP, and authoritative guidance on the interpretation of SFAS 48 has been extent more than ten years. ¶ 30.

In order to circumvent SFAS 48, defendants exchanged new, fresh product for short-dated product and excluded the full cost of the new product by purporting to say that, pursuant to footnote 3 of SFAS 48, the fresh product was an exchange of "one item for another of the same kind, quality, and price (for example, one color or size for another)."  Medicis Mem. at 1.  In fact, Medicis appeared to ignore SFAS 48 completely and "based [its accounting treatment] on the Company's view of the economic impact of returns on its business" instead.  ¶ 89.  Defendants' purported "misinterpretation" of SFAS 48, therefore, was a *post hoc* rationalization, having been caught red-handed.

The authoritative accounting literature, however, does not support such an

interpretation.   The American Institute of Certified Public Accountants ("AICPA")
addressed this issue in the context of software revenue in 1997 when it issued Statement
of Position ("SOP") 97-2.[2]   In  SOP 97-2, the AcSEC ("Accounting Standards Executive
Committee") states:

> **.121**  *Rights to Exchange or Return Software.*   AcSEC believes that the
> rights to exchange or return software (including platform transfer rights) are
> subject to the provisions of FASB Statement No. 48, even if the software is
> not returned physically.   Accordingly, AcSEC concluded that the
> accounting for exchanges of software for products with no more than
> minimal differences in price, functionality, and features by users qualify for
> exchange accounting because, as discussed in footnote 3 to FASB
> Statement No. 48, (*a*) users are "ultimate customers" and (*b*) exchanges of
> software with no more than minimal differences in price, functionality, and
> features represent "exchanges . . . of one item for another of the same kind,
> quality, and price."   AcSEC concluded that because resellers are not
> "ultimate customers," such exchanges by resellers should be considered
> returns.

Medicis sells its pharmaceuticals to large wholesale pharmaceutical distributors,
*i.e.*, resellers, not to the ultimate customers of its products.  ¶ 2.  Accordingly, exchanges
of pharmaceuticals to wholesalers with "no more than minimal differences . . . should be
considered returns" that are not excluded under SFAS 48 n.3.   There is nothing opaque
about the rule, and nothing in the literature on SFAS 48 n.3 to support the defendants'
*post hoc* rationalization here for failing to properly account for returns of short-dated and
expired goods.

Moreover, the differences between the short-dated or expired drugs and new, fresh
products were anything but "minimal."   Once a pharmaceutical expires, it cannot be

---

[2]  The Court may take judicial notice of SOP 97-2 on this motion as the fact of the SOP is
"capable of accurate and ready determination by resort to sources whose accuracy cannot
be reasonably questioned," (*see* Fed. R. Evid. 201) and such financial accounting
standards are proper subjects of judicial notice. *See In re New Century*, 588 F. Supp. 2d
1206, 1219 (C.D. Cal. 2008).

resold.  *See* Prescription Drug Manufacturing Act, 21 U.S.C. 331, *et seq.* (Public Law 100-293); *RxUSA Wholesale, Inc. v. Dep't Health and Human Serv.*, 467 F. Supp. 2d 285, 293 (E.D.N.Y. 2006) ("The object of the bill introduced into the U.S. House of Representatives and the Senate, which eventually became the PDMA, was to assure safe and effective distribution of prescription drugs and to minimize risks to consumers from taking counterfeit, adulterated, sub-potent or expired drugs.  *See* The Prescription Drug Marketing Act Report to Congress June 2001.").  Accordingly, an expired or short-dated product is neither the same in kind, quality or price, as a new, fresh product.

Thus, contrary to Medicis's and E&Y's representations, exchanging new, fresh product for Medicis's expired and short-dated product was not excepted under SFAS 48 n.3 as exchanges of the "same kind, quantity, and price" (Medicis Mem. at 10; E&Y Mem. at 1), and it was a violation of SFAS 48 for Medicis to treat sales returns as if they were warranty exchanges and to book only Medicis's actual replacement cost for the exchanged products.  ¶ 32.

The violation of SFAS 48 is not some esoteric issue under GAAP, and there was no change in direction within the industry during the Class Period or upon the commencement of oversight by the Public Company Accounting Oversight Board (the "PCAOB").  It is beyond peradventure that the application of SFAS 48 was, and is, so central to the core business of the Company, that neither Medicis, the Individual Defendants, nor E&Y can legitimately argue that they were unaware of this "key" issue regarding the Company's products.  *See Makor Issues & Rights, Ltd., v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008); *accord Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (citing *Makor* and holding that "in certain circumstances, some form of collective scienter pleading might be appropriate.  For instance, as outlined in the hypothetical posed in *Makor*, there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong

inference that at least *some* corporate officials knew of the falsity upon publication."). Just as Judge Posner noted in *Makor*, it is "exceedingly unlikely" that Medicis, the Individual Defendants, or E&Y were "unaware" of the application of SFAS 48 and the overstatement of revenues on the Company's books associated with the failure to properly account for the return of perishable goods under SFAS 48.   Indeed, the Company stated in its Form 10-K for 2005:

> We account for returns and exchanges of product in accordance with SFAS 48, "Revenue Recognition When Right of Return Exists," whereby an allowance is established based on our estimate of revenues recorded for which the related products are expected to be returned in the future.

And, the Company has admitted that it discussed the methodology under SFAS 48 with E&Y "on several occasions in the past."  Medicis Mem. at 6.

Medicis personnel who worked in the department that handled the accounting for returns raised the issue of the Company's improper accounting treatment for the returns to defendant Peterson, and other personnel with knowledge of the accounting for returns corroborate the fact that Medicis was aware that it could not treat expired and short-dated product as equivalent to new, fresh product.  ¶¶ 33-36.

Confidential Witness 1 ("CW1") was "an accounts receivable senior accountant at Medicis from 2000 to 2006."  ¶ 33.  As such, CW1 has personal knowledge of the accounting for returns in four of the five fiscal years included in the Class Period.[3] During this time, CW1 reported indirectly to Peterson and was directly involved in calculating the reserves under the improper actual replacement cost methodology that is

---

[3]  Medicis's fiscal years ended on June 30 through 2005, at which time the Company switched its fiscal years to end on December 31.  Fiscal year 2003 ended on June 30, 2003; fiscal year 2004 ended on June 30, 2004; fiscal year 2005 ended on December 31, 2005; fiscal year 2006 ended on December 31, 2006; and fiscal year 2007 ended on December 31, 2007.  Accordingly, CW1 has personal knowledge of the accounting for fiscal years 2003 through 2006.  The Class Period ends on September 23, 2008.

at the heart of the GAAP violation of SFAS 48. *Id.* Indeed, CW1 spoke to Peterson several times during the Class Period about the improper accounting treatment for returns. *Id.* Not only did she admit to being directed by Peterson to employ the improper replacement cost methodology, she was able to identify three wholesalers by name: Cardinal Health, Quality King, and McKesson. *Id.* CW1's testimony also corroborated the allegation that the Company was channel stuffing and its effect on the accounting for returns. ¶ 34.

Confidential Witness 2 ("CW2") was a "senior accounts receivable coordinator at Medicis during parts of 2008." ¶ 35. CW2's testimony corroborated CW1's testimony regarding the failure to properly account for returns. *Id.* Both CW2 and CW1 were in a position to know how Medicis accounted for returns, as they worked in accounts receivables, which was the department that made the adjustments for returns. Furthermore, as an accountant, CW1 knew the proper accounting treatment for returns, and CW2's experience in accounts receivables afforded him the understanding of the proper methodology. Moreover, it was a matter of discussion and concern within the receivables and finance departments during the Class Period. ¶¶ 34, 38.

Confidential Witness 3 ("CW3") was "an accounts receivable team leader at Medicis between 2000 and 2004." ¶ 36. As such, CW3 has personal knowledge of the accounting treatment for returns at Medicis for parts of the first two fiscal years during the Class Period. CW3's testimony corroborated CW1's and CW2's testimony regarding the improper accounting treatment, as well as named two wholesalers that received swaps (exchanges) of fresh product for short-dated product, and explained that Medicis should have been taking a charge to revenue. *Id.* That is essentially what SFAS 48 required.

Confidential Witness 4 ("CW4") was "a senior financial analyst at Medicis in 2005," who reported to Peterson. ¶ 37. CW4 corroborated the testimony of CW1, CW2 and CW3 regarding the improper accounting for expired and short-dated product.

Indeed, CW3 stated that Medicis was aware that expired and short-dated product should not be treated for accounting purposes as equivalent to new product. *Id.* CW4's testimony is based on his personal knowledge in implementing a reserve for expired inventory at the Company's own warehouses. It directly supports the allegations in the Amended Complaint that the defendants knew what the proper accounting treatment was under SFAS 48, but chose to ignore it. Indeed, CW4's testimony directly supports, at a minimum, that Medicis was reckless, and more likely, that it intentionally refused to comply with SFAS 48.

Confidential Witness 5 ("CW5") was "the head of information technology for Medicis's finance department from 2001 until 2008." ¶ 38. As such, CW5 has personal knowledge of events at Medicis for each year in the Class Period. CW5's testimony corroborates each of the other Confidential Witnesses' testimony regarding the fact that Medicis, the Individual Defendants and E&Y were not properly accounting for returns. ¶¶ 38-39. Among CW5's responsibilities at Medicis was to oversee the operation of the financial accounting and reporting software used by Medicis. *Id.* Overseeing the operation of financial accounting required CW5 to know what the accounting treatments were for programming and inputting into the financial accounting systems. Thus, when he says that the reserve accounting for returns was "always an issue," it is based on his personal knowledge interfacing with auditors and management. *Id.* Indeed, he directly interfaced on the issue with Peterson and Prygocki, as well as the auditors to extract historical return rates and returns analysis. *Id.*

CW5 further corroborated the testimony that Medicis was "stuffing the channel" with product that the Company knew would likely not be sold, and for which the Company would negotiate a swap (exchange) in a later quarter. ¶39. Importantly, CW5 confirmed that the Company was not reserving for the anticipated returns, which is a direct violation of SFAS 48.

Accordingly, to argue, as defendants do, that this was merely a "misapplication of accounting principles" is belied by the fact that the authoritative accounting literature is directly contradicted by defendants' methodology, and multiple employees challenged the accounting for returns during the Class Period to the defendants.   ¶¶ 33-39.   The Confidential Witnesses' testimony that Peterson and E&Y were aware that the auditing personnel in accounts receivables challenged the propriety of the accounting for returns – together with the fact that SFAS 48 is the key provision for accounting of returns of perishable items, which are the bread and butter of Medicis – is sufficient evidence at this stage of the litigation to find that the defendants were, at a minimum, reckless.

Furthermore, Medicis's senior managers let the market know that they were on top of the problem with returns, and that returns were not negatively impacting the Company's revenues.   During conference calls with analysts, defendants Shacknai and Prygocki stated that they closely followed prescription and sales data.   ¶ 40.   Schacknai went so far as to falsely state in August 2007 that "we weren't booking revenue in advance of future quarters or even our prescription trends.   So they're right in line with our prescription trends."   *Id.*   These statements to analysts relate directly to the accounting for returns in SFAS 48, and analysts' concerns that returns were impacting revenues.   Indeed, Prygocki assured analysts during a conference call in November 2006 that the Company monitored the prescription data "very closely."   *Id.*

Further, Schacknai stated during a conference call in April 2005 that the Company received inventory information from its wholesalers and used that data to assess whether inventory would likely be returned for exchange rather than sold in the distribution channel.   ¶ 41.   The fact is, returns are an inherent part and risk of Medicis's business, and Medicis advised the SEC and investors that it monitored returns and its distribution channels, including data from its "accounting records" in its Form 10-Ks.   ¶ 42.   The guiding accounting principle for returns under GAAP is SFAS 48, and it is "exceedingly

unlikely" that either Medicis, the Individual Defendants or E&Y were not aware of the inappropriate interpretation that the Company was utilizing during the Class Period, which resulted in materially misstated financial statements during the Class Period.

By restating the Company's financials, the defendants have admitted they made material misrepresentations in its financial statements during the Class Period.  *See* Accounting Principles Bulletin No. 20 ("APB 20").   Moreover, the restatements of Medicis's financial statements during the Class Period, at the direction of E&Y, are proof that E&Y's Auditors' Reports disseminated with and certifying those false financial statements also contained material misrepresentations.  Whether considered individually or holistically, as the Supreme Court has mandated in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (cited hereinafter as "*Tellabs*"), the allegations in the Amended Complaint satisfy the heightened pleading standards under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Fed. R. Civ. P. 9(b) with respect to all of the defendants.

## ARGUMENT

### THE AMENDED COMPLAINT SHOULD BE SUSTAINED AS LEAD PLAINTIFF HAS ADEQUATELY PLED *SCIENTER*

**A.**    **Standards for Pleading *Scienter* Under Section 10(b) of the Exchange Act**

It is well-established that to adequately allege scienter under Section 10(b) of the Exchange Act, a plaintiff is required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Ernst & Ernst v. Hockfelder*, 425 U.S. 185, 194 (1976).  More recently, the Supreme Court held that a complaint will survive a motion to dismiss if the inference of *scienter* is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Thus, if the inferences for and against scienter are in equipoise,

the complaint survives.  The Supreme Court went on to caution that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citations omitted). It further reaffirmed the applicability, in the context of the PSLRA, of the principles that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically" (*id.* at 326), and that a court must "accept all factual allegations in the complaint as true." *Id.* at 322.[4]

Accordingly, in determining the cogency of the allegations, district courts are required to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*  That is, district courts must consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (emphasis in the original).

This "holistic" approach mandated by the Supreme Court altered the way district courts within the Ninth Circuit analyzed *scienter* pleadings.  *Zucco Partners, LLC v. Digimarc Corp.*, 2009 U.S. App. LEXIS 7025, at *15-*16 (9th Cir. Feb. 10, 2009).

> Although we have developed a set of rules to analyze different types of scienter allegations, we recognize that *Tellabs* calls into question a methodology that relies exclusively on a segmented analysis of scienter. We read *Tellabs* to mean that our prior, segmented approach is not sufficient to dismiss an allegation of scienter.  Although we have continued to employ the old standards in determining whether a plaintiff's allegations of scienter are as cogent or as compelling as an opposing innocent

---

[4]  The Supreme Court also reiterated "'that private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses.'" *Id.* at 321 n.4 (citation omitted) (alteration in original), *see also id.* at 313 ("This  Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions . . .").

inference, *see, e.g., Metzler Investment* [*GMBH v. Corinthian Colleges, Inc.*], 540 F.3d [1049] at 1065-69 [(9th Cir. 2005)], we must also view the allegations as a whole. *See South Ferry LP, No.2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Tellabs* counsels us to consider the totality of the circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."). Thus, following *Tellabs*, we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

*Id.* at *17-*18.

In sum, if a district court does not find that individual allegations are sufficient to plead a strong inference of *scienter*, then it must "determine whether the complaint contains an inference of scienter that is greater than the sum of its parts." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1165 (9th Cir. 2009); *see also Glazer Capital Mgmt. LP*, 549 F.3d at 745 (holding that courts must determine whether allegations "even though individually lacking, are sufficient to create a strong inference of scienter").

**B.** **The Amended Complaint Satisfies the Ninth Circuit's Individual Analysis for *Scienter* and the Holistic Approach Mandated by the Supreme Court**

The allegations in the Amended Complaint support a strong inference of fraud against each of the defendants, regardless of whether the Court applies the individual analysis utilized by the Ninth Circuit prior to *Tellabs*, or the holistic analysis mandated by the Supreme Court in *Tellabs*.

**1.** **Individual Analysis**

Fundamental to the individual analysis is the fact that the violation of SFAS 48 was both obvious and of key importance to the Company's business. Given the perishable nature of the Company's products, defendants could not but know the proper

accounting under SFAS 48.  The application of SFAS No. 48 to Medicis's expired and short-dated products is not subject to debate under the accounting rules.  As noted above, the accounting literature is clear that manufacturers who exchange products with resellers (as Medicis did here with wholesalers) that have even minimal differences are not excluded under SFAS No. 48 pursuant to footnote 4 thereto.  Moreover, the short-dated and expired goods have little or no value, and were not of the same kind or quality (fresh for about-to-expire), which on their face are more than minimal differences.  The fact that Medicis was not exchanging its products with the "ultimate customers" only adds to the obviousness of the violation.[5]

Each of the defendants, the Company, the Individual Defendants and E&Y turned a blind eye to the proper accounting for exchanges of short-dated products.  The Individual Defendants, Shacknai, Peterson and Prygocki were the senior managers of Medicis during the Class Period.  Shacknai is and was the Company's founder, Chairman and Chief Executive Officer.  ¶ 20.  Peterson and Prygocki each served as the Chief Financial Officer of the Company during the Class Period. ¶¶ 21-22.  Shacknai and Prygocki admitted that they received and monitored returns "very closely," and Prygocki told analysts that the Company was not "booking revenue in advance of future quarters." ¶¶ 40-41.  Peterson was advised by CW1 that the Company was calculating its reserves under the improper replacement cost methodology.  ¶ 33.  Thus, each of the Individual

---

[5] Contrary to defendants' view, this is not a case where there is a "range of 'reasonable' treatments."  *See In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002). Indeed, neither the accounting literature nor common sense supports the unreasonable interpretation propounded by defendants.  A piece of fruit that is ripening and turning brown is not the same as a fresh piece of fruit beginning to ripen.  To claim than an exchange of fresh products for short-dated products is an exchange of "the same kind, quality and price" belies common sense and puts the lie to defendants' rationalization for evading the requirement of SFAS 48.

Defendants was aware by virtue of their positions at the Company, the reports they received, and direct challenges to GAAP violations, that Medicis was in violation of SFAS 48.  *See Makor*, 513 F.3d at 710-11; *Glazer Capital Mgmt.*, 549 F.3d at 744.

Defendants repeatedly claim that fraud has not been alleged with particularity as to each defendant, citing cases holding that position-based inferences are improper. However, like *Glazer Capital Mgmt.*, recent decisions by courts in the Ninth Circuit post-dating *Tellabs* have held otherwise.  In *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008), the court noted that pre-*Tellabs* cases, such as certain cases cited by defendants here, are neither authoritative nor instructive on this issue: "*Berson* and *South Ferry* renounce any language in *Metzler* or pre-*Tellabs* cases."  588 F.Supp.2d at 1191 n.75.  *Countrywide* performed a thorough analysis of *Tellabs* and Ninth Circuit case law post-*Tellabs*; and it determined, based on post-*Tellabs* cases such as *South Ferry* and *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), that:

> From these cases, the Court derives the following principles: (1) a defendant's position within the company is a relevant circumstance to consider in the *Tellabs* analysis; (2) all particularized allegations about a defendant's activities and statements should be considered before making a position-based inference, just as in any *Tellabs* analysis; and (3) position alone creates a strong inference of scienter only in the extraordinary case where it is "absurd to suggest" that a defendant did not know.

*Countrywide*, 588 F. Supp. 2d at 1191.

Thus, in *Countrywide*, the court found the inference of scienter appropriate for the Chief Operating Officer taking into consideration his job position, duties and access to corporate reports and information systems.  *Id.* at 1194.  The Court held "[t]hough the core business knowledge that is imputed to the Defendants is not in the form of discrete events as in *Berson*, the alleged underwriting quality and credit risk management issues were so fundamental to Countrywide, and on such a broad scale, should have been so

apparent that 'it would be difficult to conclude that those Defendants at the top levels of Countrywide management did not know what was going on.'"   *Id.* (quoting *In re Countrywide Deriv. Litig.*, 554 F. Supp. 2d 1044, 1066 (C.D. Cal. 2008)).

Defendants' reliance on *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) to the contrary is also misplaced.   In *Daou*, the Ninth Circuit held that "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter." *Id.* at 1022, *citing Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004).   As noted above, the Amended Complaint here similarly alleges that defendants Shacknai and Prygocki specifically disclosed to the public that they closely monitored prescription and sales data.   ¶¶ 40, 42.   They also admitted that the Company uses inventory information from its wholesalers to determine whether excess inventory is in the distribution channel.   ¶ 41.   Other cases cited by defendants are not on point. [6]

In *Berson*, the Ninth Circuit confirmed that scienter can be inferred from officers'

---

[6]  In *Zucco Partners, LLC. v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009), the court recognized two situations where scienter is adequate based solely on high-level positions: first, where there are specific allegations that defendants admit that they were involved in the very issues at hand; and second, where the "falsity of the information was obvious from the operations of the company, the defendants' awareness of the information's falsity can be assumed." *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407 (9th Cir. 1994) was an appeal from an order granting *summary judgment*, where risk disclosures in a prospectus were found to negate inference of scienter.   *Glazer Capital Mgmt.* actually held that one can infer scienter from officers' positions and nature of the misstatements, but that the facts in that case involved "a discrete set of illegal payments made by [the defendant Company's] foreign sales agents operating in China, the Philippines, and Thailand.   Unlike the misstatements in *Daou* and *Berson*, those payments were not, by their nature, the type of transaction of which it would be 'hard to believe' senior officials were unaware."   549 F.3d at 746.

positions and the nature of the misstatements.  There, plaintiffs alleged that the Company failed to report accurately certain "stop-orders" received from customers.  The Court held that plaintiffs had adequately demonstrated a strong inference of scienter against the individual officer defendants, based on the officers' positions and the nature of the misstatements, even though plaintiffs did not allege any specific facts showing that the individually named officers actually *knew* about the stop-work orders.  The Court further held that the defendants "were directly responsible for Applied Signal's day-to-day operations" and that the stop-work orders "were prominent enough that it would be 'absurd to suggest' that top management was unaware of them."  527 F.3d at 988-89, *citing No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West,* 320 F.3d 920, 943 n.21 (9th Cir. 2003).  Indeed, the sheer importance of an issue alone may sometimes give rise to a strong inference of scienter.  *See, e.g.*, *Am. West, 320 F.3d at 943 n.21*; *In re Northpoint Commns Group, Inc.. Sec. Litig. & Consol. Cases,* 221 F. Supp. 2d 1090, 1104-05 (N.D. Cal. 2002).

## 2. <u>The Holistic Approach</u>

If one were to read only the defendants' memoranda, one would not know that the Supreme Court has mandated that complaints be read "holistically," as defendants are completely silent on that crucial fact of Rule 12(b)(6) review.  Under the holistic analysis, however, the inference of *scienter* is even more compelling.  Here, we have a Company that is stuffing its channel to wholesalers on extremely generous return policies, which absent some spike in consumer sales will inevitably result in greater returns of short-dated or expired product.[7]  ¶¶ 3, 36, 41.  Shacknai and Prygocki were touting to market

---

[7]  Defendants contention that the allegations of channel stuffing are insufficient to support an inference of *scienter* is simply a red herring.  Plaintiffs do not contend that the channel stuffing itself constitutes fraud; rather, plaintiffs contend that defendants' knowledge of channel stuffing shows that it had knowledge that its reserves were inadequate, and that the defendants ignored the proper treatment under SFAS 48.  It is not the channel stuffing

analysts that they were monitoring these trends throughout the Class Period.  ¶¶ 40-41. They went so far as to deny that there was any channel stuffing or "unusual stocking that we are aware of" in response to questions from analysts.  ¶ 59.

As the Company was experiencing more returns, personnel in the accounts receivables department were telling Peterson that the accounting for the exchanges was in violation of GAAP.  ¶¶ 33-39.  The Company was pressuring customers to accept exchanges instead of credit, which would have been required to have been booked against revenue, and was establishing a reserve for inventory at its own warehouse for product it could not stuff down the channel to wholesalers.  ¶¶ 36-37.  All the while, E&Y, Peterson and Prygocki were in contention over the accounting methodology for returns as the Company negotiated swaps (exchanges) of short-dated product in later quarters, without the proper reserving for the exchanges.  ¶¶ 38-39.

The Company, Individual Defendants and E&Y knew that the accounting for returns was a key factor for the Company's revenue recognition.  They knew that more product was being shipped than the wholesalers could sell, *i.e.*, that the distribution channel was being stuffed, and thus that there would be more returns.  Medicis's own

---

*per se* that is actionable, but the accounting related to the channel stuffing.  This claim has been upheld as sufficient in the Ninth Circuit in a case cited by defendants – *In re Connetics Corp. Sec. Litig.*, 2008 U.S. Dist. LEXIS 62515 (N.D. Cal. Aug. 4, 2008). Like here, there was no dispute that defendants' financial statements were misstated with regard to reserves for returns.  The defendants moved to dismiss, contending, *inter alia*, that plaintiffs failed to allege channel stuffing with sufficient particularity.  The Court dismissed defendants' argument, finding that "although the complaint continues to lack specific detail with regard to the alleged practice of channel stuffing, such as allegations about specific shipments, customers, times, or dollar amounts . . . , plaintiffs have adequately alleged scienter with regard to the false financial statements based on the allegations of the many confidential witnesses who have spoken to defendants' knowledge that their estimates of rebates and chargebacks were artificially low." *Id.* at *31-*33.

employees told Peterson, Shacknai and E&Y that the accounting for returns was improper under GAAP.   Regardless, the defendants ignored, turned a blind eye to the obvious requirement for revenue recognition under SFAS 48 and failed to account for returns at the full replacement cost.  By doing so, they reported materially false revenue, income, and working capital to investors during the Class Period, which falsely projected the financial health of the Company and caused the price of Medicis stock to be inflated during the Class Period.

For example, by improperly recognizing revenue in violation of SFAS 48, Medicis was able to report on a quarterly and yearly basis increased revenue growth during the entire fiscal year of 2005.  In the first quarter of 2005, the Company announced "net revenue growth of 40%."  ¶ 52.  For the second quarter of 2005, the Company announced "net revenue growth of 31%."   ¶ 54.   For the third quarter of 2005, the Company announced "net revenue growth of 16%."   ¶ 56.   For the fourth quarter of 2005, the Company announced "net revenue growth of 14.3%," and for the fiscal year ended, the Company announced "revenue growth of approximately 24.1%." ¶ 58.[8]

In sum, when considered as a whole, the allegations in the Amended Complaint plead a strong inference of *scienter* on the part of each of the defendants.  Moreover, the

---

[8] It is of no moment that the restatement resulted in increases in revenue for some fiscal years and declines for other years during the Class Period.  The restated revenue, income, and working capital numbers reported in the Company's financials were admittedly materially false and misleading when made.  As the court in *In re Omnivision Techs.*, 2005 U.S. Dist. LEXIS 16009, at *10 (N.D. Cal. July 29, 2005), explained, "Defendants' argument that there is a distinction between overstatements and understatements of revenue is simply not credible.  The one third drop in OmniVision's stock price on June 9, 2004 overwhelmingly demonstrates that the investing community finds improper revenue recognition incidents to be serious matters regardless of the direction of the improper recognition." The same is true here.  Improper revenue recognition, especially where it results in a material misstatement that requires the restatement of a company's financials is a serious matter to the investing public, and a factor to be considered in the total mix of evidence for a holistic analysis of *scienter*.

inference of scienter is cogent and compelling, and at least as likely as the explanation proffered by defendants.   Accordingly, the Amended Complaint should be sustained. *Tellabs*, 551 U.S. at 314.

## C.   Medicis's Restatement Supports a Strong Inference of *Scienter*

Contrary to defendants' assertions, overstating revenues "may state a claim for securities fraud," and "[v]iolations of GAAP standards can provide evidence of scienter." *Daou*, 411 F.3d at 1016, *citing Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) ("[w]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter.  After all, books do not cook themselves.").

Here, the Amended Complaint states with particularity the violation of SFAS 48 that occurred and the materially misstated amounts in the Company's financial statements.  ¶ 92.  Moreover, it emphasizes that the GAAP violation was not some technical issue or marginal issue for Medicis.  The drug products that Medicis sells are perishable with a date certain shelf life.  The application of SFAS 48 is central to the accounting for Medicis's revenue recognition.  Exchanging fresh product for short-dated product was a regular practice of Medicis.  The application of SFAS 48, therefore, was a key function of Medicis's business – it went to the heart of its revenue recognition. Given those facts, the violation of SFAS 48 alone is sufficient to plead *scienter*. [9]

---

[9]  Defendants' reliance on cases that suggest that GAAP violations alone do not support an inference of *scienter* are inapposite.  For example, *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1456 n.10 (N.D. Cal. 1996), was a summary judgment decision, and thus was based on a review of all admissible evidence.  Further, plaintiffs there argued that defendant deviated from its undisclosed internal inventory reserve policy, but plaintiffs' accounting expert acknowledged that this policy complied with GAAP.  The Court upheld this particular accounting claim, finding "[w]here, however, a company deviates

18

Defendants ignore the bulk of Plaintiffs' allegations even though, as noted above, they are required to read the complaint as a whole, rather than look at each allegation separately.  Plaintiffs have not only alleged GAAP violations, but have alleged, through confidential witnesses, that defendants were aware that expired and short-dated products could not be treated for accounting purposes as an equivalent product and were aware that they were not reserving correctly, yet continued to do so for five years.  ¶¶ 33-39.  Thus, the accounting treatment was a core issue for Medicis, and personnel who worked on the accounting for returns raised the improper accounting treatment with defendant Peterson.

Defendants' reliance on *Daou* does not suggest otherwise.  There, the accounting issue related to the defendant company's method of revenue recognition based on the amount of labor incurred.  The Ninth Circuit reversed the district court's dismissal of the accounting claims, finding "[i]f plaintiffs can in fact prove such intentional manipulation of the accounting principles, they will have shown that Daou's public statements regarding recognized revenue were materially misleading."  411 F.3d at 1018.  The Circuit Court further found that statements from confidential witnesses and allegations pertaining to the approximate amount by which revenues and earnings were overstated "have provided enough information for 'a court [to] discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'"  *Id.* at 1020 (quoting *In re McKesson*, 126 F. Supp. 2d at 1273) (alteration in original).  The Ninth Circuit held that plaintiff's complaint adequately pled *scienter* based on the fact that prematurely recognizing revenue "is not minor or technical in nature."  Furthermore, like here, the complaint alleged that these practices occurred "systematically throughout the class period."  *Id.*

---

from its own procedures in a way that violates GAAP, that deviation from internal policy may be evidence of scienter."  *Id.* at 1459 (citations omitted).

Defendants' reliance on *In re Wet Seal, Inc. Secs. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007) is similarly misplaced.  There, the district court held that Plaintiffs were correct in asserting that GAAP violations can give rise to 10(b) liability:

> Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided.  *17 C.F.R. § 210.4-01(a)(1)*; see also *Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1418 (9th Cir. 1994)* ("WOW") ("[A] company that 'substantially overstates its revenues by reporting consignment transactions as sales . . . makes false or misleading statements of material fact."  (citations omitted and alteration in original)).

*Id.* at 1160. The district court, however, dismissed the complaint because it failed to adequately show that there was a GAAP violation in the first place, and failed to allege that the need to take an accounting charge was central to the business such that a high-level executive should have known about it.  Here, it is beyond purview that a violation of SFAS 48 occurred, and there can be no question that the application of SFAS 48 for Medicis's revenue recognition is central to its business, such that Shacknai, Prygocki and Peterson should have known about it.

*Commun. Workers of Am. Plan for Emples. Pensions & Death Ben. v. CSK Auto Corp.*, 2007 U.S. Dist. LEXIS 22782 (D. Ariz. March 28, 2007), also cited by defendants, is inapposite.  Unlike here, in that case, allegations against individual officer defendants were solely based on "hands-on" management style with no corroborating or detailing facts pertaining to the financial fraud.  Indeed, there, plaintiffs' amended complaint, which was briefed after the decision in *Tellabs* was handed down, was upheld as to these defendants despite the fact that the court found that it "generally fails to show knowledge on the part of these defendants."  The court reasoned:

> To be sure, there are many facts that would support an inference of nonculpability.  Foremost among these is the fact that CSK's accounting

irregularities actually understated the company's net income in 2004 and the first three quarter of 2005 – hardly support for an inference that Defendants Jenkins and Watson were wrongly trying to inflate the company's worth and enrich themselves through accounting misdeeds.  But the Court must consider the Second Amended Complaint as a whole, and in doing so the Court cannot conclude that the inference of nonculpability is greater than the inference of scienter.  The widespread problems at CSK may have resulted from poor management, but it appears equally plausible that Defendants Jenkins and Watson possessed the deliberate recklessness or fraudulent intent necessary for scienter in this circuit.  *See In re Vantive Corp. Secs. Litig.*, 283 F.3d at 1085.  Because Plaintiff need only "plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference," Defendants' motion to dismiss must be denied. *Tellabs,* 127 S. Ct. at 2513 (emphasis in original).

525 F. Supp. 2d 1116, 1124-25 (D. Ariz. 2007).[10]

**D.      Pleading Motive is not Required to Establish *Scienter***

Motive is not an element of a claim under Section 10(b) of the Exchange Act, and failing to plead motive does not negate the strong inference of *scienter*.  *See Tellabs*, 551 U.S. at 325; *In re Apollo Group Inc., Sec. Litig.*, 395 F. Supp. 2d 906, 922 (D. Ariz. 2005) (holding that motive is not a "required element," and that all that plaintiff must allege is that the defendant "'acted with intentionality or deliberate recklessness . . . .'")

---

[10] Defendants' reliance on other cases is similarly inapposite.  *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007) (plaintiffs' only allegation against the individual defendants for accounting fraud was  their control through their high-level positions); *In re Hypercom Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 45482 (D. Ariz. July 5, 2006) (plaintiffs failed to allege facts establishing that the GAAP violations were more than mere technical errors based on an incorrect application of an accounting rule); *Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*, 2009 U.S. Dist. LEXIS 31832 (D. Ariz. Mar. 27, 2009) (stock options backdating case where the court found scienter against certain defendants adequately alleged but found that as to other defendants scienter failed where there were no allegations other than restatement); *In re Software Toolworks Sec. Litig.*, 50 F.3d 615, 627 (9th Cir. 1994) (an appeal from summary judgment where the court reviewed all admissible evidence and the Court actually reversed the dismissal of certain accounting claims because it found the existence of material facts where defendants had access to information but "deliberately chose to conceal the truth").

(citing *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir. 2001)); *In re McKesson*, 126 F.

Supp. 2d at 1269 ("A motive for fraud, such as personal gain, is not a required element of

scienter or of fraud in general.") (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.

1989)); W. Page Keeton, Prosser and Keeton On the Law of Torts, § 107, at 741 (5th ed.

1984) ("ultimate purpose, as to benefit the speaker, or to cause harm to the one

addressed . . . is of no importance").

Indeed, in the Ninth Circuit, "recklessness satisfies Section 10(b)'s scienter

requirement." *Ponce v. SEC*, 345 F.3d 722, 731 (9th Cir. 2003). *See also In re Employee*

*Solutions Sec. Litig.*, 1998 U.S. Dist. LEXIS 16444, at *8 (D. Ariz. Sept. 22, 1998)

(holding that recklessness is sufficient to show scienter); *Raychem*

 *Corp. v. Fed. Ins. Co.*, 853 F. Supp. 1170, 1180 (N.D. Cal. 1994) (holding that

violations of Section 10(b) and Rule 10b-5 require only a showing of recklessness to

fulfill the scienter requirement).

Accordingly, that the Amended Complaint does not explicitly state a motive for

the defendants' wrongful acts does not negate the allegations of *scienter*. [11]

The cases relied on by defendants to the contrary are neither on point nor

instructive given the facts alleged here.  In *In re Downey Sec. Litig.*, 2009 U.S. Dist.

LEXIS 25007 (C.D. Cal. Mar. 18, 2009), defendants actually lost several hundred million

---

[11]  *See In re Nuko Info. Sys. Sec. Litig.,* 199 F.R.D. 338 (N.D. Cal. 2000) (holding that the absence of any allegations concerning insider trading had "little bearing on determining whether Plaintiffs [had] adequately pleaded scienter"); *see also In re Amylin Pharm., Inc. Sec. Litig.*, U.S. Dist. LEXIS 7667, at *12 (S.D. Cal. May 1, 2003) (finding that complaint raised requisite scienter inference regardless of lack of insider trading allegations); *In re Adaptive Broadband Sec. Litig.,* 2002 U.S. Dist. LEXIS 5887, at *49 (N.D. Cal. Apr. 2, 2002) ("Plaintiffs are only obliged to state some set of facts giving rise to a strong inference of deliberate recklessness . . . .  [G]iven the sufficiency of the facts supporting the deliberately reckless GAAP violations, it makes no difference that there were no stock sales, or that the Complaint only alludes to internal company reports.") (citation omitted).

dollars due to their failure to sell, and as such the court found that other allegations of *scienter* were not sufficient to uphold the complaint. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001), was a case where plaintiffs attempted to show *scienter* through motive and opportunity, and the Second Circuit held that, *even where motive fails*, it is possible to plead fraud through recklessness.  Finally, in *In re PETsMART Sec. Litig.*, 61 F. Supp. 2d 982 (D. Ariz. 1999), a pre-*Tellabs* case, the district court found that the alleged false and misleading statements were inactionable forward-looking statements, and plaintiffs were attempting to plead *scienter* only through motive and opportunity, which currently is not a viable means to plead *scienter* in the Ninth Circuit.

In sum, the case law in the Ninth Circuit is clear that motive is not a required element to be pled under Section 10(b) of the Exchange Act, and the absence of explicit motive allegations in the Amended Complaint do not defeat *scienter*.

**E.    The Allegations Support Ernst & Young's *Scienter***

E&Y turned a blind eye to the obvious fact that Medicis was required to take a charge for exchanged short-dated and expired product.  By allowing this GAAP violation, E&Y violated Generally Accepted Auditing Standards ("GAAS").  As a result of E&Y's reckless conduct, the financials disseminated to the public during the Class Period were materially misleading and/or false.

E&Y would have this Court ignore the flagrant GAAP and GAAS violations and insist that Plaintiffs plead specifics relating to E&Y's audit that are proprietary to E&Y or confidentially maintained by E&Y and Medicis.  Indeed, E&Y argues that they are afforded a privileged position under the securities laws, which requires an even higher pleading standard than that applicable to Medicis and the Individual Defendants.  That simply is not the case.

As the court in *Countrywide* explained:
Some courts have given outside auditors as a class remarkable

> deference in part because some courts think outside auditors lack "any rational economic incentive to participate in its client's fraud." *Reiger v. Price Waterhouse Coopers, LLP*, 117 F. Supp. 2d 1003 (S.D. Cal. 2000), *aff'd sub. nom. DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002). The Court finds this supposition suspect, at best. Auditors are hired and retained by insiders. A few top auditing firms compete for high-profile clients such as Countrywide. Therefore, they have strong structural incentives to yield to management on close questions. More to the point, *Tellabs* and *South Ferry* put to rest the misguided idea that courts should create categorical rules and presumptions for different kinds of actors and statements.

588 F. Supp. 2d at 1197 n. 79. After *Tellabs* and *South Ferry*, there is no basis to ascribe any heightened status for auditors. The majority of cases cited by E&Y in support of their claim for a more stringent standard are pre-*Tellabs* decisions. The Supreme Court put such claims to rest when it stated the standard for alleging *scienter* under Section 10(b) of the Exchange Act. It did not state that the standard was only for individuals and corporations, nor did it carve out any higher standard for auditors. Regardless of how one believes auditors act, if a plaintiff alleges facts that support an inference of *scienter* for auditors that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent," then *scienter* has been adequately pled. *Tellabs*, 551 U.S. at 315. Here, the allegations are clear that E&Y ignored the clear and obvious application of SFAS 48. In so doing, one can conclude only that its auditing of revenue for returns amounted to *no audit at all*. *DSAM Global Value Fund*, 288 F.3d at 390.

Turning a blind eye to the obvious at a minimum supports the allegation that E&Y acted recklessly. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (holding that "an egregious refusal to see the obvious" supports an inference of *scienter*). When combined with the facts that Medicis was channel stuffing, and that Medicis management and personnel raised the issue of accounting for returns with E&Y, one can easily infer that E&Y's actions were knowingly deliberate. The inference that E&Y acted recklessly or intentionally is at least as compelling as the possibility that E&Y innocently

misapplied SFAS 48.

### F.   <u>Confidential Witness Testimony Supports the Inference of *Scienter*</u>

The testimony of a confidential witness may be relied upon if there is sufficient probability that the person was in a position to possess the information she alleges. *See, e.g.*, *Daou*, 411 F.3d at 1015 (indicating that sources should be described with sufficient particularity to support the probability that a person in that position would possess the information); *Nursing Home*, 380 F.3d at 1233 (same) (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).   Here, the confidential witnesses have been sufficiently described and were working in positions that afforded them first-hand knowledge of the facts alleged.

Contrary to defendants' assertions, the testimony of the Confidential Witnesses is not unsupported vague conclusions or hearsay.  Each of the Confidential Witnesses was in a position to know how the Company was accounting for returns:  three worked in accounts receivables – the department that actually handled returns; one worked on implementing an inventory reserve for expired product – which applies the same SFAS 48 requirements; and one oversaw the financial accounting software which had to be written and imputed for the accounting treatment under SFAS 48.

In sum, the Amended Complaint describes the Confidential Witnesses with sufficient particularity to support the probability that they were in positions to posses the information to which they have testified.  That is all that is required by the Ninth Circuit to proffer their testimony in support of the inference of *scienter*.  *See Daou*, 411 F.3d at 1015.[12]  Accordingly, the information obtained from these former employees is properly

---

[12]  Contrary to defendants' assertions, the Confidential Witnesses need not be certified public accountants to be considered reliable sources with relevant and valuable information.  *See, e.g.*, *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 225, 229 (S.D.N.Y. 2008) (rejecting that confidential sources must have been connected to company's accounting department or have been knowledgeable of company's

considered and supports a strong inference of defendants' scienter.

## G.    The Amended Complaint Adequately Alleges Section 20(a) Liability

The Amended Complaint alleges that the Company and Individual Defendants committed a primary violation of Section 10(b) of the Exchange Act, and that the Individual Defendants acted as controlling persons of Medicis within the meaning of Section 20(a) of the Exchange Act by virtue of their positions and their power to control public statements about Medicis.  The defendants had the power and ability to control the

accounting; rather, plaintiffs need only allege that the informants were in a position to have possessed the information alleged) (citing *Novak*, 216 F.3d at 314); *In re Alstom S.A., Sec. Litig.*, 406 F. Supp. 2d 433, 505 (S.D.N.Y. 2005) (allegations by confidential employee sources that cost overruns were "widely known" at the company did not "depend on whether the employee had a link to a particular department . . . . The allegation is that cost overruns were widely known, and is thus supported by the fact that various employees . . . stated that 'everyone knew' of the cost overruns"). *Weiss* relied upon by defendants, is inapposite.  There, among other failures, the confidential witnesses' statements merely "reflect[ed] matters that companies deal with on a daily basis [lack of internal controls]" and there was no evidence that the confidential witnesses were in a position to possess knowledge of the forecasting process."  527 F. supp. 2d at 954-55.  Here, the statements by the confidential witnesses clearly allege that they were each in a position to possess knowledge regarding the issue of reserves and properly alleging the defendants' role in accounting for them.  Defendants' reliance on *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334 (D. Md. 2004) is misplaced because the court was focused on the conflicting allegations in the complaint that the Company concealed information from the auditor, yet the auditor should have known about the fraud:  "[b]ased on these inconsistencies in the complaint, it is impossible to draw a 'strong inference' that the Deloitte defendants knew about or recklessly disregarded the vendor rebate fraud at USF."  *Id.* at 390.  Other cases relied upon by defendants are inapplicable.  *Rudolph v. UTStarcom*, 560 F.Supp.2d 880 (N.D. Cal. 2008) (options backdating case where a few of the defendants were not implicated at all and where plaintiffs' amended complaint remedied the deficiencies; *see Rudolph v. UT Starcom*, 2008 U.S. Dist. LEXIS 63990 (N.D. Cal. Aug.21, 2008)); *In re Wash. Mut.*, 2009 U.S. Dist. LEXIS 41575, at *36 (W.D. Wash. May 15, 2009) (court's dismissal of 10(b) claims was based on "counsel's failure to allege cohesive claims, submit helpful briefing, or prepare a response to the Court's inquiry in advance of oral argument," and the fact that the disorganized complaint did not even put defendants on notice of their claims.).

actions of Medicis and its employees, and Medicis controlled the defendants and its other officers and employees.   By reason of such conduct, defendants are liable pursuant to Section 20(a).   Here the first element is satisfied because, as discussed above, the Amended Complaint has adequately alleged a primary violation by the defendants under Section 10(b) and Rule 10b-5 promulgated thereunder.

### CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request this Court deny defendants' motion to dismiss.[13]

Respectfully submitted this 31st day of August, 2009

**MARTIN & BONNETT, P.L.L.C.**

By: s/Susan Martin
Susan Martin
Jennifer Kroll
1850 N. Central Avenue, Suite 2010
Phoenix, AZ  85004
Telephone:  (602) 240-6900
Facsimile:  (602) 240-2345

**POMERANTZ HAUDEK
GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
Joshua B. Silverman
Leigh Handelman Smollar
10 South LaSalle Street, Suite 3505
Chicago, Illinois  60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
***Counsel for Lead Plaintiff Steve Rand***

---

[13] Should the Court find that the Amended Complaint does not adequately plead *scienter*, Lead Plaintiff respectfully requests leave to replead.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  Leave to replead should be freely granted (*see Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)), especially where dismissal of the complaint is based on Rule 9(b).  Fed. R. Civ. P. 15.  *See also Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

# CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Joel P. Hoxie
Joseph G. Adams
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202

Brian E. Pastuszenski
Goodwin Procter LLP
53 State Street
Boston, MA 02109

Blake E. Williams
John D. Cooke
Goodwin Procter LLP
Three Embarcadero Center
San Francisco, CA 94111

Lloyd Winawer
Goodwin Proctor LLP
135 Commonwealth Drive
Menlo Park, CA 94025-1105

Don P. Martin
Nicole France Stanton
Quarles & Brady LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391

JEREMY A. LIEBERMAN (*pro hac vice*)
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
100 Park Avenue, 16th Floor
New York, New York 10017

PATRICK V. DAHLSTROM (*pro hac vice*)
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603


s/Kathy Pasley

28