QUARLES & BRADY LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, Arizona 85004-2391
Telephone (602) 229-5200
Don P. Martin (#004232)
don.martin@quarles.com
Nicole France Stanton (#020452)
nicole.stanton@quarles.com

ROBERT HUBBELL, CA SBN 100904
(admitted pro hac vice)
RHubbell@gibsondunn.com
ALEXANDER MIRCHEFF, CA SBN 245074
(admitted pro hac vice)
AMircheff@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone:   (213) 229-7000
Facsimile:   (213) 229-7520

Attorneys for Defendant
Ernst & Young LLP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE MEDICIS PHARMACEUTICAL CORP. SECURITIES LITIGATION | Master File No. CV-08-01821-PHX-GMS<br><br>**ERNST & YOUNG LLP'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**<br><br>ORAL ARGUMENT REQUESTED |

QB\9011310.1

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

    I.    Plaintiffs Fail to Plead Particularized Facts Indicating that Anyone at EY Knew that Medicis' Accounting Judgments Misapplied GAAP ................. 4

    II.   Plaintiffs Fail to Establish that Using Replacement Cost to Calculate Reserves Was an Error So Obvious as to Establish Scienter By Itself ............... 5

    III.  Plaintiffs Fail to Refute EY's Explanation Why, Viewed as a Whole, the Most Cogent and Compelling Inference from the Complaint Is that EY's Audit Opinions Were Innocently Misstated ....................................... 9

CONCLUSION ................................................................................................................... 10

# TABLE OF AUTHORITIES

## Cases

*DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002)........3, 4, 5, 8
*Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736 (9th Cir. 2008)................................................9
*Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002) ................................................................3
*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)......................................................8
*In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1012 (N.D. Cal. 2008) .........................8
*In re Countrywide Fin. Corp Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) ....................10
*In re Daou Sys.*, 411 F.3d 1006 (9th Cir. 2005) ..........................................................................5
*In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134 (D. Mass. 2001) ...................8
*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000).......................9
*In re Metawave Communs. Corp. Sec. Litig.*, 629 F. Supp. 2d 1207 (W.D. Wash. 2009) .........8
*In re Omnivision Techs., Inc.*, 2005 U.S. Dist. LEXIS 16009 (N.D. Cal. July 29, 2005) ..........9
*In re Silicon Graphics*, 183 F.3d 970 (9th Cir. 1999).................................................................3
*In re Software Toolworks Inc.*, 50 F.3d 615 (9th Cir. 1994) ......................................................3
*In re U.S. Aggregates, Inc.*, 235 F. Supp. 2d 1063 (N.D. Cal. 2002) .........................................8
*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002) ..................................................3
*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008)................................7
*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)....................................................................................................7
*Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003 (S.D. Cal. 2000) ................10
*SG Cowen Sec. Corp. v. U.S. Dist. Court*, 189 F.3d 909 (9th Cir. 1999).................................10
*South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008).............................................3
*Tellabs, Inc. v. Makor Issues & Rights, Inc.*, 551 U.S. 308 (2007) ............................................3
*Thor Power Tool Co. v. Comm'r*, 439 U.S. 522 (1979) .............................................................2
*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ...........................3, 8, 9

## Statutes

15 U.S.C. § 78u-4(b)(2) ................................................................................................................4

QB\9011310.1

# INTRODUCTION

Plaintiffs' opposition fails to identify the particularized facts necessary to raise a strong inference that EY acted with scienter—the standard Plaintiffs must meet in order to avoid dismissal. Indeed, the opposition barely mentions EY—and when it does, it relies on newly-minted "allegations" that *do not appear* anywhere in the complaint. As an example, the opposition asserts that Medicis employees told EY that the Company's accounting for returned products was improper—an allegation found nowhere in the complaint. The fact that Plaintiffs' opposition depends on these improper allegations is a clear admission that the formulaic, bare-bones allegations of scienter found in the complaint are deficient. EY's motion to dismiss can and should be granted on this ground alone.

In truth, Plaintiffs' scienter argument boils down to a single contention, that "the violation of FAS 48 *alone* is sufficient to plead scienter." (Opp. at 18 (emphasis added).) Plaintiffs cite no authority for the novel proposition that a misapplication of GAAP alone is sufficient to establish scienter. If that proposition were true, it would establish a *per se* rule that any accounting restatement would create a cause of action for securities fraud. No such *per se* rule exists—for good reason: it would gut the PSLRA's mandate that a plaintiff plead *particularized facts* raising a strong inference that the defendant acted with the intent to deceive. Fact-specific allegations of an intent to deceive are particularly necessary where, as here, GAAP "tolerates a range of reasonable judgments." APB Op. No. 22.

Plaintiffs argue that this particular misapplication of GAAP was extraordinary because it affected the revenues Medicis reported in its financial statements. But, by definition, virtually *every* accounting restatement will have a material impact on a company's financial statements. There is nothing exceptional or unique about the fact that the restatement at issue here impacted Medicis' financial statements. To the contrary, as EY established in its opening brief, to the extent that this restatement is different than most, it is because the restatement left Medicis' revenues *virtually unchanged* over a five-year period: $1.906 *billion* before the restatement, and $1.907 *billion* afterwards. The relatively modest difference in revenue reflects the fact that Medicis *always* maintained a reserve for product returns and the

fact that the change in the application of FAS 48 related only to the *timing* of revenue recognition, not whether the revenue could or should be recognized. Because the revenues at issue were generated by *actual sales* of product for which Medicis was *paid in cash*, the true economic exposure of Medicis for exchanges of expired product was minor in relation to total revenue. Thus, far from being extraordinary or unique as suggested by Plaintiffs, the restatement related to a technical interpretation of GAAP that affected only the timing of revenue recognition—and provides no basis for scienter.

Plaintiffs also argue that the misapplication of GAAP was so "obvious" that it creates a strong inference of scienter. But that argument fails when one examines the language of FAS 48—nothing in that standard references the proper accounting for expired pharmaceutical products that are replaced with the same product. Unable to reference definitive language in FAS 48, Plaintiffs resort to analogy and inference in an attempt to explain why Medicis' exchange policy for expired pharmaceutical products is "obviously" governed by FAS 48. Plaintiffs argue that accounting literature written specifically for the software industry proves that Medicis' accounting for expired pharmaceutical products "obviously" misapplied FAS 48. But the literature cited by Plaintiffs is expressly limited to sales of software and does not address, much less govern, accounting for exchanges of expired pharmaceuticals. EY submits that Plaintiffs' resort to accounting literature for software products proves EY's point—that judgment and interpretation are required in the application of GAAP, particularly where, as here, there is no accounting principle that directly addresses the transactions to be accounted for. *See Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979) (GAAP "requires that judgment be exercised as to the relative appropriateness of acceptable alternatives"). Indeed, other companies use replacement cost to establish reserves for expired product, indicating that there was a reasonable basis for believing that the replacement cost method was an acceptable alternative under GAAP. *See, e.g.*, Supplemental Request for Judicial Notice ("Supp. RJN"), Ex. A at 29 [2007 Form 10-K for Heska Corp.].

Finally, given the complete absence of particularized allegations that EY acted with an intent to deceive, it does Plaintiffs no good to argue that the complaint is somehow greater

than the sum of its parts. They fail to explain why EY would risk its reputation as an independent auditor by participating in a supposed fraud that had the remarkable feature of leaving revenues at Medicis virtually unchanged over a five-year period. The most cogent and compelling inference is that EY's audit opinions were, at most, innocently misstated. The complaint should be dismissed.

## ARGUMENT

Though their brief contains several misstatements of law, which EY will address below, Plaintiffs do not appear to dispute the overarching legal standard. To plead scienter, Plaintiffs must plead "no less than a degree of recklessness that strongly suggests *actual intent*," by providing, "in great detail, facts that constitute strong circumstantial evidence of *deliberately reckless or conscious* conduct." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 973, 979 (9th Cir. 1999) (emphases added). In the context of claims against an auditor, this standard requires particularized allegations that the defendant employed practices "so deficient that the audit amounted to *no audit at all*." *In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 628 (9th Cir. 1994) (emphasis added, citation omitted). Allegations of GAAP and GAAS violations are insufficient where they are "not based on specific facts that shed light on the mental state of the [accountant's] auditors." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 387 (9th Cir. 2002).[1] Plaintiffs' complaint fails to satisfy the relevant standard, and their opposition does not demonstrate otherwise.

---

[1] Plaintiffs incorrectly suggest that prior law, presumably including *DSAM Global Value Fund*, was superseded by the Supreme Court's holding in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). (*See* Opp. at 13, 24.) Plaintiffs overstate *Tellabs*' impact. Although the Ninth Circuit in *South Ferry LP, No. 2 v. Killinger* conjectured that, in light of *Tellabs*, "perhaps" certain of the Circuit's earlier decisions were "too demanding," it stopped short of concluding that *Tellabs* overruled those decisions. 542 F.3d 776, 784 (9th Cir. 2008). Later, in *Zucco Partners, LLC v. Digimarc Corp.*, the Circuit held that "*Tellabs* does not materially alter the particularity requirements for scienter claims established in [the Circuit's] previous decisions, but instead only adds an additional 'holistic' component to those requirements." 552 F.3d 981, 987 (9th Cir. 2009). Of course, even before *Tellabs*, the Circuit had held that "courts should consider all the allegations in their entirety." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002); *see also, e.g., In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002) (insufficient allegations of fraud elsewhere in the complaint have a "spillover effect" on subsequent allegations). So pre-*Tellabs* authorities are no less relevant.

3

QB\9011310.1

I.   **Plaintiffs Fail to Plead Particularized Facts Indicating that Anyone at EY Knew that Medicis' Accounting Judgments Misapplied GAAP**

The opposition essentially ignores EY. First, it indiscriminately lumps together allegations of scienter and refers collectively to all "defendants"—even when those allegations do not and cannot refer to EY as the outside auditor. (*See, e.g.*, Opp. at 2, 3, 7, 8, 13, 17, 19.) This form of group pleading is deficient under the PSLRA. *See* 15 U.S.C. § 78u-4(b)(2) ("[T]he complaint shall, with respect to *each act* or omission alleged to violate this chapter, *state with particularity* facts giving rise to a strong inference that *the defendant* acted with the required state of mind." (emphases added)).

Plaintiffs' alternative strategy for dealing with the complaint's absence of particular allegations directed to EY is to make up new allegations in the opposition that appear nowhere in the complaint. For example,

- Plaintiffs assert in their opposition—but do not plead in their complaint—that "Medicis employees told . . . EY that the accounting for returns was improper under GAAP." (*Compare* Opp. at 16-17, *with* Compl. ¶¶ 33-39.)

- Plaintiffs assert in their opposition—but do not plead in their complaint—that the "Confidential Witnesses [state] that Peterson *and EY* were aware that the auditing personnel in accounts receivable challenged the propriety of the accounting for the returns." (*Compare* Opp. at 8, *with* Compl. ¶¶ 33-39 (emphasis added).)

- Plaintiffs assert in their opposition—but do not plead in their complaint—that CW5 "interfaced . . . [with] the auditors to extract historical return rates and returns analysis." (*Compare* Opp. at 7:22 *with* Compl. ¶¶ 38-39.)

Of course, the sufficiency of Plaintiffs' allegations must be measured by their complaint, not the opposition. Even if Plaintiffs had pleaded the above facts as to EY, they would still fail to indicate any "mental state" on the part of EY that remotely approaches scienter. *DSAM Global Value Fund*, 288 F.3d at 387. None of the confidential witnesses referenced above played any role in establishing Medicis' accounting policies for product returns or has any basis for evaluating whether the misapplication of FAS 48 was intentional or otherwise. For example, CW5 is the former head of information technology who oversaw software applications. That CW5 may have known "what the accounting treatments were"

4

(Opp. at 7) so that he could install software provides him no basis for evaluating the technical interpretation of accounting literature.[2] Likewise, the statements by CW1 and CW4 do not relate to product returns from distributors, but instead address inventory levels at Medicis. Those statements provide no basis for asserting that EY was "aware" that FAS 48 was being misapplied.

Plaintiffs' only other attempt at particularized pleading is their half-hearted claim that "Medicis was channel stuffing." (*See* Opp. at 24.) But Plaintiffs allege no facts that were allegedly known to EY—let alone *who* at EY knew what, when and how—that demonstrated Medicis was knowingly manipulating its financial statements by selling more product than its wholesalers needed or could sell. Nor does the complaint explain why wholesalers would agree to this supposed activity—they were required to pay for the product upon delivery and their exchange rights were limited to receiving fresh product upon expiration. There was no provision for a refund of the purchase price or deferment of payment.

Accordingly, none of Plaintiffs' factual allegations—whether pled in the complaint or invented in the opposition—gives rise to a strong inference of scienter on the part of EY.

## II. Plaintiffs Fail to Establish that Using Replacement Cost to Calculate Reserves Was an Error So Obvious as to Establish Scienter By Itself

Although Plaintiffs appear to acknowledge the well-settled rule that a mere misapplication of GAAP is not enough to plead scienter, *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002), they argue that Medicis' restatement is different and that here, "the violation of SFAS 48 alone is sufficient to plead scienter." (Opp. at 18.) Plaintiffs are wrong.

Plaintiffs argue that FAS 48 is so easy to apply that no one could have innocently come to a different conclusion. Plaintiffs' own briefing demonstrates the fallacy of this assertion. Instead of pointing to authority applying FAS 48 to exchanges for fresher product, or even to

---

[2] Contrary to Plaintiffs' assertion, EY has not argued that confidential witnesses must be CPAs. Rather, they must understand what they are talking about—otherwise, there is no "probability that a person in the position occupied by the source would possess the information alleged." *See In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

the pharmaceuticals industry generally, Plaintiffs resort to secondary guidance (SOP 97-2) regarding sales of *software*, which obviously does not become stale with passage of time. (Opp. at 3.) By its very terms, SOP 97-2 is limited to revenue recognition for sales of software and does not address, much less govern, revenue recognition in the sale of pharmaceuticals. Plaintiffs cite accounting literature that is expressly limited to the software industry because, contrary to Plaintiffs' suggestion, there is no "authoritative guidance" governing return reserves requirements for expired pharmaceutical products. Moreover, the software industry guidance Plaintiffs cite merely acknowledges the general need to "establish reserves for anticipated returns"—which is precisely what Medicis did. Plaintiffs cite no guidance describing *how* reserves were to be measured (replacement cost versus sales price) for exchanges like those of Medicis. (*See* Opp. at 3-4.) And even if such guidance existed, Plaintiffs plead no facts indicating that the EY audit team deliberately ignored it.

Moreover, Plaintiffs do not address EY's explanation why its interpretation of FAS 48 was reasonable. (EY Mot. to Dismiss, at 1.) Medicis customers made payments upon delivery. The purchase price was not refunded. Rather, if wholesalers could not sell product before it expired, their only right from Medicis was to exchange it for fresher product. The economic substance of Medicis' financial exposure for future returns was the cost of the replacement product, not the return of the original sales price. Thus, it was reasonable to conclude that future exchanges should be reflected on Medicis' balance sheet based on replacement cost, which was the economic impact to Medicis.

Medicis was not alone in concluding that replacement cost was an appropriate measure for accruing product return reserves. Other companies that allowed exchanges of expired product for fresh product accrued reserves based on replacement cost. For example, Heska Corporation disclosed in its 2007 annual filing with the SEC that "[c]ertain of our products have expiration dates. Our policy is to exchange certain outdated, expired product with the same product. We record an accrual for the estimated cost of replacing the product." Supp. RJN, Ex. A at 29. Likewise, Questcor Pharmaceuticals disclosed in its 2004 annual filing with the SEC that it permitted exchanges of expired product for fresh product and established

a reserve for such exchanges based on the "estimated costs for such exchanges." *Id.*, Ex. B at 63. Questcor later explained in response to an SEC staff comment letter that Questcor believed it was "appropriate to record a provision for product exchanges . . . based on the cost of the replacement product." *Id.*, Ex. C at 8. Shortly after Questcor explained its replacement cost methodology, the SEC staff completed its review of Questcor's 2004 financial disclosures and stated that it "had no further comments at this time." *Id.*, Ex. D. Although Medicis later revised its own judgment about the application of FAS 48 to its particular practices, the fact that other companies used the replacement cost method demonstrates that others believed there were reasonable alternatives under GAAP for accounting for product return reserves.

The cases cited by Plaintiffs provide no support for their assertion that FAS 48 was so central to Medicis' business that its misapplication must have been intentional. (*See* Opp. at 5.) Plaintiffs rely heavily on *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008), where Judge Posner posed the following hypothetical:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Id.* at 710. The *Makor* plaintiffs had made similar allegations, asserting that the CEO claimed demand for "key products" was steady when actually it was nose-diving. *Id.* at 711. The court found that on these facts, it was "exceedingly unlikely" that the CEO "was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company." *Id.*; *see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 943 & n.21 (9th Cir. 2003) (absurd to suggest airline directors and shareholders had no knowledge of planes' maintenance problems).

The claims against EY are easily distinguished. Here, there were no phantom sales and no imaginary demand. In fact, Plaintiffs have not pleaded that Medicis or EY underestimated

the number of products that Medicis' customers were expected to exchange.[3] Rather, the sole issue is whether the reserve should have been recorded at replacement cost (which reflected the economic cost to Medicis), versus reserving the full sales price and deferring recognition of revenue to a later period. RJN, Ex. A at 51.

The Ninth Circuit has regularly rejected attempts to establish scienter based on restatements alone. In *DSAM Global Value Fund*, even detailed allegations of egregious errors were insufficient because plaintiffs "failed to allege *any facts* to establish that Pricewaterhouse knew or must have been aware of the improper revenue recognition, intentionally or knowingly falsified the financial statements, or that the audit was *such an extreme departure from reasonable accounting practice* that Price Waterhouse knew or had to have known that its conclusions would mislead investors." 288 F.3d at 390-91 (emphases added, internal quotation marks, citations, and alterations omitted). Similarly, in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), the court rejected allegations of accounting manipulation, deeming them "generalized claims about corporate knowledge [that] are not sufficient to create a strong inference of scienter." *Id.* at 998; *see also, e.g., In re Metawave Communs. Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1221, 1224 (W.D. Wash. 2009) (complaint dismissed for lack of scienter despite restatement); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1012, 1014 (N.D. Cal. 2008) (same); *In re U.S. Aggregates, Inc.*, 235 F. Supp. 2d 1063, 1073, 1075 (N.D. Cal. 2002) (same).

Given the lack of definitive GAAP guidance regarding how to set reserves for exchanges of expired product, and given that Medicis' accounting treatment reflected the exchanges' real-world impact (replacement cost), the error here can hardly be called the result of "an egregious refusal to see the obvious." *DSAM Global Value Fund*, 288 F.3d at 390. Rather, this error was "technical in nature" and therefore does not establish scienter. *In re*

---

[3] The complaint pleads no particularized facts indicating that Medicis' estimates of the number of future returns were improper. This defect is fatal. Because "[t]he establishment of reserves entails a degree of unavoidable guesswork," *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 158 (D. Mass. 2001), courts have rejected conclusory claims based on estimates of future returns. *E.g., Greebel v. FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999).

QB\9011310.1

*Daou Sys.*, 411 F.3d 1006, 1017 (9th Cir. 2005). Put simply, if Plaintiffs were excused "from pleading [particularized] scienter with respect to these [statements], then it is difficult to imagine what statements would not qualify." *Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008). The restatement itself simply does not establish scienter.

### III. Plaintiffs Fail to Refute EY's Explanation Why, Viewed as a Whole, the Most Cogent and Compelling Inference from the Complaint Is that EY's Audit Opinions Were Innocently Misstated

Contrary to Plaintiffs' suggestion (*see* Opp. at 15), EY has always acknowledged that Ninth Circuit law also requires complaints for securities fraud to be evaluated as a whole (Mot. at 15). Indeed, Plaintiffs have not disputed that holistic review cuts both ways: "a plaintiff cannot *avoid* dismissal by reliance on an isolated statement that stands in contrast to a host of other insufficient allegations." *Zucco*, 552 F.3d at 999 (citation omitted).

Moreover, Plaintiffs have offered no good reason why their complaint is greater than the sum of its parts. Plaintiffs' alchemy mixes conclusory allegations of accounting errors with conclusory allegations of channel stuffing. These bald conclusions simply do not indicate that EY's audit team was aware of anything undermining its unqualified audit opinions. Nor do Plaintiffs offer any coherent reason why EY would risk its reputation as an independent auditor by issuing an unqualified audit opinion on false financial statements. The omission is glaring here, where the purported fraud resulted in virtually no benefit even to the client, as the restatement barely budged Medicis' balance sheets, moving net revenues over the five-year period from $1.906 *billion* to $1.907 *billion*. See RJN, Ex. A at 53.[4]

Instead, Plaintiffs claim that EY has argued that a "heightened status" applies to securities fraud claims against auditors as compared to securities fraud claims generally. (Opp. at 24.) Not true. Given the inherent limitations of the audit process and the information available to auditors from that process, courts have repeatedly recognized how difficult it is to raise a strong inference of scienter against auditors. *See, e.g., Reiger v. Price*

---

[4] Plaintiffs have no response. They cite *In re Omnivision Technologies, Inc.*, 2005 U.S. Dist. LEXIS 16009 (N.D. Cal. July 29, 2005), where scienter was found because of insider sales, *see id.* at *14-16, which Plaintiffs have not alleged here.

*Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1008 (S.D. Cal. 2000). In fact, one of these cases is *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008), on which Plaintiffs rely heavily. (*See* Opp. at 24.) In *Countrywide*, the court recognized the inherent difficulty in pleading securities fraud against an outside auditor, in part because:

> outside auditors have more limited information than, for example, the committee members who oversee the audit. Further, an auditor's job requires *complex and subjective professional judgments that courts are not ideally positioned to second guess.*

*Id.* at 1197 (emphasis added). So it is not a "heightened standard" that defeats Plaintiffs' claims. It is the application of the same standard to the context of claims against an auditor.

Similarly, Plaintiffs create a straw man argument when they complain that motive is not an element of a securities fraud claim. EY has not argued otherwise. But where there is no rational reason to deceive, the inference that the defendant intentionally did so is obviously weakened, to the extent it exists at all.[5] *See Reiger*, 117 F. Supp. 2d at 1008. Plaintiffs have pleaded no facts whatsoever indicating that EY had any reason to intentionally deceive the public—much less that it did.[6]

## CONCLUSION

Plaintiffs rushed to file a lawsuit as soon as they learned of the restatement—and before they had any facts to support their claims of fraud. Not surprisingly, their complaint is devoid of the required factual detail supporting fraudulent intent. Rather, to the extent that facts in the complaint give rise to any inference, it is that the accounting errors at Medicis, and EY's unqualified audit opinions, were innocent misinterpretations of a technical accounting principle. Plaintiffs' claim against EY should be dismissed.

---

[5] EY respectfully disagrees with the dicta in *Countrywide* musing that outside auditors have a rational incentive to condone a client's fraud. True, auditors must compete for clients, but they do so through their reputation for high-quality, independent judgment.

[6] Plaintiffs also complain they have not conducted discovery concerning what EY and Medicis discussed during the audits. (Opp. at 23.) But the PSLRA's premise is that companies faced with weak allegations of securities fraud should not be put to the burden and invasiveness of discovery simply so that plaintiffs can try to validate speculative claims. *See, e.g., SG Cowen Sec. Corp. v. U.S. Dist. Court*, 189 F.3d 909, 911 (9th Cir. 1999).

| | | |
|---|---|---|
| 1 | DATED:  October 15, 2009 | QUARLES & BRADY LLP |
| 2 | | By: /s/ Nicole France Stanton |
| 3 | | Nicole France Stanton |
| 4 | | GIBSON, DUNN & CRUTCHER LLP |
| 5 | | By: /s/ Robert Hubbell |
| 6 | | Robert Hubbell |
| 7 | | Attorneys for Defendant Ernst & Young LLP |

11

QB\9011310.1

# CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List.

/s/ Kelly Thwaites

## Electronic Mail Notice List

Joseph G. Adams
jgadams@swlaw.com, amurray@swlaw.com, docket@swlaw.com

Jeremy James Christian
jjc@tblaw.com, sam@tblaw.com, sab@tblaw.com

John D. Cooke
jcooke@goodwinprocter.com, rnovak@goodwinprocter.com

Patrick V. Dahlstrom
pdahlstrom@pomlaw.com

Andrew S. Friedman
afriedman@bffb.com, rcreech@bffb.com, ngerminaro@bffb.com

Mark I. Gross
mgross@pomlaw.com

Richard Glenn Himelrick
rgh@tblaw.com, sab@tblaw.com

Joel Philip Hoxie
jhoxie@swlaw.com, jkfisher@swlaw.com, docket@swlaw.com

Jeremy A. Lieberman
jalieberman@pomlaw.com

Susan Joan Martin
smartin@martinbonnett.com, tmahabir@martinbonnett.com, mblawfirm@aol.com

Jennifer Lynn Kroll
jkroll@martinbonnett.com

Brian E. Pastuszenski
bpastuszenski@goodwinprocter.com

Blake E. Williams
bwilliams@goodwinprocter.com

Lloyd Winawer
lwinawer@goodwinprocter.com, sasmith@goodwinprocter.com

QB\9011310.1