Joel P. Hoxie (State Bar No. 005448)
*jhoxie@swlaw.com*
Joseph G. Adams (State Bar No. 018210)
*jgadams@swlaw.com*
**SNELL & WILMER L.L.P.**
One Arizona Center
Phoenix, Arizona 85004-2202
Telephone: 602-382-6000
Facsimile: 602-382-6070

Brian E. Pastuszenski (*Pro Hac Vice*)
*bpastuszenski@goodwinprocter.com*
**GOODWIN PROCTER LLP**
53 State Street
Boston, Massachusetts 02109
Telephone: 617-570-1000
Facsimile: 617-523-1231

Lloyd Winawer (*Pro Hac Vice*)
*lwinawer@goodwinprocter.com*
John D. Cooke (Pro Hac Vice)
*jcooke@goodwinprocter.com*
**GOODWIN PROCTER LLP**
135 Commonwealth Drive
Menlo Park, California 94301
Telephone: 650-752-3100
Facsimile: 650-853-1038

Attorneys for Defendants
*Medicis Pharmaceutical Corporation,
Jonah Shacknai, Richard D. Peterson, and
Mark A. Prygocki, Sr.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE MEDICIS PHARMACEUTICAL CORP. SECURITIES LITIGATION | Lead Case No. CV-08-01821-PHX-GMS<br><br>**Consolidated with**:<br>Case No. CV-08-1821-PHX-GMS<br>Case No. CV-08-1870-PHX-DKD<br>Case No. CV-08-1964-PHX-JAT<br><br>THE MEDICIS DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED FEDERAL SECURITIES CLASS ACTION COMPLAINT<br><br>**ORAL ARGUMENT REQUESTED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT .................................................................................................................. 3

I.   PLAINTIFFS HAVE NOT ALLEGED PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER. ............................ 3

    A.   Plaintiffs Have Cited No GAAP Provision That The Medicis Defendants "Had to Have Known" Was Misapplied. ................................... 4

    B.   The "Core Operations" Inference Applies Only In "Exceedingly Rare" Circumstances Not Present Here. ................................................... 5

    C.   The "CW" Allegations Support No Inference Of Fraud. ............................ 7

    D.   The Absence Of Personal Benefit Or Other Motive Negates Scienter. ....... 10

CONCLUSION .............................................................................................................. 11

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Berson v. Applied Signal Tech.*
  527 F.3d 982 (9th Cir. 2008) .................................................................................. 6, 7

*DSAM Global Value Fund v. Altris Software, Inc.*
  288 F.3d 385 (9th Cir. 2002) ....................................................................................... 3

*Eason v. IndyMac Fed. Bank, FSB*
  No. CV 09-1423-PHX-JAT, 2009 WL 2857961 (D. Ariz. Sept. 3, 2009) .................... 4

*In re Cadence Design Sys., Inc. Sec. Litig.*
  Case No. C-08-4966 SC, 2009 WL 2950815, (N.D. Cal. Sept. 11, 2009) .................... 9

*In re Daou Sys., Inc.*
  411 F.3d 1006 (9th Cir. 2005) ..................................................................................... 3

*In re White Elec. Designs Corp. Sec. Litig.*
  416 F. Supp. 2d 754 (D. Ariz. 2006) ......................................................................... 11

*Mizzaro v. Home Depot, Inc.*
  544 F.3d 1230 (11th Cir. 2008) ................................................................................. 10

*New York State Teachers' Ret. Sys. v. Fremont General Corp.,*
  No. 2:07-cv-5756-FMC-FFMx, 2009 WL 3112574, (C.D. Cal. Sept. 25, 2009) ......... 8

*Pugh v. Tribune Co.*
  521 F.3d 686 (7th Cir. 2008) ..................................................................................... 10

*Schneider v. Cal. Dept. of Corr.*
  151 F.3d 1194 (9th Cir. 1988) .................................................................................. 4, 9

*Shalala v. Guernsey Mem'l Hosp.*
  514 U.S. 87 (1995) ....................................................................................................... 3

*South Ferry LP, No. 2 v. Killinger*
  542 F.3d 776 (9th Cir. 2008) ....................................................................................... 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
  127 S. Ct. 2499 (2007) ................................................................................ 2, 4, 9, 10

*Weiss v. Amkor Tech., Inc.*
  527 F. Supp. 2d 938 (D. Ariz. 2007) ........................................................................... 3

*Zucco Partners, LLC v. Digimarc Corp.*
  552 F.3d 981 (9th Cir. 2009) ..................................................................................... 3, 7

## PRELIMINARY STATEMENT

Plaintiffs' opposition brief ("Opposition" or "Opp.") does not point to a single factual allegation in the Complaint that would support a strong inference that the Medicis Defendants together with the Company's independent auditors, Ernst & Young ("E&Y"), deliberately misapplied generally accepted accounting principles ("GAAP"). To the contrary, Plaintiffs implicitly acknowledge that the Complaint is deficient, making factual assertions in the Opposition that are found nowhere in their pleading or are embellished to the point of bearing no resemblance to those that are. The following examples are illustrative:

- Plaintiffs contend that supposedly "authoritative accounting literature" "obviously" required Medicis to defer the recording of revenues associated with the pharmaceutical sales transactions at issue in this case. But, the only literature Plaintiffs cite in their Opposition – Statement of Position 97-2 *Software Revenue Recognition* ("SOP 97-2") – is not mentioned anywhere in the Complaint, and the law in this Circuit is clear that a plaintiff may not seek to amend its complaint through a brief. Moreover, the title and express terms of SOP 97-2 make clear that this provision applies only to the sale of computer software, not the sale of pharmaceutical products.

- Plaintiffs argue that the application of Statement of Financial Accounting Standards No. 48, *Revenue Recognition When Right of Return Exists* ("SFAS 48") – the provision that Medicis and E&Y misinterpreted – "was, and is, so central to the core business of the Company that neither Medicis, the Individual Defendants, nor E&Y can legitimately argue that they were unaware of this 'key' issue regarding the Company's products." Opp. at 4. Again, no such factual allegation appears in the Complaint. Moreover, this argument misses the point. The issue here is not whether Medicis was aware of SFAS 48 (it was). Rather, the issue is whether Plaintiffs have alleged specific facts showing that Medicis's ***interpretation*** of SFAS 48 was such an extreme departure from reasonable accounting practices that it supports a strong inference that the Company deliberately misapplied this GAAP provision. SFAS 48, however, does not address how it

should be applied to pharmaceutical sales involving the right to exchange short-dated or expired products for the same products with longer shelf life (the interpretative question at issue here), and Plaintiffs have alleged no facts warranting any inference (let alone the requisite strong inference) that Medicis deliberately misapplied this provision.

- Plaintiffs assert that they "have not only alleged GAAP violations, but have alleged, through confidential witnesses, that defendants were aware that expired and short-dated products could not be treated for accounting purposes as an equivalent product and were aware that they were not reserving correctly, yet continued to do so for five years." Opp. at 19. Plaintiffs also assert that "multiple employees challenged the accounting for returns during the Class Period to the defendants." *Id.* at 8. No factual allegations that even remotely support these assertions are found anywhere in the Complaint. Indeed, no facts are alleged showing that any confidential witness ("CW") was even familiar with what GAAP required, let alone communicated those requirements to any defendant or articulated a cogent basis for disputing Medicis's and E&Y's judgment as to how SFAS 48 should be applied.

In sum, when the Complaint is construed as a whole as the Supreme Court in *Tellabs* held it must be, the inference of intent to defraud that Plaintiffs ask this Court to draw is far weaker than the inference that Medicis and its auditors erroneously interpreted an ambiguous accounting provision in good faith. The inference of a good-faith mistake is supported both by the absence of facts suggesting the contrary in the Complaint and by the fact that Plaintiffs nowhere dispute that: (1) E&Y approved Medicis's accounting methodology following full disclosure by the Company of its reserve procedures; (2) for three of the six fiscal years at issue Medicis actually ***understated*** revenues, and ***understated*** its cumulative diluted net income per share for this entire period; and (3) no defendant is alleged to have sold Medicis stock or obtained any personal benefit whatsoever from the alleged fraud. Dismissal therefore is required under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

# ARGUMENT

## I. PLAINTIFFS HAVE NOT ALLEGED PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER.

The application of GAAP, particularly in the area of reserves, requires "continuous judgments and estimates." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995). For this reason, the Ninth Circuit has held that "the mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009). *See* Medicis Defendants' Motion to Dismiss Plaintiffs' Amended Federal Securities Class Action Complaint ("MD Mot.") at 8-9. Rather, accounting fraud claims must be supported by highly detailed factual allegations supporting a strong inference that the defendant's application of GAAP constituted "such an extreme departure from reasonable accounting practice" that the defendant "knew or had to have known that its conclusions would mislead investors." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002). Such facts must be alleged as to "each individual defendant[.]" *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 948 (D. Ariz. 2007).[1]

Plaintiffs argue in their Opposition that they have adequately alleged a securities fraud claim based on (1) the existence of supposedly "clear" accounting literature, (2) the "importance" of SFAS 48 to Medicis's business, and (3) the accounts of "confidential witnesses." Opp. at 2-6. None of these arguments, however, refutes the Medicis

---

[1] Citing *In re Daou Sys., Inc.* 411 F.3d 1006, 1022 (9th Cir. 2005), Plaintiffs argue that "'violations of GAAP standards can provide evidence of scienter.'" Opp. at 18. In *Daou*, however, the Ninth Circuit actually held that "scienter ***cannot*** be established by publishing inaccurate accounting figures, ***even when in violation of GAAP***[.]" *Daou*, 411 F.3d at 1022 (emphasis added). The Court then recognized the unremarkable proposition that "***significant violations***" of GAAP standards can provide some evidence of scienter "***so long as they are pled with particularity***." *Id*. (emphasis added). Given the absence of clear guidance as to how SFAS 48 should have been applied in this case and the relatively small percentage of revenue that Medicis misreported (*see* MD Mot. at 5; *infra* at 7), Plaintiffs have not alleged any "significant violations" of GAAP, let alone with the particularity *Daou* requires.

3

Defendants' showing that the most reasonable inference to be drawn in this case is that Medicis and its outside auditor, E&Y, innocently misapplied a complex accounting provision that did not provide clear and definitive guidance for the pharmaceutical transactions at issue. Plaintiffs thus have not satisfied *Tellabs*. *See* MD Mot. at 7-12.

### A. Plaintiffs Have Cited No GAAP Provision That The Medicis Defendants "Had to Have Known" Was Misapplied.

Plaintiffs argue that the misinterpretation of SFAS 48 that gave rise to Medicis's restatement was "obvious" and "flagrant." Opp. at 11, 23-24. The sole basis for this contention, however, is Plaintiffs' assertion that so-called "authoritative accounting literature" required Medicis to defer under SFAS 48 the gross sales price of "short-dated and expired products" that Medicis expected to be exchanged for fresher products. *Id.* at 2-3.[2] Plaintiffs cite no GAAP provision that addresses this specific issue. Rather, Plaintiffs rely solely on SOP 97-2, which, far from being "authoritative," itself states that it does not apply to the pharmaceutical sales transactions at issue in this case.

The Complaint nowhere cites SOP 97-2, let alone alleges that Medicis should have considered this provision in determining its reserves for future product returns. "In determining the propriety of a Rule 12(b)(6) dismissal," however, "a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dept. of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1988) (emphasis in original). Because "factual allegations appearing in only a response to a motion, and not in a pleading, cannot be considered by the Court in ruling on a motion to dismiss under 12(b)(6)," *Eason v. IndyMac Fed. Bank, FSB*, No. CV 09-1423-PHX-JAT, 2009 WL 2857961, at *1 (D. Ariz. Sept. 3, 2009), Plaintiffs' after-the-fact

---

[2] SFAS 48 permits the recognition of revenue from the sale of products that are subject to a right of return in certain circumstances but requires the sale value of the expected product returns to be excluded from net sales. MD Mot. at 4; *id.*, Ex. A ¶ 7. Footnote 3 to SFAS 48 excludes from this requirement "[e]xchanges by ultimate customers of one item for another of the same kind, quality, and price (for example, one color or size for another)[,]" providing that such transactions "are not considered returns for purposes of this Statement." MD Mot., Ex. A ¶ 7 & n.3; *see id.* at 1-2, 4.

citation to SOP 97-2 should be ignored.

Moreover, if SOP 97-2 was as "authoritative" and "obvious" as Plaintiffs now argue it was, Plaintiffs presumably would not have neglected to mention it in their Complaint. Instead, it is apparent that Plaintiffs' citation to SOP 97-2 for the first time in their Opposition is an incongruous afterthought. By its title and terms, SOP 97-2 applies only to "*Software* Revenue Recognition," not the pharmaceutical sales transactions at issue here. Indeed, the second paragraph of SOP 97-2, which defines the scope of this provision, explicitly states that "[t]his SOP provides guidance on when revenue should be recognized and in what amounts for licensing, selling, leasing, or otherwise marketing ***computer software***." *Statement of Position 97-2 Software Revenue Recognition* ¶ 02 (emphasis added). If that were not clear enough, this same paragraph also states that SOP 97-2 "does ***not*** apply . . . to revenue earned on products or services containing software that is incidental to the products or services as a whole. *Id.* (emphasis added). If SOP 97-2 does not apply to transactions in which software is "incidental" to the sale, it necessarily does not apply to the sale of pharmaceutical products that do not involve software at all. In short, SOP 97-2 is irrelevant.[3]

### B. The "Core Operations" Inference Applies Only In "Exceedingly Rare" Circumstances Not Present Here.

Plaintiffs next argue that they are somehow relieved of the burden of specifically alleging facts showing each individual defendant's scienter (*see* MD Mot. at 15-16) because "the application of SFAS 48 was, and is, so central to the core business of the Company that

---

[3] Plaintiffs' sole reason for citing SOP 97-2 is its statement that "because [computer software] resellers are not 'ultimate customers,' . . . exchanges by resellers should be considered returns." Plaintiffs then argue that this language must mean that Medicis should have treated exchanges of short-dated or expired product for fresher product as returns, not as exchanges, because Medicis allegedly sells to "large pharmaceutical distributors" who Plaintiffs contend are not its "ultimate customers." Opp. at 3. SFAS 48, however, does not define what an "ultimate customer" is, and there is no dispute that the customers that bought and paid Medicis for the products it sold and later exchanged were the distributors – in practical terms, the distributors were Medicis's ultimate customers. In any event, SOP 97-2 by its terms does not apply to pharmaceutical products and is irrelevant here.

5

neither Medicis, the Individual Defendants, nor E&Y can legitimately argue that they were unaware of this 'key' issue regarding the Company's products." Opp. at 4; *see also id.* at 13-15. This argument, however, fails for two reasons: (1) Medicis does not contend it was "unaware" of SFAS 48; and (2) in any event, the "core operations" inference (even if it were relevant here) applies only in "exceedingly rare" circumstances not present here.

Plaintiffs' "core operations" argument is based on *Berson v. Applied Signal Technology*, 527 F.3d 982 (9th Cir. 2008). In that case, the Court said that because of their positions as CEO and CFO of Applied Signal and the nature of the company's business, the defendants could not credibly disclaim knowledge of the well-pleaded *facts* alleged in the plaintiffs' complaint, including the fact that Applied Signal had stopped work on four large contracts with government agencies (the company's entire customer base), the company "immediately cease[d] to earn money" on those suspended contracts, and the resulting "*devastating* effect on the corporation's revenue" that the suspended contracts had. *Id.* at 984, 987-88 & n.5 (emphasis added). The Ninth Circuit then concluded that a strong inference existed that the defendants must have known that these facts rendered false their contemporaneous optimistic statements.

First, Plaintiffs' reliance on *Applied Signal* is puzzling because the Medicis Defendants' "awareness" of SFAS 48 is not disputed for purposes of this motion. Opp. at 4, 13-15. Rather, the issue is whether – in the absence of clear, definitive GAAP guidance – Medicis's (and its auditors') interpretation of SFAS 48 was such an "extreme" departure from reasonable accounting judgment that it should be deemed to support a strong inference of fraud.

Second, in *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 & n.3 (9th Cir. 2008), the Ninth Circuit limited the application of the "core business" inference to "exceedingly rare" circumstances – like those present in *Applied Signal* – where the facts defendants are alleged to have known had a "devastating effect" on the company's operations and future prospects. Unlike the stop-work orders alleged in *Applied Signal*, the misapplication of SFAS 48 in this case has not been – nor could it be – alleged to have had

a "devastating effect" on Medicis's business. To the contrary, the overstatement of revenue for fiscal 2007 was only 1.57%, the largest annual overstatement of revenue (for 2003) was only 15%, and in three of the six fiscal years at issue (2004 through 2006), revenues actually *increased* as a result of the restatement. *See* Compl. ¶ 92. These adjustments required an unfortunate restatement, but are nowhere alleged to have had any impact on cash, liquidity, or viability of operations, a far cry from the "devastating" facts alleged in *Applied Signal* that warranted application of the "core operations" inference.[4]

### C. The "CW" Allegations Support No Inference Of Fraud.

Plaintiffs' final argument is that the CW accounts alleged in the Complaint give rise to a strong inference of fraud. Opp. at 25-26. In the Ninth Circuit, however, allegations attributed to a CW can help support such an inference only if *two* requirements are met: (1) the CW allegations must be supported by "sufficient detail about [the] confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge[,]" *Zucco Partners*, 552 F.3d at 995; and (2) "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id*. The CW allegations in this case do not satisfy this exacting pleading standard. And, the factual assertions Plaintiffs in their Opposition try to attribute to the CWs do not appear anywhere in the Complaint, and must be ignored. *See supra* at 4-5.

First, the Complaint does not allege any facts suggesting that any CW was responsible for or even involved in establishing reserves in connection with customer transactions involving exchange rights. The closest Plaintiffs come is their conclusory allegation that "CW1 was directly involved in calculating the reserves under the improper actual replacement cost methodology." Compl. ¶ 33. Plaintiffs, however, do not provide any hint as to what CW1 supposedly did. This sort of generalized allegation is insufficient.

---

[4] Were it to be adopted, Plaintiffs' argument also would contravene settled Ninth Circuit law that securities fraud claims may not be based on a GAAP violation alone, even one resulting in a restatement. *See* MD Mot. at 8-9 (citing cases).

*See, e.g.*, *Zucco Partners*, 552 F.3d at 995.

Second, whether or not any of the CWs was in a position to know ***how*** Medicis accounted for reserves is not the issue. Medicis's reserve methodology was disclosed in its SEC filings and is not in dispute. Rather, the issue is whether the Complaint adequately alleges that any of these CWs had a communication with any of the Medicis Defendants in which a defendant learned that Medicis's interpretation of SFAS 48 was erroneous. In order for any such inference to be drawn, however, the Complaint would need to allege that the CWs were themselves knowledgeable about the requirements of SFAS 48 in regard to the exchange of expired or short-dated product for the same but fresher product, ***and*** explained to any defendant cogently why Medicis's interpretation of SFAS 48 was incorrect. Nothing in the CW accounts alleged in the Complaint, however, even remotely suggests that any of the CWs knew anything about GAAP or SFAS 48, much less the appropriate interpretation of SFAS 48 in the circumstances here. Moreover, nothing in the Complaint suggests that any CW ever articulated to any of the Medicis Defendants, cogently or otherwise, how Medicis's interpretation of SFAS 48 differed from what GAAP required. *See* MD Mot. at 12-15; *see New York State Teachers' Ret. Sys. v. Fremont General Corp.,* No. 2:07-cv-5756-FMC-FFMx, 2009 WL 3112574, at *11 (C.D. Cal. Sept. 25, 2009) (dismissing Section 10(b) claim, including claim for alleged GAAP violations; "although allegations in the SAC are sufficient to establish that the various confidential witnesses have personal knowledge of the work they did, the reports they made, and their own experiences as Fremont employees, the allegations do not establish that any of the confidential witnesses were in a position to gain personal knowledge of what Defendants saw, knew, or thought").

No doubt recognizing the inadequacy of the CW allegations in the Complaint, Plaintiffs attempt in the Opposition to rewrite or embellish beyond recognition those allegations. For example, Plaintiffs assert in the Opposition that CW1 admitted "to being directed by Peterson to employ the improper replacement cost methodology." Opp. at 6. No such allegation appears anywhere in the Complaint. Rather, Plaintiffs allege in the

Complaint only that "CW1 voiced her concerns of this accounting treatment several times to [Brian] Barley and Defendant Peterson" and her "questions were dismissed because Barley and Defendant Peterson 'didn't like people questioning them' and insisted on proceeding with what she considered to be 'creative accounting.'"  Compl. ¶ 33.  Plaintiffs do not allege in the Complaint that Mr. Peterson directed CW1 to do anything.  Moreover, Plaintiffs nowhere specify what CW1 allegedly discussed with Mr. Peterson or explain what "concerns" CW1 supposedly had or expressed to him.  Similarly, the Complaint nowhere explains why CW1 allegedly considered Medicis's accounting "creative" or what possible experience or other basis she had that supposedly led her to reach that conclusion.  Accordingly, CW1's alleged account is insufficiently vague and thus not adequate to support a strong inference of scienter.

Plaintiffs also assert that "multiple employees challenged the accounting for returns during the Class Period to the defendants" and "Peterson and E&Y were aware that the auditing personnel in accounts receivables challenged the propriety of the accounting for returns[.]"  Opp. at 8.  But, the Complaint does not contain a single allegation that any auditing personnel (or any other employees for that matter) ever "challenged" Medicis's interpretation of how SFAS 48 should be applied.  Likewise, the Complaint contains no factually-supported allegation that any of the Medicis Defendants was ever "aware" that the Company's – and E&Y's – interpretation of SFAS 48 was improper in any way.  At most, Plaintiffs allege in the Complaint only that CW1 expressed unspecified "concerns" to Messrs. Barley and Peterson – an allegation too general to support any inference of scienter.

In short, Plaintiffs' attempt through their Opposition to rewrite the inadequate CW allegations in the Complaint is impermissible and should be disregarded.  *See Schneider*, 151 F.3d at 1197 n.1.  As actually pleaded, the CW allegations "do not provide any concrete allegations that Individual Defendants actually knew about the accounting errors, . . . [and] these accounts cannot support a strong inference of scienter."  *In re Cadence Design Sys., Inc. Sec. Litig.*, Case No. C-08-4966 SC, 2009 WL 2950815, at *9 (N.D. Cal. Sept. 11, 2009).

### D. The Absence Of Personal Benefit Or Other Motive Negates Scienter.

Plaintiffs' argument that "[m]otive is not an element of a claim under Section 10(b)" misses the point. Opp. at 21. *Tellabs* makes clear that the allegations in a complaint must be considered as a whole, along with any inferences suggested by the complaint and any facts that the Court may judicially notice that tend to support an inference that defendants did not act with intent to defraud. As such, the existence or absence of motive to commit the alleged fraud is pertinent to the scienter analysis. *Tellabs*, 127 S. Ct. at 2511 ("[T]he significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint"). After *Tellabs*, courts thus have held that the absence of alleged insider stock sales or other personal benefit supplying a motive, as is the case here, weighs against an inference of scienter. *See*, *e.g.*, *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) ("*Tellabs* instructs us to consider all potential inferences, and the fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of Tribune's stock fell."); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 (11th Cir. 2008) ("[T]he amended complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs against inferring scienter.").

In addition to the absence of any conceivable personal benefit here, the scienter inference that Plaintiffs ask the Court to draw is illogical and contradicted by the absence of any discernible corporate benefit. As a result of its accounting error, Medicis actually understated revenues in three of the annual fiscal periods affected by the restatement and ***understated*** the Company's cumulative diluted net income per share by $0.11 over this period. MD Mot. at 5 (emphasis added). Plaintiffs have provided absolutely no logical reason why Medicis would have deliberately underreported revenues and earnings for these periods.[5]

---

[5] Plaintiffs also argue that an inference of scienter can be drawn because Medicis was supposedly "'stuffing the channel' with product the Company knew would likely not be sold." Opp. at 7. This "channel stuffing" assertion is a non-sequitur at best – the Complaint nowhere alleges (nor could it) that the restatement resulted from persuading

10

When considered in conjunction with the fact that no individual defendant is alleged to have benefited from the accounting error that gave rise to Medicis's restatement, the absence of any corporate benefit makes Plaintiffs' already weak Complaint even weaker (to the extent that is possible).[6]

## **CONCLUSION**

For the reasons stated in this memorandum of law and in the Medicis Defendants' Opening Memorandum, the Court should dismiss Plaintiffs' Complaint with prejudice.

Dated: October 15, 2009                    Respectfully submitted,

                                           By: s/Lloyd Winawer
                                               Brian E. Pastuszenski (*Pro Hac Vice*)
                                               Lloyd Winawer (*Pro Hac Vice*)
                                               John D. Cooke (*Pro Hac Vice*)
                                               **GOODWIN PROCTER LLP**

                                               Joel P. Hoxie (State Bar No. 005448)
                                               **SNELL & WILMER LLP**
                                               Attorneys for Defendants
                                               *Medicis Pharmaceutical Corporation, Jonah Shacknai, Richard D. Peterson, and Mark A. Prygocki, Sr.*

---

distributors to buy more product than they likely could sell, but rather from a misinterpretation of SFAS 48 in regard to exchange of short-dated or expired product.  Any supposed "channel stuffing" would plainly be irrelevant to the accounting issue that led to the restatement.  In any event, the Complaint alleges no facts whatsoever that would support an inference either that Medicis was "channel stuffing" (which even if it were would not violate any securities laws), let alone that Medicis "knew" any product shipped to distributors "likely would not be sold."  *See* MD Mot. at 16-17 n.6.

[6] Because Plaintiffs have failed to plead a violation of Section 10(b), their Section 20(a) "control person" liability claim also must be dismissed.  *See In re White Elec. Designs Corp. Sec. Litig.*, 416 F. Supp. 2d 754, 771 (D. Ariz. 2006); MD Mot. at 17.

# **CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that the following participants in the case are not registered as CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid to the following non-CM/ECF participants:

Laurence M. Rosen
Phillip Kim
Timothy W. Brown
THE ROSEN LAW FIRM P.A.
350 Fifth Avenue
New York, NY 10118

                                                             s/ Sally A. Smith-Weymouth
                                                             Sally A. Smith-Weymouth