1  **WO**

2  NOT FOR PUBLICATION

3

4

5

6  IN THE UNITED STATES DISTRICT COURT

7  FOR THE DISTRICT OF ARIZONA

8

9  IN RE MEDICIS PHARMACEUTICAL )   Lead Case No. CV-08-1821-PHX-GMS
   CORP. SECURITIES LITIGATION    )

10                              )   Consolidated with:
                                )   Case No. CV-08-1870-PHX-GMS

11                              )   Case No. CV-08-1964-PHX-GMS
                                )

12  _____ )   **ORDER**

13        Pending before the Court are Defendant Ernst & Young's Motion to Dismiss (Dkt. #

14  56) and the Medicis Defendants' Motion to Dismiss (Dkt. # 58) Plaintiffs' Amended

15  Complaint (Dkt. # 53). For the following reasons, the Court grants both Motions.[1]

16                                  **BACKGROUND**

17        Medicis Corporation ("Medicis" or the "Company") is a publicly-traded

18  pharmaceutical company that develops perishable products for the treatment of

19  dermatological and aesthetic conditions. (Dkt. # 53 at ¶ 17.) On September 24, 2008, Medicis

20  announced that the Company and its independent auditor, Ernst & Young LLP ("Ernst &

21  Young"), failed to comply with Generally Accepted Accounting Principles ("GAAP") in

22  preparing several years of financial statements. Due to the violation, Medicis announced that

23  its financial statements from 2003 through the second quarter of 2008 would need to be

24  restated. On news of the anticipated restatement and violation of GAAP, the price of Medicis

25

26  _____

27        [1]The parties' requests for oral argument are denied because the parties have had an
    adequate opportunity to discuss the law and evidence, and oral argument will not aid the
    Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d

28  724, 729 (9th Cir. 1991).

common stock dropped $ 2.34 per share, or 13%.[2] The decline represented a loss of approximately $125 million in shareholder equity. (Dkt. # 53 at ¶ 10.)

When Medicis later filed its restated financials with the SEC on November 10, 2008, the Company asserted that its previous financial statements were based on an incorrect interpretation of accounting principles related to Medicis's product return reserves. (*See* Dkt. ## 59 at Ex. A ¶ 6; 59, Ex. B.) Specifically, Medicis admitted that it improperly accounted for exchanges of expired or about to expire pharmaceutical products by failing to comply with Statement of Financial Accounting Standards No. 48 ("SFAS 48"). SFAS 48 provides that revenue may be recognized on product sales when a right of return exists, but only if certain conditions are met. (*See* Dkt. # 59, Ex. A at ¶ 6.) Pursuant to these conditions, Medicis was required to estimate the amount of likely returns and then exclude the value of those returns from revenue recognized on the sale of its pharmaceutical products. (*See id.*) These conditions also required that Medicis maintain a reserve account for estimated future returns based on the gross sales price of returned products. (*See id.*) But, rather than book its reserves based on the *gross sales price* of exchanged products, as required under SFAS 48, Medicis's reserve account was based on the *replacement cost* for fresh product. (*See* Dkt. # 53 at ¶ 89.)

This improper accounting methodology was uncovered in 2008, when the Public Company Accounting Oversight Board (the "PCAOB")[3] inspected Ernst & Young's audit of the Company's 2007 financial statements. (*See* Dkt. # 59, Ex. B). Based on PCAOB's

---

[2]Ernst & Young asserts that the decline in value of Medicis's stock was primarily due to the Company's simultaneous announcement that it was suspending guidance about its future earnings because of concerns related to Medicis's flagship drug, SOLODYN, and because of uncertainties arising from the "the impact of the U.S. economy on the Company's aesthetic and therapeutic franchises." (Dkt. # 56 at 2.) Nevertheless, accepting the allegations of the Amended Complaint as true, the Court assumes that the loss was due to Medicis's restatement and failure to comply with GAAP.

[3]The PCAOB is a nonprofit entity created by the Sarbanes-Oxley Act of 2002 to oversee public companies' auditors. *See* 15 U.S.C. § 7211.

inspection and advice from Ernst & Young, Medicis then modified its accounting methodology and began booking reserves for exchanged pharmaceuticals based on the full sales price of those pharmaceuticals. (Dkt. # 59, Ex. B at 2.) At the same time, Medicis restated its 2003–2008 financial statements using the correct methodology. (*See id.*)

The restated financial data from 2003–2008, which reflect the revised reserve calculations, indicates that the accounting violation had a significant effect on the timing of Medicis's revenue recognition. In 2003, for instance, Medicis overstated revenues by $ 37.2 million (or 17.7%), and in 2006, revenues were understated by $ 44 million (or 11%). (*See* Dkt. # 59, Ex. B at 3.) Yet, while these numbers present large differences from year to year, the overall impact of the accounting error on net revenue was relatively small. The following table reflects the impact of the revised reserve calculations on Medicis's financial statements from 2003–2008:

| *Net Revenue (in millions)* | Fiscal year Ended 12/31/07 | Fiscal year Ended 12/31/06 | Fiscal year Ended 12/31/05 | Fiscal year Ended 06/30/05 | Fiscal year Ended 06/30/04 | Fiscal year Ended 06/30/03 |
|---|---|---|---|---|---|---|
| As Reported | $ 464.7 | $ 349.2 | $ 164.0 | $ 376.9 | $ 303.7 | $ 247.5 |
| Adjustment | – 7.3 | + 44.0 | + 1.3 | – 11.2 | + 11.5 | – 37.2 |
| As Restated | $ 457.4 | $ 393.2 | $ 165.3 | $ 365.7 | $ 315.2 | $ 210.3 |

As these numbers demonstrate, Medicis overstated revenues during three of the restated fiscal periods and understated revenues in three other periods. In the aggregate, Defendants' accounting error resulted in an understatement of net revenues of approximately $1.1 million over the entire six-year period. Before the restatement, net revenue for the five-year period totaled $1.906 billion; after the restatement, the net revenue total was $ 1.907 billion. This difference represents less than 0.058 % of Medicis's net revenues over the five-year period. Thus, Defendants' accounting error principally had an impact on the timing of revenue recognition. Plaintiffs allege no facts in the Amended Complaint suggesting how Defendants would benefit from the manipulation of the period in which revenue was recognized.

Defendants explain their violation of SFAS 48 as a misinterpretation of a "technical" accounting provision. (Dkt. # 53 at ¶ 89.) Defendants assert that Medicis did not establish reserves based on the full sales price of estimated exchanges because Defendants mistakenly believed that these exchanges qualified for an exception to the general provisions of SFAS 48. This exception is found in Footnote 3 to SFAS 48. Footnote 3 provides, "Exchanges by ultimate customers of one item for another of the same kind, quality, and price (for example, one color or size for another) are not considered returns for purposes of this Statement."[4] (Dkt. # 59, Ex. A at ¶6.) Defendants assert that they understood Footnote 3 to allow Medicis to use the replacement cost of expired or nearly-expired pharmaceuticals, rather than the gross sales price, in calculating the Company's reserves. After the PCAOB inspection, Medicis concluded that, "although the exchanged product was similar, it was not of the same quality, strictly due to dating" because the Company was "replacing nearly-expired or expired product with newer, fresher product." (Dkt. # 59, Ex. B at 2.)

Plaintiffs, on the other hand, allege that Defendants' "purported misinterpretation" of SFAS 48 is "a *post hoc* rationalization." (Dkt. # 67 at 7.) Since Medicis develops and distributes perishable pharmaceuticals, the Company's products have a limited shelf life. (Dkt. # 53 at ¶¶ 24–26.) Plaintiffs, therefore, assert that Defendants' mistaken belief that these products were the "same kind, quantity, and price" is absurd. (*See* Dkt. # 59, Ex. A at 10 n. 3.) Plaintiffs further allege that the mistake was unreasonable and obvious since Defendants' accounting explanation is contradicted by both authoritative accounting literature on SFAS 48 and common sense.

The crux of Plaintiffs' allegations is that Medicis and Ernst & Young (collectively "Defendants") intentionally, or with deliberate recklessness, manipulated revenues by ignoring SFAS 48. Specifically, Plaintiffs allege that Medicis induced wholesalers to purchase large quantities of Medicis products by offering generous return/exchange polices.

---

[4]Nothing in SFAS 48 explains or defines the meaning of an "ultimate customer" or what it means to be the same in "kind, quality, and price." (*See* Dkt. # 59, Ex. A.)

According to the Plaintiffs, Defendants "stuffed the distribution channel" with its products, then intentionally or recklessly failed to properly account for the value of products that would be returned. Plaintiffs further allege that as wholesalers' "bloated inventories" neared expiration, Medicis exchanged new and fresh pharmaceuticals without properly taking a charge to reserves for the full cost of the returned product, as required under SFAS 48. Plaintiffs allege this process allowed Defendants to "book[] revenues years in advance . . . by omitting the required reserve and concealing from investors the fact that a material portion of [Medicis's] sales were likely to be returned." (Dkt. # 53 at ¶ 4.) To support these allegations, Plaintiffs bring forth statements from several confidential witnesses, who attest that Defendants knew they were in violation of SFAS 48 before the PCAOB audit. These confidential witnesses primarily allege that Defendants were aware that Medicis's reserves were deceptively low and/or were using an inapplicable GAAP exception.

Based on the accounting violation and subsequent restatement, Plaintiffs allege that Medicis made material misrepresentations in its financial statements filed from 2004–2008.[5] Plaintiffs further allege that these financial statements are proof that Ernst & Young's audits, which certified the false financial statements, also contained material misrepresentations. On October 3, 2008, the first of three securities class action lawsuits was filed against Medicis. (Dkt. # 1.) After these three cases were consolidated and Steven Rand was appointed Lead Plaintiff (Dkt. # 40), Plaintiffs filed an Amended Complaint on May 18, 2009 (Dkt. # 53). The Amended Complaint names the following defendants: Medicis, Ernst & Young, Johan Shacknai ("Shacknai"), Richard D. Peterson ("Peterson"), and Mark A Prygocki ("Prygocki"). (Dkt. # 53 at ¶¶ 17–23.) Shacknai is Medicis's founder, and Chief Executive Officer ("CEO"), Peterson serves as Medicis's Chief Financial Officer ("CFO"), and Prygocki is Medicis's Chief Operating Officer ("COO"). Plaintiffs allege that Defendants

---

[5]While Medicis restated its financial statements beginning in fiscal year 2003, the five year statute of limitations for actions arising under § 10(b) of the Securities and Exchange Act of 1934 limits Plaintiffs' cause of action to the alleged misstatements made during fiscal years 2004–2008. *See* 15 U.S.C. § 78i(e); 28 U.S.C. § 1658(b).

violated § 10(b) of the Securities and Exchange Act of 1934 and that Shacknai, Peterson, and Prygocki violated § 20(a) of that Act. Ernst & Young moved to dismiss based on Rule 12(b)(6) on July 17, 2009. (Dkt. # 56.) On that same date, Medicis, Schacknai, Peterson, and Prygocki (collectively the "Medicis Defendants") brought a separate Motion to Dismiss pursuant to Rule 12(b)(6). (Dkt. # 58.)[6]

## DISCUSSION

### I. Legal Standard

Plaintiffs' primary cause of action is for federal securities fraud under § 10(b) of the Securities and Exchange Act of 1934. *See* 15 U.S.C. § 78j(b). To establish a valid claim under Rule 10b-5, Plaintiffs must satisfy five elements: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys. Inc., Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

Federal securities fraud complaints under § 10(b) also must satisfy stringent pleading requirements. First, the complaint must include a short and plain statement of the plaintiff's

---

[6]Both parties request consideration of multiple documents that are not part of the Amended Complaint. These documents include GAAP provisions, a newspaper article about Medicis' stock price, a Company press release, Medicis' financial statements, and other SEC filings. In the context of securities litigation, courts frequently take judicial notice of these types of documents. *See, e.g.*, *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n. 2 (9th Cir. 2006) (citation omitted). In this case, the parties do not oppose these requests, and they do not raise any grounds to challenge the authenticity of these documents. Therefore, under the doctrines of incorporation by reference and judicial notice, the Court will consider these documents as necessary in resolving the Motions to Dismiss.

With respect to the Parties' SEC filings, however, the Court may only take judicial notice of the "'the content' of these . . . filings, 'and the fact that they were filed with the agency.'" *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 633 F. Supp.2d 763, 776 (D. Ariz. 2009) (citing *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008)). In other words, "[t]he truth of the content, and the inferences properly drawn from them . . . [are] not a proper subject of judicial notice under [Federal Rule of Evidence] 201." *Id.*; *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996).

claim. *See* Fed. R. Civ. P. 8(a). Next, "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . ." Fed. R. Civ. P. 9(b); *See Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003). Under Rule 9(b), "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106.

In addition, the Private Securities Litigation Reform Act ("PSLRA") requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter. 15 U.S.C. § 78u-4(b)(2); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976). The required state of mind is either that the defendant acted intentionally or with "deliberate recklessness." *Daou Sys.*, 411 F.3d at 1014–15. In a securities claim under § 10(b), "recklessness only satisfies scienter" when it "reflects some degree of intentional or conscious misconduct." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999); *see also DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002) (holding that in order to allege a strong inference of deliberate recklessness, a plaintiff must state "facts that come closer to demonstrating intent, as opposed to mere motive and opportunity") (citations omitted).

To survive a motion to dismiss, the inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). However, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre or even the 'most plausible of competing inferences.'" *Id.* (internal citations omitted). In determining the cogency of the allegations, federal courts are required to consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. In other words, courts may not rely "exclusively on a segmented analysis of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). Instead, courts must "consider the totality of the circumstances," *Id.* at 992 (citing *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)). In the wake of *Tellabs*, a federal district court must "conduct a dual

inquiry." *Id.* First a court must "determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient," the court must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

## III. ANALYSIS

Applying these standards, the sole issue before the Court is whether the Amended Complaint, read most favorably to the Plaintiffs, but considering all reasonable inferences, alleges particular facts giving rise to a strong inference that the Defendants made fraudulent representations or omissions, either with knowledge of their falsity or with deliberate recklessness. Plaintiffs essentially assert that the collective allegations in their Amended Complaint give rise to a strong inference of scienter for two reasons: (1) Defendants must have known they were in violation of SFAS 48 because the violation was obvious and egregious; and (2) testimony from several confidential witnesses demonstrates that Defendants knew their accounting methodology was incorrect. Analyzing these allegations, both individually and holistically, the Court finds that Plaintiffs' Amended Complaint "fails to create an inference of scienter more cogent or compelling than an alternative innocent inference." *See Zucco Partners,* 552 F.3d at 999–1000 (citing *Tellabs*, 551 U.S. at 324).

### A. The Violation of SFAS 48 and Medicis's Restatement Do Not Support a Strong Inference of Scienter.

The American Institute of Certified Public Accountants ("AICPA") sets official accounting standards, which are commonly known as GAAP. *In re K-Tel Int'l Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002). These accounting standards, however, are "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions." *Id.* (quoting *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979)). Indeed, "[t]here are [nineteen] different GAAP sources, any number of which might present conflicting treatments of a particular accounting question." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995). Accordingly, GAAP standards "tolerate a range of

- 8 -

'reasonable' treatments, leaving the choice among alternatives to management." *K-Tel Int'l*, 300 F.3d at 890 (quoting *Thor Power Tool*, 439 U.S. at 544).

Given the number of potentially conflicting sources and good faith but aggressive interpretations of accounting principles, allegations of GAAP violations are generally insufficient to raise an inference of scienter. *See DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) ("[M]ere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of scienter."). This is so, even if the GAAP violations are "significant" or "require large or multiple restatements." *Apollo Group*, 633 F. Supp.2d at 794–95 (internal alterations and quotation omitted).

Thus, as a general rule, a restatement of financial data due to an accounting error, without more, is insufficient to create a strong inference of scienter. *See Zucco Partners*, 552 F.3d at 1000. The Ninth Circuit has recognized only two "narrow" exceptions to this general rule. *Id.* First, a restatement due to accounting violations, without more, may be sufficient to establish a strong inference of scienter under those limited circumstances where "'the nature of the relevant [violation] is of such prominence" or obviousness "that it would be absurd to suggest that management was without knowledge'" of the violation. *Id.* (internal quotations and citation omitted). Second, an accounting violation "may itself be indicative of scienter where it is combined with 'allegations regarding . . . management's role in the company' that are 'particular and suggest'" that the defendant must have known its accounting methodology was wrong. *Id.* (quoting *South Ferry*, 542 F.3d at 785). Neither of these exceptions applies in this case.

### (1) Plaintiffs Fail to Allege an Accounting Error that Was So Obvious that Defendants Must Have Been Aware that Their Interpretation of SFAS 48 Was Incorrect.

Under the first exception, a plaintiff can establish an inference of scienter when an accounting violation was obviously apparent to the defendant corporation's senior management. Where a defendant "'must have known' about the falsity of the information [he or she] . . . provid[ed] to the public because the falsity of the information was obvious from

the operations of the company," the defendant's "awareness of the information's falsity can be assumed." *Zucco Partners*, 552 F.3d at 1001; *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987–89 (9th Cir. 2008). In this case, Plaintiffs allege two reasons suggesting that Defendants' mistaken accounting methodology was so patently obvious that Defendants must have known that they were in violation of GAAP: (1) accounting literature available since 1997 made it clear that Defendants' interpretation of SFAS 48 was incorrect; (2) the notion that expired and fresh pharmaceuticals could be treated as the same in "kind, quantity, and price" is absurd on its face. (*See* Dkt. ## 53, 67.)

### (a) Accounting Literature Did Not Make Defendants' Accounting Error Obvious.

Plaintiffs first direct the Court's attention to allegedly "authoritative accounting literature" to support their assertion that Defendants' interpretation of SFAS 48 was obviously incorrect. (Dkt. # 67 at 2.) When an accounting rule is clearly defined by authoritative accounting literature, violation of the rule becomes more obvious. *See DSAM*, 288 F.3d at 391 (holding that "an extreme departure from reasonable accounting practice[s]" may demonstrate that the defendant "knew or had to have known" of the departure). In turn, where the accounting rule is extremely clear, and the violation is very obvious, this can give rise to strong inference of scienter. *See id.*; *cf. Zucco Partners*, 552 F.3d at 1000. Here, Plaintiffs allege that Defendants' interpretation of SFAS 48 was obviously incorrect because that interpretation was precluded in 1997 when the AICPA issued Statement of Position 97-2 ("SOP 97-2"). Specifically, SOP 97-2 provides,

> [T]he rights to exchange or return software . . . are subject to the provisions of [SFAS 48] . . . . Accordingly, . . . exchanges of software for products with no more than minimal differences in price, functionality, and features by users qualify for exchange accounting because, as discussed in footnote 3 to [SFAS 48], *(a)* users are "ultimate customers" and *(b)* exchanges of software with no more than minimal differences in price, functionality, and features represent "exchanges . . . of one item for another of the same kind, quality, and price." . . . [B]ecause resellers are not "ultimate customers," [however,] such exchanges by resellers should be considered returns.

*See Statement of Position 97-2 Software Revenue Recognition* ¶ 121 (AICPA 1997). In other words, when a software manufacture gives its distributors the right to exchange software for a product that is the same in "kind, quality, and price," the manufacturer must book the exchange as a return since software "resellers are not 'ultimate customers.'" *See id*. Hence, according to Plaintiffs, the same rule that applies in the software industry is applicable in the pharmaceutical industry. Plaintiffs allege that SOP 97-2 precluded Medicis from applying Footnote 3 to expired pharmaceuticals because Medicis sells its products to large wholesale distributors, or "resellers," which should not be considered "ultimate customers." (Dkt. # 69 at 3.) Plaintiffs further argue that Defendants must have known their accounting methodology was in violation of this GAAP provision because "there is nothing opaque" about SOP 97-2. (*Id.*)

There is no indication, however, that this "statement of position" relating to another industry would be both (a) applicable and (b) so obvious to Medicis's senior management that it establishes scienter. *See DSAM Global Value Fund*, 288 F.3d at 391. By its terms, SOP 97-2 only applies to the "Right to Exchange or Return Software." *Statement of Position 97-2 Software Revenue Recognition*, at ¶ 121. The scope of SOP 97-2 is specifically limited to "guidance on when revenue should be recognized and in what amounts for licensing, selling, leasing, or otherwise marketing computer software." *Id.* at ¶ 2.

That Plaintiffs refer to accounting literature that is expressly limited to the computer software industry actually demonstrates that there is no "authoritative guidance" that governs revenue recognition for the exchange of pharmaceuticals. *Cf. id.* And, even if SOP 97-2 does apply outside of the software industry, Plaintiffs have alleged no facts suggesting that Medicis's senior management or Ernst & Young must have known about SOP 97-2 or deliberately ignored it. Thus, because SOP 97-2 only pertains to revenue recognized from

the sale of computer software, Defendants' failure to apply SOP 97-2 was not such an obvious accounting error to give rise to a strong inference of scienter.[7]

### (b) Medicis's Accounting Methodology Was Not So Absurd as to Give Rise to a Strong Inference of Scienter.

Plaintiffs further allege that the error in Medicis's accounting methodology was so "obvious from the operations of the [C]ompany," that Defendant's "awareness of the [correct interpretation of SFAS 48] can be presumed." *See Zucco Partners*, 552 F.3d at 1001. In other words, Plaintiffs allege that the violation was "prominent enough that it would be 'absurd to suggest' that top management was unaware" of both the correct interpretation and its applicability. *See id.* (quoting *Berson*, 527 F.3d at 989). To prevail under this narrow exception, a "plaintiff must prove that the accounting practices were . . . an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made" were so irrational, that no accountant "would have made the same decisions if confronted with the same facts." *See In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 628 (9th Cir. 1994) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994)).

This high standard is difficult to meet. *See, e.g.*, *Berson*, 527 F.3d at 987–88. In *Berson*, executives at a corporation made several optimistic statements about the corporation's health. *See id.* at 987. The executives, in making these statements, failed to reveal that several of their largest and most important clients, which represented eighty percent of the corporation's revenue, had issued "stop-work orders" just weeks earlier. *Id.* at 983, 988. The plaintiffs in *Berson*, however, did not allege particular facts indicating that the executives had knowledge of the "stop-work orders" at the time they made the optimistic statements. *Id.* at 987. Despite the apparent deficiency in the pleadings, the Ninth Circuit held

---

[7]The Medicis Defendants take issue with SOP 97-2 because it was not referenced in the Amended Complaint. This, however, is not fatal because such financial accounting standards are the proper subjects of judicial notice. *See, e.g.*, *In re New Century Sec. Litig.*, 588 F. Supp.2d 1206, 1219 (C.D. Cal. 2008).

that it was "absurd to suggest" that the executives were unaware of the orders because these executives were closely involved in the company's "day-to-day operations" and because the "stop-work orders" had a "devastating effect on the corporation's revenue." *Id.* at 987. Similarly, in *South Ferry*, the Ninth Circuit reiterated that a misstatement without more only gives rise to scienter in those "exceedingly rare" circumstances where the facts that defendants are alleged to have known had a "devastating effect" on the company's operations and future prospects. *See* 542 F.3d at 785 n.3.

Courts have also held that there is a strong inference of scienter when corporate officials falsely announce information about core-business operations that are so integral to the company that the announcement must "have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008); *see also South Ferry*, 542 F.3d at 784. In *Makor*, a CEO stated that demand for "key products" was steady when, in reality, demand was steadily declining. 513 F.3d at 711. Writing for the Seventh Circuit, Judge Posner held that it was "exceedingly unlikely" that the CEO "was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company." *Id.* In other words, it was absurd to suggest that the CEO was unaware of such an obvious misstatement because the subject matter was of such great importance to the company's product demand, cash, liquidity, and core-business operations. *See id.*

Medicis and its auditor's interpretation of FSAS 48 was not crucial to underlying demand for a product, which was at issue in *Berson* and *Makor*. 527 F.3d at 987–88; 513 F.3d at 711. Because this interpretation of a GAAP provision is not related to actual demand for a product or associated business operations, there is no basis to suggest that it would be absurd for Medicis corporate executives to be unaware that SFAS 48's Footnote 3 exception was inapplicable. And, while the misinterpretation required a restatement of Medicis's financial data, Plaintiffs fail to present any allegations that the error had such an effect on

cash, liquidity, or viability of Medicis's core-business operations that Defendants' must have known about the mistake. *See South Ferry*, 542 F.3d at 784; *Makor*, 513 F.3d at 710.

Moreover, based on the particular facts alleged, the inference that Medicis took an aggressive interpretation of SFAS 48 with approval from its auditor is more compelling than the inference that Defendants recklessly ignored a patently obvious GAAP provision. *See Zucco Partners*, 552 F.3d at 999–1000 (citing *Tellabs*, 551 U.S. at 324). Here, it appears that Medicis aggressively interpreted Footnote 3 as allowing the Company to account for exchanges of expired pharmaceuticals based on the economic cost of replacing each item. Under this interpretation, Medicis initially overstated revenue because the Company deducted only the replacement cost of pharmaceuticals, rather than the full sales price, in calculating its reserves. In subsequent accounting periods, however, the inflated revenue was offset by the fact that the Company did not actually expend the full sales price—as the actual cost of replacing the expired items was less than the full price. In the end, the accounting error only shifted the amount of total revenue among different fiscal periods. In fact, Medicis's accounting error actually resulted in a slight *understatement* of net revenues of approximately $1.1 million or 0.058% of Medicis's net revenues over the six-year period.

It also appears that Medicis was not alone in its mistaken interpretation of SFAS 48. Other pharmaceutical companies have attested to the SEC that they too allowed exchanges of expired product for fresh product and then booked reserves using replacement cost. For instance, Heska Corporation disclosed in its 2007 annual filing with the SEC that their "policy is to exchange certain outdated, expired product with the same product," and "record an accrual for the estimated cost of replacing the product." (Dkt. # 69, Ex. A at 29.) Similarly, Questor Pharmaceuticals declared in its 2004 annual filing with the SEC that it permitted exchanges of expired product for fresh product and established a reserve for such exchanges based on the "estimated cost for such exchanges." (Dkt. # 69, Ex. B at 63.) While Medicis later revised its own judgment about the application of SFAS 48 to its reserves, these other companies' SEC filings demonstrate that Medicis's previous approach was not so

obviously incorrect or so patently absurd that it was highly unreasonable for Defendants to adopt this approach. *See Zucco Partners*, 552 F.3d at 1001.[8]

Thus, given the lack of definitive GAAP guidance with respect to setting reserves for exchanges of expired products, and given that Medicis's accounting treatment reflected the exchanges' actual economic impact, the error in this case cannot be called the result of "an egregious refusal to see the obvious." *See Software Toolworks*, 50 F.3d at 628.

### (2) Plaintiffs Have Not Alleged Sufficient Facts to Support their Allegation that Defendants Must Have Known Their Interpretation of SFAS 48 Was Incorrect.

Under the second exception to the general rule that a restatement based on GAAP violations is not sufficient to support a strong inference of scienter, allegations about "'management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements' . . . create a strong inference of scienter when these allegations are buttressed with 'detailed and specific allegations'" about management's exposure to the actual truth. *Zucco Partners*, 552 F.3d at 1000 (quoting *South Ferry*, 542 F.3d at 785). To prevail under this exception, a plaintiff must allege "specific admissions from top executives" or "particular details" which illustrate that the executives must have been aware that the original statement was false or misleading. *Id.* (internal quotations and citation omitted).

---

[8]Again, judicial notice only permits the Court to accept as true the fact that these companies filed documents with the SEC containing declarations about their accounting procedures. *See Apollo Group*, 633 F. Supp.2d at 776. The doctrine of judicial notice, therefore, does not permit the Court to draw the inference that these companies actually utilized such accounting techniques. *See id.* Accordingly, the Court may only take judicial notice of the fact that these companies declared in their SEC filings that they booked reserves for expired pharmaceuticals at replacement cost rather than gross sales price. *See id.* Nevertheless, that other companies indicated that they follow these accounting procedures supports the conclusion that Defendants' interpretation of SFAS 48 was not obviously or unreasonably incorrect. Regardless, even if these filings were not considered, the Court would still reach the conclusion that Defendants' interpretation of SFAS 48 was not "patently absurd."

Whether specific admissions or allegations demonstrate that management must have been aware of a misstatement or omissions depend on the particular circumstances of the misstatements. *See Daou Sys.*, 411 F.3d 1023. For instance, the Ninth Circuit has held that general allegations or admissions of a "hands-on" management style and interaction with officers and employees are not sufficient to demonstrate awareness of a misstatement under this exception. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 (9th Cir. 2002). However, in a case discussing whether executives must have known about certain defects in a software database, the Ninth Circuit held that allegations against company executives were sufficient to raise an inference of scienter because those executives specifically admitted "that they [were] involved in every detail of the company and that they monitored portions of the company's database." *Daou Sys.*, 411 F.3d at 1022 (internal citations omitted). Similarly, a misstatement about company sales could be knowingly false when executives admit that "we know exactly how much we have sold in the last hour around the world." *Zucco Partners*, 552 F.3d at 1000 (citing *Daou Sys.*, 411 F.3d at 1022–23) (internal alteration omitted).

The Amended Complaint, fails to satisfy this narrow exception because Plaintiffs do not present particular facts suggesting that the Defendants knew that the Company was in violation of SFAS 48 when it issued its original financial statements. *See id*. Here, Plaintiffs allege that Company executives (Peterson and Prygocki, in particular) admitted to monitoring returns "very closely. " (*See* Dkt. # 53 at ¶¶ 40–41.) Plaintiffs also point out that Prygocki told analysts that the Company was not "booking revenue in advance of future quarters." (*Id.*) Unlike the misstatements discussed in *Daou Sys.* and *Zucco Partners*, however, this is not enough to give rise to a strong inference of intentional falsity or deliberate recklessness. *See* 552 F.3d at 1000; 411 F.3d at 1022–23. To be sure, reserve calculations represented an important part of Medicis's revenue recognition. Nevertheless, allegations that Medicis's management monitored the number of exchanged pharmaceutical products or that these executives believed that they were not booking revenues in advance of future quarters does not support the inference that management must have been in a position to know that the

Company's accounting methodology was in violation of GAAP. Instead, these admissions and allegations merely indicate that management was aware of SFAS 48 and aware of their reserve methodology—not that management knew its interpretation of SFAS 48 was wrong.

The Court also rejects Plaintiffs' allegation that Defendants must have been aware of their incorrect interpretation of SFAS 48 because they were "stuff[ing] the distribution channel" with Medicis Pharmaceuticals. (Dkt. # 53 at ¶ 3.) Here, Plaintiffs allege that Medicis "stuffed more product into the channel than normal sales could bear." (Dkt. # 53 at ¶ 86.) According to Plaintiffs, "channel stuffing" shows that Medicis knew its reserve calculations were low and in violation of SFAS 48. Plaintiffs, however, never explain how "stuffing the distribution channel" demonstrates that Defendants must have known that their interpretation of SFAS 48 was wrong. Plaintiffs' allegation of channel stuffing might be more indicative of scienter if Defendants had intentionally distributed products they knew would be returned in an attempt to show increased revenue. Yet, Plaintiffs provide no allegations suggesting that Defendants deliberately underestimated the number of product returns. (*See* Dkt. # 53.) Here, Plaintiffs merely allege that the value of Medicis's reserve calculation was low. Under these circumstances, Medicis's low reserve calculation gives rise to the inference that the mistake was an innocent misinterpretation of SFAS 48. Further, there is no allegation that the accounting error resulted in an overstatement of aggregate revenue over the relevant period.

The most that can be said is that the accounting error resulted in the manipulation of when revenue was recognized, but allegations that a company intentionally manipulated the timing of revenue recognition require more than a restatement or an accounting error to give rise to scienter. Generally, such allegations also require plaintiffs to allege facts suggesting why a company would deliberately control the timing of revenue recognition. *See, e.g.*, *Zucco Partners*, 552 F.3d at 1006 (dismissing allegations that company executives intentionally controlled the timing of revenue recognition to sell stock because there was no indication that the executives engaged in irregular or suspicious stock trades). Here,

Plaintiffs' Amended Complaint provides no reason or incentive for Defendants to intentionally or recklessly control the timing of Medicis's revenue recognition.

Defendants' admissions and Plaintiffs' allegations of channel stuffing at most demonstrate that the Defendants were aware of SFAS 48 and that they had knowledge of the manner in which Medicis calculated its reserves. None of these admissions or allegations, however, suggests that Medicis, Peterson, Prygocki, or Shacknai knew or were reckless as to whether their interpretation of SFAS 48 was wrong. Furthermore, as discussed in further detail in the following section, none of the confidential witnesses provide "particular details" suggesting that the Defendants were aware of a correct interpretation of SFAS 48 but chose to intentionally or recklessly ignore it. (*See* Dkt. # 53 at ¶¶ 33–39.)

**B. Confidential Witnesses' Allegations Do Not Support a Strong Inference of Scienter.**

Plaintiffs next point to the testimony of several confidential witnesses to support their allegations of scienter. According to Plaintiffs' confidential witnesses, each of the Defendants was actually aware that the accounting methodology was in violation of GAAP. A confidential witness' allegations can help support an inference of fraud if two requirements are met. First, the confidential witness' allegations must be supported by "sufficient detail about [the] confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." *Zucco Partners*, 552 F.3d at 995. Second, "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.*

In analyzing the first prong, whether the confidential witnesses have personal knowledge of the events they allege, a court must "look to 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Id.* (quoting *Daou Sys*, 411 F.3d at 1015). Here, Plaintiffs describe the confidential witnesses with some "degree of specificity." *See*

*Daou Sys*, 411 F.3d at 1016. In their Amended Complaint, Plaintiffs number each witness, provide a brief job description, and, in some instances, provide the Medicis executive to whom the witness reported. *See id.* Nevertheless, many of these witnesses' statements fail to demonstrate the level of detail required to establish personal knowledge of the Defendants' alleged state of mind. *See id.* And, while some of Plaintiffs' allegations do reach the "requisite level of particularity to withstand the first prong of the . . . confidential witness test," the allegations "fail to demonstrate the deliberate recklessness required to survive the second prong." *See Zucco Partners*, 552 F.3d at 998.

### (1) Confidential Witness No. 1

Confidential Witness No. 1 ("CW 1") was allegedly an accounts receivable senior accountant at Medicis from 2000–2006. (Dkt. # 53 at ¶ 33.) During this time, CW 1 alleges that she reported indirectly to Peterson and was involved in calculating reserves using Medicis's replacement cost methodology. (*Id.*) CW 1 further alleges that she "voiced her concerns over this accounting treatment several times" and that she was directed by Peterson to employ the improper replacement cost methodology.[9] (*Id.*) According to CW 1, Peterson did not "like people questioning [him]" and insisted on proceeding with what CW 1 considered to be "creative accounting." (*Id.*) This allegedly led CW 1 to believe that "something shady was going on." (*Id.*)

Although CW 1 was likely familiar with Medicis's accounting methodology, her allegations fail to provide "sufficient detail" to support a conclusion that she had personal

---

[9]The allegation that CW 1 was directed by Peterson to employ the improper replacement cost methodology is not specifically found in the Amended Complaint. (*See* Dkt. # 53 at 33–34.) Nevertheless, viewing these allegations in the light most favorable to the Plaintiffs, the Court can reasonable infer from CW 1's other statements that she also makes this allegation. *See Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). Thus, the Court will consider the allegation for purposes of this Motion.

To the extent that Plaintiffs assert other allegations that are not present or properly inferred from the Amended Complaint, these allegations are disregarded. *See Schneider v. Cal. Dep't. of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); *Eason v. IndyMac Fed. Bank, FSB*, 2009 WL 2857961 at *1 (D. Ariz. Sept. 3, 2009).

knowledge about the Defendants' improper state of mind. *See Zucco Partners*, 552 F.3d at 995 (citing *Daou Sys.*, 411 F.3d at 1015). The Amended Complaint does not specify when alleged conversations with the Defendants took place; nor does it provide details about the content of those conversations.

To the extent that CW 1's allegations support personal knowledge of Peterson's state of mind, her testimony only establishes that Peterson was aware that an employee was concerned about the accounting treatment. Her allegations do not demonstrate that Peterson, or any other Defendant, recklessly ignored a correct interpretation of SFAS 48 or otherwise acted with scienter. *See id.* Nothing in the Amended Complaint suggests that CW 1 drew Peterson's attention to the provisions of SFAS 48 or pointed out that Footnote 3, which only allows for exchanges that are the same in "kind, quality, and price," did not apply to expired pharmaceuticals. (*See* Dkt. # 59, Ex. A at 10 n. 3.) Furthermore, even if CW 1 had done all of those things, it is unclear what qualifies her to provide authoritative guidance with respect to an interpretation of a lengthy and relatively technical accounting provision. *See Zucco Partners*, 552 F.3d at 995 (requiring detailed knowledge to provide a basis for a confidential witnesses' allegations); *see also In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181 at *5 (D. Ariz. July 5, 2006) (requiring accounting background, knowledge, or experience for a confidential witness to attest to a technical accounting violation).[10] As previously discussed,

---

[10] While the Amended Complaint does not allege that CW 1 is an accountant, this fact alone does not preclude her from making an accounting judgment. *See 380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp.2d 199, 225, 229 (S.D. N.Y. 2008). To plead scienter in circumstances that call for technical knowledge of the relevant accounting provisions, a confidential witness must provide his or her basis, i.e. qualifications, knowledge, or expertise, for believing that a company has violated accounting principles. *See Hypercom*, 2006 WL 1836181 at *5 (noting that a confidential witness, who was a non-accountant, did not plead sufficient facts to suggest that he possessed any specific knowledge of a technical accounting provision that was couched in a fifty-seven page Statement of Financial Accounting Standard). Here, Plaintiffs do not allege that CW 1 even knew about SFAS 48, let alone that she possessed unique knowledge or experience that qualified her to provide Defendants with the correct interpretation of that provision.

SFAS 48 is not some patently obvious accounting standard that someone without an accounting background would necessarily understand and easily apply.

Likewise, CW 1's allegation that Peterson directed her to employ the improper methodology is not indicative of scienter. This fact simply demonstrates that Peterson was aware that Medicis was using replacement cost rather than gross sales price in calculating reserves. To the extent that Plaintiffs suggest that this allegation demonstrates that Peterson knew the accounting methodology was incorrect, it is insufficient to do so. The strongest inference that can be drawn from CW 1's testimony is that there was some disagreement and even concern about Medicis's accounting methodology. Vague allegations of disagreement and concern, however, do not establish that Peterson, let alone the other Defendants, were deliberately reckless with respect to SFAS 48. Thus, these allegations are insufficient to satisfy the scienter requirement for securities fraud.

### (2) Confidential Witnesses No. 2

Confidential Witness No. 2 ("CW 2") was allegedly a "senior accounts receivable coordinator at Medicis during parts of 2008." (Dkt. # 53 at ¶ 35.) Despite the short duration of CW 2's work at Medicis, CW 2 attests that Medicis's accounting treatment was "easy, but not correct." (*Id*.)

These vague allegations are an insufficient basis on which to draw an inference that the Defendants knew or deliberately disregarded a correct interpretation of SFAS 48. First, Plaintiffs do not provide any information linking CW 2 with the Defendants, or giving him personal knowledge of the Defendants' state of mind. *See Zucco Partners*, 552 F.3d at 995. There also is no indication that CW 2 worked closely with management or with Ernst & Young, and nothing in the Amended Complaint suggests that CW 2 ever communicated with any of the Medicis Defendants. *See id.* Furthermore, the Amended Complaint provides no details to suggest how CW 2 knew Medicis's accounting treatment was incorrect. *See id.*; *Hypercom*, 2006 WL 1836181 at *5. And, even if this confidential witness was an accountant

with specific knowledge of SFAS 48,[11] CW 2's conclusory assertion that Medicis applied an incorrect accounting methodology does not establish that management knew that its accounting methods violated GAAP. The Amended Complaint simply does not suggest that CW 2 explained to the Defendants his belief that Medicis's accounting treatment was "easy, but not correct." Accordingly, CW 2's testimony does nothing to indicate that the Defendants intentionally ignored SFAS 48 or acted with deliberate indifference.

### (3) Confidential Witnesses No. 3

Plaintiffs allege that Confidential Witness No. 3 ("CW 3") "was an accounts receivable team leader at Medicis between 2000 and 2004." (Dkt. # 53 at ¶ 36.) According to CW 3, "Medicis routinely pressured customers to accept exchanges of returned product instead of credit, which would have to be reflected in a credit memo and booked against revenue." (*Id.*)

These allegations are also insufficient to establish an inference that the Defendants knew or deliberately disregarded a correct interpretation of SFAS 48. While CW 3 may have had personal knowledge that Medicis pressured customers to accept exchanges rather than return expired products, this allegation does nothing to suggest that Medicis acted with fraudulent intent or deliberate recklessness. *See Zucco Partners*, 552 F.3d at 995 (holding that a confidential witness' statements must be both knowledgeable and indicative of scienter). That a company might prefer to accept an exchange rather than issue a full refund does not create an inference of fraud or deliberate recklessness. And, to the extent that CW 3's allegations support plaintiffs' claim that Medicis intentionally stuffed the distribution

---

[11]The Amended Complaint does not specify CW's qualifications or whether this witness had an accounting background. Plaintiffs' responsive memorandum, however, implies that CW 2 was an accountant. In their response, Plaintiffs discuss each confidential witness' testimony at length. In the discussion of CW 2's testimony, Plaintiffs state, "[A]s an accountant, CW 1 knew the proper accounting treatment for returns." (Dkt. # 67 at 11.) Because this statement is included in Plaintiffs' discussion of CW 2's testimony, rather than CW 1's testimony, it appears that the reference here to "CW 1" is a typographical error.

channel with its pharmaceutical products, that argument does not bolster Plaintiffs' primary claim that Defendants error was intentional or deliberately reckless.

### (4) Confidential Witnesses No. 4

Confidential Witness No. 4 ("CW 4") "was a senior financial analyst at Medicis in 2005." (Dkt. # 53 at ¶ 37.) CW 4 also indirectly reported to Peterson. (*Id.*) According to CW 4, "Medicis was aware that expired or short-dated product could not be treated for accounting purposes as equivalent to new product because in 2005, Medicis accountants required it to establish a [physical] reserve for the expired inventory at its own warehouses." (*Id.*)

The reserve for expired pharmaceuticals only demonstrates that Defendants knew that expired drugs cannot be sold on the market. But this does not indicate that Defendants knew that their accounting methodology based on replacement cost was incorrect. And, even if such an inventory reserve was indicative of fraud, CW 4 does not specify who, other than maybe Peterson, at Medicis or Ernst & Young implemented or was aware of these inventories. Accordingly, CW 4's statements do not provide an inference of scienter.

### (5) Confidential Witnesses No. 5

Confidential Witness No. 5 ("CW 5") was allegedly "the head of information technology for Medicis's finance department from 2001 until 2008." (Dkt. # 53 at ¶ 38.) CW 5 alleges that he "oversaw the operation of the financial accounting and reporting software used by Medicis." (*Id.*) According to CW 5, the Company's reserve accounting methodology was "always an issue" and a "point of contention between auditors and management" during his employment. (*Id.*) CW 5 further attests that Peterson and Prygocki were aware of the issues with reserve accounting because they consistently asked CW 5 to generate reports regarding Medicis's "historical return rates and return analysis." (*Id.*)

CW 5's testimony also fails to create an inference of scienter. While CW 5 alleges that reserve accounting was "a point of contention between management and the auditors," he does not explain how he knew about any contention. *See Zucco Partners*, 552 F.3d at 995. He also does not allege that he participated in meetings between auditors and management, and he does not specify when such meetings took place, which managers and auditors

attended, or what was discussed during these meeting. (*See* Dkt. # 52 at ¶ 38.) And, even if CW 5 did have personal knowledge that the accounting methodology was "an issue" or that it was "a point of contention," these allegations do not explain why the methodology was an issue or how it created contention. *See Zucco Partners*, 552 F.3d at 995. There is nothing in the allegations to suggest that the "issue" or "contention" related to Defendant's mistaken interpretation of SFAS 48. Indeed, CW 5's allegations, like the other confidential witnesses, are devoid of any reference to SFAS 48 or Footnote 3.

Similarly, CW 5's allegations that Defendants requested reports about the historical rate of return for its products does not create an inference of scienter. Medicis and its auditors would be expected to be familiar with the historical return rate in order to more accurately predict the number of future returns and exchanges, as they were required to do under both SFAS 48 as SFAS 5.[12] (See Dkt. # 57, Ex. D at ¶ 8(c), Ex. E at ¶ 25.) The Court finds nothing suspect about Defendants' requests for these types of reports.

Accordingly, testimony from each of the confidential witnesses, as contained in the Amended complaint, fails to sufficiently allege that Defendants intentionally, or with deliberate recklessness, controlled the timing of Medicis's revenue recognition in violation of SFAS 48. At the most, "these . . . allegations demonstrate only that there was some disagreement" within the Company about Medicis's accounting processes, and not that the Defendants were "deliberately reckless" in their interpretation of SFAS 48. *See Zucco Partners*, 552 F.3d at 998 (citing *Silicon Graphics*, 183 F.3d at 974). Thus, when the five confidential witnesses' allegations are examined under the *Zucco Partners* standard, these allegations either fail to allege personal knowledge or do not support a sufficient inference of scienter.

**C. Even When Viewed Holistically, the Amended Complaint Does Not Give Rise to a Strong Inference of Scienter with Respect to Any of the Defendants.**

---

[12]SFAS 5 provides the criteria for determining whether revenue can be recognized on products that may be returned. Of these criteria, management must have experience and expertise to reasonably estimate the number of product returns. (*See* Dkt. # 57, Ex. # at ¶ 25.)

When a district court does not find that a plaintiff's individual allegations are sufficient to plead a strong inference of scienter, then the court must "determine whether the complaint," as a whole, "contains an inference of scienter that is greater than the sum of its parts." *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1165 (9th Cir. 2009); *see also Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (holding that courts must determine whether allegations "even though individually lacking are sufficient to create a strong inference of scienter" when considered as a whole"). Under this "holistic" approach, "federal courts . . . need not close their eyes to circumstances that are probative of scienter [when] viewed [from] a practical and common-sense perspective." *South Ferry*, 542 F.3d at 784.

At the same time, the PSLRA requires a plaintiff to plead particularized facts "with respect to each act or omission alleged" in order to raise a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). This means that a plaintiff must plead specific facts as to each defendants's improper state of mind. *See, e.g.*, *Weiss v. Amkor Tech., Inc.*, 527 F. Supp.2d 938, 949 (D. Ariz. 2007). With respect to a corporate defendant, "the most straightforward way to raise an inference of scienter . . . will be to plead it for an individual defendant[,]" such as a corporate executive. *Glazer Capital*, 549 F.3d at 743 (internal alteration and citation omitted). Only in those cases where a "company's public statements [are] so important and so dramatically false" can a plaintiff establish corporate scienter without also establishing scienter on the part of the company's individual executive officers. *See id.* at 744–45.

**(1) The Amended Complaint Does Not Raise a Strong Inference of Scienter Against the Medicis Defendants.**

With respect to the Medicis's Defendants, Plaintiffs primary allegation is that Shacknai, Prygocki, and Peterson must have known that the Company was in violation of GAAP based on their positions at Medicis. While it is true that "a defendant's position within the company" may be relevant to the Court's scienter analysis, "position alone creates a strong inference of scienter only in the extraordinary case where it is 'absurd to suggest' that

a defendant did not know" of the violation or misstatement. *See In re Countrywide Financial Corp. Sec. Litig.*, 588 F. Supp.2d 1132, 1191 (C.D. Cal. 2008) (analyzing both *South Ferry*, 542 F.3d at 776 and *Berson*, 527 F.3d at 982). Plaintiffs' Amended Complaint then attempts to bolster these allegations with statements from confidential witnesses and accusations of "channel stuffing."

Even when all of Plaintiffs' allegations are combined and the Amended Complaint is viewed as a whole, Plaintiffs have not pled sufficient facts giving rise to a strong inference of scienter. First, the fact that Shacknai, Prygocki, and Peterson respectively serve as Medicis's CEO, COO, and CFO is insufficient to raise a strong inference of fraud given that all of Plaintiffs allegations do little to suggest that these Defendants were aware of Medicis's improper accounting methodology.

Similarly, the statements from confidential witnesses do not further the Plaintiffs' allegations. For the most part, these allegations are not supported by personal knowledge. But even to the extent these allegations are supported by personal knowledge, they do not create a strong inference of scienter. The confidential witnesses, at most, demonstrate that the Medicis Defendants knew about SFAS 48 and may have disagreed about the Company's accounting methodology. These facts, however, add nothing to Plaintiffs' allegation that the Medicis Defendants recklessly ignored SFAS 48.

Next, Plaintiffs allegations of "channel stuffing" provide little support to their assertion that the Medicis Defendants must have known their accounting methodology was in violation of GAAP. Again, it is unclear how Plaintiffs' allegations of channel stuffing have any relevance to the Medicis Defendants' knowledge that their accounting methodology was flawed. Therefore, these allegations, even when combined with the rest of Plaintiffs' Amended Complaint, fail to present a strong inference of intentional fraud or deliberate recklessness.

To the extent that the Amended Complaint creates some minor inferences of scienter, those inferences are not as strong or cogent as the opposing inference that Defendants' mistake was innocent because Medicis's restatement demonstrates that the accounting error

had no impact on Medicis's cash flows, business operations, or net revenues from 2003–2008. *See Tellabs*, 551 U.S. at 324. Again, the restatement actually *understated* Medicis's net revenue from 2003—2008 by $ 1.1 million.

Finally, Plaintiffs' assertion that Defendants intentionally violated SFAS 48 to "manipulate[] the recognition of revenues" is also unavailing. Improper revenue recognition, even when the original financial data understated revenues, can be a basis for scienter. *See In re Omnivision Tech., Inc.*, 2005 WL 1867717 at *4 (N.D. Cal. July 29, 2005). In *Omnivision*, a technology company moved to dismiss a securities claim for insider trading because alleged accounting violations actually resulted in a large understatement of revenue rather than an overstatement of revenue. *See id.* The Court refused to dismiss the claim, holding that "the investing community finds improper revenue recognition incidents to be serious matters regardless of the direction of the improper recognition." *Id.* Subsequent courts, however, have limited *Omnivision* to the specific facts of that case. *See, e.g.*, *Morgan v. AXT, Inc.*, 2005 WL 2347125 at *15 n. 7 (N.D. Cal. Sept. 23, 2005). The *Morgan* court noted that the allegation in *Omnivision* that company executives intentionally understated revenues was only sufficient to create a strong inference of scienter because the executives "sold personal shares of the company's stock dramatically out of line with their trading history." *Id.* In other words, the unusual stock trades in *Omnivision* indicated that the executives acted with scienter because such trading created a cogent inference that the executives intentionally understated revenues for a specific reason—to take advantage of high stock prices. *See Omnivision*, 2005 WL 1867717 at *4; *see also Zucco Partners*, 552 F.3d at 1006 (dismissing allegations that company executives improperly sold stock when revenues were artificially high due to an accounting violation because there was no indication that the executives varied from their regular stock-trading patterns).

Other than pointing to the restatement and raising allegations of channel stuffing, Plaintiffs in this case plead no particular facts supporting their claim that Medicis intentionally understated revenues. Unlike the executives in *Omnivision*, Plaintiffs do not allege that any of the Medicis Defendants manipulated revenues to sell their own stock at an

inflated price. *See Omnivision*, 2005 WL 1867717 at *4; *see also Zucco Partners*, 552 F.3d at 1007. Here, Plaintiffs provide no allegation as to why the Medicis Defendants would have intentionally understated revenues. The Amended Complaint also fails to provide a pattern of revenue manipulation or any facts indicating that the understatement was intentional. *See Zucco Partners*, 552 F.3d at 1007.

This is not to say that motive is necessary to prove scienter. *See Apollo Group*, 395 F. Supp.2d at 922 (holding that motive is not a "required element" and that all the plaintiff must allege is that the defendant "acted with intentionality or deliberate recklessness") (internal quotations and citation omitted). Nevertheless, the absence of a personal benefit supplying a motive can create an inference that a defendant did not act with scienter. *See Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (holding the fact "defendants are not alleged to have sold the stock at . . . inflated prices," and the fact "that they stood to lose a lot of money if the value of [the company's] stock fell" supported an inference against scienter).

Thus, considering Plaintiffs' allegations as a whole, the Court finds that any inference of scienter by the Medicis Defendants is outweighed by the opposing inference that the Medicis Defendants made an innocent accounting mistake.

### (2) Amended Complaint Does Not Raise a Strong Inference of Scienter Against Ernst & Young.

Plaintiffs also fail to plead facts with sufficient particularity to demonstrate that Ernst & Young acted with the requisite scienter. To successfully allege that an auditor acted with the scienter, a plaintiff must bring forth facts which show "that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgements which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Software Toolworks*, 50 F.3d at 628 (quoting *Worlds of Wonder*, 35 F.3d at 1426 (9th Cir. 1994)). This is not to say that auditors are subject to higher pleading requirements than other securities defendants or that auditors never have any incentive to

commit fraud. *See Countrywide*, 588 F. Supp.2d at 1197 n. 79 (noting that auditors have "structural incentives to yield to management on close questions"). Thus, auditors are held to the same pleading requirements under the PSLRA as other securities defendants. *See id.* (analyzing *Tellabs*, 551 U.S. at 308).

Here, Plaintiffs assert that when the Amended Complaint is viewed holistically, it demonstrates that Ernst & Young acted with scienter because the auditing firm's failure to properly apply SFAS 48 was an "egregious refusal to see the obvious" and amounted to "no audit at all." (Dkt. # 67 at 24.) This, however, is not the case as Plaintiffs' Amended Complaint does not present particular facts supporting their allegations that Ernst & Young "turned a blind eye" to obvious accounting standards. As previously discussed, Plaintiffs fail to present particular facts suggesting that Defendants intentionally or recklessly violated SFAS 48—the terms of that provision are not so obvious to suggest that Ernst & Young must have known that Medicis's accounting policy was in violation of GAAP. Furthermore, the allegations from confidential witnesses do nothing to link Ernst & Young to the alleged fraud. None of the confidential witnesses had any connection to Ernst & Young, and none of those witnesses plead particular facts suggesting that Ernst & Young deliberately ignored a proper interpretation of SFAS 48.

In addition, Plaintiffs allege that Ernst & Young was biased toward Medicis because Prygocki was a former Ernst & Young employee. (Dkt. # 53 at ¶ 120.) This too, however, is not indicative of scienter. Plaintiffs do not describe any interactions between Prygocki and Ernst & Young's audit team that give rise to an inference of bias. Plaintiffs also do not suggest that it was impermissible in 1995 for an auditor to accept employment with a former client, as Prygocki did with Medicis. Plaintiffs also do not bring forth any facts suggesting impropriety from Prygocki's prior relationship with Ernst & Young. *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp.2d 334, 390–91 (D. Md. 2004) (dismissing securities claim despite allegation that an auditor's "extensive relationship with [its client] compromised" the auditor's "ability to aggressively seek the truth from company management").

Like the Medicis Defendants, the inference that Ernst & Young mistakenly misapplied SFAS 48 is more compelling than the opposing inference that Ernst & Young deliberately ignored the provision. The accounting error slightly understated Medicis's net revenues from 2003–2008 and had no effect on the Company's cash flows, sales, or the viability of its products. Accordingly, when the facts are holistically "viewed [from] a practical and common-sense perspective," nothing in the Amended Complaint creates a strong inference that Ernst & Young acted with fraudulent intent or deliberate recklessness. *See South Ferry*, 542 F.3d at 784.

### D. The Amended Complaint Does Not Adequately Allege Section 20(a) Liability

In addition to Plaintiffs' § 10(b) claims, the Amended Complaint also alleges that Shacknai, Prygocki, and Peterson are "control persons" subject to § 20(a) liability under the Securities and Exchange Act of 1934. *See* U.S.C. § 78t(a). As a threshold matter, however, to state a prima facie case under § 20(a), a plaintiff must allege (1) a primary violation of the federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). Because the Court has determined that Plaintiffs failed to plead a primary violation of § 10(b), or any other securities law, their § 20(b) claim must also be dismissed.

### CONCLUSION

Plaintiffs have failed to plead particularized facts establishing a strong inference that Defendants acted with scienter, as required by the PSLRA. To the extent that Plaintiffs may be able to cure this pleading deficiency, Plaintiffs' Amended Complaint is dismissed without prejudice.

**IT IS THEREFORE ORDERED** that Ernst and Young's Motion to Dismiss (Dkt. # 56) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Medicis Defendants' Motion to Dismiss (Dkt. # 58) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Amended Complaint (Dkt. # 53) is **DISMISSED** with leave to file a Second Amended Complaint on or before **January 4, 2010**.

**IT IS FURTHER ORDERED** that due to the complexity of this case and the length of the Amended Complaint, if Plaintiffs amend by submitting a Second Amended Complaint, Plaintiffs are **ORDERED:** (1) to provide the Court and all Defendants a redline indicating all changes from the Amended Complaint and the Second Amended Complaint; and (2) to provide the Court and all Defendants a conversion table indicating which Amended Complaint paragraphs have been renumbered in the Second Amended Complaint.

DATED this 1st day of December, 2009.

G. Murray Snow
United States District Judge