Susan Martin (AZ#014266)
Jennifer Kroll (AZ#019859)
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Avenue
Suite 2010
Phoenix, Arizona  85004
Tel:   (602) 240-6900
Fax:  (602) 240-2345
smartin@martinbonnett.com
jkroll@martinbonnett.com

Patrick V. Dahlstrom (*admitted pro hac vice*)
Joshua B. Silverman
Leigh H. Smollar
**POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP**
Ten South LaSalle Street
Suite 3505
Chicago, Illinois  60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com
jbsilverman@pomlaw.com
lsmollar@pomlaw.com

*Attorneys for Lead Plaintiff Steve Rand and the Class*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE MEDICIS PHARMACEUITICAL CORP. SECURITIES LITIGATION | Master File No.  CV -08-01821-PHX-GMS<br><br>SECOND AMENDED FEDERAL SECURITIES CLASS ACTION COMPLAINT<br><br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff, Steve Rand, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Second Amended Class Action Complaint against defendants, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, interviews with confidential informants, Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Medicis Pharmaceutical Corporation ("Medicis" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is a securities fraud class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company, its accountants, and certain of its top officials and is brought on behalf of all persons who purchased or otherwise acquired Medicis common stock, or who purchased and/or sold options on Medicis's common stock between October 30, 2003 and September 23, 2008, both dates inclusive (the "Class Period").

2.      Medicis is a dermatological pharmaceutical company that sells prescription acne and non-acne products primarily to large wholesale pharmaceutical distributors, which in turn distribute the products to the pharmacies that fill prescriptions and sell the products to consumers.

3.     To induce these large wholesale pharmaceutical distributors to purchase greater quantities of Medicis products than they needed, and thereby inflate its revenues, Medicis offered extremely generous return policies.  Medicis allowed customers to return vast quantities of expired or about-to-expire ("short-dated") products in exchange for fresh, non-expired products, at either no cost whatsoever or, in some cases, at a very large discount.  Such channel stuffing practices, however, cannot be sustained without some accounting ploy, as over stocking by distributors eventually leads to large returns.  Accordingly, Generally Accepted Accounting Practices ("GAAP") and Statement of Financial Accounting Standards No. 48 ("SFAS 48") require companies accepting returns to book reserves for expected sales returns.

4.     SFAS 48 specifically requires that "[S]ales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns."  The requirements of SFAS 48 are simple – if a Company estimates that a certain portion of its sales will be returned, it is required to deduct such anticipated returns from its gross sales.  Indeed, virtually all of Medicis's competitors understood this requirement and deducted its anticipated returns from revenues.

5.     Medicis however was in a quandary.  If it followed the unmistakable dictates of SFAS 48, its working capital – a metric consistently reported by the Company and analyzed by the Street – would have been dramatically reduced.  Moreover, the Company's ability to manage its earnings by stuffing the channel would have been crimped, as it would have had to immediately reduce the anticipated returns triggered by its channel stuffing from revenues.

6.      Instead, Medicis, with the imprimatur of its auditor Ernst & Young LLP ("E&Y"), engaged in a subterfuge in order to free itself from SFAS 48's dictates.  The Company employed an exclusion found in footnote 3 of SFAS 48, which exempted from the rule "exchanges by ***ultimate*** customers of one item for another of the ***same quality, kind and price"*** (emphases added).  Thus, Medicis took the position, unsupported by a common sense understanding of the terms of SFAS 48 as well as any authority or literature in accounting, that unsalable, expired prescription drugs were of the "same quality, kind and price" as drugs more than fifteen months from expiration.  Medicis maintained that its expired drugs were of the same "quality, kind and price" as unexpired drugs even though it immediately destroyed the expired or short dated drugs when returned by its customers or sold them at steep discounts to charities.  Indeed, Medicis's treatment of returned expired drugs is akin to classifying a one year old carton of spoiled milk as the "same quality, kind and price" as a fresh carton – an outright fabrication.

7.      Moreover, in order to fall within the parameters of the exclusion provided by footnote 3 of SFAS 48, Medicis deemed its customers as "ultimate customers," even though it had admitted repeatedly in its public filings that its customers were "large pharmaceutical wholesalers" who in turn sold the drugs to retail pharmacies that in turn filled prescriptions for the "ultimate customers."

8.      Significantly, Medicis also failed to tell the market and investors that it was using the exclusion provided by footnote 3 of SFAS 48 to run an end around the requirements of SFAS 48.  Had Medicis advised the market that it was not complying with SFAS 48 during the Class Period, investors would have learned sooner that the

integrity of the Company's financial statements could not be trusted, and would have punished the price of Medicis common shares as they did upon the ultimate disclosure by the Company.   Instead, Medicis intentionally or recklessly told that market that "provisions for estimates for product returns and exchanges . . . . ***are established as a reduction of product sales revenues at the time such revenues are recognized***," leading investors to believe that it was reducing the sales costs of the products for estimated returns, in accordance with SFAS 48.   At no time during the Class Period did the Company state in its public filings or elsewhere that it was exploiting an exclusion to get around compliance with SFAS 48 on the false premise that its customers were "ultimate customers" and that expired prescription drugs were of the "same quality, kind and price" as those that are 15 months or more from expiration.   Despite this outright misrepresentation, E&Y consistently blessed Medicis's financial statements year after year.

9.     As a result of the Company's and E&Y's machinations, Medicis's revenues and working capital were consistently misrepresented throughout the Class Period, thereby inflating the Company's share price.   Medicis's stock reached a Class Period high of $44.81 per share on May 4, 2004.

10.     Medicis's long standing scheme came to a halt only after the Public Company Accounting Oversight Board ("PCAOB") reviewed E&Y's audit, and required the patently false and misleading accounting treatment to stop.   On September 24, 2008, the Company finally revealed that it had omitted the required reserves under SFAS 48, and instead accounted for returns using a "replacement cost" methodology that is

absolutely forbidden under applicable accounting rules and rejected by nearly all of the Company's competitors, thereby inflating Medicis's revenues and working capital during the Class Period.  As a result, the Company admitted, its financial statements for fiscal years 2003 through 2007 and the first and second quarters of 2008 were materially false when made and required restatement.

11.    The disclosure on September 24, 2008 devastated investors, causing Medicis's stock to plummet $2.34 per share, a statistically significant, one-day decline of 13% on extremely high trading volume of more than 3 million shares, which injured Class members who had purchased at prices inflated by Defendants' materially false and misleading statements.   The one-day drop wiped out approximately $125 million of shareholder equity.

## **JURISDICTION AND VENUE**

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Medicis conducts business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.   In addition, the Company's principal executive offices are located in this District.

15.     In connection with the challenged conduct, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

16.     Lead Plaintiff, Steve Rand, as set forth in his certification heretofore filed with the Court and incorporated by reference herein, purchased and sold options on Medicis common stock during the Class Period and was damaged when the disclosure of the Company's accounting improprieties caused the price of Medicis shares to decline.

17.     Plaintiff Darlene Oliver, as set forth in her certification heretofore filed with the Court and incorporated by reference herein, purchased shares of Medicis common stock at artificially inflated prices during the Class Period and was damaged when the disclosure of the Company's accounting improprieties caused the price of Medicis shares to decline.

### Defendants

18.     Defendant Medicis is a Delaware corporation which maintains its principal executive office at 8125 North Hayden Road, Scottsdale, Arizona 85258. The Company provides pharmaceuticals focusing on the treatment of dermatological, pediatric, and podiatric conditions, as well as aesthetics medicine. The Company has branded prescription products in therapeutic categories such as acne, asthma, eczema, fungal infections, hyperpigmentation, photoaging, psoriasis, and rosacea.

19.     The aggregate number of shares of Medicis common stock outstanding as of August 2008 was approximately 56.7 million.   Medicis common stock is actively traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "MRX."

20.     Defendant Jonah Shacknai ("Shacknai") is, and at all relevant times was, the Company's founder, Chairman and Chief Executive Officer.

21.     Defendant Richard D. Peterson ("Peterson") has been the Company's Executive Vice President, Chief Financial Officer and Treasurer since April 1, 2008. Peterson also serves as the Company's Chief Accounting Officer and served as the Company's Senior Vice President of Finance between February 2007 and April 1, 2008. From August 2002 to February 2007, he served as the Company's Vice President of Finance.

22.     Defendant Mark A. Prygocki ("Prygocki") has been the Company's Chief Operating Officer since April 1, 2008 and its Executive Vice President since January 2001. From May 1995 to April 1, 2008, Prygocki served as the Company's Chief Financial Officer and Treasurer.   Prygocki served as the Company's Corporate Secretary from May 1995 through July 2006.

23.     The defendants referenced above in ¶¶ 20-22 are sometimes referred to herein as the "Individual Defendants."

24.     Defendant E&Y is an accounting firm that at all relevant times provided accounting services to Medicis. E&Y audited Medicis's books and records, and rendered opinion letters stating that its annual financial statements filed with the SEC conformed

with GAAP; and that E&Y's audits thereof were conducted in conformance with Generally Accepted Auditing Standards ("GAAS").

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Medicis is an independent specialty pharmaceutical company focused primarily on helping patients attain an enhanced appearance through the development and marketing in the United States of products for the treatment of dermatological, aesthetic and podiatric conditions. It offers a range of products addressing various conditions or aesthetic improvements, including, acne, fungal infections, psoriasis, facial wrinkles and skin and skin-structure infections.

26.     Like most pharmaceutical companies, Medicis sold products with a limited shelf life. Medicis products typically have an expiration date printed on the label or box, and cannot lawfully be sold after that date has expired.

27.     Accordingly, wholesale pharmaceutical distributors had an economic incentive to purchase only the quantity of Medicis products that they were confident would be prescribed and filled prior to their expiration.

28.     To encourage these large customers to purchase greater quantities of Medicis products, and thereby inflate the Company's revenues and working capital, Medicis allowed the distributors to shift the risk of product expiration back to Medicis. When products were expired or about-to-expire, distributors were permitted to ship them to Medicis in exchange for new, fresh-dated products. These exchanges – which either occurred at zero cost or at an enormous discount – were intended only to shift the risk of

product expiration back to Medicis.  Medicis did not receive any meaningful value from the returned product, because as expired or near-expired product, it could not be sold.

29.    These exchanges were substantial, often reaching tens of millions of dollars per quarter during the course of the Class Period.

30.    According to multiple confidential witnesses, Medicis knowingly refused to properly reserve for these anticipated returns during the Class Period as required by SFAS 48, and E&Y approved the improper accounting treatment.

## CONFIDENTIAL WITNESSES

31.    Confidential Witness 1 ("CW1") was an accounts receivable senior accountant at Medicis from 2000 to 2006.  CW1 reported directly to Brian Barley ("Barley"), vice-president of accounting, and indirectly to Defendant Peterson.  CW1 was directly involved in calculating the reserves under the improper actual replacement cost methodology.  CW1 voiced her concerns over this accounting treatment several times to Barley and Defendant Peterson.

32.    Confidential Witness 2 ("CW2") was a contract senior accounts receivable coordinator at Medicis during parts of 2008.  CW2 confirmed that Medicis accounted for the exchanges of expired/short-dated products using "zero dollar invoices" that "created a wash on the books."

33.    Confidential Witness 3 ("CW3") was an accounts receivable team leader at Medicis between 2000 and 2004.  CW3 stated that many of the swaps while she was at Medicis were with Quality King and AmerisourceBergen.  CW3 confirmed that Medicis

routinely pressured customers to accept exchanges of returned product instead of credit, which would have to be reflected in a credit memo and booked against revenue.

34.     Confidential Witness 4 ("CW4") was a senior financial analyst at Medicis in 2005.  CW4 reported to Barley and Defendant Peterson.  CW4 stated that Medicis was aware that expired and short-dated product could not be treated for accounting purposes as equivalent to new product because in 2005, Medicis's accountants required it to establish a reserve for the expired inventory at its won warehouses (*i.e.*, product it had not been able to stuff into the distribution channel prior to expiration).   CW4 helped implement that inventory reserve.

35.     Confidential Witness 5 ("CW5") was the head of information technology for Medicis's finance department from 2001 until 2008, and oversaw the operation of the financial accounting and reporting software used by Medicis.  According to CW5, reserve accounting methodology was "always and issue" at Medicis during his employment, and was a point of contention between auditors and management.  CW5 confirmed that Defendants Peterson and Prygocki were aware of these issues because he was consistently asked to generate reports for the Company's auditors extracting historical return rates and returns analysis from the Epicor and SAP accounting systems Medicis used.

36.     Confidential Witness 6 ("CW6") worked at Medicis in the order control department at the Scottsville, Arizona headquarters from 2003 until 2006.  Between 2003 and February 2006, CW6 was an inventory control analyst.   In February 2006, CW6 was promoted to supervisor of the inventory control department.

37.     Confidential Witness ("CW7") was an order control analyst at Medicis from June 2005 until November 2006. She reported to Zelms.

### Accounting For Reserves Under SFAS 48

38.     Statement of Financial Accounting Standards No. 5 ("FASB No. 5"), enacted in 1975, requires companies to account for loss contingencies as a charge to income if the contingency is probable or estimable.  SFAS No. 48, which was adopted nearly three decades ago, specifically provides that "[s]ales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns."

39.     There is no room for disagreement as to the application of this principle. Companies are required to deduct from their gross sales the estimated returns expected from such sales.  By way of example, if Company X had $100 million in gross sales in a given period, but anticipated that 20% of the products it had sold would be returned, it would only be able to record $80 million in sales for that year.  Moreover, the Company would need to accrue a reserve of $20 million on the Company's accounts receivables, thereby decreasing its working capital by $20 million.

### Medicis's Improper Accounting For Reserves

40.     Medicis's business model was premised on its ability to stuff its wholesale customer channels with unneeded prescription drugs, which could be exchanged by customers once the product was near or at expiration.  This allowed the Company to manipulate its earnings – *i.e.*, if the demand for its prescription drugs was too low for a given period, it could merely push unneeded inventory on to its wholesale customers which could be returned at a later date once the product expired – and Medicis could

recognize the revenues immediately.  SFAS 48, however, presented a threat to the Company's business model, as it required Medicis to establish a reserve for all of the product stuffed in the channel that would be returned or replaced.  If anticipated returns had to be deducted immediately from revenues, there would be no benefit to be derived from channel stuffing and the Company would lose its lynchpin in manipulating its revenues and working capital.

41.     Thus, the Company tried to run an end around SFAS 48 by exploiting exclusion provided in footnote 3 of SFAS 48 which states that "[e]xchanges by ***ultimate*** customers of one item for another of the ***same kind, quality and price*** (for example, one color or size for another) are not considered returns for purposes of this statement." (emphasis added).  The Company's customers, however, were not "ultimate users." Indeed, Medicis's customers were wholesalers who sold their product to retailers.  Thus, Medicis's customer base did not support applying footnote 3 to SFAS 48 to any of the Company's sales.

42.     Furthermore, Medicis deemed unsalable, expired prescription drugs as the "same, quality kind and price" as drugs that were at least fifteen months from expiration. It therefore treated such returns as warranty exchanges, which allowed it to reduce its revenues by the much less substantial replacement costs.

43.     Such a position was wholly untenable, especially in light of the fact that CW1 and CW5 both attest to the fact that expired products returned by Medicis's customers were destroyed by the Company as they were no longer salable – proof that Medicis understood they had no value, let alone value equivalent to salable products.

CW6 further relates that product with approximately twelve to three months remaining until expiration (short dated products) were donated to charity.  Moreover, products with three months or less until expiration were **destroyed**, because according to CW1, such products "had no value."  In light of the Company's own treatment of its short dated and expired products, it was wholly disingenuous of Medicis and E&Y to treat such products as "the **same, quality, kind and price**" as fresh, unexpired product.

44.    Dr. Joshua Ronen, an eminent Professor of Accounting and former Peat Marwick Faculty Fellow at the New York University's Leonard N. Stern School of Business, reviewed the Company's restatement, as set forth in Medicis's Form 10K/A for the fiscal year ended December 31, 2007 and its previous unamended 10-K for the same period, as well as the Company's September 24, 2008 press release regarding its restatement.  In light of that review, and in reliance on allegations of the Complaint,  Dr. Ronen  made the following assessment:

> In reviewing the Company's statements regarding its accounting for return reserves for short dated and expired product during the Class Period, it is my opinion that the only correct accounting treatment for the product exchange is the one governed by SFAS 48.    Under this standard, the exchanges should have been accounted for as a reduction in revenue and cost of sales to reflect estimated returns.
>
> ＊＊＊＊＊＊
>
> Treatment of the exchange transactions as returns under the exclusion provided in footnote 3 of SFAS 48 "exchanges by ultimate customers of one item for another of the same kind, quality and price" is clearly inappropriate:    Neither the wholesale customers of Medicis are "ultimate customers" nor is the quality of the products subject to exchanges the same "quality kind or price."  Hence, neither Medicis nor Ernst & Young had a sound basis to conclude that the exclusion of

footnote 3 was applicable to Medicis's transactions.

**Medicis's Competitors Properly Reserved For Expired Product**

45.     In light of the simplicity of SFAS 48, and the obvious fact that that expired goods are not of the "same, quality, kind and price" as its unexpired counterparts, Medicis's competitors overwhelmingly accounted for returns of expired products during the Class Period by reducing its gross sales, in accordance with SFAS 48.

46.     For example, Johnson & Johnson, one of Medicis's main competitors, stated in its 10K for the period ending December 31, 2007, that "[p]rovisions for certain rebates, sales incentives, trade promotions, coupons, ***product returns and discounts to customers are accounted for as reductions in sales in the same period the related sales are recorded.***" (Johnson & Johnson, 10K filed dated 2/26/08, page 44.    Teva Pharmaceutical Industries, Ltd. ("Teva"), one of the largest prescription drug manufacturers in the world "record[ed] a reserve for estimated sales returns in accordance with the provision of [S]FAS 48, "Revenue Recognition When Right of Return Exists"" (Teva Pharmaceutical Industries 20-F dated 2/28/08, page 67).

Notably, Allergan, Inc., ***a company audited by E&Y***, made provisions for returns ***"based upon historical patterns of products returned matched against the sales from which they originated***." (Allergen, Inc. 10-K dated 2/28/08, page 45) (emphasis added).  There are scores of other examples of Medicis's competitor's getting it right, such as Impax Laboratories, Inc. (Impax 10-K filed on 3/15/04, page 32, "our returned goods policy requires prior authorization for the return, with ***corresponding credits being issued at the original invoice prices***") (emphasis added), KV Pharmaceutical Company ("KV") (KV 10-K filed on March 25, 2009, pp. 29-30, 69), and others.

47.     While there were a few companies that appear to have incorrectly utilized the exception provided by footnote 3 of SFAS 48, they are distinguished from Medicis in that they (i) actually disclosed to investors their methodology for reserving for returns of expired products, as opposed to Medicis which left investors completely in the dark regarding its dubious accounting methodologies, (ii) did not have liabilities for exchange returns in material amounts, which unlike Medicis did not necessitate a restatement of their financials or SEC action; (iii) had direct sales to end users, unlike Medicis which did not report any direct sales much less the majority of its sales.

48.     For example, Questcor Pharmaceuticals, Inc. ("Questcor"), a pharmaceutical company audited by E&Y, alerted investors in its 10-K's for fiscal years 2004 through 2007 that for products sold prior to May 31, 2004, "the estimated costs for such potential exchanges, which included actual product costs and related shipping charges, were included in cost of product sales." (Questcor 10-K filed on March 18, 2008, page 20-21).  The return product liability for these pre-May 31, 2004 products was a mere $11,000.  Thus the impact of the misuse of footnote 3 by Questcor was not material under Accounting Principles Board Opinion No. 20, and therefore did not require a restatement or incur any regulatory action.  Indeed, in correspondence with the SEC, Questcor stated that the liabilities for its product exchange policy in fiscal 2003 and 2004 were not material amounts. For sales since May 31, 2004, *i.e.*, for the financial statements filed with the SEC during the last four years of the Medicis Class Period, Questcor gave full credit for product returns. Indeed, Questcor's three largest wholesale customers, which accounted for 88% of Questcor's accounts receivables and 81% of

Questcor's gross sales during 2004, insisted on return of the full sales price. Accordingly, since May 31, 2004, Questcor has accounted for product returns pursuant to SFAS 48, recording such returns "as a liability as shipments occur with a corresponding reduction in gross product sales." *Id.* Moreover, some of Questcor's sales were direct sales.

49.     Heska Corporation ("Heska"), a maker of veterinarian products, stated in its 10-K for the fiscal year ended 2007, "[w]e record an accrual for the estimated cost of replacing the expired product expected to be returned in the future . . ." (Heska 10-K filed on March 3, 2008, page 29).   Unlike Medicis, Heska has direct sales to veterinarians, which amounted to 49% of its sales in the 2007 fiscal year, and 23% by other distribution relationships.   Only 28% of its sales were by third-party distributors.   Accordingly, Heska arguably has a basis to invoke footnote 3 of SFAS 48 as it has a majority of its sales to end users and not wholesalers like Medicis.   Moreover, unlike Medicis, it disclosed both the fact that it accrued for replacement cost and that the majority of its sales were to end users.

**Medicis's Misleading Disclosures Regarding Its Reserve Accounting Policies**

50.     In contrast, Medicis never disclosed to investors that it was exploiting an exclusion to SFAS 48, and considered unsalable, expired drugs as of the same "quality, kind and price" as a new product.   Moreover, it never alerted investors that it was reserving for returns based on replacement costs, rather than as a deduction from gross sales.   Indeed, its disclosures regarding the Company's return policies were purposefully crafted to lead investors to believe that it was reserving for returns by reducing gross

sales, in accordance with SFAS 48.  In its 10-K for the year ending December 31, 2007, the Company made the following statements regarding its return reserve policy:

> The Company's customers consist primarily of large pharmaceutical wholesalers who sell directly into the retail channel. Provisions for estimates for product returns and exchanges, sales discounts, chargebacks, managed care and Medicaid rebates and consumer rebates and loyalty ***programs are established as a reduction of product sales revenues at the time such revenues are recognized. These deductions from gross revenue are established by the Company's management as its best estimate at the time of sale based on historical experience adjusted to reflect known changes in the factors that impact such reserves, including but not limited to, prescription data, industry trends, competitive developments and estimated inventory in the distribution channel.*** The Company's estimates of inventory in the distribution channel are based on historical shipment and return information from its accounting records and data on prescriptions filled, which the Company purchases from one of the leading providers of prescription-based information. The Company also utilizes projected prescription demand for its products, as well as, written and oral information obtained from certain wholesalers with respect to their inventory levels and the Company's internal information. These deductions from gross revenue are generally reflected either as a direct reduction to accounts receivable.
>
> ***Provisions for estimates for product returns and exchanges, sales discounts, chargebacks, managed care and Medicaid rebates and consumer rebate and loyalty programs are established as a reduction of product sales revenues at the time such revenues are recognized.*** These deductions from gross revenue are established by us as our best estimate at the time of sale based on historical experience adjusted to reflect known changes in the factors that impact such reserves, including but not limited to, prescription data, industry trends, competitive developments and estimated inventory in the distribution channel.

(emphasis added).

51.   Nothing in these statements even suggests that Medicis was utilizing an exclusion from SFAS No. 48 when reserving for returns.  Moreover, Medicis made no

mention of the fact that it was reserving for returns at replacement costs, rather than as a reduction from gross revenues.  Indeed, the Company specifically stated that its provisions for product returns "*are established as a reduction for product sales revenues at the time such reserves are recognized*."

52.     Dr. Joshua Ronen, of NYU's Stern Business School, made the following observation regarding the disclosures in the Company's 10-K: "a reasonable accounting professional reading Medicis's statements regarding its policies for return reserves would have assumed that the Company was reserving for expired and short dated products in conformity with SFAS 48, and not pursuant to the exclusion set forth in footnote 3. There is nothing in the Company's 10-K that would have led a reasonable accounting professional to the conclusion that the Company was reserving for returns based upon replacement costs, rather than deducting anticipated returns from gross sales."

53.     Thus, Medicis's statements throughout the Class Period regarding its return reserves intentionally or recklessly led investors into believing that the Company was reserving in accordance with SFAS. No. 48, which as the company later acknowledged, was not true.

**Medicis's Channel Stuffing Practices Necessitated Its Faulty Reserve Accounting**

54.     Medicis placed tremendous pressure on its accounting and sales staff to project an image of a Company that was consistently profitable, and which consistently met analyst expectations.  According to CW1, Medicis's "executive management was under a lot of pressure to meet expectations on the Street."  CW1 relates that "There was an overall expectation on the Company" as a whole that the Company would do as well

or better than the prior quarter. "You could feel it through the entire Company." The Company emphasized the importance of having consecutive quarters without reporting a fiscal loss. According to CW1, the Company's management "celebrated each quarter that they didn't have a loss." CW1 recalls the company celebrating its 20th consecutive quarter without a loss. Indeed, from fiscal year 2000 until November 2006, the Company did not report a loss for a fiscal quarter.

55.     The Company achieved these consistent results by stuffing the channel, and according to CW5, booking revenues as products sold "just because it went out the door." The Company's consistent stuffing of the channel led to excessive returns by its customers.

56.     According to CW5, Medicis monitored the sales from its wholesale customers to end users such as dermatologists by tracking script sales. Medicis's order sales reflected product purchases by wholesale distributors. Script sales, or script data, however, reflected the number of Medicis products physicians purchased from the Company's distributors. According to CW5, "script sales were never in line with order sales." For example, the script data might have shown the sale of thirty units of a certain drug sold to physicians, while Medicis's corresponding order data showed a sale of 400 units to the Company's wholesale customers. CW5 relates that the data showed that Medicis was selling far more product than its wholesale customers were able to sell and that extra inventory was sitting on the shelves somewhere.

57.     Generally, the Company stuffed the channel by ramping up its "sales" at the end of the quarter. CW1 recalls that there were an excessive amount of shipments in

the last two weeks of each quarter.  CW1 was often unable to properly forecast for inventory during this period because "so much went out the door (at the end of) the (last) month."  It was difficult to properly predict inventory return levels because "everything was in the air" at the end of the quarter.  CW6 further confirms that "most of Medicis's sales were done" the last month of the quarter.  CW7 also noted that Medicis made "big deals on all product to get stuff out the door" at the end of the quarter.

58.    In order to induce its wholesale customers to accept the excess inventory, Medicis allowed for a liberal return policy regarding returned expired products, including permitting the exchange of short dated or expired products for fresher product at no cost to the customer.  According to CW2, if a customer returned a product, Medicis's ordering department created a credit memo acknowledging a financial credit.  However, if the Company was able to convince the customer to exchange or "swap" the product, Medicis reshipped the new product at "zero dollar value", *i.e.*, at no cost to the customer.  Medicis would create a "zero dollar invoice" for the new product being shipped to the customer.  According to CW2, the zero dollar invoices "created a wash on the books."

59.    CW7 was involved in the Company's handling of "swap" arrangements for customers.  According to CW7, a customer would contact Medicis's customer service department to notify the Company of its intent to return short dated or expired product.  Customer service sent the order control department the customer's order form for new product.  CW7 keyed in codes from the form into the Company's Epicor system so that accounting would know not to charge the customer for the new product.  CW7 knew that she was handling a swap because "a different code was entered into one of the fields that

triggered the accountant to book as a no dollar sale." According to CW6, approximately 25% of Medicis's credit returns were "swaps."

**Medicis Employees Realized That The Company's Accounting Was Improper**

60.    During the Class Period, numerous Medicis personnel realized that the Company's accounting practices relating to the recognition of revenues and reserves for swap sales was a sham. CW2 stated that instead of creating a zero dollar invoice for the fresh product exchanged for the expired product, the Company should have matched the market value of the new product and credit the customer accordingly. "If a customer returned a product six months after expiration, but Medicis's price (for the returned product) had increased or decreased at the time, they are not acknowledging a price increase or decrease." According to CW2, Medicis's method for return accounting "makes it easy, but not correct."

61.    According to CW1, Medicis encouraged its customers to engage in swaps so that it did not have to record a credit on its books. A credit was a counter-sale, which reduced net sales and the company did not want to reduce net sales. While at the Company, CW1 questioned whether it was really accurate to account for the swap as an even exchange when the new product was not of the same value as the returned product, which was expired or soon to be expired. In CW1's words "is it really accurate to say this is an even exchange when the value (of the product) is so different than it was a year ago?". According to CW1, the Company was "inflating revenues and not recognizing enough liabilities." The Company "was not looking at all the factors impacting reserves."

62.    CW1 questioned her supervisors as to whether Medicis should even be recognizing the swaps as revenue because the customers hadn't recognized a need for the products.  She was told by her supervisors, "I don't care if you agree with it or not."  On other occasions CW1 asked her supervisors for a rational as to the Company's reserve policies.  They refused to give one, leading her to believe that "something shady was going on."  On at least one occasion, CW1 refused to book a reserve because she felt that it was not in compliance with the relevant accounting principles.  When questioning Barely and Songstand regarding the appropriateness of the Company's reserve practices, she was told to "just book it."  Barley and Songstad ended up booking certain return reserves because CW1 refused to do it.

63.    CW5 related that Medicis booked the "swap" sale as revenue even though "you know this stuff is going to come back," albeit in another quarter.  According to CW#5, the Company was "inflating sales by booking revenue for product that the Company knew was going to be returned."  Medicis "was not reserving for these potential returns," and the Company "should not have been recognizing revenue in the first place."  CW5's assessment was that the Company clearly "ignored mechanisms to manage channel stuffing" because Medicis "always sold to a target.  The Company was driven by the (sales) numbers."

**Medicis's & E&Y's Knowledge of the Reserve Manipulations**

64.    CW5 recalls that the Company's calculation of reserves was "always an issue" at Medicis throughout the Class Period.  Medicis's internal auditors, repeatedly asked CW5 to extract data from the Company's Epicor and SAP systems because they

had issues with Medicis's reserve calculations.   According to CW5, the Company's reserve calculations "was always a point of contention from a revenue standpoint" between Medicis's internal auditors and Barley and Stongstad.   CW 5 relates that Defendant Peterson was aware of the dispute between the internal auditors and the Company's accounting personnel regarding the reserve calculations.

65.   E&Y was also acutely aware of the inherent difference in accounting treatment for fresher product and short dated or expired product with respect to Medicis's financial reporting for reserves.  According to CW4, in 2005, E&Y recommended that the Company institute a new reserve for inventory that the Company might not be able to sell before expiring or becoming-short dated.   In light of this recommendation, Medicis created an "expiring inventory reserve."

66.   In addition, prior to CW1's departure, E&Y auditors asked CW1 a number of questions regarding return reserves.  The auditors asked CW1 for reports and evidence of the Company's reserve methodology and reconciliations.   CW1, not feeling comfortable with the Company's accounting practices, deferred the auditors to Barley and Songstad.

**Defendants' False and Misleading Statements**

67.   On October 30, 2003, the Company issued a press release announcing its financial results for the first quarter of fiscal 2004 ended September 30, 2003. The Company reported net revenue of $63.3 million with net income of $10.3 million, or $0.36 per diluted share, absent a $37.5 million tax-effected loss associated with the early extinguishment of debt. Including the loss on early extinguishment of debt, the Company

reported a net loss of $27.2 million, or $1.00 per diluted share. In the first quarter of fiscal 2003, Medicis reported net revenues of $58.7 million with net income of $15.3 million, or $0.54 per diluted share, absent a $3.4 million tax-effected special charge associated with a research and development collaboration.  Defendant Shacknai touted the Company's ability to achieve " another solid quarter, with results surpassing street consensus estimates."

68.     The Company announced working capital of $594.6 million for the end of the period.

69.     On November 14, 2003, the Company filed its quarterly report for the first quarter of fiscal 2004 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

70.     On January 22, 2004, the Company announced its financial results for the second quarter of fiscal 2004 ended December 31, 2003.  Defendant Shacknai touted Medicis's "strong quarter, driven by sales growth in our core brands."  The Company reported the following:

> net revenues of $70.6 million with "if-converted" net income of $16.0 million, or $0.25 per diluted share, absent a $1.6 million tax-effected special charge associated with a research and development collaboration, compared to second quarter fiscal 2003 net revenues of $59.5 million with net income of $15.3 million, or $0.27 per diluted share. Including the tax-effected special charge of $1.6 million, the Company reported net income of $13.6 million, or $0.23 per diluted share for the

second quarter of fiscal 2004. Second quarter fiscal 2004
diluted per share amounts are calculated using the "if-
converted" method of accounting in accordance with
Generally Accepted Accounting Principles ("GAAP") due to
the outstanding 2.5% Convertible Senior Notes meeting the
criteria for conversion, regardless of whether the bondholders
actually convert their bonds into shares. Second quarter fiscal
2003 diluted per share amounts do not reflect the "if-
converted" method, as the criteria for conversion had not
been met.

71.     The Company announced working capital of $574,269,000 for the end of
the period.

72.     On February 17, 2004, the Company filed its quarterly report for the second
quarter of fiscal 2004 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the
previously announced financial results and was signed by defendants Shacknai and
Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed
certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not
contain any material misrepresentations.

73.     On April 29, 2004, the Company announced its financial results for the
third quarter of fiscal 2004 ended March 31, 2004.   Defendant Shacknai touted Medicis's
"very solid quarter."  The Company reported the following:

revenues of $81.8 million with "if-converted" net income of
$21.5 million, or $0.33 per diluted share, compared to third
quarter fiscal 2003 revenues of $62.6 million with net income
of $15.8 million, or $0.28 per diluted share, absent a $5.5
million tax-effected special charge reported in third quarter
fiscal 2003 associated with a research and development
collaboration. Including the tax-effected special charge of
$5.5 million, the Company reported Generally Accepted
Accounting Principles ("GAAP") net income of $10.2
million, or $0.18 per diluted share for the third quarter of
fiscal 2003. Third quarter fiscal 2004 diluted per share

amounts are calculated using the "if-converted" method of accounting in accordance with GAAP due to the outstanding 2.5% Convertible Senior Notes meeting the criteria for conversion, regardless of whether the bondholders actually convert their bonds into shares. Third quarter fiscal 2003 diluted per share amounts do not reflect the "if-converted" method, as the criteria for conversion had not been met.

74.   The Company announced working capital of $628.2 million for the end of the period.

75.   On May 12, 2004, the Company filed its quarterly report for the third quarter of fiscal 2004 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki.  In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

76.   On August 24, 2004, the Company announced its financial results for the fourth quarter and full year of fiscal 2004 ended June 30, 2004.  Defendant Shacknai touted Medicis's "strongest quarter and fiscal year in the Company's history."   The Company reported the following:

net revenue growth of approximately 32% to $88.0 million with "if-converted" net income of $24.5 million, or $0.37 per diluted share. The Company reported Generally Accepted Accounting Principles ("GAAP") net income for the fourth quarter fiscal 2004 of $23.7 million. Included in net income is a tax-effected loss of approximately $249,000 associated with the loss on sale of certain product rights. The Company reported fourth quarter fiscal 2003 net revenues of $66.7 million with net income of $17.1 million, or $0.30 per diluted share, absent a $3.3 million tax-effected special charge reported during the fourth quarter of fiscal 2003 associated with a research and development collaboration. Including the

$3.3 million tax-effected special charge reported during the fourth quarter of fiscal 2003, Medicis reported GAAP net income of $13.9 million, or $0.24 per diluted share for fourth quarter fiscal 2003.

For fiscal year 2004, Medicis reported net revenue growth of approximately 23% to $303.7 million with "if-converted" net income of $73.2 million, or $1.13 per diluted share, absent a $37.5 million tax-effected loss associated with the early extinguishment of debt reported in the first quarter of fiscal 2004 and absent a $1.6 million tax-effected special charge associated with a research and development collaboration reported in the second quarter of fiscal 2004. Included in net income is a tax-effected loss of approximately $249,000 associated with the loss on sale of certain product rights. Including the special charges and the loss on sale of certain product rights, the Company reported GAAP net income of $30.8 million, or $0.52 per diluted share for fiscal 2004.

Comparatively, Medicis reported fiscal 2003 net revenues of $247.5 million with net income of $63.5 million, or $1.13 per diluted share, absent a $12.2 million tax-effected special charge reported during fiscal 2003 associated with research and development collaborations. Including the tax-effected special charge of $12.2 million reported during fiscal 2003, the Company reported GAAP net income of $51.3 million, or $0.91 per diluted share for fiscal 2003.

Fourth quarter and fiscal year-end 2004 diluted per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP due to the outstanding 2.5% Convertible Senior Notes meeting the criteria for conversion, regardless of whether the bondholders actually convert their bonds into shares. For the year ended June 30, 2004, the dilutive shares relative to the convertible notes do not impact GAAP earnings per share, as they are anti-dilutive. Fourth quarter and fiscal year-end 2003 diluted per share amounts do not reflect the "if-converted" method, as the criteria for conversion had not been met.

77.     The Company also announced working capital of $666,743,000 at the end of the period.

78.     On September 10, 2004, the Company filed its annual report for fiscal 2004 with the SEC on a Form 10-K.  The Form 10-K reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki.  In addition, pursuant to the SOX, the Form 10-K contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-K did not contain any material misrepresentations.  Defendant Ernst & Young issued an unqualified audit opinion that the financial statements complied with GAAP.

79.     The Company made the following statement regarding accounting for returns of expired product:

> We believe the following critical accounting policies affect our most significant estimates and assumptions used in the preparation of our consolidated financial statements and are important in understanding our financial condition and results of operations.
>
> Provisions for early payment discounts, and estimates for chargebacks, managed care and Medicaid rebates, damaged product returns, exchanges for expired product ***are established as a reduction of product sales revenues at the time such revenues are recognized***. These revenue reductions are established by us as our best estimate at the time of sale based on historical experience adjusted to reflect known changes in the factors that impact such reserves.

(emphases added).

80.     The statements referenced above in ¶¶ 67 to 79 were each materially false and misleading because they:

a)      Failed to disclose that the Company was reserving for expired or short dated product based upon replacement costs rather than as a reduction of gross sales or revenue as mandated by SFAS. 48;

b)      Misrepresented to investors that the Company's reserves were established "as a reduction of product sales revenues" in accordance with SFAS No. 48 rather than as an expense calculated by replacement costs;

c)      Failed to disclose that Medicis had stuffed more product into the channel than normal sales could bear, creating an overhang of product that would expire and return to Medicis as an exchange;

d)      improperly utilized the exclusion provided by Footnote 3 of SFAS 48 to account for its swaps of expired products as warranty exchanges as opposed to returns even though such products were not returned by "ultimate customers," but rather by the Company's standard wholesale customers and were not of the "same quality, kind and price" because expired and short dated products were unsalable as opposed to their fresher, unexpired counterparts; and

e)      improperly inflated the Company's reported working capital.

81.     On October 19, 2004, the Company announced its results for the first quarter of fiscal 2005 ended September 30, 2004.  Defendant Shacknai stated that he was "pleased to announce a solid first quarter in line with our expectations as we begin our fiscal 2005 year."  The Company reported the following results:

> net revenue growth of approximately 40% to $88.8 million with "if-converted" net income of $21.2 million, or $0.32 per diluted share, absent a $19.4 million tax-effected special charge associated with the SubQ(TM) transaction. Including this special charge, the Company reported Generally Accepted Accounting Principles ("GAAP") net income of $1.0 million, or $0.02 per diluted share. In the first quarter of fiscal 2004, Medicis reported net revenues of $63.3 million with net income of $10.3 million, or $0.18 per diluted share, absent a $37.5 million tax-effected loss associated with the

early extinguishment of debt. Including the loss on early extinguishment of debt, the Company reported a first quarter fiscal 2004 GAAP net loss of $27.2 million, or $0.50 per diluted share.

82.     The Company also reported working capital of $611,574,000 at the end of the period.

83.     On November 9, 2004, the Company filed its quarterly report for the first quarter of fiscal 2005 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

84.     On January 20, 2005, the Company issued a press release announcing financial results for its second quarter of fiscal 2005 ended December 31, 2004. Defendant Shacknai touted the Company's "solid second quarter."   The Company announced the following financial results:

> net revenue growth of approximately 31% to $92.3 million with "if-converted" net income of $25.4 million, or $0.36 per diluted share, absent a $3.5 million tax-effected special charge associated with a research and development collaboration, compared to second quarter fiscal 2004 net revenues of $70.6 million with "if-converted" net income of $16.9 million, or $0.24 per diluted share, absent a $1.6 million tax-effected special charge associated with a research and development collaboration. Including the tax-effected special charge of $3.5 million, the Company reported Generally Accepted Accounting Principles ("GAAP") net income of $20.2 million, or $0.31 per diluted share for the second quarter of fiscal 2005. Including the tax-effected special charge of $1.6 million, the Company reported GAAP net income of $13.6 million, or $0.21 per diluted share for the

second quarter of fiscal 2004. Diluted per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP.

85.     The Company also announced that its working capital for the end of the period was $552,391,000.

86.     On February 9, 2005, the Company filed its quarterly report for the second quarter fiscal 2005 with the SEC on a Form 10-Q.   The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

87.     On April 20, 2005, the Company issued a press release announcing financial results for its third quarter of fiscal 2005 ended March 31, 2005.   Defendant Shacknai boasted of "another strong quarter" for Medicis.   The Company's reported the following financial results:

net revenue growth of approximately 16% to $95.2 million with net income of $24.3 million, or $0.37 per diluted share, absent a $5.0 million tax-effected special charge associated with a research and development collaboration with aaiPharma, compared to third quarter fiscal 2004 revenues of $81.8 million with net income of $20.7 million, or $0.31 per diluted share. Including the $5.0 million tax-effected special charge associated with the research and development collaboration, the Company reported Generally Accepted Accounting Principles ("GAAP") net income of $19.4 million, or $0.30 per diluted share for the third quarter of fiscal 2005. Diluted per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP.

88.     The Company reported working capital of $572,514,000 for the end of the period.

89.     On May 10, 2005, the Company filed its quarterly report for the third quarter of fiscal 2005 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki.  In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

90.     On September 1, 2005, the Company issued a press release announcing financial results for its fourth quarter and full year of fiscal 2005 ended June 30, 2005. Regarding the Company's financial results, Defendant Shacknai stated "[w]e are pleased to announce another solid fiscal year of revenue growth."   The Company reported the following financial results:

> revenue growth of approximately 14.3% to $100.5 million with net income growth of approximately 17.1% to $27.8 million, or $0.43 per diluted share, absent a $3.4 million tax-effected special charge associated with integration planning costs in connection with the proposed merger with Inamed Corporation, compared to fourth quarter fiscal 2004 revenue of $88.0 million with net income of $23.7 million, or $0.34 per diluted share. Including the $3.4 million tax-effected special charge associated with the merger integration planning costs, the Company reported Generally Accepted Accounting Principles ("GAAP") net income of $24.4 million, or $0.38 per diluted share for the fourth quarter of fiscal 2005, compared to fourth quarter fiscal 2004 GAAP net income of $23.7 million, or $0.34 per diluted share. Diluted per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP.

***

For the year ended June 30, 2005, Medicis reported revenue growth of approximately 24.1% to $376.9 million with net income growth of approximately 37.6% to $96.2 million, or $1.45 per diluted share, absent a $27.8 million tax-effected special charge associated with research and development collaborations and absent a $3.4 million tax-effected special charge associated with the merger integration planning costs, totaling $31.2 million. Including the tax-effected special charges of $31.2 million reported in fiscal 2005, Medicis reported GAAP net income of $65.0 million, or $1.01 per diluted share for fiscal 2005.

Comparatively, for fiscal 2004, Medicis reported revenue of $303.7 million with net income of $69.9 million, or $1.06 per diluted share, absent a $37.5 million tax-effected loss associated with the early extinguishment of debt reported in the first quarter of fiscal 2004 and absent a $1.6 million tax-effected special charge associated with a research and development collaboration reported in the second quarter of fiscal 2004, totaling $39.1 million. Including the tax-effected special charges of $39.1 million and the loss on sale of certain product rights, the Company reported GAAP net income of $30.8 million, or $0.52 per diluted share for fiscal 2004.

91.    The Company reported working capital of $600,070,000 for the end of the period.

92.    In an earnings conference call also held on September 1, 2005, Defendants Shacknai and Prygocki each represented to analysts that there was no channel stuffing. In response to an inquiry as to whether there was "unusual stocking" by the distributors, Defendant Shacknai said "No – no unusual stocking that we are aware of.  And Mark is in the business of monitoring levels . . . "   Defendant Prygocki responded " . . .  our inventory levels in the trade are reasonable.  We have said that consistently."

93.    On September 12, 2005, the Company filed its annual report for fiscal 2005 with the SEC on a Form 10-K. The Form 10-K reiterated the previously announced

financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-K contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-K did not contain any material misrepresentations. Defendant Ernst & Young issued an unqualified audit opinion stating that the financial statements in the 10-K complied with GAAP.

94. Regarding the Company's policies for reserving for exchanges of expired or short dated products, the Company made the following statements:

> We believe the following critical accounting policies affect our most significant estimates and assumptions used in the preparation of our consolidated financial statements and are important in understanding our financial condition and results of operations.
>
> *******
>
> Provisions for estimates for product returns and exchanges, sales discounts, chargebacks, managed care and Medicaid rebates and other adjustments are ***established as a reduction of product sales revenues at the time such revenues are recognized***. These deductions from gross revenue are established by us as our best estimate at the time of sale based on historical experience adjusted to reflect known changes in the factors that impact such reserves. ***These deductions from gross revenue are generally reflected either as a direct reduction to accounts receivable through an allowance***, or as an addition to accrued expenses if the payment is due to a party other than the wholesale or retail customer.

95. The statements referenced above in ¶¶ 81 to 94 were each materially false and misleading because they:

a)      failed to disclose that the Company was reserving for expired or short dated product based upon replacement costs rather than as a reduction of gross sales or revenue as mandated by SFAS. 48;

b)      misrepresented to investors that the Company's reserves were established "as a reduction of product sales revenues" in accordance with SFAS No. 48 rather than as an expense calculated by replacement costs;

c)      failed to disclose that Medicis had stuffed more product into the channel than normal sales could bear, creating an overhang of product that would expire and return to Medicis as an exchange;

d)      improperly utilized the exclusion provided by Footnote 3 of SFAS 48 to account for its swaps of expired products as warranty exchanges as opposed to returns even though such products were not returned by "ultimate customers," but rather by the Company's standard wholesale customers and were not of the "same quality, kind and price" because expired and short dated products were unsalable as opposed to their fresher, unexpired counterparts; and

e)      improperly inflated the Company's reported working capital.

96.     On November 8, 2005, the Company issued a press release announcing financial results for its first quarter of fiscal 2006 ended September 30, 2005.  Touting the Company's "solid first quarter," the Company announced the following financial results:

> revenue of $83.3 million and "if-converted" net income of $19.6 million, or $0.28 per diluted share, absent $5.1 million in tax-effected FAS 123R share-based compensation expenses and absent $0.4 million in tax-effected integration planning costs. Including the $5.5 million in tax-effected FAS 123R share-based compensation expenses and integration planning costs, the Company reported Generally Accepted Accounting Principles ("GAAP") net income of $12.5 million, or $0.20 per diluted share, for the first quarter of fiscal 2006. In the first quarter of fiscal 2005, the Company reported revenue of $88.8 million and "if-converted" net income of $22.2 million, or $0.30 per diluted share, absent a

> $19.4 million tax-effected special charge associated with the SubQ(TM) transaction and $0.1 million of share-based compensation expense. Including these special charges, the Company reported GAAP net income of $1.0 million, or $0.02 per diluted share for the first quarter fiscal 2005.

97.     The Company reported working capital of $625,413,000 for the end of the period.

98.     On November 9, 2005, the Company filed its quarterly report for the first quarter of fiscal 2006 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

99.     On March 15, 2006, the Company issued a press release announcing financial results for its second quarter of fiscal 2006 ended December 31, 2005 which reflected the following financial results:

> revenue of approximately $80.7 million with "if-converted" net income of approximately $20.1 million, or $0.29 per diluted share, absent tax-effected special items of $18.8 million. The net impact of the special items resulted in an increase to net income and is more fully described below. This is compared to December 2004 quarter-end revenue of $92.3 million with "if-converted" net income of $25.4 million, or $0.36 per diluted share, absent tax-effected special charges of $3.6 million.

> Including the tax-effected special items of $18.8 million, the Company reported Generally Accepted Accounting Principles ("GAAP") net income of $37.3 million, or $0.56 per diluted share for the December 2005 quarter-end, compared to December 2004 quarter-end GAAP net income of $20.2 million, or $0.31 per diluted share. Diluted per share amounts

are calculated using the "if-converted" method of accounting in accordance with GAAP.

100. The Company reported working capital of $692,453,000 for the end of the period.

101. On March 16, 2006, the Company filed an annual transition report with the SEC on a Form 10-K/T for the transition period from July 1, 2005 to December 31, 2005. Specifically, effective December 31, 2005, the Company changed its fiscal year end from June 30 to December 31 to align its fiscal year end with other companies within its industry. The Form 10-K/T reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-K/T contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-K/T did not contain any material misrepresentations.  Defendant Ernst & Young issued an unqualified audit opinion stating that the financial statements contained in the 10-K/T complied with GAAP.

102. Regarding the Company's policies for reserving for exchanges of expired or short dated products, Defendants made the following statements:

> We believe the following critical accounting policies affect our most significant estimates and assumptions used in the preparation of our consolidated financial statements and are important in understanding our financial condition and results of operations.
>
> ****
>
> Provisions for estimates for product returns and exchanges, sales discounts, chargebacks, managed care and Medicaid rebates and other adjustments *are established as a reduction of product sales revenues at the time such revenues are recognized*. These deductions from gross revenue are established by us as our best estimate at the time of sale based

on historical experience adjusted to reflect known changes in the factors that impact such reserves. ***These deductions from gross revenue are generally reflected either as a direct reduction to accounts receivable through an allowance***, or as an addition to accrued expenses if the payment is due to a party other than the wholesale or retail customer.

(emphases added).

103.    The statements referenced above in ¶¶ 96 to 102 were each materially false and misleading because they:

a)      failed to disclose that the Company was reserving for expired or short dated product based upon replacement costs rather than as a reduction of gross sales or revenue as mandated by SFAS. 48;

b)      misrepresented to investors that the Company's reserves were established "as a reduction of product sales revenues" in accordance with SFAS No. 48 rather than as an expense calculated by replacement costs;

c)      failed to disclose that Medicis had stuffed more product into the channel than normal sales could bear, creating an overhang of product that would expire and return to Medicis as an exchange;

d)      improperly utilized the exclusion provided by Footnote 3 of SFAS 48 to account for its swaps of expired products as warranty exchanges as opposed to returns even though such products were not returned by "ultimate customers," but rather by the Company's standard wholesale customers and were not of the "same quality, kind and price" because expired and short dated products were unsalable as opposed to their fresher, unexpired counterparts; and

e)      improperly inflated the Company's reported working capital.

104.    On May 9, 2006, the Company issued a press release announcing financial results for its first quarter ended March 31, 2006.  The Company reported the following financial results:

> revenue of approximately $75.2 million with "if-converted" net income of approximately $14.0 million, or $0.20 per diluted share, absent tax-effected special charges of $100.9 million.... This is compared to revenue for the three months ended March 31, 2005 of $95.2 million with "if-converted" net income of $26.1 million, or $0.37 per diluted share, absent a tax-effected special charge of $5.0 million associated with a research and development collaboration and a tax-effected $0.1 million charge for share-based compensation expense related to restricted stock awards.
>
> Including the tax-effected special charges of $100.9 million, the Company reported a Generally Accepted Accounting Principles ("GAAP") net loss of $88.5 million, or $(1.63) per diluted share, for the three months ended March 31, 2006, compared to the three months ended March 31, 2005 GAAP net income of $19.4 million, or $0.30 per diluted share. Diluted per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP.

105.    The Company reported working capital of $615,255,000 for the end of the period.

106.    On May 10, 2006, the Company filed its quarterly report for the first quarter ended March 31, 2006 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

107.    On August 2, 2006, the Company issued a press release and corresponding Form 8-K with the SEC announcing financial results for its second quarter ended June 30, 2006.   Regarding the Company's financial performance for the period, Defendant Shacknai commented "we are pleased to announce another solid quarter." The Company's financial results were as follows:

> revenue of approximately $85.0 million with non-Generally Accepted Accounting Principles (non-"GAAP") "if-converted" net income of approximately $22.1 million, or $0.32 per diluted share. This is compared to revenue for the three months ended June 30, 2005 of $100.5 million with non-GAAP "if-converted" net income of $29.5 million, or $0.43 per diluted share.
>
> The Company reported GAAP net income of $15.5 million, or $0.25 per diluted share, for the three months ended June 30, 2006, compared to GAAP net income of $24.4 million, or $0.38 per diluted share, for the three months ended June 30, 2005. Diluted per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP.

108.    The Company reported working capital of $608,597,000 for the end of the period.

109.    On August 9, 2006, the Company filed its quarterly report for the second quarter ended June 30, 2006 with the SEC on a Form 10-Q.   The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

110.    On November 8, 2006, the Company issued a press release announcing financial results for its third quarter ended September 30, 2006.  The Company touted "another strong quarter," reporting that "if-converted" net income was:

> approximately $90.0 million, compared to $83.3 million for the three months ended September 30, 2005. Net loss computed in accordance with U.S. generally accepted accounting principles ("GAAP") for the three months ended September 30, 2006 was $20.7 million, or ($0.38) per share, compared to GAAP net income of $12.5 million, or $0.20 per diluted share for the three months ended September 30, 2005.

> Non-GAAP "if-converted" net income for the three months ended September 30, 2006 was approximately $19.4 million, or $0.28 per diluted share, compared to non-GAAP "if-converted" net income of $19.6 million, or $0.28 per diluted share for the three months ended September 30, 2005. Non-GAAP net income for the three months ended September 30, 2006 is adjusted for the write-off of long-lived assets described below ($52.6 million pre-tax; $33.5 million net of tax), and FAS 123R share-based compensation expense ($6.6 million pre-tax; $4.8 million net of tax). Total adjustments from GAAP net loss to non-GAAP net income is $59.2 million pre-tax and $38.4 million net of tax.

111.    The Company reported working capital of $575,430,000 for the end of the period.

112.    On November 9, 2006, the Company filed its quarterly report for the third quarter ended September 30, 2006 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

113.    On February 28, 2007, the Company issued a press release and corresponding Form 8-K with the SEC announcing financial results for its fourth quarter and year ended December 31, 2006.    Regarding the Company's financial results, Defendant Shacknai stated "we are pleased to announce strong results for the quarter and year end".  The Company reported the following financial results:

> revenue for the three months ended December 31, 2006 of approximately $99.1 million, compared to $80.7 million for the three months ended December 31, 2005. Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the three months ended December 31, 2006 was $17.9 million, or $0.27 per diluted share, compared to GAAP net income of $37.3 million, or $0.56 per diluted share for the three months ended December 31, 2005. Diluted per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP. FAS 123R share-based compensation expense was approximately $4.9 million for the three months ended December 31, 2006, or approximately $3.7 million after taxes, and approximately $0.05 per diluted share. The three months ended December 31, 2005 includes income associated with the break-up fee received by the Company upon the termination of the proposed merger with Inamed. FAS 123R share-based compensation expense decreased approximately 37% after taxes as compared to the same period in 2005.
>
> Non-GAAP earnings per diluted share for the three months ended December 31, 2006, adjusted only for FAS 123R share-based compensation expense, was approximately $0.33 per diluted share, compared to $0.29 per diluted share for the three months ended December 31, 2005.
>
> ***
>
>  Revenue for the twelve months ended December 31, 2006 was approximately $349.2 million, and net loss computed in accordance with GAAP was $75.8 million, or $1.39 per share. Due to the Company's net loss during the twelve months ended December 31, 2006, a calculation of diluted earnings per share is not required.

114.   The Company reported working capital of $575,430,000 for the end of the period.

115.   On March 1, 2007, the Company filed its annual report for 2006 with the SEC on a Form 10-K. The Form 10-K reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-K contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-K did not contain any material misrepresentations. Defendant Ernst & Young issued an unqualified audit opinion stating that the financial statements contained in the 10-K complied with GAAP.

116.   Regarding the Company's policies for reserving exchanges of expired or short dated products, Defendants made the following statements:

> We believe the following critical accounting policies affect our most significant estimates and assumptions used in the preparation of our consolidated financial statements and are important in understanding our financial condition and results of operations.
>
> ****
>
> Provisions for estimates for product returns and exchanges, sales discounts, chargebacks, managed care and Medicaid rebates and other adjustments ***are established as a reduction of product sales revenues at the time such revenues are recognized***. These deductions from gross revenue are established by us as our best estimate at the time of sale based on historical experience adjusted to reflect known changes in the factors that impact such reserves. ***These deductions from gross revenue are generally reflected either as a direct reduction to accounts receivable through an allowance***, or as an addition to accrued expenses if the payment is due to a party other than the wholesale or retail customer.

(emphases added).

117.   The statements referenced above in ¶¶ 104 to 116 were each materially false and misleading because they:

a)   failed to disclose that the Company was reserving for expired or short dated product based upon replacement costs rather than as a reduction of gross sales or revenue as mandated by SFAS. 48;

b)   misrepresented to investors that the Company's reserves were established "as a reduction of product sales revenues" in accordance with SFAS No. 48 rather than as an expense calculated by replacement costs;

c)   failed to disclose that Medicis had stuffed more product into the channel than normal sales could bear, creating an overhang of product that would expire and return to Medicis as an exchange;

d)   improperly utilized the exclusion provided by Footnote 3 of SFAS 48 to account for its swaps of expired products as warranty exchanges as opposed to returns even though such products were not returned by "ultimate customers," but rather by the Company's standard wholesale customers and were not of the "same quality, kind and price" because expired and short dated products were unsalable as opposed to their fresher, unexpired counterparts; and

e)   improperly inflated the Company's reported working capital.

118.   On May 8, 2007, the Company issued a press release announcing financial results for its first quarter ended March 31, 2007.  Regarding the Company's financial results, Defendant Shacknai stated "[w]e are pleased to begin the year with a strong first quarter."  The Company reported the following financial results for the period:

revenue for the three months ended March 31, 2007 of approximately $95.1 million, compared to approximately $75.2 million for the three months ended March 31, 2006. Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the three months ended March 31, 2007 was approximately $9.3 million, or approximately $0.15 per diluted share, compared to GAAP net loss of approximately $88.5 million, or approximately $1.63 per diluted share for the three months ended March 31, 2006. This compares to the Company's published guidance of approximately $95 million in revenue and approximately $0.12 in earnings per diluted share for the three months ended March 31, 2007. Diluted per share amounts are calculated using the "if-converted" method of accounting in accordance with GAAP.

Non-GAAP earnings per diluted share for the three months ended March 31, 2007, adjusted only for FAS 123R share-based compensation expense, was approximately $0.20 per diluted share. This compares to the Company's published guidance of approximately $0.18 in non-GAAP earnings per diluted share for the three months ended March 31, 2007. FAS 123R share-based compensation expense was approximately $5.5 million for the three months ended March 31, 2007, or approximately $3.6 million after taxes, and approximately $0.05 per diluted share.

119.    The Company reported working capital of $638,158,000 for the end of the period.

120.    On May 10, 2007, the Company filed its quarterly report for the first quarter ended March 31, 2007 with the SEC on a Form 10-Q. The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

121.   On August 7, 2007, the Company issued a press release announcing financial results for its second quarter ended June 30, 2007,  touting a "solid second quarter."  The Company announced the following financial results:

> revenue for the three months ended June 30, 2007 of approximately $108.9 million, compared to approximately $85.0 million for the three months ended June 30, 2006, representing a year-over-year increase of approximately 28%. This increase was primarily due to the successful launches of ZIANA(TM) and PERLANE(R) and the continued strength of SOLODYN(R). Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the three months ended June 30, 2007 was approximately $15.5 million, or approximately $0.24 per diluted share, compared to GAAP net income of $15.5 million, or $0.25 per diluted share, for the three months ended June 30, 2006.

122.   The Company reported working capital of $570,713,000 for the end of the period.

123.   In an earnings conference call on August 7, 2007, Defendant Prygocki falsely stated that "we weren't booking revenue in advance of future quarters or even our prescription trends.  So they're right in line with our prescription trends."

124.   On August 9, 2007, the Company filed its quarterly report for the second quarter ended June 30, 2007 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

125.   On November 7, 2007, the Company issued a press release announcing financial results for its third quarter ended September 30, 2007. The Company reported

revenue of approximately $120.4 million, compared to approximately $90.0 million for the three months ended September 30, 2006, representing a year-over-year increase of approximately 34% and GAAP net income was approximately $29.1 million, or approximately $0.43 per diluted share, compared to GAAP net loss of $20.7 million, or ($0.38) per diluted share, for the three months ended September 30, 2006.  Regarding the Company's financial results, Defendant Schacknai touted "another record revenue quarter" for the Company.

126.   The Company reported working capital of $734,824,000 for the end of the period.

127.   On November 9, 2007, the Company filed its quarterly report for the third quarter ended September 30, 2007 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-Q did not contain any material misrepresentations.

128.   On February 27, 2008, the Company issued a press release announcing financial results for its fourth quarter and year ended December 31, 2007. For the quarter, the Company reported revenue of approximately $140.3 million, compared to approximately $99.1 million for the three months ended December 31, 2006, representing an increase of approximately 42%.  Regarding the Company's results for the year, Defendant Shacknai stated "During 2007, our revenues and cash flow reached record levels."

129.   Also, the Company reported the following:

> net income in accordance with U.S. generally accepted accounting principles ("GAAP") for the three months ended December 31, 2007 was approximately $27.5 million, or approximately $0.41 per diluted share, compared to net income in accordance with GAAP of $17.9 million, or approximately $0.27 per share, for the three months ended December 31, 2006. Non-GAAP net income for the three months ended December 31, 2007 was approximately $36.8 million, or approximately $0.54 per diluted share, compared to GAAP and non-GAAP net income of $17.9 million, or $0.27 per diluted share, for the three months ended December 31, 2006....

***

> Revenues for the twelve months ended December 31, 2007 were approximately $464.7 million, compared to $349.2 million for the twelve months ended December 31, 2006, representing a year-over-year increase of approximately 33%. GAAP net income for the twelve months ended December 31, 2007 was $75.1 million, or $1.14 per diluted share, compared to a GAAP net loss of $75.8 million, or $1.39 per share for the twelve months ended December 31, 2006. Non-GAAP net income for the twelve months ended December 31, 2007 was approximately $88.3 million, or approximately $1.33 per diluted share, compared to non-GAAP net income of $53.0 million, or $0.85 per diluted share, for the twelve months ended December 31, 2006.

130.   The Company reported working capital of $460,079,000 for the end of the period.

131.   On February 29, 2008, the Company filed its annual report for 2007 with the SEC on a Form 10-K. The Form 10-K reiterated the previously announced financial results and was signed by defendants Shacknai and Prygocki. In addition, pursuant to the SOX, the Form 10-K contained signed certifications by defendants Shacknai and Prygocki, stating that the Form 10-K did not contain any material misrepresentations.

132.   Regarding the Company's policies for reserving for exchanges of expired or short dated products, Defendants made the following statements:

> We believe the following critical accounting policies affect our most significant estimates and assumptions used in the preparation of our consolidated financial statements and are important in understanding our financial condition and results of operations.
>
> ****
>
> Provisions for estimates for product returns and exchanges, sales discounts, chargebacks, managed care and Medicaid rebates and other adjustments ***are established as a reduction of product sales revenues at the time such revenues are recognized***. These deductions from gross revenue are established by us as our best estimate at the time of sale based on historical experience adjusted to reflect known changes in the factors that impact such reserves. ***These deductions from gross revenue are generally reflected either as a direct reduction to accounts receivable through an allowance***, or as an addition to accrued expenses if the payment is due to a party other than the wholesale or retail customer.

133.   The statements referenced above in ¶¶ 118 to 132 were each materially false and misleading because they:

    a)   failed to disclose that the Company was reserving for expired or short dated product based upon replacement costs rather than as a reduction of gross sales or revenue as mandated by SFAS. 48;

    b)   misrepresented to investors that the Company's reserves were established "as a reduction of product sales revenues" in accordance with SFAS No. 48 rather than as an expense calculated by replacement costs;

c)      failed to disclose that Medicis had stuffed more product into the channel than normal sales could bear, creating an overhang of product that would expire and return to Medicis as an exchange;

d)      improperly utilized the exclusion provided by Footnote 3 of SFAS 48 to account for its swaps of expired products as warranty exchanges as opposed to returns even though such products were not returned by "ultimate customers," but rather by the Company's standard wholesale customers and were not of the "same quality, kind and price" because expired and short dated products were unsalable as opposed to their fresher, unexpired counterparts; and

e)      improperly inflated the Company's reported working capital.

134.    On May 8, 2008, the Company issued a press release announcing financial results for its first quarter ended March 31, 2008. The Company reported revenue of approximately $131.3 million, compared to approximately $95.1 million for the three months ended March 31, 2007, representing an increase of approximately 38%. Defendant Shacknai touted "a solid first quarter" for the Company.    Medicis also reported the following:

> net income in accordance with U.S. generally accepted accounting principles ("GAAP") for the three months ended March 31, 2008 was approximately $22.1 million, or approximately $0.34 per diluted share, compared to net income in accordance with GAAP of approximately $9.3 million, or approximately $0.15 per diluted share, for the three months ended March 31, 2007.

> The GAAP net income for the three months ended March 31, 2008 included a charge for the reduction of the carrying value of our investment in Revance of approximately $2.9 million. Without that charge, our non-GAAP net income would have

been $24.9 million, or approximately $0.38 per diluted share. No income tax benefit was generated related to the 2008 charge. There were no adjustments to the GAAP net income of approximately $9.3 million, or $0.15 per diluted share, for the three months ended March 31, 2007.

135.   The Company reported working capital of $447,553,000 for the end of the period.

136.   On May 12, 2008, the Company filed its quarterly report for the first quarter ended March 31, 2008 with the SEC on a Form 10-Q.  The Form 10-Q reiterated the previously announced financial results and was signed by defendants Shacknai and Peterson. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Peterson, stating that the Form 10-Q did not contain any material misrepresentations.

137.   On August 5, 2008, the Company issued a press release announcing financial results for its second quarter ended June 30, 2008. Touting "another solid quarter," the Company reported revenues of approximately $132.5 million, compared to approximately $108.9 million for the three months ended June 30, 2007, representing an increase of approximately 22% and GAAP net income of approximately $10.0 million, or approximately $0.17 per diluted share, compared to GAAP net income of $15.5 million, or $0.24 per diluted share, for the three months ended June 30, 2007.

138.   The Company reported working capital of $415,582,000 for the end of the period.

139.   On August 11, 2008, the Company filed its quarterly report for the second quarter ended June 30, 2008 with the SEC on a Form 10-Q.  The Form 10-Q reiterated

the previously announced financial results and was signed by defendants Shacknai and Peterson. In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Shacknai and Peterson, stating that the Form 10-Q did not contain any material misrepresentations.

140.   The Company reported working capital of $447,079,000 for the end of the period.

141.   The statements referenced above in ¶¶ 134 to 140 were each materially false and/or misleading because they:

a)   failed to disclose that the Company was reserving for expired or short dated product based upon replacement costs rather than as a reduction of gross sales or revenue as mandated by SFAS. 48;

b)   misrepresented to investors that the Company's reserves were established "as a reduction of product sales revenues" in accordance with SFAS No. 48 rather than as an expense calculated by replacement costs;

c)   failed to disclose that Medicis had stuffed more product into the channel than normal sales could bear, creating an overhang of product that would expire and return to Medicis as an exchange;

d)   improperly utilized the exclusion provided by Footnote 3 of SFAS 48 to account for its swaps of expired products as warranty exchanges as opposed to returns even though such products were not returned by "ultimate customers," but rather by the Company's standard wholesale customers and were not of the "same quality, kind

and price" because expired and short dated products were unsalable as opposed to their fresher, unexpired counterparts; and

e)      improperly inflated the Company's reported working capital.

142.   As a result of the foregoing, the Company materially misstated the Company's reported revenues and earnings.

143.   The Company has admitted that its accounting during the Class Period was improper and restated its financial statements between 2003 and mid-2008 to correct for material errors in return reserve accounting.

**The Truth Emerges**

144.   On September 24, 2008, the Company shocked the market by announcing its intention to restate past financial statements for the annual, transition and quarterly periods for fiscal years 2003 through 2007 and the first and second quarters of 2008. Specifically, the Company disclosed the following in relevant part:

> The restatement relates to a modification in the Company's technical interpretation of the generally accepted accounting principles relating to sales return reserve calculations. The Company's prior accounting method, with respect to sales return reserves, accrued returns at replacement cost rather than deferring the gross sales price, based on the Company's view of the economic impact of returns on its business. In connection with the restatement, the Company is in the process of revising its reserve calculations to defer the gross sales value of the returned product.

> ***

> Management is in the process of analyzing the impact of the restatement on its previously reported financial statements. Based on the Company's preliminary analysis, subject to audit, it appears that the dollar value changes in sales return reserves, increases and decreases, are concentrated in periods from the year ending June 30, 2003, to the stub period ending

December 31, 2005. However, there will also be changes in the periods between January 1, 2006, and June 30, 2008. The actual amounts of adjustments to be made in any annual or quarterly period are being determined by management and will be audited and reviewed, as applicable, by Ernst & Young LLP.

*** 

The technical error in the interpretation of the authoritative literature related to the accounting for sales return reserves. This error was identified during an inspection of Ernst & Young LLP's audit of the Company's 2007 financial statements.

145.   On this news, Medicis's stock dropped $2.34 per share to close at $15.58 per share on September 24, 2008, a statistically significant, one-day decline of 13% on extremely high trading volume.

## POST-DISCLOSURE EVENTS CONFIRM THAT MISREPRESENTATIONS WERE MATERIAL TO INVESTORS

146.   In response to written questions by the SEC, Defendants clarified the nature of their accounting fraud.  In an October 7, 2008 letter sent from Defendant Peterson to Tabatha Atkins, a staff accountant at the SEC, a copy of which was filed on the SEC's EDGAR database, Defendants admitted:

a)     that the accounting deficiencies involved the "method of accounting for returns of short dated/expired goods in the periods covered by the financial statements was not in conformity with generally accepted accounting principles, as the returns for expired product did not qualify for warranty or exchange accounting, and, accordingly, under Statement of Financial Accounting Standards No. 48 ('SFAS 48'), the Company should have deferred the full sales price of the product for the amount of estimated returns";

b)     that Medicis had incorrectly "treated returns of short dated/expired goods as a warranty or exchanges at the estimated cost of the replacement product";

c)      that its outside accountants, Ernst & Young, had notified Medicis of the deficiency in advance of the September 24, 2008 disclosure;

d)      that they made the disclosure only because "the amounts involved were material under Staff Accounting Bulletin ('SAB') 99 for one or more periods" (also contending "[h]ad the preliminary estimate of the impact of the error not been determined to be material to any prior period, no Item 4.02 Form 8-K would have been required");

e)      that Medicis needed to "reconsider the adequacy of its previous assertions regarding its disclosure controls and procedures specific to all of the periods affected by the restatement in light of the errors and issues" and may need to modify or supplement its statements as to the adequacy of these controls.

**The Company's Restatement Shatter's Medicis's Image As a Company With Consistent, Reliable Growth and Ample Working Capital**

147.    On November 10, 2008, after the market closed, Medicis filed an amended annual report for 2007 on Form 10-K/A and amended quarterly reports for the first two quarters of 2008 on Form 10-Q/A, which materially shifted the revenue recognition for the past five years to reflect proper sales return reserve accounting.

| **Net revenues** (in millions) | Fiscal Year Ended 12/31/07 | Fiscal Year Ended 12/31/06 | Transition Period Ended 12/31/05 | Fiscal Year Ended 6/30/05 | Fiscal Year Ended 6/30/04 | Fiscal Year Ended 6/30/03 |
|---|---|---|---|---|---|---|
| Reported | $   464.7 | $   349.2 | $   164.0 | $   376.9 | $   303.7 | $   247.5 |
| Adjustment | (7.3) | 44.0 | 1.3 | (11.2) | 11.5 | (37.2) |
| Restated | $   457.4 | $   393.2 | $   165.3 | $   365.7 | $   315.2 | $   210.3 |

| **Diluted net income (loss) per share** (in dollars) | Fiscal Year Ended 12/31/07 | Fiscal Year Ended 12/31/06 | Transition Period Ended 12/31/05 | Fiscal Year Ended 6/30/05 | Fiscal Year Ended 6/30/04 | Fiscal Year Ended 6/30/03 |
|---|---|---|---|---|---|---|
| Reported | $   1.14 | $   (1.39) | $   0.76 | $   1.01 | $   0.52 | $   0.84 |
| Adjustment | (0.06) | 0.51 | 0.03 | (0.09) | 0.06 | (0.34) |
| Restated | $   1.08 | $   (0.88) | $   0.79 | $   0.92 | $   0.58 | $   0.50 |

148.    Significantly, the restatement indicates how the Company's actual figures belied Medicis's carefully sculpted image as a pharmaceutical Company of consistent and reliable growth – which could be relied upon to break its previously set revenue records.   For example, on November 7, 2007, the Company announced revenues of $120.4 million, compared to the prior quarter's revenue of $108.8M.     Defendant Shacknai, in an effort to artificially boost the Company's stock price, boasted that these figures represented "another record revenue quarter" for Medicis.     However, as demonstrated by the chart below, Medicis's restated revenue for the period ending September 30, 2007 was only $110.9M, ***3 million less than the Company's restated revenues of $113M for the prior quarter.***   Thus contrary to Shacknai's bluster, Medicis was indeed *not* experiencing yet "another revenue record quarter" – In fact its numbers were weak compare to the prior quarters.

### Medicis's Quarterly Revenues

| June 30, 2007 | | September 30, 2007 | |
|---|---|---|---|
| **As Previously Reported** | **As Restated** | **As Previously Reported** | **As Restated** |
| $ 108,864 | $ 113,606 | $ 120,422 | $ 110,983 |
| $ 15,523 | $ 18,540 | $ 22,761 | $ 16,993 |
| $ 0.24 | $ 0.28 | $ 0.34 | $ 0.26 |
| $ 570,713 | $ 543,628 | $ 734,824 | $ 701,972 |

149.    Similarly, the Company's shenanigan's allowed it to portray itself as a Company with steadily growing annual revenues.   As demonstrated in the chart below, which was gleaned from Medicis's 10K for the fiscal year ended June 30, 2004, the

Company's revenues *purported* a steady rise over the years.  By way of example, from 2002 to 2003, the Company reported that its revenues increased from $212.M to $247.52M, an impressive increase of 16.3%.

### Medicis's Reported Annual Revenues

**FISCAL YEAR ENDED JUNE 30,**

| 2004 | 2003 | 2002 | 2001 | 2000 |
|------|------|------|------|------|
| (in thousands, except per share amounts) | | | | |
| $  303,722 | $  247,539 | $  212,807 | $  167,802 | $  139,099 |

150.   In reality though, as demonstrated below, the Company's actual revenues for 2003 were 210.3M, which represented a decline from the prior year's revenues of 212.8M.

### Restated Annual Revenues

**FISCAL YEAR ENDED JUNE 30,**

| 2004 | 2003 | 2002 | 2001 | 2000 |
|------|------|------|------|------|
| (in thousands, except per share amounts) | | | | |
| $    315.2 | $    210.3 | $  212,807 | $  167,802 | $  139,099 |

151.   Thus, contrary to the Company's assertions, it was not experiencing steady, predictable growth, but was rather a Company's whose performance was far more erratic and unreliable.

152.   Moreover, the Company's working capital, a metric that Medicis reported on in each period of the Class Period, in order to give in investors a sense of the

Company's ability to meet its capital requirements as on ongoing concern, was materially overstated in each period throughout the Class Period as a result of the Company's slick attempt to avoid the dictates of SFAS 48.  The Chart below details how the Company's restatement impacted its reported working capital throughout the Class Period:

| Working capital (in millions) | Fiscal Year Ended 12/31/07 | Fiscal Year Ended 12/31/06 | Transition Period Ended 12/31/05 | Fiscal Year Ended 6/30/05 | Fiscal Year Ended 6/30/04 | Fiscal Year Ended 6/30/03 |
|---|---|---|---|---|---|---|
| Reported | $   460.1 | $   356.9 | $   692.5 | $   600.1 | $   666.7 | $   576.8 |
| Adjustment | (37.1) | (33.8) | (61.5) | (69.2) | (62.1) | (62.0) |
| Restated | $   423.0 | $   323.1 | $   631.0 | $   530.9 | $   604.6 | $   514.8 |

153.   The Form 10-K/A also admitted that there were material weaknesses in the Company's internal controls over financial reporting with respect to the sales return reserves, as CW 1, CW 2 and CW 5 stated were extant during the Class Period, and made evident to senior management in the accounting and finance department of the Company.

154.   The investors did not breathe a sigh of relief, but instead pushed shares lower the following day from $13.07 to $12.55.  At no point form the disclosure date to the present did shares ever recover their pre-disclosure values, indicating that the disclosure materially altered investors' assessment of Medicis's value.

**DEFENDANT ERNST & YOUNG'S FRAUDULENT AUDIT OPINIONS**

155.   Defendant Ernst & Young served as Medicis's independent auditor during the Class Period.  Ernst & Young acted in that capacity pursuant to the terms of engagement letters with Medicis which required Ernst & Young, among other things, to

audit the Company's financial statements in accordance with GAAS and the standards promulgated by the PCAOB, and to report the results of those audits to Medicis, its Board of Directors and the investing public.

156.   Ernst & Young performed audits of the consolidated financial statements of Medicis for its fiscal years ended June 30, 2003; June 30, 2004, June 30, 2005, December 31, 2005, December 31, 2006, and December 31, 2008.  For each of these years, Ernst & Young issued an Independent Auditors' Report ("Auditors' Report"), in which it stated that its audits of Medicis's financial statements had been conducted in accordance with GAAS or PCAOB standards, and that Medicis's consolidated financial statements conformed to GAAP.

157.   Defendant Ernst & Young knew from its audits of Medicis's financial statements, reviews of Medicis's financial controls, and discussions with Medicis management and Medicis internal auditors that Medicis was not properly booking sales reserves as was unquestionably required by SFAS 48, or in the event it lacked actual knowledge, lacked such knowledge only because it recklessly disregarded the truth that was presented to it.  This is despite the fact that E&Y's own client, Allergen, Inc. accounted for exchanges of expired and short dated prescription drugs by deducting such anticipated exchanges from gross sales.

158.   Nonetheless, for each of the annual statements identified herein filed during the Class Period, Defendant Ernst & Young fraudulently issued an unqualified audit opinion.

159.    Moreover, each year, Medicis stated that it was making "provisions for estimates for product returns and exchanges . . . . *as a reduction of product sales revenues at the time such revenues are recognized*", leading investors to believe that the Company was indeed reserving as a full reduction of gross sales, and not at replacement costs, as required by SFAS. 48. However, despite this outright misrepresentation, Ernst & Young continued to issue unqualified audit opinions throughout the Class Period, assisting the Company in defrauding its investors.

160.    In so doing Ernst & Young failed to comply with the "Objectives" and "Standards" which guide its work as auditors.  For example, FAS No. 1, ¶16 states:

> The function of financial reporting is to provide information
> that is useful to those who make economic decisions about
> business enterprises and about investments in or loans to
> business enterprises.  Independent auditors commonly
> examine or review financial statements and perhaps other
> information, and both those who provide and those who use
> that information often view an independent auditor's opinion
> as enhancing the reliability or credibility of the information.

161.    The Company has admitted the financial statements Defendant Ernst & Young certified were materially false, and that Ernst & Young was aware of the misapplication of GAAP with respect to the sales return reserves.

162.    As previously detailed herein at ¶ 78, on September 10, 2004, Medicis filed a Form 10-K with the SEC for the year ended June 30, 2004 ("FY2004 10-K").  The FY2004 10-K included Ernst & Young's Independent Auditors' Report, dated August 13, 2004, which stated, in pertinent part:

> We conducted our audits in accordance with the standards of
> the Public Company Accounting Oversight Board.  Those
> standards require that we plan and perform the audit to obtain

reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Medicis Pharmaceutical Corporation and subsidiaries at June 30, 2004 and 2003, and the consolidated results of their operations and their cash flows for each of the three years in the period ended June 30, 2004, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, present fairly in all material respects the information set forth therein.

163.    As previously detailed herein at ¶ 93, on September 12, 2005, Medicis filed a Form 10-K with the SEC for the year ended June 30, 2005 ("FY2005 10-K").  The FY2005 Y200410-K included Ernst & Young's Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements, dated September 9, 2005, which stated,  in pertinent part:

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Medicis Pharmaceutical Corporation and subsidiaries at June 30, 2005 and 2004, and the consolidated results of their operations and their cash flows for each of the three years in the period ended June 30, 2005, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, present fairly in all material respects the information set forth therein.

\*   \*   \*   \*   \*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Medicis Pharmaceutical Corporation's internal control over financial reporting as of June 30, 2005, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated September 9, 2005 expressed an unqualified opinion thereon.

164.   As previously detailed herein at ¶ 101, on March 16, 2006, Medicis filed a Form 10-K/T with the SEC for the interim period ended December 31, 2005 ("FY2005 10-K/T").  The FY2005 Y200410-K/T included Ernst & Young's Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements, dated March 10, 2006, which stated, in pertinent part:

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as

evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Medicis Pharmaceutical Corporation and subsidiaries at December 31, 2005, June 30, 2005 and June 30, 2004, and the consolidated results of their operations and their cash flows for the six months ended December 31, 2005 and each of the three years in the period ended June 30, 2005, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

\*   \*   \*   \*   \*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Medicis Pharmaceutical Corporation's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 10, 2006 expressed an unqualified opinion thereon.

165.    As previously detailed herein at ¶ 115, on March 1, 2007, Medicis filed a Form 10-K with the SEC for the year ended December 31, 2006 ("FY2006 10-K").  The FY2006 Y200410-K included Ernst & Young's Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements, dated February 26, 2007, which stated, in pertinent part:

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting

the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Medicis Pharmaceutical Corporation and subsidiaries at December 31, 2006 and 2005 and the consolidated results of their operations and their cash flows for the year ended December 31, 2006, the six months ended December 31, 2005 and each of the two years in the period ended June 30, 2005, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Medicis Pharmaceutical Corporation's internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 26, 2007 expressed an unqualified opinion thereon.

166.    As previously detailed herein at ¶ 131, on February 29, 2008, Medicis filed a Form 10-K with the SEC for the year ended December 31, 2007 ("FY2007 10-K"). The FY2007 Y200410-K included Ernst & Young's Report of Independent Registered Public Accounting Firm on the Consolidated Financial Statements, dated February 26, 2008, which stated, in pertinent part:

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the

audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Medicis Pharmaceutical Corporation and subsidiaries at December 31, 2007 and 2006 and the consolidated results of their operations and their cash flows for each of the two years in the period ended December 31, 2007, the six months ended December 31, 2005 and the year ended June 30, 2005, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

\* \* \* \* \*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Medicis Pharmaceutical Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 26, 2008 expressed an unqualified opinion thereon.

167.   Ernst & Young's August 13, 2004, September 9, 2005, March 10, 2006, February 26, 2007 and February 26, 2008 Auditors' Reports attesting to Ernst & Young's performance of its audits in accordance with GAAS or the standards of the PCAOB and representing that Medicis's financial statements conformed to GAAP were materially false and misleading when made.  The Auditors' Reports were false because:

    a.    Ernst & Young's audits were not conducted in accordance with GAAS and PCAOB standards;

    b.    Medicis's financial statements did not fairly present the financial position of and results of operations for Medicis for fiscal years represented in the Audtiors' Reports in conformity with GAAP; and

    c.    Medicis's internal controls were not effective but rather had serious material weaknesses that enabled Medicis employees to manipulate the Company's financial reporting to a significant extent. Specifically, Medicis's failure to adequately monitor its internal controls prevented it from taking the necessary corrective actions to stop the improper recording of reserves for returns.  As a result, Ernst & Young knew that the system of internal controls had material weaknesses that enabled the financial statements to be materially misstated.

168.   By issuing unqualified Auditors' Reports for these years, Ernst & Young violated Statement of Accounting Standard ("SAS") 98 entitled, "Reports on Audited Financial Statements," which states:

> The auditor's standard report states that the financial statements present fairly, in all material respects, an entity's financial position, results of operations, and cash flow in conformity with generally accepted accounting principles. This conclusion may be expressed only when the auditor has formed such an opinion on the basis of an audit performed in accordance with generally accepted auditing standards. AU § 508.07.

169.   Ernst & Young knew that Medicis was intentionally manipulating its financial statements by accounting for returns of short dated and expired goods during the Class Period under warranty or exchange accounting.  Under SFAS 48, the Company should have deferred the full sales price of the goods for the amount of estimated returns.  Indeed, the Company should have reserved for the deferred gross sales value of the returned goods, as any swapped goods were not of the same quality as the nearly-expired or expired goods returned to the Company. Moreover, Ernst & Young knew that the

Company was representing to investors that it in fact was accounting for reserves in accordance with SFAS No. 48.   In so doing, Ernst & Young allowed the Company to report materially misstated revenues, income and working capital which had the effect of artificially inflating the price of Medicis common stock.

170.   This deception on investors happened with the knowledge and acquiescence of Ernst & Young.  In fact, the Company has admitted that Ernst & Young was fully aware of its accounting treatment for sales reserves during the Class Period.

171.   Moreover, CW 4 has stated that Ernst & Young had specifically discussed with the Company the accounting problems caused by inventory that became expired or short-dated.

172.   Thus, Ernst & Young knew from its direct conversations with Medicis accounting personnel that the Company was understating reserves and inflating its revenues and working capital during the Class Period, and that the Company was lying to the public regarding its reserve policies.

173.   Ernst & Young was well aware of the Company's woeful lack of appropriate internal controls.  CW1 testified that when Ernst & Young asked for specific information regarding return reserves, a task within CW1's responsibility, she always deferred the auditors to her superiors, who had carte blanche to set the reserves, and who "didn't like people questioning them."

174.   Ernst & Young nonetheless issued Auditors' Reports that – as the Company has admitted -- falsely stated that the Company had no material weaknesses in its internal control structure.

175.   Generally Accepted Auditing Standards, or GAAS, are established by the American Institute of Certified Public Accountants ("AICPA"), of which defendant Ernst & Young is a member.   The standards, initially adopted by the PCAOB as interim standards, set the minimum level of performance and quality that auditors are expected, by clients and the public, to achieve.   Under GAAS, the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud.   Ernst & Young repeatedly and materially violated GAAS in each of its audits, failed to properly plan and perform its audits to obtain reasonable assurance that Medicis's financial statements were free of material misstatements, and, therefore, had no basis on which to state that Medicis's financial statements were presented in conformity with GAAP.

176.   While Ernst & Young may have had basic knowledge of Medicis's business, organization and operating characteristics through its experience with the Company, it either knowingly acquiesced in Medicis's fraud or turned a blind eye and once it failed to obtain the knowledge necessary to gain an understanding of the accounting processes and internal controls used by Medicis to record its reserves.   AU Section 311, entitled Planning and Supervision, requires that in order to properly plan an audit, an auditor should obtain a level of knowledge of its clients' business sufficient to enable it to "obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements." AU § 311.06. In planning the audit, the auditor also must "consider the methods the entity uses to process accounting information . . . because such methods influence the design of the internal

control." AU § 311.09.  In connection with planning its audit, Ernst & Young either was

aware of the Company's methods which were used to commit fraud or recklessly failed to

obtain sufficient knowledge to evaluate:

a.  Medicis's accounting and reporting systems and accounting data concerning, inter alia, the establishment and application of various reserves;

b.  Medicis's estimates and management representation concerning, inter alia, the establishment and subsequent release of reserves; and

c.  The propriety and consistency of Medicis's application of accounting principles to, *inter alia*, sales returns; and

d.  Medicis' disclosures regarding its accounting for return reserves.

177.  Ernst & Young's intentional or reckless lack of understanding is borne out by the fact that Medicis consistently engaged in a practice of failing to adequately reserve for sales returns as early of 2003, which continued into the 2008 fiscal year.  Moreover, Ernst & Young allowed Medicis to represent to investors that the Company was accounting for reserves in accordance with SFAS No. 48. Ernst & Young was required to know its client's process for creating reserves which enabled Ernst & Young to plan its auditing procedures to extend or modify its audit testing in the area.  AU § 311.03.

178.  Ernst & Young was required to base its opinion on evidence obtained during the audit, not the conclusions of management.  "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements."  AU § 326.02.  "[W]ithout adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted."  AU § 326.16.

179.   Ernst & Young failed to obtain additional sufficient competent evidential matter with respect to its audits of Medicis's reserves.   GAAS requires that "the evidential matter obtained should be sufficient for the auditor to form conclusions concerning the validity of the individual assertions embodied in the components of financial statements."   AU § 326.13.   Once Ernst & Young learned that Medicis was selling more product to its distributors than they could reasonably sell, Ernst & Young should have expanded its audit procedures in this area.   Furthermore, GAAS is clear that planning continues throughout the audit:   "[a]s the audit progresses, changed conditions may make it necessary to modify planned audit procedures."   AU § 311.05.

180.   GAAS required Ernst & Young to be particularly diligent with respect to unusual quarter-end transactions: Furthermore, GAAS is clear that planning continues throughout the audit:   "[T]he auditor should design procedures to test the appropriateness of journal entries recorded in the general ledger and other adjustments (for example, entries posted directly to financial statement drafts) made in the preparation of the financial statements."   AU § 316.58. SAS 99.   "Specific responses to the auditor's assessment of the risk of material misstatement due to fraud will vary depending upon the types or combinations of fraud risk factors or conditions identified and the account balances, classes of transactions, and assertions they may affect…The following are specific examples of responses…Perform a detailed review of the entity's quarter-end or year-end adjusting entries and investigate any that appear unusual as to nature or amount." AU § 316.29, SAS 82.

181.   GAAS also makes clear that "[t]he risk of material misstatement of the financial statements is generally greater when account balances and classes of transactions include accounting estimates rather than essentially factual data because of the inherent subjectivity in estimating future events." AU § 312.36 [Emphasis added].

182.   Thus, GAAS required that Ernst & Young plan its audit of reserve estimates with an attitude of professional skepticism. AU § 342.04.  This should have been particularly important to Ernst & Young since it had knowledge of the Company's improper reserve accounting as far back as 2003, and their misstatements regarding the same, and since Medicis's CFO, Defendant Prygocki, was a former Ernst & Young employee.

183.   Given Prygocki's previous employment with Ernst & Young, and the numerous relationships Prygocki developed while there, Ernst & Young was aware of the potential risk that Prygocki would exert improper influence over its auditors as they performed their audit work for Medicis.  Thus, there was clearly a risk of "bias with respect to the client" as warned of in the Auditing Standards. [AU § 220.02, SAS 1.]

184.   Ernst & Young's reckless disregard or willful violation of Generally Accepted Accounting Standards permitted the issuance of the false and misleading financial statements identified herein during the Class Period, and discouraged investors from questioning the accuracy of those statements.

185.   Ernst & Young's recklessness is underscored by the fact that it willfully allowed the patently wrong accounting methodology to be employed for at least five years and allowed the Company to misstate its procedures, and only ceased doing so

when the PCAOB independently reviewed Ernst & Young's audit, and directed that it comply with SFAS 48.

## **CLASS ACTION ALLEGATIONS**

186.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Medicis common stock, or purchased or sold options on Medicis common stock during the Class Period (the "Class").  Excluded from the Class are defendants herein, the officers and directors of the Company and Ernst & Young, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

187.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Medicis common shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Medicis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

188.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

189.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

190.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Medicis, as well as of investigations by regulators;

- whether the Individual Defendants caused Medicis to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Medicis common stock and options during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

191.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

192.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Medicis common stock and options are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the New York Stock Exchange, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiff and members of the Class purchased and/or sold options and Medicis stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

193.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder

194.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

195.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

196.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Medicis securities; and (iii) cause Plaintiff and other members of the Class to purchase Medicis common stock and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

197.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the

media that were designed to influence the market for Medicis common stock and options. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Medicis' finances and business prospects.

198.   By virtue of their positions at Medicis, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.   Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.   In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

199.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Medicis common stock from their personal portfolios.

200.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.   As the senior managers and/or directors of Medicis, the Individual Defendants had knowledge of the details of Medicis internal affairs.

201.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the

Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Medicis.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Medicis's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Medicis common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Medicis's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Medicis common stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by defendants and were damaged thereby.

202.   Defendant Ernst & Young fraudulently certified the financial statements contained in each of the annual reports identified herein, without qualification, despite having actual knowledge of, or at least recklessly disregarding, the fact that the financial statements violated SFAS 48 and were materially false and misleading.

203.   During the Class Period, Medicis common stock and options were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Medicis common stock and options at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known

the truth, they would not have purchased said shares and options, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of Medicis stock and options were substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Medicis common stock and options declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

204.   By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

205.   As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock and options during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

206.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

(a)   During the Class Period, the Individual Defendants participated in the operation and management of Medicis, and conducted and participated, directly and indirectly, in the conduct of Medicis's business affairs.  Because of their senior positions, they knew the adverse non-public information about Medicis's misstatement of income

and expenses and false financial statements.

(b)    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Medicis's financial condition and results of operations, and to correct promptly any public statements issued by Medicis which had become materially false or misleading.

(c)    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Medicis disseminated in the marketplace during the Class Period concerning Medicis's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Medicis to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Medicis within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Medicis common stock and options.

207.   Each of the Individual Defendants, therefore, acted as a controlling person of Medicis.  By reason of their senior management positions and/or being directors of Medicis, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Medicis to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Medicis and possessed the power to control the specific activities

which comprise the primary violations about which Plaintiff and the other members of the Class complain.

208.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Medicis.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated: January 18, 2010

**MARTIN & BONNETT, P.L.L.C.**

By: s/Jennifer Kroll
Susan Martin
Jennifer Kroll
1850 N. Central Avenue
Suite 2010
Phoenix, Arizona  85004
Tel:   (602) 240-6900
Fax:  (602) 240-2345


**POMERANTZ HAUDEK
    GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
Joshua B. Silverman
Leigh H. Smollar
Ten South LaSalle Street
Suite 3505
Chicago, Illinois  60603
Telephone**:** (312) 377-1181
Facsimile**:**  (312) 377-1184

**POMERANTZ HAUDEK
    GROSSMAN & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
100 Park Avenue – 26th Floor
New York, New York 10017
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

*Counsel for Lead Plaintiff Steve Rand,
Plaintiff Darlene Oliver and the Class*

1

2

## CERTIFICATE OF SERVICE

3

4

I hereby certify that on January 18, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

5

6

7

8

Lloyd Winawer (*Pro Hac Vice*)
**GOODWIN PROCTOR LLP**
135 Commonwealth Drive
Menlo Park, California 94301
Telephone: 650-752-3100
Facsimile: 650-853-1038

9

10

11

12

13

Brian E. Pastuszenski (*Pro Hac Vice*)
**GOODWIN PROCTOR LLP**
53 State Street
Boston, Massachusetts 02109
Telephone: 617-570-1000
Facsimile:  617-523-1231

14

15

16

17

18

19

John D. Cooke (*Pro Hac Vice*)
Blake E. Williams (*Pro Hac Vice*)
**GOODWIN PROCTOR LLP**
3 Embarcadero Center
24th Floor
San Francisco, California 94025-1105
Telephone: 415-733-6000
Facsimile:  415-677-9041

20

21

22

23

24

25

26

Joel P. Hoxie (State Bar. No. 005448)
Joseph G. Adams (State Bar No. 018210)
**SNELL & WILLMER LLP**
One Arizona Center
400 East Van Buren Street
Suite 1900
Phoenix, Arizona 85004
Telephone: 602-382-6000
Facsimile:  602-382-6070

27

28

Alexander K. Mircheff
Robert B. Hubbell
**GIBSON DUNN & CRUTCHER LLP**
333 S Grand Avenue

1  Suite 4600
2  Los Angeles, California 90071
   Telephone: 213-229-7307
3  Facsimile: 213-229-6307

4
   Nicole France Stanton
5  **QUARLES & BRADY LLP**
6  2 N Central Avenue
   1 Renaissance Square
7  Phoenix, Arizona 85004
   Telephone: 602-229-5662
8  Facsimile: 602-229-5690

9

10  s/Jennifer Kroll

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28