QUARLES & BRADY LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, Arizona  85004-2391
Telephone (602) 229-5200
Don P. Martin (#004232)
don.martin@quarles.com
Nicole France Stanton (#020452)
nicole.stanton@quarles.com

ROBERT HUBBELL, CA SBN 100904
(admitted pro hac vice)
RHubbell@gibsondunn.com
ALEXANDER MIRCHEFF, CA SBN 245074
(admitted pro hac vice)
AMircheff@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:   (213) 229-7000
Facsimile:   (213) 229-7520

Attorneys for Defendant
Ernst & Young LLP

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE MEDICIS PHARMACEUTICAL CORP. SECURITIES LITIGATION | Master File No. CV-08-01821-PHX-GMS |
| | **ERNST & YOUNG LLP'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| | (ORAL ARGUMENT REQUESTED) |

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................. 1

I.   THE STANDARD FOR PLEADING SCIENTER IN A CLAIM
     AGAINST AN AUDITOR IS EXTRAORDINARILY STRINGENT ............. 3

II.  ALLEGATIONS OF GAAP VIOLATIONS DO NOT RAISE A
     STRONG INFERENCE OF SCIENTER ........................................................ 4

     A.   EY Exercised Reasonable Accounting Judgment in
          Concluding That Replacement Cost Was An Acceptable
          Methodology ........................................................................................ 4

     B.   The Disclosures By Medicis's Competitors Do Not Support
          Scienter; Rather, They Show That Companies That Permitted
          Exchanges Used Replacement Cost ...................................................... 6

     C.   The Alleged Expert Opinion Testimony Is Conclusory and
          Does Not Support Scienter .................................................................. 7

     D.   Medicis's Conclusion That Expired Product Was The Same
          Kind, Quality and Price As Fresh Product Does Not Support
          Scienter ................................................................................................ 9

III. THE ALLEGATIONS BASED ON CONFIDENTIAL WITNESSES
     DO NOT SUPPORT SCIENTER ................................................................ 10

IV.  ALLEGATIONS OF "CHANNEL STUFFING" AND OTHER
     MOTIVES DO NOT SUPPORT SCIENTER ............................................... 11

     A.   The Channel-Stuffing Allegations Are Unconnected to EY and
          Are Vague and Implausible ................................................................ 11

     B.   The Remaining Motive Allegations Are Similarly Defective .............. 13

V.   READ HOLISTICALLY, THE MOST COGENT INFERENCE
     FROM THE AMENDED COMPLAINT IS THAT MEDICIS'S
     FINANCIALS WERE INNOCENTLY MISSTATED ................................... 15

CONCLUSION ................................................................................................. 16

# TABLE OF AUTHORITIES

## Cases

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ........................................14

*Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009) ........................................3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................3

*Concha v. London*, 62 F.3d 1493 (9th Cir. 1995) ........................................3

*Demarco v. Depotech Corp.*, 149 F. Supp. 2d 1212 (S.D. Cal. 2001) ........................................8

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) ........................................3

*DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002)................4, 6

*Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir. 2006) ........................7, 8

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999) ........................................12

*In re Ashworth, Inc. Sec. Litig.*, 2000 WL 33176041 (S.D. Cal. July 18, 2000) ........................12

*In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446 (N.D. Cal. 1996)........................................5

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) ........................................8

*In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055 (C.D. Cal. 2004)........................12

*In re Metawave Commc'n Corp. Sec. Litig.*, 629 F. Supp. 2d 1207 (W.D. Wash. 2009)........14

*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999) ........................................4

*In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535 (N.D. Cal. Mar. 9, 2007) .......7

*In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615 (9th Cir. 1994) ........................................4

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002) ........................................15

*In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007) ........................................5

*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002)........................................14

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008)........................12

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) ......8

*Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008) ........................................15

*Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156 (9th Cir. 2009) ........................................15

*South Ferry LP, #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ........................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ........................................3

*Thor Power Tool Co. v. Comm'r*, 439 U.S. 522 (1979) ........................................5

*Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*, 2006 WL 2669035 (N.D. Cal. Sept. 18, 2006)........................................14

*Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007)........................................5

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ........................14, 15

*Zucker v. Sasaki*, 963 F. Supp. 301 (S.D.N.Y. 1997) ........................................14

## Statutes

15 U.S.C. § 78u-4(b)(2) ........................................3, 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**
[Continued]

<u>Page(s)</u>

**Regulations**

21 C.F.R. § 205.50 ........................................................................................................9

21 C.F.R. § 211.137(a) .................................................................................................9

21 C.F.R. § 211.166 .....................................................................................................9

iii

## **INTRODUCTION**

The Court dismissed the prior complaint because it failed to raise a strong inference of scienter as to Ernst & Young LLP ("EY"). The amended complaint does nothing to repair this fatal defect. Instead of adding factual detail to support the claim of fraud against EY, the amended complaint has *eliminated* the few references to EY's alleged knowledge of an intentional misapplication of GAAP. The other changes to the amended complaint do not relate to EY. The amended complaint should therefore be dismissed—this time with prejudice.

The fundamental facts alleged in the amended complaint have not changed. Medicis sold pharmaceuticals that had a prescribed shelf life. Medicis permitted its wholesale purchasers to exchange expired product for fresh product. The sales were final. The distributors did not have the right to return product for a refund of the purchase price. Because no accounting literature specifically addressed exchanges of expired product for fresh product, Medicis made a reasonable accounting judgment: it recognized the actual economic impact of the exchange by reducing its sales revenue by the cost of estimated future exchanges. Medicis later determined that its accounting was incorrect and restated its financial statements to accrue a reserve under FAS 48 using the full sales price of the exchanged products. The net effect of the restatement was to *increase* revenues slightly over the restatement period. The restatement had no effect on cash flow or revenue trends. In short, the restatement corrected a technical interpretation of accounting literature that had no effect on Medicis's product demand, liquidity, or core-business operations.

On these facts, Plaintiffs allege that EY intentionally issued false audit opinions stating that Medicis's financial statements were fairly presented in accordance with GAAP. As before, Plaintiffs base their claim on two propositions: First, Plaintiffs allege EY must have known that use of replacement cost violated FAS 48 because the error was so obvious and egregious. Second, Plaintiffs allege that statements by confidential witnesses demonstrate that EY knew that use of replacement cost was incorrect. The factual support for these allegations falls far short of the particularized pleading required by the PSLRA.

1

1        The Court has considered and rejected Plaintiffs' contention that use of the sales price

2   to accrue a reserve under FAS 48 was so obvious that any other interpretation must have been

3   a knowing misstatement.  No facts have been added to the amended complaint to cause the

4   Court to revisit its conclusion.  As before, the amended complaint fails to identify any

5   provision of FAS 48 that expressly governs the exchange of expired product for fresh product.

6   The amended complaint abandons Plaintiffs' prior contention that SOP 97-2 (relating to

7   software upgrades) required Medicis to use the full sales price to accrue a reserve.  In the

8   absence of controlling literature, Plaintiffs now allege that the "obvious" requirements of

9   FAS 48 can be gleaned from disclosures by other pharmaceutical companies who accepted

10  returns.  But those disclosures show that when a company accrued for *exchanges* (rather than

11  returns), they consistently used replacement cost—as did Medicis.  Finally, Plaintiffs offer

12  statements from an accounting professor whose opinion is not properly considered under the

13  PLSRA and who, in any event, stops notably short of concluding that the misapplication of

14  GAAP must have been intentional.

15       The allegations of the confidential witnesses in the amended complaint contain even

16  less detail about EY than did the prior complaint—allegations which the Court found to be

17  deficient.  For example, in the prior complaint, a confidential witness stated that reserve

18  accounting was a "point of contention" between Medicis and its "auditors."  But the amended

19  complaint clarifies that the "point of contention" was between Medicis's management and the

20  company's *internal* auditors—not EY, the company's *outside* auditor.  Second Am. Compl.

21  ("SAC") ¶ 64, Docket No. 74.  The only remaining confidential witness statements relating to

22  EY allege that it asked an accounts receivable clerk for "reports and evidence of the

23  Company's reserve methodology."  *Id.* ¶ 66.  The fact that EY asked for such reports shows

24  nothing more than the performance of routine audit work and does not support an inference

25  that EY was aware of a knowing misapplication of GAAP.

26       The Court found that the prior complaint failed "to present particular facts supporting

27  their allegations that Ernst & Young 'turned a blind eye' to obvious accounting standards"

28  and that FAS 48 is "not so obvious to suggest that Ernst & Young must have known that

2

Medicis's accounting policy was in violation of GAAP."[1]  The amended complaint alleges no new facts to cause this Court to change its conclusions.  Accordingly, Plaintiffs' amended complaint should be dismissed with prejudice.

## I.  THE STANDARD FOR PLEADING SCIENTER IN A CLAIM AGAINST AN AUDITOR IS EXTRAORDINARILY STRINGENT

The amended complaint is governed by the pleading standards set forth in Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the PSLRA.  To survive a Rule 12(b)(6) motion, a complaint must plead sufficient facts establishing a "plausible" entitlement to relief.  This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1944, 1953 (2009) (holding that *Twombly*'s "plausibility standard" applies to all civil pleadings).

Plaintiffs also must satisfy Rule 9(b) which, to ensure that the defendant has proper notice of the fraud-based claims against it, requires that the complaint allege with particularity the facts constituting fraud—that is, the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995).

Finally, under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., scienter.  15 U.S.C. § 78u-4(b)(2) (emphasis added).  To qualify as "strong," a pleaded inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  To plead scienter, the PSLRA requires Plaintiffs to plead "no less than a degree of recklessness that strongly suggests actual intent," by providing "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973, 979 (9th

---

[1]  Order dated December 1, 2009, Docket No. 71 ("Order") at 29.

Cir. 1999). In the context of claims against an auditor, this standard requires particularized allegations that the defendant employed practices "so deficient that the audit amounted to no audit at all." *In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 628 (9th Cir. 1994) (internal citation omitted). Allegations of GAAP and GAAS violations are insufficient where they are "not based on specific facts that shed light on the mental state of [the accountant's] auditors." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 387 (9th Cir. 2002). That is, the "plaintiff must prove that the accounting practices were . . . an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made" were so irrational that no accounting professional "would have made the same decisions if confronted with the same facts." *Software Toolworks*, 50 F.3d at 628 (citation omitted).

## II.  ALLEGATIONS OF GAAP VIOLATIONS DO NOT RAISE A STRONG INFERENCE OF SCIENTER

The amended complaint alleges that the requirements of FAS 48 were so obvious and "simple" that the use of replacement cost to accrue a return reserve establishes scienter. The Court rejected this contention in dismissing the prior complaint. The amended complaint adds no new facts to support this allegation and, accordingly, the Court's prior determination should stand.

### A.  EY Exercised Reasonable Accounting Judgment in Concluding That Replacement Cost Was An Acceptable Methodology

The amended complaint is premised on the notion that the "requirements of SFAS 48 are simple—if a Company estimates that a certain portion of its sales will be returned, it is required to deduct such anticipated returns from its gross sales." SAC ¶ 4. Plaintiffs' central premise misses the point: Medicis did not grant its wholesalers a general right to return products for a refund of the purchase price as contemplated by FAS 48. Rather, Medicis granted wholesalers a more limited right to exchange expired or short-dated product for the *same* fresh product. Plaintiffs point to no language in FAS 48 that addresses such limited exchange rights—because there is none. In the absence of explicit guidance, Medicis and EY

were required to exercise their judgment in determining the appropriate accounting treatment. Medicis chose to account for the exchanges based on the real-world economic impact on its balance sheet: the cost of the replacement product.  Thus, the allegation that *accounting for returns* under FAS 48 is "simple" ignores the fact that Medicis was *accounting for exchanges* of expired product for fresh product.

Stripped of its false syllogism, the amended complaint amounts to nothing more than an assertion that a violation of GAAP establishes scienter.  But a "mere violation of a generally accepted accounting principle (GAAP) or accounting rules fails to plead scienter." *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 948-49 (D. Ariz. 2007).  Indeed, "even *deliberate* GAAP violations do not by themselves establish scienter."  *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1163 (C.D. Cal. 2007).

GAAP violations do not support scienter especially where, as here, the auditor was required to exercise its judgment in applying literature that does not specifically address the particular transaction to be accounted for:

> GAAP is not a set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range of reasonable treatments, leaving the choice among alternatives to management. . . .  APB Op. No. 22 ("Applying [GAAP] requires that judgment be exercised as to the relative appropriateness of acceptable alternative principles and methods of application in specific circumstances of diverse and complex economic activities.").

*In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1457 (N.D. Cal. 1996) (citing *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979)).

Here, as the Court noted in its Order dismissing the prior complaint, given the "lack of definitive guidance with respect to setting reserves for exchanges of expired products" and given that "Medicis's accounting treatment reflected the exchanges' actual economic impact," the error cannot be called the result of 'an egregious refusal to see the obvious.'"  Order at 15.

Plaintiffs' conclusory allegations in the amended complaint that accounting for *returns* was "simple" does not address the question faced by Medicis of accounting for exchanges of expired product—and therefore provides no basis for the Court to change the conclusion reached in its Order dismissing the prior complaint.

**B.**   **The Disclosures By Medicis's Competitors Do Not Support Scienter; Rather, They Show That Companies That Permitted Exchanges Used Replacement Cost**

In apparent recognition that their bare allegations of GAAP violations are deficient, Plaintiffs allege that the "egregiousness" of the violation is demonstrated by disclosures made by Medicis's competitors.  SAC ¶¶ 45-49.  But the disclosures cited in the amended complaint actually support the inference that EY acted reasonably in determining that replacement cost was an acceptable alternative.

The disclosures cited by Plaintiffs are general in nature and do not describe in detail the specific methodology used to account for the underlying transactions.  But, in general, the cited disclosures fall into two categories: disclosures that discuss accounting for *returns* and disclosures that discuss accounting for *exchanges*.  Plaintiffs allege that the companies that accounted for *returns* accrued the full sales price.[2]  *Id.* ¶ 46.  But the two companies whose disclosures discussed accounting for *exchanges* (Heska and Questcor)[3] used *replacement cost* to accrue for the estimated future expense.  Thus, in the only examples discussed in the pleadings, every company that disclosed accounting for exchanges (Heska, Questcor, and Medicis) used replacement cost methodology.[4]

While the accounting employed by competitors does not determine how GAAP applies to the specific circumstances at Medicis, the fact that other companies adopted a similar methodology demonstrates that Plaintiffs cannot possibly meet their burden of establishing "that no reasonable accountant would have made the same decisions," *DSAM Global Value Fund*, 288 F.3d at 387.

---

[2]   Those companies are Johnson & Johnson, Inc., Allergan, Inc., Teva Pharmaceuticals Industries, Ltd., and Impax Laboratories, Inc.  *See* SAC ¶ 46.  EY has filed a Request for Judicial Notice ("RJN") that attaches the relevant portions of the public filings.  *See* RJN at Exs. A-D.

[3]   *See* RJN at Exs. E-F.

[4]   Plaintiffs note that Questcor later changed its methodology to accrue the full sales price for returns.  SAC ¶ 48.  But Questcor's disclosure makes clear that the change was made in response to commercial pressures from its customers to change its return policy, not because it believed the methodology was not acceptable.  RJN at Ex. F.

The competitor disclosures cited in the amended complaint undermine the allegations of scienter in another respect.  The amended complaint alleges that Medicis's disclosures were misleading because they did not explain the specific details of Medicis's accrual methodology.  SAC ¶¶ 50-53.  But a comparison of Medicis's disclosures to those cited in the amended complaint shows that Medicis provided the same level of detail provided by its competitors.  Like Medicis, its competitors typically combined a discussion of a variety of sales practices—such as returns, rebates, sales incentives, trade promotions, coupons and discounts—into a single disclosure.  Plaintiffs cite no authority requiring Medicis to provide detailed explanations of how every accounting policy was implemented across hundreds of underlying accounts, balances, and transactions.  What Medicis did disclose—that it reduced sales revenue to account for estimated future exchanges—was accurate.  Thus, Medicis's truthful disclosure at a level of detail that was common in the industry reflects a reasonable judgment about financial statement presentation, and does not support the assertion that EY was aware of an intentional misapplication of GAAP.

## C.   The Alleged Expert Opinion Testimony Is Conclusory and Does Not Support Scienter

The amended complaint includes purported expert opinion from an NYU professor.  This "opinion testimony" is conclusory and therefore irrelevant to Plaintiffs' obligation under the PSLRA to plead *facts* showing that EY knew replacement cost methodology did not comply with GAAP.

As an initial matter, courts have repeatedly emphasized that, to the extent allegations from an expert are included in a complaint, they must be "nonconclusory" and "factual"— opinion testimony is not allowed.  *See, e.g.*, *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006) (affirming district court's refusal to consider expert opinion testimony because "[e]ven if non-opinion portions of an expert's affidavit constitute an instrument pursuant to Rule 10 [that could properly be attached to a pleading], *opinions cannot substitute for facts* under the PSLRA"); *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535, at *31 (N.D. Cal. Mar. 9, 2007) (rejecting "argument that courts have

allowed 'expert' opinion . . . as factual support for claims of securities fraud brought under the PSLRA"); *Demarco v. Depotech Corp.*, 149 F. Supp. 2d 1212, 1222 (S.D. Cal. 2001) (striking expert affidavit and holding that it would only consider the expert's "nonconclusory assertions within specific paragraphs in the complaint"); *cf. Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004) (considering expert's *factual* allegations). Here, the allegations from Plaintiffs' expert are explicitly framed as opinions, not facts. SAC ¶ 44 ("[I]t is my opinion that . . . ."). Because "opinions cannot substitute for facts under the PSLRA," *Blackwell*, 440 F.3d at 285-86, the expert opinion in the amended complaint does not support scienter.[5]

Furthermore, even if the Court were to consider this opinion testimony, the stated opinions do not support scienter. The professor carefully parses his words, declining to assert that the relevant accounting provisions were so obvious that they could have been misapplied only intentionally:

- "[T]he only correct accounting treatment for the product exchange is the one governed by SFAS 48."

- "Treatment of the exchange transactions as returns under the exclusion provided in footnote 3 of SFAS 48 . . . is clearly inappropriate."

- "[N]either Medicis nor Ernst & Young had a sound basis to conclude that the exclusion of footnote 3 was applicable to Medicis's transactions."

SAC ¶ 44. In other words, the professor says only that Medicis's financial statement contained an error and should have been restated—which, of course, is what Medicis did when it concluded that use of replacement cost did not comply with GAAP. Moreover, the professor does not discuss the particular facts of Medicis's exchange of expired product for fresh product, but instead relies on the conclusory allegations of the complaint that assume the

---

[5]    Moreover, the Ninth Circuit has repeatedly held that plaintiffs' sources of information should be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *E.g.*, *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Here, Plaintiffs allege nothing more than their "expert's" job title, which is patently insufficient. SAC ¶ 44.

1   question to be decided: whether an exchange of expired product was a return governed by

2   FAS 48.  Thus, his opinions are no better than the deficient allegations of the complaint and

3   are therefore entitled to no weight.

4   **D.   Medicis's Conclusion That Expired Product Was The Same Kind, Quality**
        **and Price As Fresh Product Does Not Support Scienter**

5

6         The amended complaint again alleges that scienter is indicated by the fact that Medicis

7   and EY concluded that that expired product was the "same kind, quality, and price" as fresh

8   product.  SAC ¶¶ 6, 65.  The Court has already determined that this allegation does not

9   support an inference of scienter.  Order at 10-12.  Because Plaintiffs have added no *factual*

10  *detail* to these allegations, there is no reason for the Court to reconsider its prior ruling on this

11  point.  Instead of alleging additional facts, however, the amended complaint does add

12  unfounded argument, culminating in the statement that expired pharmaceuticals were the

13  equivalent of year-old "spoiled milk" and thus clearly not of the same "kind, quality, and

14  price" of fresh product.  SAC ¶ 6.  The comparison is specious.

15        FDA regulations require drug makers to set expiration dates and mandate that state

16  licensing bodies prohibit wholesalers from selling outdated pharmaceuticals.  *See* 21 C.F.R. §

17  211.137(a) (requiring expiration dating); *id.* § 205.50 (requiring return of "[p]rescription

18  drugs that are outdated").  However, the regulations merely require manufacturers to prove

19  that a drug remains stable at whatever expiration date the manufacturer *chooses* to set.  *See id.*

20  § 211.166 (requiring stability testing).  So a pharmaceutical's expiration date is not the date

21  on which its inherent qualities spontaneously degrade, as implied by Plaintiffs.  It is the end-

22  date of stability testing chosen by the manufacturer.  Indeed, an FDA study of the U.S.

23  military's massive drug stockpile found that approximately 90% of the more than 100 drugs

24  tested were "safe and effective far past their original expiration date."  Laurie P. Cohen, *Safe*

25  *and Effective: Many Medicines Prove Potent for Years Past Their Expiration Dates*, Wall St.

26  J., Mar. 28, 2000, at A.1.  So just because a pharmaceutical has reached its regulatory

27  expiration date does not mean that it is "spoiled."  Plaintiffs plead no facts to support their

28  insinuation to the contrary.

9

In the absence of such facts, nothing indicates it was unreasonable for Medicis to initially conclude that the exchanged drugs were similar enough to the replacement product to meet the criteria of footnote 3 of FAS 48—particularly in the absence of accounting guidance to the contrary.  In evaluating the like "kind, quality, and price" requirement under FAS 48, Medicis was assessing whether the wholesaler was exchanging expired product for unexpired units of the *same product* (e.g., Restalyne for Restlyne)—as opposed to a *different product* (e.g., Restalyne for Loprox).  Medicis and EY reasonably believed that an exchange of the *same* product (Restalyne for Restalyne) met the "like kind, quality, and price" requirement, even though the product being exchanged had exceeded the FDA mandated expiration date— which is the same reasonable judgment made by Questcor and Heska.

In the absence of any new facts in the amended complaint regarding the reasonableness of the accounting judgments made by Medicis and EY, there is no reason for the Court to change its prior conclusion that use of replacement cost "was not so obviously incorrect or patently absurd that it was highly unreasonable for Defendants to adopt this approach."  Order at 15.

## III. THE ALLEGATIONS BASED ON CONFIDENTIAL WITNESSES DO NOT SUPPORT SCIENTER

The most significant change in the amended complaint is the elimination of previous allegations regarding EY.  The prior complaint included allegations from CW5 claiming that reserve accounting methodology was "always an issue" at Medicis during his employment, and was a "point of contention between auditors and management."  AC ¶ 38; *see also id.* ¶ 109.[6]  The amended complaint contradicts this allegation, stating that the "contention" was "between the *internal* auditors and the Company's accounting personnel."  SAC ¶ 64 (emphasis added).

Plaintiffs have also abandoned the unsupported factual assertions they made in their brief in opposition to the prior motion to dismiss.  For example, Plaintiffs argued that (1)

---

[6]    Am. Compl., Docket No. 53.

1   "Medicis employees told . . . EY that the accounting for returns was improper under GAAP,"

2   Opp. at 16-17, and (2) "Confidential Witnesses [state] that . . . EY [was] aware that the

3   auditing personnel in accounts receivable challenged the propriety of the accounting for the

4   returns," Opp. at 8.[7] These allegations appear nowhere in the amended complaint.

5          Only two confidential witness allegations remain as to EY.  The amended complaint

6   alleges that EY "asked CW1 a number of questions regarding return reserves" and asked for

7   "reports and evidence of the Company's reserve methodology and reconciliations."  SAC ¶

8   65.  CW1 referred EY to her superiors for answers to those questions.  *Id.*  These allegations

9   are innocuous and demonstrate only that EY tested the reserve in its audits.

10         Finally, CW 4 alleges that EY recommended that Medicis establish an inventory

11   reserve for short dated or expired product that had not yet been sold.  *Id.*  This allegation

12   remains unchanged from the prior complaint.  Accordingly, the Court need not revisit its

13   determination that EY's recommendation regarding inventory reserves "does not indicate that

14   Defendants knew that their accounting methodology based on replacement cost was

15   incorrect."  Order at 23.

16   **IV.   ALLEGATIONS OF "CHANNEL STUFFING" AND OTHER MOTIVES DO**
     **NOT SUPPORT SCIENTER**
17
          **A.    The Channel-Stuffing Allegations Are Unconnected to EY and Are Vague**
18              **and Implausible**

19         The amended complaint devotes considerable length to alleged channel stuffing—but

20   adds no new facts.  *See* SAC ¶¶ 5, 80(c), 85(c), 103(c), 117(c), 133(c).  As before, Plaintiffs

21   allege *no facts* indicating that EY knew of the purported channel-stuffing.  Nor do Plaintiffs

22   "explain how 'stuffing the distribution channel' demonstrates that [EY] must have known that

23   their interpretation of FAS 48 was wrong."  Order at 17.

24         But even if Plaintiffs had alleged EY knew about the supposed channel stuffing, the

25   allegations are far too vague to indicate scienter in any event.  No detail is given as to the

26   dates of particular shipments, whether Medicis's customers were in agreement with the

27

28   [7]     Pls' Opp. to Mot. to Dismiss, Docket No. 62.

arrangements, or the amount of any purported "stuffing."  For an allegation of channel stuffing to be pled with sufficient particularity, the complaint must "allege 'specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts.'"  *In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) (quoting *In re Ashworth, Inc. Sec. Litig.*, 2000 WL 33176041, at *6 (S.D. Cal. July 18, 2000)); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 204 (1st Cir. 1999) (finding no scienter based on channel stuffing where "[t]he allegations in the complaint do not include such basic details as the approximate amount by which revenues and earnings were overstated; the products involved in the contingent transactions; the dates of any of the transactions; or the identities of any of the customers or FTP employees involved in the transactions").  In the absence of such detail, the allegations in the amended complaint establish nothing more than a strategy by Medicis to keep its wholesalers fully-stocked.  Courts have regularly rejected attempts to premise scienter on vague allegations of "channel stuffing" that failed to distinguish between legitimate and illegitimate sales practices.  *See, e.g., Greebel*, 194 F.3d at 204 ("there may be any number of legitimate reasons for attempting to achieve sales earlier"); *In re ICN Pharm.*, 299 F. Supp. 2d at 1062 (holding plaintiffs had not shown that "an inference of illegitimacy could be drawn from the Defendants' [channel stuffing]"); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (noting that "a seller might have a realistic hope that stuffing the channel of distribution would incite his distributors to more vigorous efforts to sell the stuff lest it pile up in inventory").

Absent an allegation that Medicis was cannibalizing future sales to bolster current revenues, or otherwise engineering fictitious sales, no facts pleaded in the amended complaint indicate anything other than perfectly legitimate business practices.  Certainly nothing in the channel-stuffing allegations creates a plausible motive for EY to have committed accounting fraud.

### B.      The Remaining Motive Allegations Are Similarly Defective

Apart from their channel-stuffing claims, Plaintiffs also allege that Medicis had a motive to misapply GAAP because it wanted to (1) portray itself as a company with steady growth and (2) inflate its reported working capital. *See, e.g.,* SAC ¶¶ 28, 40, 54. Again, these motives are alleged only as to Medicis, with no facts that attribute these motives to EY. But even if amended complaint alleged some connection to EY, the motives are implausible and hopelessly vague.

As noted in the Court's Order, the effect of restating Medicis's financials to accrue the full sales price of exchanges under FAS 48 resulted in a slight *understatement* of revenue during the periods restated. Order at 14. Likewise, the year-to-year *trends* in revenue remained the same after the restatement:

| Net revenues (in millions) | Fiscal Year Ended 6/30/03 | Fiscal Year Ended 6/30/04 | Fiscal Year Ended 6/30/05 | Transition Period Ended 12/31/05 | Fiscal Year Ended 12/31/06 | Fiscal Year Ended 12/31/07 |
|---|---|---|---|---|---|---|
| Reported | $247.5 | $303.7 | $376.9 | $164.0 | $349.2 | $464.7 |
| Restated | $210.3 | $315.2 | $365.7 | $165.3 | $393.2 | $457.4 |

Thus, the difference in the methodology for accruing the reserve did not change the year-to-year variability of the company's revenue. The allegation in the complaint that Medicis used the exchange reserve to create the false impression of consistent growth is simply wrong.

As to working capital, the methodology for accruing the reserve *did not affect cash flow*. Working capital is a financial reporting measure that includes non-cash items. So while reported working capital was affected by the amount of the returns reserve, it had no effect on the company's available cash, its liquidity, or its core operations. The impact of the reserve methodology did not have a "devastating effect" on the company's future operations and prospects such that the company must have known about the misstatement. *See South Ferry LP, #2 v. Killinger,* 542 F.3d 776, 785 n.3 (9th Cir. 2008) (misstatement without more only

gives rise to scienter in exceedingly rare instances where facts known to defendants had a "devastating effect" on company's operations and future prospects).

Moreover, even if EY were alleged to have known about these motives, and even if they were plausible, they are precisely the sort of generic claims that could be said of any business. The Ninth Circuit has regularly rejected attempts to premise Section 10(b) claims on such weak foundations. *See, e.g., Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (holding that executives' pecuniary motives did not weigh in favor of scienter); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) ("[G]eneralized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of *Silicon Graphics*."). As the *Lipton* court explained:

> If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. . . . [A]lleged desires to obtain favorable financing and to expand abroad are in themselves ordinary and appropriate corporate objectives. Such routine business objectives, without more, cannot normally be alleged to be motivations for fraud. To hold otherwise would be to support a finding of fraudulent intent for all companies that plan to lower costs and expand sales.

284 F.3d at 1038 (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)); *see also In re Metawave Commc'n Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1218 (W.D. Wash. 2009) ("the motive of raising capital is too generic to establish scienter"); *Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*, 2006 WL 2669035, at *2 (N.D. Cal. Sept. 18, 2006) ("Generalized assertions of financial motive, without more, are insufficient to meet the heightened pleading requirement of the PSLRA.").

Accordingly, as to EY, the amended complaint "contains no [meaningful] allegations of motive and makes no suggestion that Ernst & Young received anything other than its usual fees for its work. . . . [W]here motive is not alleged and plaintiff relies entirely on allegations of recklessness in asserting scienter, the evidence presented must be proportionally greater." *Zucker v. Sasaki*, 963 F. Supp. 301, 308-09 (S.D.N.Y. 1997). But far from presenting "proportionally greater" evidence of scienter, Plaintiffs present none whatsoever.

14

## V.   READ HOLISTICALLY, THE MOST COGENT INFERENCE FROM THE AMENDED COMPLAINT IS THAT MEDICIS'S FINANCIALS WERE INNOCENTLY MISSTATED

Plaintiffs' scienter allegations are also deficient when read as a whole. Although scienter allegations must be examined both individually and collectively, "a plaintiff cannot avoid dismissal by reliance on an isolated statement that stands in contrast to a host of other insufficient allegations." *Zucco*, 552 F.3d at 999 (internal citation omitted). Even when viewing allegations holistically, the Ninth Court has not hesitated to dismiss allegations that were vague and shed no light on the defendant's mental state. *See, e.g., id.*; *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1166 (9th Cir. 2009). This is because, as this Court has recognized, the PSLRA requires a plaintiff to plead particularized facts "with respect to each act or omission alleged" in order to raise a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2).

Here, viewing the amended complaint as a whole, the most significant change is the elimination of factual detail regarding EY's alleged scienter. The amended complaint abandons the only allegations regarding interactions between EY and Medicis about the exchange reserve. Moreover, it squarely contradicts Plaintiffs' prior allegations that exchange reserves were a source of "contention" between Medicis and EY, now claiming the contention was internal at Medicis. This reversal undermines any isolated allegation that might somehow indicate scienter. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002) (inadequate allegations of fraud elsewhere in the complaint have a "spillover effect" on subsequent allegations). Moreover, Plaintiffs remain unable to point to any contemporary accounting guidance indicating that the accounting judgment at issue was so obviously wrong that it could only have been made with scienter.

Finally, Plaintiffs still have not offered any motive for EY to commit fraud. While motive is not an element of a Section 10(b) claim, Plaintiffs' allegations are premised on the implausible inference that EY acted irrationally by risking its reputation for independent, professional judgment. *See DiLeo*, 901 F.2d at 627; *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008).

1     For all these reasons, the most cogent and compelling inference to be drawn from the

2   amended complaint is that EY's audit opinions on Medicis's financial statements were

3   innocently misstated.

4                                    **CONCLUSION**

5     This is the second opportunity Plaintiffs have had to allege the detailed facts required

6   by the PSLRA to support their claim that EY acted with scienter.  This Court's Order

7   analyzed the deficiencies in the prior complaint at length.  But even with the benefit of that

8   guidance, Plaintiffs fall far short of pleading the factual detail necessary to support scienter,

9   making clear that they cannot do so.  Accordingly, the amended complaint should be

10  dismissed with prejudice.

11

12  DATED:  February 19, 2010          QUARLES & BRADY LLP

13                                     By: /s/ Nicole France Stanton
14                                         Nicole France Stanton

15                                     GIBSON, DUNN & CRUTCHER LLP

16                                     By: /s/ Robert Hubbell
17                                         Robert Hubbell

18                                     Attorneys for Defendant
                                       Ernst & Young LLP
19  100814393_2.DOC

20

21

22

23

24

25

26

27

28

**ERNST & YOUNG LLP'S MOTION TO DISMISS**          Master File No. CV-08-01821-PHX-GMS
**PLAINTIFFS' SECOND AMENDED COMPLAINT**

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on February 19, 2010, I electronically filed the foregoing with the

3   Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4   email addresses denoted on the attached Electronic Mail Notice List.

5                                                          /s/ Kelly Thwaites

6                          **Electronic Mail Notice List**

7   Joseph G. Adams
8   jgadams@swlaw.com, amurray@swlaw.com,docket@swlaw.com

9   Jeremy James Christian
    jjc@tblaw.com, sam@tblaw.com, sab@tblaw.com

10  John D. Cooke
11  jcooke@goodwinprocter.com, rnovak@goodwinprocter.com

12  Patrick V. Dahlstrom
    pdahlstrom@pomlaw.com

13  Andrew S. Friedman
14  afriedman@bffb.com, rcreech@bffb.com, ngerminaro@bffb.com

15  Mark I. Gross
    mgross@pomlaw.com

16  Richard Glenn Himelrick
17  rgh@tblaw.com, sab@tblaw.com

18  Joel Philip Hoxie
    jhoxie@swlaw.com, jkfisher@swlaw.com, docket@swlaw.com

19  Jeremy A. Lieberman
20  jalieberman@pomlaw.com

21  Susan Joan Martin
    smartin@martinbonnett.com, tmahabir@martinbonnett.com, mblawfirm@aol.com

22  Jennifer Lynn Kroll
23  jkroll@martinbonnett.com

24  Brian E. Pastuszenski
    bpastuszenski@goodwinprocter.com

25  Blake E. Williams
26  bwilliams@goodwinprocter.com

27  Lloyd Winawer
    lwinawer@goodwinprocter.com, sasmith@goodwinprocter.com

28

**ERNST & YOUNG LLP'S MOTION TO DISMISS**                    **Master File No. CV-08-01821-PHX-GMS**
**PLAINTIFFS' SECOND AMENDED COMPLAINT**