Joel P. Hoxie (State Bar No. 005448)
*jphoxie@swlaw.com*
Joseph G. Adams (State Bar No. 018210)
*jgadams@swlaw.com*
**SNELL & WILMER LLP**
One Arizona Center
Phoenix, Arizona 85004-2202
Telephone:  602-382-6000
Facsimile:  602-382-6070

Lloyd Winawer (*Pro Hac Vice*)
*lwinawer@goodwinprocter.com*
**GOODWIN PROCTER LLP**
135 Commonwealth Drive
Menlo Park, California  94025-1105
Telephone:  650-752-3100
Facsimile:  650-853-1038

Brian E. Pastuszenski (*Pro Hac Vice*)
*bpastuszenski@goodwinprocter.com*
**GOODWIN PROCTER LLP**
53 State Street
Boston, Massachusetts 02109
Telephone: 617-570-1000
Facsimile:  617-523-1231

Attorneys for Defendants
*Medicis Pharmaceutical Corporation,*
*Jonah Shacknai, Richard D. Peterson, and*
*Mark A. Prygocki, Sr.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: MEDICIS PHARMACEUTICAL CORP. SECURITIES LITIGATION | Case No. 2:08-CV-01821-PHX-GMS |
| | **CLASS ACTION** |
| | **THE MEDICIS DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED FEDERAL SECURITIES CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | <u>**ORAL ARGUMENT REQUESTED**</u> |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 2

I.      PLAINTIFFS AGAIN HAVE FAILED TO SATISFY THE
        REFORM ACT'S STRONG INFERENCE PLEADING
        REQUIREMENT. ............................................................................................. 2

        A.      Plaintiffs Have Not Alleged Any Facts Showing That
                Medicis's Accounting Error Was "Obvious." .................................... 3

                1.      The SAC Does Not Rebut This Court's Determination
                        That There Is No Definitive GAAP Guidance As To
                        Application Of SFAS 48. ........................................................ 3

                2.      Medicis's Accounting Methodology Was Not "Absurd." ...... 5

                3.      Plaintiffs' Repetition Of "Channel Stuffing" Allegations
                        In The SAC Does Not Support Any Inference That
                        Defendants Knew Their Interpretation Of SFAS 48 Was
                        Incorrect. ................................................................................ 6

        B.      The "Confidential Witness" Allegations Do Not Support A
                Strong Inference Of Scienter. ............................................................ 8

II.     LIKE THE PRIOR COMPLAINT, THE SAC SHOULD BE
        DISMISSED. ................................................................................................. 14

CONCLUSION ............................................................................................................. 14

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Berson v. Applied Signal Technical, Inc.*,
    527 F.3d 982 (9th Cir. 2008)...........................................................................5

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002)...........................................................................5

*Fin. Acquisition Partners LP v. Blackwell*,
    440 F.3d 278 (5th Cir. 2006)...........................................................................4

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ............................................................7

*In re Nat'l Austl. Bank Sec. Litig.*,
    No. 03-cv-6537 (BSJ), 2006 U.S. Dist. LEXIS 94162 (S.D.N.Y. Oct. 25, 2006).........7

*In re Oracle Corp. Sec. Litig.*,
    No. C 01-00988 SI, 2009 WL 1709050 (N.D. Cal. June 19, 2009)..............................7

*In re Sierra Wireless, Inc., Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007)..............................................................7

*In re Trex Co., Inc. Sec. Litig.*,
    212 F. Supp. 2d 596 (W.D. Va. 2002) ..........................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................3, 6

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)...........................................................................8

**FEDERAL STATUTES**

15 U.S.C. § 78j(b) ............................................................................................. 3, 14

15 U.S.C. § 78t(a) ………...............................................................................................14

15 U.S.C. § 78u-4(b)(2) ..................................................................................... 3

**PRELIMINARY STATEMENT**

Plaintiffs' Second Amended Complaint ("SAC") does not address, let alone remedy, the numerous deficiencies that led this Court to dismiss the prior Amended Complaint ("AC").  Accordingly, there is no reason for the Court to depart from its earlier determination that this case should be dismissed because Plaintiffs have not adequately alleged securities fraud.  *See* December 2, 2009 Order dismissing complaint ("Order") at 3.

Medicis Pharmaceutical Corporation ("Medicis") restated certain financial statements due to its and its outside auditors' misinterpretation of Statement of Financial Accounting Standards No. 48, *Revenue Recognition When Right of Return Exists* ("SFAS 48").[1]  Medicis and Ernst & Young LLP ("EY") had concluded that exchanges of short-dated or expired products for more recently produced versions of the same product constituted an exchange of "one item for another of the same kind, quality, and price" within the meaning of the exception in footnote 3 to SFAS 48 ("Footnote 3").  Medicis and its auditors had interpreted Footnote 3 as requiring only that the cost to the Company of estimated future product exchanges be excluded from current sales revenues.  After the Public Company Accounting Oversight Board questioned EY's interpretation of SFAS 48, Medicis later restated its financial statements to exclude from revenue the full purchase price of the products that it estimated would be exchanged in the future.  As this Court held, "the overall impact of the accounting error on net revenue was relatively small. . . . In the aggregate, Defendants' accounting error resulted in an understatement of net revenues of approximately $1.1 million over the entire six-year period."  Order at 3. Medicis also understated cumulative diluted net income during this period by $0.11 per share.

The allegations in the SAC have not changed meaningfully from those in the prior

---

[1] The Court previously granted the Medicis Defendants' Request for Judicial Notice (Order at 6 n.6), which ruling applies equally to this motion to dismiss the SAC.  The full text of SFAS 48 is set forth at Exhibit A to the Medicis Defendants' Motion to Dismiss Plaintiffs' Amended Federal Securities Class Action Complaint.

1    complaint that the Court found deficient, including Plaintiffs' mantra-like incantation that

2    Medicis supposedly engaged in "channel stuffing."  Nothing in the SAC thus remedies

3    Plaintiffs' failure to identify "definitive GAAP guidance with respect to setting reserves

4    for exchanges of expired products" and "present particular facts suggesting that the

5    Defendants knew that the Company was in violation of SFAS 48 when it issued its original

6    financial statements."  Order at 14, 15.  In that regard, Plaintiffs' "confidential witness"

7    ("CW") allegations are either verbatim repetitions or substantively the same repackaging

8    of the allegations the Court found deficient in the prior complaint.  Any new assertions

9    attributed to CWs are not factually supported, or are legally irrelevant.  Because they

10   cannot point to definitive GAAP guidance that would support any inference that Medicis

11   and its outside auditors must have known their interpretation of SFAS 48 was incorrect,

12   Plaintiffs retained an accounting professor to put in the form of an "opinion" the same

13   factually unsupported assertions about how SFAS 48 is to be interpreted that the Court

14   rejected in the earlier complaint.  Opinions, however, are not fact and provide no basis for

15   an inference – let alone the required strong inference – that Defendants deliberately

16   misinterpreted SFAS 48.

17        In short, there is nothing in the SAC that should lead this Court to conclude

18   anything other than that "the inference that Medicis took an aggressive interpretation of

19   SFAS 48 with approval from its auditor is more compelling than the inference that

20   Defendants recklessly ignored a patently obvious GAAP provision."  *Id.* at 14, 15.

21   Because Plaintiffs have had more than an ample opportunity to plead a viable claim and

22   are clearly unable to do so, the SAC should be dismissed with prejudice.

23                              **<u>ARGUMENT</u>**

24   **I.    <u>PLAINTIFFS AGAIN HAVE FAILED TO SATISFY THE REFORM</u>**
     **<u>ACT'S STRONG INFERENCE PLEADING REQUIREMENT.</u>**

25

26        In its Order, the Court discussed the Private Securities Litigation Reform Act's

27   ("Reform Act") "stringent pleading requirements."  Order at 6.  Like the prior amended

28   complaint, the SAC fails to meet these stringent requirements, including in particular the

1   Reform Act's requirement that a plaintiff "'state with particularity facts giving rise to a

2   strong inference that the defendant acted with the required state of mind,' or scienter." *Id.*

3   at 7 (quoting 15 U.S.C. § 78u-4(b)(2)).  Under Section 10(b) of the Securities Exchange

4   Act, "[t]he required state of mind is either that the defendant acted intentionally or with

5   'deliberate recklessness.'"  *Id.*  The Reform Act's "strong inference" standard is satisfied

6   only when the inference of scienter drawn from the particularized facts alleged in the

7   complaint is as "'cogent and at least as compelling as any opposing inference one could

8   draw from the facts alleged.'"  *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

9   551 U.S. 308, 324 (2007)).  Plaintiffs again have failed to satisfy this exacting pleading

10  requirement.

11            **A.      Plaintiffs Have Not Alleged Any Facts Showing That**
                        **Medicis's Accounting Error Was "Obvious."**
12

13            In dismissing the prior complaint, this Court observed that GAAP is "far from being

14  a canonical set of rules that will ensure identical accounting treatment of identical

15  transactions" and "[t]hus as a general rule, a restatement of financial data due to an

16  accounting error, without more, is insufficient to create a strong inference of scienter." *Id.*

17  at 8, 9 (quotation marks omitted).  The Court held that neither of the two narrow

18  exceptions to this rule were applicable, and concluded that Medicis's misinterpretation of

19  SFAS 48 and its later restatement did not support a strong inference of scienter.  *Id.* at 9.

20  Nothing in the SAC warrants a different determination.

21            **1.      The SAC Does Not Rebut This Court's Determination**
                        **That There Is No Definitive GAAP Guidance As To**
22                      **Application Of SFAS 48.**

23            In its Order, the Court observed that "[n]othing in SFAS 48 explains or defines the

24  meaning of . . . what it means to be the same in 'kind, quality, and price.'"  *Id.* at 4 n.4.

25  Rejecting as inapplicable the other accounting literature identified by Plaintiffs, the Court

26  concluded that there is a "lack of definitive GAAP guidance with respect to setting

27

28

1    reserves for exchanges of expired products." *Id.* at 15.[2]

2         In the SAC, Plaintiffs do not point to any GAAP provision or definitive guidance to

3    rebut the Court's conclusion.  There simply is nothing more to be said about the meaning

4    of SFAS 48, which the Court already has held is "not some patently obvious accounting

5    standard." *Id.* at 21.  Plaintiffs' assertion that Medicis's interpretation of this standard is

6    not supported by "any authority or literature in accounting" gets it backwards.  SAC ¶ 6.

7    As the party alleging fraud claims, it is Plaintiffs who bear the burden of identifying

8    definitive GAAP guidance that Medicis deliberately disregarded, thus supporting an

9    inference of scienter.  There is no such definitive GAAP guidance, and the SAC points to

10   none.

11        Because no definitive GAAP guidance exists, Plaintiffs retained an accounting

12   professor (Joshua Ronen) to make the same assertions that Plaintiffs made – and the Court

13   rejected – in the original complaint but to cloak them in the guise of an "opinion." *See id.*

14   ¶ 44.  Like the SAC and its predecessor, Ronen cites no definitive GAAP guidance but

15   simply asserts with no support that "exchanges should have been accounted for as a

16   reduction in revenue and cost of sales to reflect estimated returns." *Id.*  These conclusory

17   assertions are not fact and cannot support any inference – let alone a *strong* inference –

18   that Medicis deliberately ignored GAAP in its mistaken interpretation of SFAS 48.  As the

19   Fifth Circuit has held, expert "opinions cannot substitute for facts under the [Reform

20   Act]." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006)

21   (affirming district court's refusal to consider opinions in expert affidavit).  In short, like the

22   rest of the SAC, the assertions attributed to Ronen do not rebut this Court's determination

23   that there is a "lack of definitive GAAP guidance with respect to setting reserves for

24   exchanges of expired products" that would have made it "clearly inappropriate" to treat the

25   pharmaceutical transactions at issue as exchanges of like product for purposes of

26   _____

27   [2] In light of the Court's ruling, Plaintiffs have dropped their argument that Statement of
     Position 97-2 ("SOP"), which is directed to computer software, applied to Medicis's

28   pharmaceutical transactions.

1    Footnote 3 of SFAS 48.  *See* Order at 15, 21.[3]

2                    **2.    Medicis's Accounting Methodology Was Not "Absurd."**

3        The Court rejected in its Order Plaintiffs' argument that it should presume that the

4    Medicis Defendants knew the Company and EY were misinterpreting SFAS 48 given their

5    positions in the Company and the alleged significance of the restatement.  *Id.* at 12-15.  In

6    so doing, the Court distinguished this case from the "exceedingly rare circumstances"

7    present in *Berson v. Applied Signal Technical, Inc.*, 527 F.3d 982 (9th Cir. 2008), where

8    the Ninth Circuit found it "absurd to suggest" that corporate officials were unaware of the

9    "devastating effect" of stop-work orders covering 80 percent of their company's revenue.

10   *Id.* at 13.  This Court concluded that the interpretation of SFAS 48 by both Medicis and

11   EY was not "absurd" such that knowledge of its misapplication should be presumed.  *Id.*

12   at 9, 12-15

13       The new complaint provides no additional reason to apply the *Applied Signal*

14   "devastating effect" analysis than did the prior complaint.  The SAC includes more

15   references to the Company's "working capital" in an apparent effort to hide Plaintiffs'

16   failure "to present any allegations that the error had such an effect on cash, liquidity, or

17   viability of Medicis's core-business operations that Defendants' must have known about

18   the mistake."  *Id.* at 13-14; *see*, *e.g.*, SAC ¶¶ 5, 9, 39, 147.  Plaintiffs' working capital

19   allegations, however, are specious.  The SAC itself shows (*see* table at ¶ 152) that

20   _____

21   [3] Plaintiffs quote Medicis's public disclosures of its accounting policy (*see, e.g.,* SAC
22   ¶¶ 8, 50, 79), arguing that the Company's reference to reducing "product sales revenues"
     in connection with reserving for future exchanges and returns was somehow misleading.
23   To the contrary, these disclosures were entirely correct.  Medicis ***did*** reduce product sales
     revenues, both in regard to estimated future returns for credit and estimated future
24   exchanges of expired or short-dated product for identical, fresher product.  Nothing in
     Medicis's statements addressed the amount of the reduction in either case, and nothing
25   would have led an investor to an incorrect conclusion about the amount of the reduction in
26   the case of estimated exchanges of expired or short-dated product.  *See Brody v.*
     *Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (holding that the securities
27   laws prohibit "*only* misleading and untrue statements, not statements that are [allegedly]
28   incomplete.").

1  Medicis's working capital was overstated by only about 8 percent to 11.5 percent during

2  the putative Class Period as a result of Medicis's misinterpretation of SFAS 48.  The same

3  table also shows that Medicis had **several hundred million dollars** of working capital at all

4  times throughout the relevant period – including **over half a billion dollars** of working

5  capital in four of the periods encompassed by Plaintiffs' table.  *See id.* ¶ 152.  Notably,

6  Plaintiffs have not alleged, and cannot allege in good faith, that "the Company's ability to

7  meet its capital requirements" would have been questioned but for the erroneous

8  application of SFAS 48.  In that regard, the SAC nowhere alleges – nor could it – that

9  Medicis's misapplication of SFAS 48 had any impact on the Company's cash flows or

10  operations.  Accordingly, Plaintiffs still "fail to present any allegations that the error had

11  such an effect on cash, liquidity, or viability of Medicis's core-business operations that

12  Defendants' must have known about the mistake."  Order at 13-14.

### 3.  Plaintiffs' Repetition Of "Channel Stuffing" Allegations In The SAC Does Not Support Any Inference That Defendants Knew Their Interpretation Of SFAS 48 Was Incorrect.

16      Like the prior complaint that this Court dismissed, the SAC alleges that Medicis

17  engaged in so-called "channel stuffing."  The Court, however, rejected these channel

18  stuffing allegations, in part because Plaintiffs "never explain how 'stuffing the distribution

19  channel' demonstrates that Defendants must have known that their interpretation of

20  SFAS 48 was wrong."  *Id.* at 17.  Although the phrase "channel stuffing" is repeated more

21  often in the SAC than in its predecessor, no amount of repetition can conceal the absence

22  of any such explanation in the SAC as well.

23      Even if there were any factual basis for inferring that Medicis pressured customers

24  to buy more product than they otherwise would have – and no such factual basis is alleged

25  in the SAC[4] – that still would not support a securities fraud claim.  Courts have found

---

26  [4] For example, the SAC alleges no facts suggesting that Medicis ever agreed to illicit deals

27  with any distributor or improperly shipped products that distributors did not want or need, let alone plead any such facts with the required particularity.  *See* SAC ¶¶ 5, 80(c), 85(c),

28  103(c), 117(c), 133(c); *see, e.g., Tellabs*, 551 U.S. at 325 (allegations must be specific

1   channel stuffing actionable when sales illegitimately recorded in one quarter were later

2   reversed – and revenues reduced – upon the customer's return of product it could not sell

3   or use and never had any intention of keeping.  As the district court explained in *In re*

4   *Sierra Wireless, Inc., Sec. Litig.*, 482 F. Supp. 2d 365, 375 n.2 (S.D.N.Y. 2007), "[c]hannel

5   stuffing is a scheme which temporarily overstates revenues by persuading customers to

6   accept product deliveries despite the absence of commensurate demand, often on the

7   understanding that excess product can be returned to the seller at a later time."  *Accord In*

8   *re Nat'l Austl. Bank Sec. Litig.*, No. 03-cv-6537 (BSJ), 2006 U.S. Dist. LEXIS 94162,

9   at *22-23 (S.D.N.Y. Oct. 25, 2006) ("[Channel stuffing is] a practice whereby revenues

10  [are] overstated by including amounts for products that the company delivered to and

11  endeavored to force their retail network to accept despite no demand, with perhaps secret

12  assurances that the goods, if unsold, could be returned.")  Here, however, the SAC does

13  not contain a single allegation that revenue was reversed – ever.  Rather, this case concerns

14  exchanges of fresher product for older versions of the same product – revenue is not

15  alleged ever to have been credited or refunded.  In any event, as the Court noted in its

16  dismissal Order, these channel stuffing allegations simply do not provide any basis for

17  inferring that Medicis did not believe that its and EY's interpretation of SFAS 48 was

18  accurate.[5]

19

20  enough to distinguish between legitimate practices such as offering customers discounts as
    an incentive to buy, and illegitimate practices such as writing orders for products

21  customers had not requested); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1011
    (N.D. Cal. 2008) (dismissing channel stuffing claim because of failure to "allege specific

22  transactions, 'specific shipments, specific customers, specific times, or specific dollar

23  amounts'").  Plaintiffs also have not alleged any facts rebutting the possibility that it was
    distributors' inventory rotation practices that contributed to the expiry or near expiry of

24  inventory that was exchanged.

25  [5] In both complaints, Plaintiffs alleged an increase in end of quarter sales activity.  AC
    ¶ 34; SAC ¶ 57.  Courts have recognized, however, that a substantial uptick in sales

26  activity and shipments at the end of a quarter is commonplace and not by itself indicative
    of any wrongdoing.  *E.g.*, *In re Oracle Corp. Sec. Litig.*, No. C 01-00988 SI, 2009 WL

27  1709050, at *6 (N.D. Cal. June 19, 2009) ("Knowing that . . . vendors report their earnings

28  on a quarterly basis, purchasing customers expect that they can extract the lowest possible

**B.     The "Confidential Witness" Allegations Do Not Support
A Strong Inference Of Scienter.**

In its Order, this Court held that Plaintiffs had failed to allege with the particularity required by the Reform Act facts supporting the assertions attributed to the so-called "confidential witnesses."  Order at 18-24.  As the Court noted, "'those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.'"  *Id.* at 18 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)).  Plaintiffs' amended CW allegations, however, still fail to satisfy this exacting requirement.

The vast bulk of Plaintiffs' CW allegations in the SAC are identical to the allegations that the Court already has rejected.  For example, CW3's alleged assertion that Medicis "pressured customers to accept exchanges of returned product" is unchanged.  AC ¶ 36; SAC ¶ 33.  Plaintiffs continue to allege that, according to CW4, EY "had specifically discussed with the Company the accounting problems caused by inventory that became expired or short-dated."  AC ¶ 65; SAC ¶ 171.  Like the prior complaint, however, the SAC never identifies what those "accounting problems" were, who was involved in the alleged discussions, or when they occurred.[6]  With respect to CW5, Plaintiffs essentially repeat the same allegations related to what they dub "channel-stuffing" (*compare* AC ¶ 39 *with* SAC ¶¶ 55-56, 63), monitoring of prescription (so-called "scripts") data (*compare* AC ¶ 39 *with* SAC ¶ 56), and reserve accounting methodology being a "point of contention" (*compare* AC ¶ 38 *with* SAC ¶¶ 35, 64).[7]  Plaintiffs also still fail to explain how CW5 – the

price for the product by waiting until late in the quarter to finalize deals . . . .  Consequently, Oracle generates most of its . . . revenue in the last days of each quarter.").

[6] Plaintiffs attribute to CW4 the assertion that EY recommended the implementation of an "'expiring inventory reserve.'"  SAC ¶ 65.  As the Court held with respect to a similar assertion in the prior complaint, however, establishing a "reserve for expired pharmaceuticals only demonstrates that Defendants knew that expired drugs cannot be sold on the market" and "does not indicate that Defendants knew that their accounting methodology based on replacement cost was incorrect."  Order at 23.

[7] In both the prior complaint and the SAC, Plaintiffs attribute to CW5 the unsupported assertion that reserve accounting "was a point of contention between auditors and

1   alleged "head of information technology for Medicis's finance department from 2001 until

2   2008" (SAC ¶ 35) and who thus was responsible for technology not accounting – would

3   have had any knowledge relating to the proper application of SFAS 48 or the Medicis

4   Defendants' knowledge with respect to that subject.

5        The allegations attributed to CW1 and CW2 also closely parallel those in the prior

6   complaint.  The few additional allegations that now appear in the SAC are either variants

7   of what was previously alleged or lack any factual support.  Moreover, the addition of the

8   alleged accounts of CW6 and CW7 – both of whom allegedly worked in Medicis's "order

9   control" group – are irrelevant: neither individual provides any information about what

10  SFAS 48 required or what the Defendants understood it required, and neither is alleged to

11  have any experience with or knowledge of GAAP in any event.  In sum, Plaintiffs have not

12  remedied in the SAC the significant deficiencies that the Court identified in painstaking

13  detail in its Order dismissing the prior complaint.

14  ### **CW1**

15       Plaintiffs continue to allege that CW1 "was an accounts receivable senior

16  accountant at Medicis from 2000-2006."  SAC ¶ 31.  The Court held that, "[a]lthough

17  CW1 was likely familiar with Medicis's accounting methodology, her allegations fail to

18  provide 'sufficient detail' to support a conclusion that she had personal knowledge about

19  the Defendants' improper state of mind."  Order at 19-20.  With respect to this subject, as

20  shown below, the SAC is even less detailed than its predecessor.

21       Regarding CW1, the SAC is more notable for what it no longer alleges than what it

22  has added.  The SAC no longer attributes to CW1 the assertion "that Defendants Peterson

23  and Prygocki were responsible for deciding how to book reserves."  AC ¶ 33.  Likewise,

24  the SAC no longer attributes to CW1 the statement that Mr. Peterson "'didn't like people

25  _____

26  management."  AC ¶ 38; SAC ¶ 35; *see also* SAC ¶ 64 (point of contention "between
    Medicis's internal auditors and Barley and Stongstad").  The Court's determination with

27  respect to this same assertion in the prior complaint applies equally to the SAC – CW5
    does "not explain why the methodology was an issue or how it created contention" (Order

28  at 24) or "how he [CW5] knew about any contention" (*id.* at 23).

questioning'" him or that "senior management" refused to present a reason for their
method of accounting for the exchanges[.]" *Id.* ¶ 33.  Instead, the SAC now alleges that
CW1 questioned unidentified "supervisors" who allegedly refused to provide her with "a
rational [sic] as to the Company's reserve policies." SAC ¶ 62.  In addition, although the
SAC continues to allege that CW1 "voiced her concerns over this accounting treatment
several times to Barley and Defendant Peterson[,]" the Complaint still fails to indicate
what "concerns" she supposedly expressed to Mr. Peterson and when any such concerns
were expressed.  SAC ¶ 33.  Like the prior complaint, the SAC does not identify a single
communication of any sort with Mr. Peterson or any other defendant.

Plaintiffs similarly allege in the SAC that, "[a]ccording to CW1, Medicis's
'executive management was under a lot of pressure to meet expectations on the Street'"
and that "[t]he Company emphasized the importance of having consecutive quarters
without reporting a fiscal loss" while supposedly "celebrating" this accomplishment. *Id.*
¶ 54.  Courts have recognized that generic allegations like these can be made as to almost
any corporation and therefore fall far short of supporting any inference of scienter under
the Reform Act.  As the district court explained in *In re Trex Co., Inc. Sec. Litig.*,
212 F. Supp. 2d 596, 607 (W.D. Va. 2002), "[e]very corporate officer wants to meet
analysts' expectations, and every corporate officer wants a bigger bonus.  Allegations
based solely on these incentives lead to no more than a 'strained and tenuous inference of
motive,' and therefore must fail." *Id*.

Although the SAC attributes to CW1 allegations concerning the supposed "swap"
of older product for fresher product (*see* SAC ¶¶ 61-62), these "swap" allegations are not
new.  Similar "swap" allegations were included, and rejected by this Court, in Plaintiffs'
prior complaint.  *See* AC ¶¶ 36 (referencing alleged swaps with Quality King and
AmerisourceBergen), 39 ("Medicis was 'stuffing the channel' by pushing product out to
distributors it knew likely would not be sold, and would instead be returned via a
negotiated 'swap' in a later quarter"), 86(d) ("[Medicis] [f]raudulently treated swaps of
expired or short-dated product for new product as warranty returns or like-kind/like-quality

1   exchanges in violation of SFAS 48"). *See also* Order at 17-18.

2   Moreover, paragraphs 61 and 62 of the SAC are devoid of supporting factual detail.

3   For example, who are the customers to which CW1 refers in the SAC? What products

4   were allegedly involved? When did the alleged swap transactions occur and in what

5   amounts? Who were the "supervisors" with whom CW1 allegedly spoke and what was

6   discussed? Given Plaintiffs' failure to allege any facts that would enable this Court to

7   answer these basic questions, the SAC does not permit this Court to infer that CW1 has

8   "sufficient reliability and personal knowledge" of the information attributed to her (Order

9   at 18), let alone any information that would suggest Medicis knowingly misapplied

10   SFAS 48.[8]

11   Plaintiffs also add the allegation that "E&Y auditors asked CW1 a number of

12   questions regarding return reserves" and "asked CW1 for reports and evidence of the

13   Company's reserve methodology and reconciliation." SAC ¶ 66. That allegation,

14   however, parallels CW1's assertion, both in the prior complaint and again in the SAC, that

15   "when Ernst & Young asked for specific information regarding return reserves, a task

16   within CW1's responsibility, she always deferred the auditors to her superiors." AC ¶ 11;

17   SAC ¶ 173. Moreover, the fact that Medicis's independent auditors asked "a number of

18   questions" and wanted to review "reports and evidence of the Company's reserve

19   methodology and reconciliation" is inconsistent with any contention that the Medicis

20   Defendants deliberately misapplied GAAP. To the contrary, auditors are supposed to ask

21   questions when auditing their clients' financial statements, and EY's concurrence with

22   ────────────
[8] Plaintiffs also allege that "[o]n at least one occasion, CW1 refused to book a reserve

23   because she felt that it was not in compliance with the relevant accounting principles" and
that "[w]hen questioning Barely [sic] and Songstad regarding the appropriateness of the

24   Company's reserve practices, she was told to 'just book it[,]'" and that "Barley and
Songstad ended up booking certain return reserves because CW1 refused to do it." SAC

25   ¶ 62. The SAC, however, nowhere states that the "relevant accounting principles" and
"reserve practices" related to accounting for exchange of short-dated or expired products

26   under SFAS 48. Moreover, Messrs. Barley and Songstad are not defendants in this case,
and the SAC nowhere alleges that CW1 ever communicated with any of the defendants

27   regarding the alleged issues vaguely alluded to in SAC ¶ 62.

28

1  Medicis' application of SFAS 48 after allegedly asking these questions and reviewing

2  these reports only undercuts any possible inference of scienter.  And, the SAC

3  acknowledges that EY and Medicis both interpreted SFAS 48 precisely the same way.  *See*

4  SAC ¶¶ 157, 169.

5       In sum, Plaintiffs have not remedied the significant deficiencies in the allegations

6  attributed to CW1 that the Court identified in its Order, including the failure to

7  demonstrate that any "Defendant recklessly ignored a correct interpretation of SFAS 48."

8  Order at 20.  As before, nowhere do Plaintiffs "allege that CW 1 even knew about

9  SFAS 48, let alone that she possessed unique knowledge or experience that qualified her to

10 provide Defendants with the correct interpretation of that provision."  *Id.* at 20 n.10.

11 Accordingly, because the allegations attributed to CW1 still do not address the core issue

12 in this case, they remain insufficient.

13 **CW2**

14      Plaintiffs again allege that CW2 "was a contract senior accounts receivable

15 coordinator at Medicis during parts of 2008."  SAC ¶ 32.  In addition to noting the short

16 duration of CW2's alleged employment at Medicis, the Court found no support in the prior

17 complaint for CW2's alleged assertion that "Medicis's accounting treatment was 'easy, but

18 not correct.'"  Order at 21 (quoting AC ¶ 35).  That is still the case with the SAC.  *See*

19 SAC ¶ 60.

20      Like the prior complaint, the SAC attributes to CW2 the allegation that Medicis

21 allegedly generated "zero dollar invoices" "if the Company was able to convince the

22 customer to exchange or 'swap' the product[.]"  AC ¶ 35; SAC ¶¶ 32, 58.  The SAC then

23 attributes to CW2 the opinion "that instead of creating a zero dollar invoice for the fresh

24 product exchanged for the expired product, the Company should have matched the market

25 value of the new product and credit the customer accordingly."  SAC ¶ 60.  Putting aside

26 the fact that it is unclear what "zero dollar invoices" supposedly are, this allegation appears

27 merely to describe the mechanics of processing an exchange of older product for fresher

28 product.  It in no way addresses the correctness – or Defendants' understanding of the

correctness – of their interpretation of SFAS 48.  Moreover, like the prior complaint, the SAC does not allege a single fact that would support the inference that CW2 was knowledgeable about GAAP or had any basis for knowing what Medicis "should have" done from an accounting perspective, or any "details to suggest how CW 2 knew Medicis's accounting treatment was incorrect."  Order at 21.  Like the prior complaint, the SAC also nowhere alleges "that CW 2 ever communicated with any of the Medicis Defendants[,] let alone "explained to the Defendants his belief that Medicis's accounting treatment was 'easy, but not correct.'"  *Id.* at 21, 22.

### **CW6 and CW7**

The SAC identifies two new CWs ("CW6" and "CW7").  As with the other CWs, however, the SAC fails to provide the requisite level of detail to establish that these individuals had personal knowledge of facts allegedly bearing on Defendants' scienter.  CW6 allegedly "worked at Medicis in the order control department . . . from 2003 to 2006."  SAC ¶ 36.  CW7 allegedly "was an order control analyst at Medicis from June 2005 until November 2006."  *Id*. ¶ 37.  Plaintiffs' allegation that, according CW6, short-dated products were donated to charity adds nothing to Plaintiffs' repeated contention throughout this case that such products "had no value."  *Id.* ¶ 43.  The deficiency of the assertions now attributed to CWs 6 and 7 to increased quarter-end sales (SAC ¶¶ 57-58) and alleged channel-stuffing (*id.* ¶¶ 3, 5, 34, 40, 54-59) has been addressed previously.  *See supra* Section I.A.3.  Plaintiffs' allegations that, according to CW6, "approximately 25% of Medicis's credit returns were 'swaps'" (SAC ¶ 59), and that CW7 allegedly "keyed in codes . . . into the Company's Epicor system so that accounting would know not to charge the customer for the new product" in connection with an exchange transaction (*id.*) have no bearing on whether SFAS 48 was knowingly misapplied – the central issue in this case.  Moreover, Plaintiffs do not allege that either CW6 or CW7 interacted or communicated with, or witnessed improper conduct by, any of the individual defendants.

## II.     <u>LIKE THE PRIOR COMPLAINT, THE SAC SHOULD BE DISMISSED</u>.

The Court's prior holding that "[o]ther than pointing to the restatement and raising allegations of channel stuffing, Plaintiffs in this case plead no particular facts supporting their claim that Medicis intentionally understated revenues" applies to the SAC with equal force.  Order at 27.  As with the prior complaint, the deficiency of the SAC is compounded by the absence of any allegations of stock sales by or financial benefit to the individual Medicis defendants or any other alleged financial motive to defraud.  In short, whether Plaintiffs' allegations are viewed individually or holistically, it remains the case that the most plausible inference to be drawn from Plaintiffs' allegations is that the Medicis Defendants and EY innocently misinterpreted an accounting standard that was not "patently obvious." *Id.* at 21.  As such, Plaintiffs have alleged no basis for claiming securities fraud.[9]

## <u>CONCLUSION</u>

For the reasons stated herein, the Court should dismiss Plaintiffs' Complaint, with prejudice.

Dated: February 19, 2010                 Respectfully submitted,

By: /s/Lloyd Winawer
    Brian E. Pastuszenski
    *bpastuszenski@goodwinprocter.com*
    Lloyd Winawer
    *lwinawer@goodwinprocter.com*
    **GOODWIN PROCTER LLP**

    Joel P. Hoxie
    *jphoxie@swlaw.com*
    Joseph G. Adams
    *jgadams@swlaw.com*
    **SNELL & WILMER LLP**

*Attorneys for Defendants
Medicis Pharmaceutical Corporation,
Jonah Shacknai, Richard D. Peterson, and
Mark A. Prygocki, Sr.*

---

[9] Because Plaintiffs have failed to allege a predicate Section 10(b) violation, their Section 20(a) claim must be dismissed as well.  Order at 30.

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

- **Joseph G Adams**
  jgadams@swlaw.com,mgarsha@swlaw.com,docket@swlaw.com

- **Jeremy James Christian**
  jjc@tblaw.com,sab@tblaw.com,jeg@tblaw.com

- **John D Cooke**
  JCooke@goodwinprocter.com

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Andrew S Friedman**
  afriedman@bffb.com,rcreech@bffb.com,ngerminaro@bffb.com

- **Richard Glenn Himelrick**
  rgh@tblaw.com,sab@tblaw.com

- **Joel Philip Hoxie**
  jhoxie@swlaw.com,jkfisher@swlaw.com,docket@swlaw.com

- **Robert B Hubbell**
  rhubbell@gibsondunn.com

- **Jennifer Lynn Kroll**
  jkroll@martinbonnett.com,jkroll1@cox.net

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,jalieberman@pomlaw.com

- **Susan Joan Martin**
  smartin@martinbonnett.com,tmahabir@martinbonnett.com,mblawfirm@aol.com

- **Alexander K Mircheff**
  amircheff@gibsondunn.com

- **Brian E Pastuszenski**
  bpastuszenski@goodwinprocter.com

- **Nicole France Stanton**
  nicole.stanton@quarles.com,docketaz@quarles.com,kthwaite@quarles.com

15

1

- **Blake E Williams**
  BWilliams@goodwinprocter.com

2

3

- **Lloyd Winawer**
  lwinawer@goodwinprocter.com,sasmith@goodwinprocter.com

4

    I certify under penalty of perjury under the laws of the United States of America

5
that the foregoing is true and correct. Executed on February 19, 2010.

6

7

8
                  /s/  Lloyd Winawer
                  Lloyd Winawer

9
                  Brian E. Pastuszenski
                  **GOODWIN PROCTER** LLP

10
                  Joel P. Hoxie

11
                  Joseph G. Adams
                  **SNELL & WILMER** L.L.P.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16