**SUSAN MARTIN (AZ#: 014226)**
**JENNIFER KROLL (AZ#: 019859)**
**MARTIN & BONNETT PLLC**
1850 North Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone:  (602) 240-6900
Facsimile:  (602) 240-2235
smartin@martinbonnett.com
jkroll@martinbonnett.com

**PATRICK V. DAHLSTROM**
(*pro hac vice*)
**POMERANTZ HAUDEK**
**BLOCK GROSSMAN &**
**GROSS LLP**
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:    (312) 377-1181
Facsimile:    (312) 377-1184
pdahlstrom@pomlaw.com

**JEREMY A. LIEBERMAN**
(*pro hac vice*)
**POMERANTZ HAUDEK BLOCK**
**GROSSMAN & GROSS LLP**
100 Park Avenue, 16th Floor
New York, New York 10017
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665
jlieberman@pomlaw.com

**Attorneys for Lead Plaintiff Steven Rand**

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE MEDICIS PHARMACEUITICAL CORP. SECURITIES LITIGATIOIN | Master File No.  CV -08-01821-PHX-GMS |
| | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS MEDICIS PHARMACEUTICAL CORPORATION AND ERNST & YOUNG'S MOTIONS TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................. 1

**BACKGROUND** .................................................................................. 3

Defendant's Application of Footnote 3 to SFAS 48 Was Not Supported By
the Requirements for its Application or by the Language of SFAS 48 ....... 3

Medicis's Customers Were Not "Ultimate Customers" Under SFAS 48 ............... 4

Medicis' New Product Was Not Of The Same Quality, Kind and Price ................ 5

A Prominent Authority On Accounting Stated That Medicis and E&Y's
Application of Footnote 3 to SFAS 48 Was "Clearly Inappropriate" ........... 6

Virtually All Of Medicis' Competitors Properly Complied With SFAS 48 ........... 7

Medicis Did Not Disclose To Investors That It Was Applying Footnote 3 ............. 8

Impact of the Company's Accounting Improprieties ............................................. 10

Testimony of Confidential Witnesses ................................................................. 11

Medicis' Channel Stuffing Practices During The Class Period ............................ 12

Medicis Employees Knew That The Company's Accounting Was Improper ....... 12

Medicis & E&Y's Knowledge of The Reserve Manipulations ............................ 14

**ARGUMENT** ..................................................................................... 17

THE SAC ADEQUATELY ALLEGES SCIENTER ...................................................... 17

A.        Standards for Pleading *Scienter*
          Under Section 10(b) of the Exchange Act ........................................... 17

B.        The SAC Satisfies the Ninth Circuit's Analysis for
          *Scienter* and the Holistic Approach Mandated
          By the Supreme Court ........................................................................ 19

          1.   The SAC Contains Numerous Additional Scienter
               Allegations Against Defendants ................................................. 19

               a.  Dr. Ronen's Testimony Supports Plaintiffs'

Allegations
Regarding Defendants Baseless Application
of Footnote 3 to SFAS ...................................................... 20

b.  The SAC Alleges Defendants Misled Investors
Regarding Accounting Practices ..................................... 21

c.  The SAC Contains Allegations Regarding Defendants'
Motives For Manipulating Medicis' Revenues And
Working Capital ............................................................. 23

d.  The SAC Provides Additional Details By Confidential
Witnesses Regarding the Company's Accounting
Manipulations ................................................................ 24

C.       Application of the *South Ferry* Core Operations Doctrine
Further Supports the Denial of Defendants' Motion to Dismiss ...... 26

1.  Actual Knowledge Analysis ....................................... 27

2.  The Absurdity Analysis ............................................. 29

3.  The Holistic Analysis ................................................ 31

D.       The Allegations Support Ernst & Young's Scienter ................................. 32

E.       The Amended Complaint Adequately Alleges Section
20(a) Liability .................................................................... 34

**CONCLUSION** ................................................................................ 34

# TABLE OF AUTHORITIES

## CASES

*In re Apollo Group Inc. Sec. Litigation,*
   395 F. Supp. 2d 906 (D. Ariz. 2005)..................................................... 9,  23

*Backe v. Novatel Wireless, Inc.,*
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ................................................ 25, 31

*Berson v. Applied Signal Technology, Inc.,*
   527 F.3d 982 (9th Cir. 2008) ........................................................................ 29

*Brody v. Transitional Hospitals Corp.,*
   280 F.3d 997 (9th Cir. 2002), cited by defendants .................................... 23

*Chill v. General Electric Co.,*
   101 F.3d 263 (2d Cir. 1996)......................................................................... 34

*In re Cirrus Logic Sec. Litigation,*
   946 F. Supp. 1446 (N.D. Cal. 1996) ............................................................. 1

*In re Countrywide Finance Corp. Sec. Litigation,*
   588 F. Supp. 2d 1132 (C.D. Cal. 2008)................................................. 29, 33

*DSAM Global Value Fund v. Altris Software, Inc.,*
   288 F.3d 385 (9th Cir. 2002)........................................................................ 33

*In re Daou System, Inc.,*
   411 F.3d 1006 (9th Cir. 2005) ..................................................................... 27

*Demarco v. Depotech Corp.,*
   149 F. Supp. 2d 1212 (S.D. Cal. 2001) ....................................................... 21

*Ernst & Ernst v. Hockfelder,*
   425 U.S. 185 (1976) .................................................................................... 17

*Fin. Acquisition Ptnrs. v. Blackwell,*
   440 F.3d 278 (5th Cir. Tex. 2006) .............................................................. 21

*Freedman v. Louisiana-Pacific Corp.,*
   922 F. Supp. 377 (D. Or. 1996).................................................................. 23

*Glazer Capital Mgmt LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008)..................................................................... 15

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001)..................................................................... 23

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)........................................................ 18, 28, 30

*Makor Issues & Rights, Ltd., v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008)..................................................................... 15

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ......................................................... 7

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004)............................................................ 7, 20, 28

*In re Read-Rite Corp. Securities Litigation*,
    335 F.3d 843 (9th Cir.2003)..................................................................... 19

*Reiger v. Price Waterhouse Coopers, LLP*,
    117 F. Supp. 2d 1003 (S.D. Cal. 2000), *aff'd sub. nom* ............................ 33

*RxUSA Wholesale, Inc. v. HHS*,
    467 F. Supp. 2d 285 (E.D.N.Y. 2006).......................................................... 5

*Shahzad v. H.J. Meyers & Co.*,
    1997 U.S. Dist. LEXIS 1128 (S.D.N.Y. Feb. 4, 1997) ............................... 24

*In re Silicon Graphics Sec. Litigation*,
    183 F.3d 970 (9th Cir. 1999)............................................................... 19, 26

*In re Silicon Storage Technology, Inc. Sec. Litigation*,
    2007 U.S. Dist. LEXIS 21953 (N.D. Cal. Mar. 9, 2007) ............................ 21

*South Ferry LP, Number2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008)........................................ 18, 19, 26, 27, 29, 31

*South Ferry LP #2*,
    2009 U.S. Dist. LEXIS 91174 (W.D. Wa. Oct. 1, 2009)................. 26, 28, 31

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*,
    633 F. Supp. 2d 763 (D. Ariz. 2009) ..................................................... 19, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................... 2, 15, 17, 18, 19, 27, 33

*In re Vantive Corp. Securities Litigation*,
    283 F.3d 1079 (9th Cir. 2002) ............................................. 19, 27

*In re Wash. Mutual Inc. Sec. Litigation*,
    2009 U.S. Dist. LEXIS 99727 (W.D. Wash. Oct. 27, 2009) ........... 7, 20, 29

*In re Zucco Partners, LLC v. Digimarc Corp.*,
    2009 U.S. App. LEXIS 7025 (9th Cir. Feb. 10, 2009) .............................. 18

**STATUTES**

Fed. R. Civ. P. 9(b) ........................................................................... 2, 17

Food and Drug Administration ("FDA") 21 C.F.R. § 205.5, cited by
    Defendant E&Y ................................................................................ 6

21 U.S.C. § 331, *et seq* ......................................................................... 5

### Preliminary Statement

The Second Amended Complaint (the "SAC")[1] alleges that use of the exclusion provided in footnote 3 of Statement of Financial Accounting Standards No. 48 ("SFAS 48") by Medicis Pharmaceutical Corporation ("Medicis") and Ernst & Young LLP ("E&Y") used for short dated and expired products was "clearly inappropriate." The exclusion, by its own terms, can only be applied for product sold to "ultimate customers." Medicis's customers are wholesalers, which remove them from the class of customers for which footnote 3 may be applicable, and the products that defendants were applying the exclusion to were not of the "same quality, kind or price." In support of plaintiffs' claims, the SAC directly quotes a leading expert in the field of accounting, Dr. Joshua Ronen. Dr. Ronen's assessment supports plaintiffs' allegation that Medicis's and E&Y's accounting for short dated and expired products was not a reasonable interpretation under Generally Accepted Accounting Practices ("GAAP"). As Dr. Ronen stated, "neither Medicis nor Ernst & Young had a sound basis to conclude that the exclusion of footnote 3 was applicable to Medicis' transactions." ¶ 44.

Medicis and E&Y would have this Court hold that any violation of GAAP can never support *scienter* because GAAP requires an exercise of judgment. The case law cited by the defendants, however, says that GAAP "tolerates a range of reasonable treatments." *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1457 (N.D. Cal. 1996). Here, the treatment that Medicis and E&Y used was not *reasonable*. It was "clearly inappropriate" under the very language of footnote 3 of SFAS 48. This is plaintiffs' allegation, and Dr. Ronen's assessment supports that allegation. To hold that any GAAP violation is immune to inferences of *scienter*, as defendants suggest, would remove false financial statements from the range of actionable statements under the securities laws. There is nothing in the case law or legislative history which supports such a proposition,

---

[1] Citations to the SAC are denoted by ¶ _____.

and here, where the application is wholly contrary to the language of the exclusion under footnote 3, even the case law cited by defendants supports sustaining the SAC.

Indeed, plaintiffs' allegations are sufficient under the pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Fed. R. Civ. P. 9(b) requiring specificity or particularization.  Medicis and E&Y, however, do not argue that the allegations lack specificity, but instead argue a competing interpretation of the facts. The Supreme Court has held that the task of the Court at this stage of the litigation is not to decide the merits of the competing facts, but to consider whether plaintiffs' allegations are as "cogent and at least as compelling as any opposing inference once could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Here, nothing that Medicis and E&Y have proffered renders their interpretation <u>more</u> compelling than the inference of *scienter* that plaintiffs' propound.

Moreover, the SAC alleges additional claims that Medicis and E&Y misled investors about how the Company was actually accounting for short dated and expired products, and further support defendants' inference of *scienter* by way of the testimony of confidential witnesses and allegations of defendants' reasons or incentive to control the timing of Medicis's revenue recognition. Read holistically, as the Supreme Court requires, the totality of the allegations support the inference that defendants <u>intentionally</u> or <u>recklessly</u> made the material misrepresentations and omissions alleged in the SAC.

This is the fundamental issue before the Court. Defendants have not moved to dismiss by challenging that plaintiffs did not allege with adequate particularity that Medicis, the Individual Defendants, and E&Y made material misrepresentations and omissions which artificially inflated the price of Medicis common stock, and that upon the disclosure of those material misrepresentations and omissions the price of Medicis common stock declined causing injury to the Class.  The only issue before the Court is whether the SAC adequately pleads an inference of *scienter*.

## Background

Medicis is a specialty pharmaceutical company that markets perishable dermatological, aesthetic and podiatric drugs, *i.e.*, pharmaceuticals with limited shelf life, to wholesale distributors, who then sell its products to customers such as retail pharmacies and dermatologists.   ¶ 25-27, 41.  Manufacturing perishable products entails the inherent risk that unsold products will be returned as the date of expiration nears.  Thus, pursuant to SFAS 48, Medicis was required to estimate likely returns and to exclude that portion from revenue recognized on the sale of products to wholesalers, and to book reserves for the expected sales returns.   ¶ 3.   Moreover, the Company was required to accrue the portion of revenues reduced as a result of anticipated returns from its accounts receivables, thereby decreasing its working capital, a metric provided by the Company to give investors a view of its ability to meet its capital requirements as an ongoing concern.

Medicis' business model was predicated on its ability to stuff its wholesale customer channels with unneeded prescription drugs, which could be exchanged by customers once the product was at or near expiration. ¶ 40.   This practice allowed the Company to manage its earnings *i.e.,* if the demand for its prescription drugs was too low in a given period, it could simply push unneeded inventory on to its wholesale customers—which could be returned at a later date once the product expired—and Medicis could recognize the revenues immediately. *Id.*

### Defendant's Application of Footnote  3 to SFAS 48 Was Not Supported By the Requirements for its Application or by the Language of SFAS 48

The express dictates of SFAS 48, however, presented a threat to this business model.  Statement of Financial Accounting Standards No. 5, enacted in 1975, requires companies to account for loss contingencies as a charge to income if the contingency is probable or estimable.  ¶ 38.  SFAS No. 48, which was adopted nearly three decades ago, specifically provides that "sales revenue and cost of sales reported in the income

statement shall be reduced to reflect estimated returns." *Id.*   There is no room for disagreement as to the application of this principle.  Companies are required to deduct from their gross sales the estimated returns expected from such sales.  ¶ 39.  By way of example, if Company X had $100 million in gross sales in a given period, but anticipated that 20% of the products it had sold would be returned, it would only be able to record $80 million in sales for that year.  *Id.*  Moreover, the Company would need to accrue $20 million as a reserve for accounts receivables, thereby decreasing its working capital by $20 million.

This simple accounting rule, however, threatened to upend the Company's long standing channel stuffing scheme.  If the Company heeded the express dictates of SFAS 48, it would be required to establish a reserve for all of the excess product stuffed into the channel that would be returned or replaced.  ¶ 40.  Thus, if anticipated returns had to be deducted immediately from revenues, there would be no benefit to be derived from stuffing the distribution channel, and the Company would lose a key tool in its arsenal for manipulating revenues and working capital.  *Id.*

As a result, the Company sought an end run around the simple dictates of SFAS 48 by exploiting an exclusion provided in footnote 3 of the provision, which states that "[e]xchanges by ***ultimate*** customers of one item for another of the ***same, kind quality and price*** (for example, one color or size for another) are not considered returns for purposes of this statement."  ¶ 41.  In utilizing this exclusion, the Company improperly treated its returns as warranty exchanges, and thereby artificially inflated its revenues by utilizing a substantially lower replacement cost of anticipated returns, rather than gross sales.  ¶ 42.

### Medicis' Customers Were Not "Ultimate Customers" Under SFAS 48

The exemption provided by footnote 3, however, was wholly inapplicable to Medicis' expired product returns.   First, Medicis' customers are not "<u>ultimate customers</u>."  As Medicis admitted in Form 10-K's filed with the SEC, the Company's

customers were <u>wholesalers</u> such as Quality King and AmerisourceBergen who sold the products to retail pharmacies and dermatologists. It was the wholesalers, pharmacies and dermatologists that filled prescriptions thereby selling to the "ultimate customer," *i.e.*, patients. ¶¶ 7, 41. Indeed, in the six briefs filed by the various defendants to date, not one has proffered *any* rational or reasonable basis to explain how the exclusion to SFAS 48 could be applicable to sales by Medicis to its customers – wholesalers. None has been proffered because there is none. The facts are uncontroverted and beyond peradventure that Medicis did not sell its product to "ultimate customers" under SFAS 48. Accordingly, there is no basis, much less a reasonable one, to invoke the exclusion under footnote 3 to SFAS 48.

### Medicis' New Product Was Not Of The Same Quality, Kind and Price

Furthermore, the exclusion provided by footnote 3 of SFAS 48 can only apply to product that is of the "same quality, kind and price." Medicis's unsalable, expired prescription drugs were not of the "same quality, kind and price" as drugs that were offered as a replacement. Indeed, the safe and efficacious replacement drugs were at least fifteen months from expiration. ¶ 42. Aside from violating all notions of common sense, Medicis and E&Y's position was belied by the fact that the Company destroyed such expired products upon receipt from its customers, or sold them at a steep discount to charities. ¶¶ 43, 6.

In addition to Medicis' own practices debunking the ridiculous notion that expired pharmaceuticals are of the "same quality kind, and price" as unexpired products, federal statute reinforces the unreasonableness of defendants position because expired pharmaceutical products cannot be resold. *See* Prescription Drug Manufacturing Act, 21 U.S.C. 331, *et seq*. (Public Law 100-293); *RxUSA Wholesale, Inc. v. HHS*, 467 F. Supp. 2d 285, 293 (E.D.N.Y. 2006) ("[t]he object of the bill introduced into the U.S. House of Representatives and the Senate, which eventually became the PDMA, was to assure safe and effective distribution of prescription drugs and to minimize risks to consumers from

taking counterfeit, adulterated sub-potent or expired drugs. *See The Prescription Drug Marketing Act Report to Congress June 2001*.").   Indeed, Food and Drug Administration ("FDA") 21 C.F.R. § 205.5, cited by Defendant E&Y, specifically provides that "[p]rescription drugs that are outdated . . . shall be quarantined and physically separated from other prescription drugs until they are destroyed or returned to their supplier."  Thus there was and is simply no good faith or reasonable basis for Medicis to invoke the exclusion under footnote 3 of SFAS 48 by deeming its unsalable, outdated prescription drugs as the "same, quality, kind and price" as drugs that were 12-15 months from expiration.

### A   Prominent Authority On Accounting Stated That Medicis and E&Y's Application of Footnote 3 to SFAS 48 Was "Clearly Inappropriate"

The lack of any reasonable basis on the part of Medicis and E&Y to exploit footnote 3 of SFAS 48  is further supported by Dr. Joshua Ronen, an eminent Professor of Accounting and former Peat Marwick Faculty Fellow at New York University's Leonard N. Stern School of Business.  Dr. Ronen confirmed that the Company had <u>no</u> basis to employ the exclusion provided by footnote 3 of SFAS 48 ¶ 44.  Dr. Ronen reviewed the Company's Form 10-K's as well as the Medicis press releases and made the following assessment:

> In reviewing the Company's statements regarding its accounting for return reserves for short dated and expired product during the Class Period, it is my opinion that the only correct accounting treatment for the product exchange is the one governed by SFAS 48.  Under this standard, the exchanges should have been accounted for as a reduction in revenue and cost of sales to reflect estimated returns.
>
> ******
>
> Treatment of the exchange transactions as returns under the exclusion provided in footnote 3 of SFAS 48 "exchanges by ultimate customers of one item for another of the same kind, quality and price" is ***clearly inappropriate***:  Neither the wholesale customers of Medicis are "ultimate customers" nor is the quality of the products subject to exchanges the same "quality kind or price."  Hence, ***neither Medicis nor Ernst & Young*** *had a sound basis to conclude that the exclusion of footnote 3 was applicable to Medicis's transactions.*

*Id.* (emphasis added).

Plaintiff's allegations in the SAC citing Dr. Ronen's expert assessment at the pleadings stage is wholly supported by applicable case law.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000);  *In re Wash. Mut. Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 99727, at *24 (W.D. Wash. Oct. 27, 2009) (finding that plaintiffs "have also provided expert data analysis reinforcing their claim that WaMu's appraisal process was corrupt").

### **Virtually All Of Medicis' Competitors Properly Complied With SFAS 48**

In stark contrast to Medicis, virtually all of the Company's competitors properly accounted for the exchange of expired products during the Class Period.  ¶ 45.  For example, Johnson & Johnson, one of Medicis' main competitors, stated in its 10-K for the period ending December 31, 2007, that "[p]*rovisions for certain rebates, sales incentives, trade promotions, coupons product returns and discounts to customers are accounted for as reductions in sales in the same period that related sales are recorded.*" (Johnson & Johnson, 10K filed dated 2/26/08, page 44 (emphasis added). ¶ 46.  Teva Pharmaceutical Industries, Ltd. ("Teva"), one of the largest prescription drug manufacturers in the world "recor[ded] a reserve for estimated sales returns in accordance with the provision of [S]FAS 48. 'Revenue Recognition When Right of Return Exists' (Teva Pharmaceutical Industries 20-F dated 2/28/08, page 67).  *Id.*

Notably, Allergen, Inc., *a company audited by E&Y*, made provisions for returns "*based upon historical patterns of products returned matched against the sales from which they originated.*"  (Allergen, Inc. 10-K dated 2/28/08, page 45) (emphasis added).  *Id.*   Other examples abound, such as Impax Laboratories, Inc. ("Impax"), KV Pharmaceutical Company ("KV"), and others.

That defendants can point to two pharmaceutical companies which did not properly apply SFAS 48 does not support their proposition that failure to properly apply

footnote 3 to SFAS 48 was reasonable. Moreover, unlike Medicis, Questcor Pharmaceuticals, Inc., had only a *de minimis* amount of $11,000 in returns to customers, who were not ultimate users under SFAS 48. *See* ¶ 49. In addition, Questcor changed its policy and properly accounted for returns post-May 31, 2004. *Id*. Next, unlike Medicis, Heska Corporation advised investors that it had "record[ed] an accrual for the estimated cost of replacing the expired product expected to be returned in the future . . . ." ¶ 50. Thus, while Heska was in violation of SFAS 48, it did not materially misrepresent to investors its accounting for expired products as Medicis did. More importantly, that another accountant violates a GAAP standard is not a reasonable basis for Medicis' and E&Y's violation. Were that the case, then any violation of GAAP by one company or auditing firm would be a basis for every other company or auditing firm to claim that it was reasonable for them to violate GAAP. Such a proposition would defeat individual responsibility under the law, and render GAAP meaningless. There is nothing in American jurisprudence that would support such a proposition under the rule of law.

### Medicis Did Not Disclose To Investors That It Was Applying Footnote 3

Significantly, Medicis never disclosed to investors that it was exploiting an exclusion to SFAS 48 based upon the tenuous contention that its unsalable, expired drugs, were of the same "quality, kind and price" as new drugs. Moreover, the Company never alerted investors that it was reserving for returns based upon replacement costs, rather than as a deduction from gross sales. *Id.*

Indeed, Medicis' disclosures during the Class Period were purposefully crafted to lead investors to believe that it was reserving for returns by reducing gross sales in accordance with SFAS 48. *Id.* The Company's 10-K throughout the Class Period made the following statements regarding its return reserve policy, which it acknowledged was one of its "critical" accounting policies:

> programs are established as a reduction of product sales revenues at the time such revenues are recognized. These deductions from gross revenue are established by the Company's management as its best estimate at the

8

*time of sale based on historical experience adjusted to reflect known changes in the factors that impact such reserves, including but not limited to, prescription data, industry trends, competitive developments and estimated inventory in the distribution channel.*

\*\*\*

*Provisions for estimates for product returns and exchanges, sales discounts, chargebacks, managed care and Medicaid rebates and consumer rebate and loyalty programs are established as a reduction of product sales revenues at the time such revenues are recognized.*

¶ 51. (emphasis supplied).

Nothing in these statements comes close to suggesting that Medicis was utilizing an exclusion to SFAS 48 when reserving for returns.  ¶ 51.  Moreover, Medicis made no mention of the fact that it was reserving for returns at replacement costs, rather than as a reduction from gross revenues.  ¶ 52.  At bare minimum, once Medicis spoke regarding its return reserve policies, it had a duty to fully inform the investing public of its deviant accounting policies.  *In re Apollo Group Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 919-20 (D. Ariz. 2005) ("[a]lternatively, even if Defendants were correct in their assertion that they had no duty to disclose the report when it was issued, the Court finds that at the point Defendants chose to speak about the DOE investigation, they had a duty to speak fully and truthfully and such full disclosure would have included the negative DOE Report") (citations omitted).

However, far from "fully and truthfully" disclosing its return reserve policies, the Company intentionally misled the public regarding the nature of its reserves. As Dr. Ronen noted, "a reasonable accounting professional reading Medicis' statements regarding its policies for return reserves would have assumed that the Company was reserving for expired and short dated products in conformity with SFAS 48, and not pursuant to the exclusion set forth in footnote 3.  There is nothing in the Company's 10-K that would have led a reasonable accounting professional to the conclusion that the Company was reserving for returns based upon replacement costs, rather than deducting anticipated returns from gross sales." ¶ 52.

9

As a result, Medicis' statements throughout the Class Period regarding its return reserves intentionally or recklessly led investors to believe that the Company was reserving in accordance with SFAS 48, which as the Company later acknowledged, was completely not true.  ¶ 53.  Moreover, E&Y consistently signed off on these financial statements as conforming to GAAP, even though investors were completely misled regarding the nature of the Company's return reserve policy.

### Impact of the Company's Accounting Improprieties

On November 10, 2008, after the market closed, Medicis filed an amended annual report for 2007 on Form 10-K/A and amended quarterly reports for the first two quarters of 2008 on Form 10-Q/A, which materially shifted the Company's reported revenues for the past five years to reflect proper sales return reserve accounting. ¶ 147. The Company's restatement demonstrates how it utilized channel stuffing as a mechanism to manage earnings and portray itself as a company with consistent and reliable growth – which could be counted on to break its previously set financial records.  ¶ 148.   In fact though, the Company's financial performance was in reality erratic and unreliable.

For example, on November 7, 2007, the Company announced revenues of $120.4 million, compared to the prior quarter's revenue of $108.8 million.  Defendant Shacknai, in an effort to artificially boost the Company's stock price, boasted that these figures represented "another record revenue quarter" for Medicis.  *Id.*  However, the Company's restated revenues for the quarter was only $110.9 million, *3 million less than the Company's restated revenues of $113 million for the prior quarter*. *Id.*   Thus, contrary to Shacknai's bluster, Medicis was indeed *not* experiencing yet "another revenue record quarter" -- in fact its numbers were weak compared to the prior quarter.  *Id.*

Similarly, the Company's machinations allowed it to portray itself as a Company with steadily increasing annual revenues.  ¶ 149.  For example, from 2002 to 2003, the Company reported that its revenues increased from $212 million to $247 million, an impressive rise of 16.3%.  In reality though, the Company's actual revenues for 2003

were *$210.3 million, which represented a decline from the prior year's revenues of $212.8 million.*

In addition, the Company's faulty accounting materially inflated its reported working capital throughout the Class Period, which was a critical metric analyzed by Wall Street to assess the Company's ability to operate as an ongoing concern and expand its operations. ¶ 152.  For example, the Company's reported working capital of $600.1 million for the fiscal year ended June 30, 2005, was inflated by 69.2 million, or 13%. Moreover, the Company's reported working capital of $356.9 million for the fiscal year ending December 31, 2006 was inflated by $33.8 million , or 10.4%.

As a result, the Company's Class Period accounting manipulations had a material impact on the Company's reported financial results, thereby necessitating a restatement.

**Testimony of Confidential Witnesses**

The testimony of Confidential Witnesses paints a picture of a Company that consistently stuffed its channel in a gambit to manipulate its revenues, with the tacit approval of E&Y.   Confidential Witness 1 ("CW 1") was an accounts receivable senior accountant at Medicis from 2000 to 2006.   ¶ 31.   CW1 reported to Brian Barley ("Barley"), vice president of accounting, and Defendant Peterson.  CW1 was directly involved in calculating reserves under the improper replacement cost methodology. *Id.* CW1 voiced her concerns over this accounting treatment several times to Barley and Defendant Peterson. *Id.* Confidential Witness 2 ("CW2") was a senior accounts receivable coordinator at Medicis during parts of 2008. ¶ 32.   CW2 confirmed that Medicis accounted for the exchanges of expired/short-dated products using "zero dollar invoices" that "created a wash on the books." *Id.*

Confidential Witness 3 ("CW3") was an accounts receivable team leader at Medicis between 2000 and 2004. ¶ 33.   CW3 confirmed that Medicis routinely pressured customers to accept exchanges of returned product instead of credit, which would have to be reflected in a credit memo and booked against revenue. *Id.*  Confidential Witness 4

("CW4") was a senior financial analyst at Medicis in 2005. ¶ 34.  CW4 reported to Barley and Defendant Peterson. *Id.*  CW4 stated that Medicis was aware that expired and short-dated product could not be treated for accounting purposes as equivalent new product because in 2005 Medicis' accountants required it to establish a reserve for the expired inventory at its own warehouse.  CW4 helped implement that inventory reserve.

Confidential Witness 5 ("CW5") was the head of information technology for Medicis' finance department from 2001 until 2008, and oversaw the operation of the financial accounting and reporting software used by Medicis. ¶ 35.  According to CW5, reserve accounting methodology was "always an issue" at Medicis during his employment, and was a point of contention between auditors and management. *Id.*  CW5 confirmed that Defendants Peterson and Prygocki were aware of these issues because he was consistently asked to generate reports for the Company's auditors extracting historical return rates and returns analyses from the Epicor and SAP accounting systems Medicis utilized.  *Id.*

Confidential Witness 6 ("CW6") worked at Medicis in the order control department at the Scottsville, Arizona headquarters from 2003 until 2006. ¶ 36.  Between 2003 and February 2006, CW6 was an inventory control analyst. *Id.*   In February 2006, CW6 was promoted to supervisor of the inventory control department.  *Id.*  Confidential Witness 7 ("CW7") was an order control analyst at Medics from June 2005 until November 2007, ¶ 37, and reported to Linda Zelms in the Finance Department.

### **Medicis' Channel Stuffing Practices During The Class Period**

Medicis placed tremendous pressure on its accounting and sales staff to project an image of a Company that was consistently profitable, which could be relied upon to meet analyst expectations. ¶ 54. According to CW1, Medicis' "executive management was under a lot of pressure to meet expectations on the Street."  *Id.*  CW1 relates that "[t]here was an overall expectation on the Company" as a whole that its financial results would be better than the prior quarter.   The Company emphasized the importance of having

consecutive quarters without reporting a fiscal loss.  *Id.*  CW1 recalls the Company celebrating its 20th consecutive quarter without a loss.  *Id.*

The Company achieved these consistent results by stuffing the channel, and according to CW5, booking revenues as products sold "just because it went out the door." ¶ 55.  According to CW 5, Medicis monitored the sales from its wholesale customers to end users such as dermatologists by tracking script sales.  ¶ 56.  Medicis' order sales reflected product purchases by wholesale distributors.  *Id.*  Script sales, or script data, however, reflected the number of Medicis products physicians purchased from the Company's distributors.  *Id.*  According to CW5, "script sales were never in line with order sales."  For example, the script data might have shown the sale of thirty units of a certain drug sold to physicians, while Medicis' corresponding order data showed a sale of *400* units to the Company's wholesale customers.  *Id.*  CW5 relates that the data showed that Medicis was selling far more product than its wholesale customers were able to resell, and the remaining inventory was lying idle on shelves somewhere.  *Id.*

In order to induce its wholesale customers to accept the excess inventory, Medicis allowed for a liberal return policy regarding returned short dated or expired products, including permitting the exchange of such products for fresher product at no cost.  ¶ 56. According to CW2, if a customer returned a product, Medicis' ordering department created a credit memo acknowledging a financial credit.  *Id.*  However, if the Company was able to convince the customer to exchange or "swap" the product, Medicis reshipped the new product at "zero dollar value", i.e., at no cost to the customer.  Medicis would create a "zero dollar invoice" for the new product being shipped to the customer.  *Id.* According to CW2, the zero dollar invoices "created a wash on the books."  *Id.*  CW7 confirmed Medicis' policy of "zero dollar billing" for returns of expired product for fresh product.  ¶ 59.  According to CW6, approximately 25% of Medicis' credit returns were "swaps."  *Id.*

**Medicis Employees Knew That The Company's Accounting Was Improper**

During the Class Period, numerous Medicis personnel realized that the Company's accounting relating to return reserves was a sham. ¶ 60. CW2 stated that instead of creating a zero dollar invoice for the fresh product exchanged for the expired product, the Company should have matched the market value of the new product and credit the customer accordingly. "If a customer returned a product six months after expiration, but Medicis' price (for the returned product) had increased or decreased at the time, they are not acknowledging a price increase or decrease." *Id.* According to CW2, Medicis' method for return accounting "makes it easy, but not correct." *Id.*

While at the Company, CW1 challenged her supervisors that it was not accurate to account for the swap as an even exchange when the new product was not of the same value as the returned product, which was expired or soon to be expired. ¶ 61. In CW1's own words, "is it really accurate to say this is an even exchange when the value of the product is so different than it was a year ago?" *Id.* CW1 questioned her supervisors as to whether Medicis should even be recognizing the swaps as revenue because the customers did not have a real need for the product. ¶ 62. She was told by management, "I don't care if you agree with it or not" and to "just book" the reserves. *Id.*

CW5 related that Medicis booked the "swap" sale as revenue even though "you know this stuff is going to come back," albeit in another quarter. ¶ 63. According to CW5, the Company was "inflating sales by booking revenue for product that the Company knew was going to be returned." *Id.* Medicis "was not reserving for these potential returns," and the Company "should not have been recognizing revenue in the first place." *Id.*

**Medicis & E&Y's Knowledge of The Reserve Manipulations**

CW5 stated that the Company's calculation of reserves was "always an issue" at Medicis throughout the Class Period. ¶ 63. Medicis' internal auditors repeatedly asked CW5 to extract data from the Company's Epicor and SAP systems because they had issues with Medicis' reserve calculations. *Id.* According to CW5, the Company's reserve

14

calculations "[were] always a point of contention from a revenue standpoint" between Medicis' internal auditors and Barley and Stongstad. ¶ 64.  CW5 relates that Defendant Peterson was aware of the dispute between the internal auditors and the Company's accounting personnel regarding the reserve calculations.  *Id.*

E&Y was also acutely aware of the inherent difference in accounting treatment for fresh product and short dated or expired product.  ¶ 65.  According to CW4, in 2005, E&Y recommended that the Company institute a new reserve for inventory that the Company might not be able to sell before expiring or becoming short dated.  *Id.*  In light of this recommendation, Medicis created an "expiring inventory reserve."

In addition, prior to CW1's departure, E&Y auditors asked CW1 a number of questions regarding return reserves. ¶ 66.  The auditors asked CW1 for reports and evidence of the Company's reserve methodology and reconciliations.  *Id.*  CW1, not feeling comfortable with the company's accounting practices, referred the auditors to Barely and Songstad.  *Id.*

The application of SFAS 48 is not an esoteric issue under GAAP, and there was no change in direction within the industry during the Class Period or upon the commencement of oversight by the Public Company Accounting Oversight Board (the "PCAOB").  It is beyond peradventure that the application of SFAS 48 was, and is, central to the core business of the Company, and that neither Medicis, the Individual Defendants, nor E&Y can legitimately argue that they were unaware of this "key" accounting treatment regarding the Company's products.  *See Makor Issues & Rights, Ltd., v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008); *accord Glazer Capital Mgmt. LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (citing *Makor* and holding that "in certain circumstances, some form of collective scienter pleading might be appropriate").  Indeed, throughout the Class Period, Medicis acknowledged in its 10-K's that its return reserve policy was a "critical" accounting issue.

For instance, as outlined by the *Makor* Court, there could be circumstances in

which a company's public statements were so important and so dramatically false that they would create a strong inference that at least "*some* corporate officials knew of the falsity upon publication." *Id.* at 710. Just as Judge Posner noted in *Makor*, it is "exceedingly unlikely" that Medicis, the Individual Defendants, or E&Y were "unaware" of the application of SFAS 48 and the overstatement of revenues on the Company's books associated with the failure to properly account for the return of perishable goods under SFAS 48.

Moreover, Medicis' senior managers informed the market that they were on top of the Company's returns, and that returns were not negatively impacting the Company's revenues. During conference calls with analysts, defendants Shacknai and Prygocki stated that they closely followed prescription and sales data. ¶ 92. Schacknai went so far as to state falsely in August 2007 that "we weren't booking revenue in advance of future quarters or even our prescription trends. So they're right in line with our prescription trends." ¶ 123. These false statements to analysts relate directly to the accounting for returns in SFAS 48, and analysts' concerns that returns were impacting revenues.

In fact, returns are an inherent part and risk of Medicis's business, and Medicis advised the SEC and investors that it monitored returns and its distribution channels, including data from its accounting records in its Form 10-Ks. ¶ 50. The guiding accounting principle for returns under GAAP is SFAS 48, and it is beyond reason to believe that either Medicis, the Individual Defendants or E&Y were not aware of the accounting that the Company was utilizing during the Class Period, which was premised on the obviously unsupportable premise that Medicis' expired drugs were of the "same quality, kind and price" as drugs that were at a minimum 15 months from expiration.

By restating the Company's financials, the defendants have admitted they made material misrepresentations in its financial statements during the Class Period. *See* Accounting Principles Bulletin No. 20 ("APB 20"). Moreover, the restatements of Medicis's financial statements during the Class Period, at the direction of E&Y, are proof

that E&Y's Auditors' Reports disseminated with and certifying those false financial statements also contained material misrepresentations.  Whether considered individually or holistically, as the Supreme Court has mandated in *Tellabs,* the allegations in the SAC satisfy the heightened pleading standards under the PSLRA and Fed. R. Civ. P. 9(b) with respect to all of the defendants.

## ARGUMENT

## THE SAC ADEQUATELY ALLEGES *SCIENTER*

### A.   Standards for Pleading *Scienter* Under Section 10(b) of the Exchange Act

It is well-established that to adequately allege *scienter* under Section 10(b) of the Exchange Act, a plaintiff is required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Ernst & Ernst v. Hockfelder*, 425 U.S. 185, 194 (1976).  More recently, the Supreme Court held that a complaint will survive a motion to dismiss if the inference of *scienter* is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Thus, if the inferences for and against *scienter* are in equipoise, the complaint must be sustained.  The *Tellabs* Court went on to caution that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citations omitted). It further reaffirmed the applicability, in the context of the PSLRA, of the principles that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically" (*Id.* at 326), and that a court must "accept all factual allegations in the complaint as true." *Id.* at 322.

Accordingly, in determining the cogency of the allegations, district courts are required to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*  That is, district courts must consider whether "*all* of the

facts alleged, taken collectively, give rise to a strong inference of *scienter*, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (emphasis in original). Thus, "[e]ach case will present a different configuration of factual allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 272 (3d Cir. 2009).

The "holistic" approach mandated by the Supreme Court has profoundly altered the way district courts within the Ninth Circuit analyze *scienter* pleadings. In *In re Zucco Partners, LLC v. Digimarc Corp.*, 2009 U.S. App. LEXIS 7025, at *15-*16 (9th Cir. Feb. 10, 2009), the Ninth Circuit noted:

> Although we have developed a set of rules to analyze different types of scienter allegations, we recognize that *Tellabs* calls into question a methodology that relies exclusively on a segmented analysis of scienter. We read *Tellabs* to mean that our prior, segmented approach is not sufficient to dismiss an allegation of scienter. Although we have continued to employ the old standards in determining whether a plaintiff's allegations of scienter are as cogent or as compelling as an opposing innocent inference, *see, e.g., Metzler Investment* [*GMBH v. Corinthian Colleges, Inc.*], 540 F.3d [1049] at 1065-69 [(9th Cir. 2005)], we must also view the allegations as a whole. *See South Ferry LP, No.2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Tellabs* counsels us to consider the totality of the circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."). Thus, following *Tellabs*, we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

*Id.* at *17-*18.

Moreover, courts have noted that the Ninth Circuit Court of Appeals decision in *South Ferry LP No.2 v. Killinger,* 542 F.3d 776, 784 (9th Cir. 2008) represents a "seismic shift in the Circuit's analysis of securities fraud complaints and significantly lowers the

bar for pleading scienter." *Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 788 (D. Ariz. 2009) (quoting 14 No. 11 Andrews Sec. Litig. & Reg. Rep. 2 (Oct 7, 2008) (footnote omitted).  Prior to *South Ferry*, the Ninth Circuit was "more stringent" than other Circuits regarding the standard for pleading *scienter*.  *Id.* at *63.  In *South Ferry* however, the Ninth Circuit revisited the issue of the "level of detail required under the PSLRA" when pleading *scienter*, and radically altered its prior holdings for pleading *scienter* as articulated in *In re Read-Rite Corp. Secs. Litig.*, 335 F.3d 843 (9th Cir. 2003),  *In re Vantive Corp. Secs. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002), and *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F. Supp. 746, 761 (N.D. Cal. 1997).  *Id.* 542 F.3d at 784.

Acknowledging that "perhaps" it had been "too demanding and focused too narrowly in dismissing vague, ambiguous or general allegations of scienter out right," now, post-*Tellabs* cases, the court stated that *"Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA  requirements, those prior holdings . . . notwithstanding." *Id.* Thus, the Ninth Circuit explicitly instructed Courts "to consider the totality of the circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."  *Id.*  Taking a holistic approach requires that "federal courts . . . not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."  *Id.*  It is that very "practical" and "common sense perspective" which mandates the denial of Defendants' motion to dismiss.

**B.    The SAC Satisfies the Ninth Circuit's Analysis for *Scienter* and the Holistic Approach Mandated by the Supreme Court**

The allegations in the SAC support a strong inference of fraud against each of the defendants, regardless of whether the Court applies the individual analysis utilized by the Ninth Circuit prior to *Tellabs*, or the holistic analysis mandated by the Supreme Court in *Tellabs*.

**1.    The SAC Contains Numerous Additional Scienter Allegations Against Defendants**

19

Contrary to Defendants' assertions, the SAC is replete with numerous additional allegations which were not pled in the first Amended Consolidated Class Action Complaint that further buttress plaintiffs' *scienter* allegations.

### a.   Dr. Ronen's Testimony Supports Plaintiffs' Allegations Regarding Defendants' Baseless Application of Footnote 3 to SFAS 48

In the December 1, 2009 Order dismissing Plaintiff's Amended Complaint, ("December 1, 2009 Order"), the Court credited Defendants' contention that SFAS 48 was subject to varying interpretations, and that Defendants' utilization of footnote 3 of the provision was merely an "aggressive" interpretation of the provision. Order at 14. Contrary to defendants' attempt to soft pedal their wrongdoing, the SAC alleges that their exploitation of footnote 3 was beyond the range of reasonable accounting, and not merely on the "aggressive" side.  As Dr. Ronen noted, Defendant's application of footnote 3 was "clearly inappropriate" and "neither Medicis or Ernst & Young had a sound basis to conclude that exclusion of footnote 3 was applicable to Medicis' transactions."   ¶ 44. Indeed, Dr. Ronen states that "the only correct accounting treatment for the product exchange (encountered by Medicis) is the one governed by SFAS 48." *Id.*  That is so, because as pled in the SAC, exchanges of expired, unsalable prescription drugs are not of the "same quality, kind and price" as fresher drugs, and that wholesale customers of Medicis are not "ultimate customers" of the Company. *Id.*

Contrary to defendants' representations, incorporating expert testimony at the pleading stage has been upheld by the Ninth Circuit, *see Nursing Home*, 380 F. 3d at 1233, and district courts within the Ninth Circuit.  *See Wash. Mut.*, 2009 U.S. Dist. LEXIS 99727, at * 24. Indeed, in *Wash. Mut.*, the district court relied on expert testimony to buttress allegations that Washington Mutual Bank's ("WaMu") "appraisal process was corrupt" and that the Company had a much higher loan to income ratio than its peers which "confirms that the deterioration in the underwriting standards in WaMu was nationwide in scope." *Id.*  at *27.

The cases cited by Defendants do not hold otherwise.  In *Demarco v. Depotech Corp.*, 149 F. Supp. 2d 1212, 1219 (S.D. Cal. 2001), the court struck an expert's affidavit because it was attached to the pleadings—and not in the complaint itself.  In fact, the court denied defendants' motion to strike those portions of the expert's report that were incorporated into the numbered allegations in the complaint.  *Id.* at 1222. Similarly, in *Fin. Acquisition Ptnrs. v. Blackwell,* 440 F.3d 278 (5th Cir. Tex. 2006), the expert opinion was contained in an affidavit, and not in the actual pleadings.  In *In re Silicon Storage Tech, Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 21953, at *31 (N.D. Cal. Mar. 9, 2007), the court disallowed expert testimony which took the form of generic market data. None of these cases stands for the proposition that defendants posit, *i.e.*, that allegations in a complaint may not contain expert testimony.[2]

**b.      The SAC Alleges Defendants Misled Investors Regarding Accounting Practices**

The SAC also adds allegations regarding Medicis' utter failure to disclose to investors that it was employing a suspect exemption to the express dictates of SFAS 48. Throughout the Class Period, Medicis acknowledged that its accounting for return reserves was a "***critical accounting polic[y] . . . . in understanding our financial condition and results of operations***."  ¶ 79 (emphasis added).  Yet despite the "critical" nature of the Company's return reserve accounting, it completely failed to disclose to investors that it was reserving for returns by reducing revenues by replacement costs, as opposed to gross sales, despite the express dictates of SFAS 48.  Investors would surely have wanted to know that the Company's reserve calculations were based upon the dubious premise that unsalable, expired drugs were of the "same quality, kind and price" as fresher drugs.  Moreover, investors would have also wanted to know, and had every right to know, that the Company's reserve calculations were based upon the indefensible

---

[2] The SAC also sufficiently states that Ronan's basic credentials as an expert and the basis of his assessment.  No more is required. *Nursing Home Pension Fund, Local 144* at 1233.

notion that the Company's customers were "ultimate customers," despite the fact that the Company consistently acknowledged in its 10-K's that its customers were "primarily large pharmaceutical <u>wholesalers</u>." (Underscore added.) Had investors known these facts, they would have been on alert that the Company's revenues and working capital were based upon untenable premises, and risked severe restatement.

Instead, Medicis purposefully tailored its disclosures to lead investors to falsely believe that it was reserving for returns by reducing gross sales in accordance with SFAS 48. Throughout the Class Period, Medicis stated that "provisions for estimates for product returns and exchanges . . . *are established as a reduction of product sales revenues at the time such revenues are recognized*. ¶ 50. After reviewing the Company's disclosures regarding its return reserve policy, Dr. Ronen stated: "a reasonable accounting professional reading Medicis' statements regarding its policies for return reserves would have assumed that the Company was reserving for expired and short dated products in conformity with SFAS 48, and not pursuant to the exclusion set forth in footnote 3. *There is nothing in the Company's 10-K that would have led a reasonable accounting professional to the conclusion that the Company was reserving for returns based upon replacement costs, rather than deducting anticipated returns from gross sales*." ¶ 52 (emphasis added).

In their memoranda in support of their Motions to Dismiss, the Medicis Defendants attempt to deflect this glaring misrepresentation by arguing that they had no duty to disclose the specifics of their accounting practices. Medicis Defendants Motion to Dismiss ("Medicis MTD"), page 5, footnote 3. First, as confirmed by Dr. Ronen, Defendants misstatements were more than mere omissions, as they would have led a "reasonable" accounting professional to believe that the Company was reserving for returns based upon gross sales. Moreover, even assuming *arguendo* that the alleged misstatements were merely omissions, given that the Company already made some disclosure regarding its "critical" return reserve accounting, it was under every obligation

to make such disclosures complete and accurate for investor consumption. *Apollo Group*, 395 F. Supp. 2d at 919-920 ("at the point Defendants chose to speak about the DOE investigation, they had a duty to speak fully and truthfully, and such full disclosure would have included the negative report"); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) ("even absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects."); *Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377, 387 (D. Or. 1996).[3]

### c.   The SAC Contains Allegations Regarding Defendants' Motives For Manipulating Medicis' Revenues And Working Capital

In the December 1, 2009 Order, the court found that the complaint had failed to allege "facts suggesting why a company would deliberately control the timing of the revenue recognition," Order at 17, and "provid[ed] no reason or incentive for Defendants to intentionally or recklessly control the timing of Medicis' revenue recognition." *Id.* The SAC cures these defects by alleging a scheme to manage revenues.

Specifically, the SAC alleges that throughout the Class Period, Medicis touted itself as a pharmaceutical Company of consistent and reliable growth—which could be counted on to continuously break its previously set revenue records.  ¶ 148.  That image was maintained by the Company's channel stuffing practices and outright violation of SFAS 48.  In short, the Company embarked upon a scheme to push forward revenues in certain quarters in order to maintain an image of consistent and steady growth.

For example, on November 7, 2007, the Company announced revenues of $120.4 million, compared to the prior quarter's revenue of $108M. ¶ 148.   In reference to these financial results, Defendant Shacknai, boasted of "another record revenue quarter" for Medicis.   However, Medicis' restated figures demonstrate that the Company's actual

---

[3] *Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002), cited by defendants, is inapposite, as the Ninth Circuit did not hold that a statement made by a company could omit material facts which render that statement misleading.

revenue for the period ending September 30, 2007 was only *$110.9M, 3 million less than the Company's restated revenues of $113M for the prior quarter*. *Id.*   Thus, Medicis in fact did not achieve yet "another revenue record quarter." *Id.*

The Company's revenue manipulation scheme extended to its annual financial reports as well.  For example, from 2002 to 2003, the Company reported that its revenues increased from $212.M to $247.52M, an impressive increase of 16.3%.  ¶ 149.  In reality though, the Company's actual revenues for 2003 were 210.3M, which represented a decline from the prior year's revenues of $212.8M.  *Id.*  Thus, the Company's restatement demonstrates that its revenue manipulations were crafted to lead the market to believe its claims of steady and reliable growth, and thereby inflate the price of the Company's stock.

The SAC also adds further details regarding the Company's manipulation of working capital—which was reported by Medicis in every period during the Class Period and is a critical gauge of a company's ability to manage its operations and expand its business.   ¶ 152.  *Shahzad v. H.J. Meyers & Co.*, 1997 U.S. Dist. LEXIS 1128, at *8 (S.D.N.Y. Feb. 4, 1997) (denying motion to dismiss where plaintiff alleged that defendant company had misstated its working capital).  For example, the Company's reported working capital of $600.1 million for the fiscal year ended June 30, 2005, was inflated by 69.2 million, or 13%.  *Id.*  Moreover, the Company's reported working capital of $356.9 million for the fiscal year ending December 31, 2006 was inflated by $33.8 million , or 10.4%.  *Id.*  Thus, the SAC provides another motive for the Company to violate the express dictates of SFAS 48—the material inflation of working capital, which was considered by analysts who followed Medicis.

**d.**      **The SAC Provides Additional Details By Confidential Witnesses**
            **Regarding the Company's Accounting Manipulations**

In the December 1, 2009 Order, the court found the complaint's allegations provided by the CW's insufficient to support an inference of *scienter* because they lacked

supporting detail regarding their personal knowledge of the allegations and because of the insufficiency of the allegations themselves.   The additional CW allegations in the SAC cure these defects.   Specifically, the SAC paints a stark picture of Medicis, with the imprimatur of E&Y, stuffing its channel in order to manipulate its revenues and improperly accounting for its return reserves in order to maintain the scheme.   *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1186 (S.D. Cal. 2009) (finding that "over-saturated channels" weighed in support of inference of *scienter*).

CW1 relates that Medicis placed tremendous pressure on its accounting and sales staff to "meet expectations on the Street."   ¶ 54.   CW1 recalls that the Company's management "celebrated each quarter that they didn't have a loss."   *Id.*   These results were achieved by stuffing the channel and booking revenues as sold "just because it went out the door."   ¶ 55.   According to CW5, Medicis monitored the sales from its wholesale customers to end users such as dermatologists by tracking script sales.   ¶ 56.   While Medicis' order sales reflected product purchases by wholesale distributors, script sales, or script data, reflected the number of Medicis' products physicians purchased from the Company's distributors.   *Id.*   According to CW 5, order sales outstripped script scales exponentially—often over ten times the actual script sales.

According to CW5, the Company was "inflating sales by booking revenue for product that the Company knew was going to be returned."   ¶ 63.   Medicis "was not reserving for these potential returns," and the Company "should not have been recognizing revenue in the first place."   *Id.*

In order to induce its wholesale customers to accept such excess inventory, Medicis allowed for a liberal return policy.   ¶ 58.   According to CW2, if a customer returned a product, Medicis' ordering department created a credit memo acknowledging the financial credit.   *Id.*   However, if the Company was able to convince the customer to exchange or "swap" the product, Medicis reshipped the new product at "zero dollar value", *i.e.,* at no cost to the customer.   Medicis would create a "zero dollar invoice" for

the new product being shipped to the customer, which "created a wash on the books."

CW7 confirmed that a swap was booked "as a no dollar sale".  ¶ 59.

Several Medicis employees questioned the propriety of the Company's accounting for reserves.  According to CW2, "If a customer returned a product six months after expiration, but Medicis' price (for the returned product) had increased or decreased at the time, they are not acknowledging a price increase or decrease."  ¶ 60.  While at the Company, CW1 also questioned whether it was really accurate to account for the swap as an even exchange when the new product was not of the same value as the returned product -- which was expired or soon to be expired.  ¶ 61.

These detailed additional allegations, as well as others referenced in the SAC regarding Medicis' channel stuffing and faulty accounting, raise an inference that the Company -- with E&Y's knowledge -- was stuffing the channel and manipulating its return reserve calculation in order to meet Wall Street's financial targets.

**C.     Application of the *South Ferry* Core Operations Doctrine Further Supports the Denial of Defendants' Motion to Dismiss**

In establishing *scienter*, it is often difficult "to find facts regarding an adversarial party's state of mind, given that the only party in full knowledge of those facts is naturally disinclined to share them."  *South Ferry LP #2,* 2009 U.S. Dist. LEXIS 91174, at *16 (W.D. Wa.  Oct. 1, 2009).  As a consequence, Plaintiffs may utilize either direct or circumstantial evidence to show that defendants knew that their statements were false or misleading.  *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999).  One "tool in Plaintiffs arsenal is the 'core operations' inference."  *South Ferry LP #2,* 2009 U.S. Dist. LEXIS 91174 at *17.  Under the core-operations doctrine, it is reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operations of their companies.  *Id.*

In *South Ferry*, 542 F.3d 776, the Ninth Circuit investigated the interaction of three cases when considering the permissibility of this inference: *Read Rite, Silicon*

*Graphics, and Vantive* in light of the then recent Supreme Court decision in *Tellabs*. The Ninth Circuit acknowledged that its three earlier decisions, "read without reference to *Tellabs*, will generally prevent a plaintiff from relying exclusively on the core operations inference to plead scienter under the PSLRA." 542 F.3d at 784.   *Tellabs*, however, changed the landscape for assessing *scienter* under the PSLRA, which led the Ninth Circuit to conclude that its prior jurisprudence was "too demanding and focused too narrowly in dismissing vague, ambiguous or general allegations outright."   Thus in light of *Tellabs*, the *South Ferry* court held that there were three circumstances in which the core operations doctrine could establish *scienter* under the PSLRA.  *Id.*

The "actual knowledge" analysis finds that pleadings which rest on the core operations theory may satisfy the pleading obligations when there are "detailed and specific allegations about management's exposure to factual information within the Company," *i.e.*, facts that indicate that management *actually did* know of the core operations of the subject company."  *Id.*   The second application of the core operations doctrine is the "absurdity" analysis.   The "absurdity" analysis allows allegations of *scienter* to succeed in those "rare occurrences where the nature of the fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* The third is the "holistic" analysis, which supports a strong inference of *scienter* when viewed "with other allegations that, when read together, raise an inference of scienter that is cogent and compelling in light of other explanations."  *Id.* at 785.  The SAC satisfies all three approaches to the core operations doctrine.

1. **Actual Knowledge Analysis**

There is no question that Defendants knew of the core operations of Medicis similar to the circumstances in *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022-23 (9th Cir. 2005), where defendants were alleged to have been involved "in every detail" of the company and alleged to have actually monitored the data that were the subject of the allegedly false statements, sufficient to plead *scienter* under the PSLRA.   Similarly, in

*Nursing Home*, the court found *scienter* sufficiently pled where the CEO had touted that "all of our information is in one data base.  We know exactly how much we have sold around the world."  380 F.3d at 1231.

Here, the SAC makes detailed allegations regarding Defendants' public statements regarding their knowledge of the Company's accounting for return reserves and the Company's flow of product into the pipeline.  Throughout the Class Period, Medicis, with E&Y's sign off, acknowledged that its accounting for return reserves was a "critical accounting policy".  ¶ 79. Moreover, Medicis' 10-K's, which were signed by Defendants Shacknai and Prygocki, consistently represented that "*exchanges for expired product are established as a reduction of product sales revenues at the time such revenues are recognized.*"  Further, throughout the Class Period, Defendant Shacknai touted the Company's quarterly and annual revenues.

In addition, during an earnings conference call with analysts held on September 1, 2005, Defendants Shacknai and Prygocki each represented to analysts that there was no channel stuffing.   ¶ 92. In response to an inquiry as to whether there was "unusual stocking" by the distributors, Defendant Shacknai said "No-no unusual stocking that we are aware of.  And Mark is in the business of monitoring levels."  *Id.*  Defendant Prygocki also answered ". . . our inventory levels in the trade are reasonable.  We have said that consistently." *Id.*  Additionally, in an earnings conference call held on August 7, 2007, Defendant Prygocki represented that "we weren't booking revenue in advance of future quarters or even our prescription trends.   So they're right in line with our prescription trends."  ¶ 123.  Thus Medicis and Defendants Schacknai and Prygocki repeatedly touted their knowledge of the Company's return reserve policies, revenues and channel flow.  As such, they had "actual knowledge" of the underlying facts which triggered the Company's restatement.  *See South Ferry LP #2*, 2009 U.S. Dist. LEXIS 91174  at *29 (holding that *scienter* adequately alleged when Defendant repeatedly told the investing public "I know what I am talking about"); *Institutional Investors*, 564 F.3d

at 270 (holding that the possibility that the CEO "was ignorant is not necessarily exculpatory.  Even if he were not aware of the full extent of the unusual discounting . . . he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials . . . would mislead investors."); *Washington Mut.*, 2009 U.S. Dist. LEXIS 99727 at *28 (holding the Plaintiff's allegations raise a strong inference of *scienter* where Defendant's own statements demonstrate that he was deeply familiar with company's underwriting guidelines); *In re Countrywide Fin. Corp. Sec. Litig.,* 588 F. Supp. 2d 1132 (C.D. Cal. 2008) (finding inference of *scienter* appropriate for the Chief Operating Officer taking into consideration his job position, duties, and access to corporate reports and information systems).

### 2.   The Absurdity Analysis

The SAC also meets the "absurdity" test set forth by the Ninth Circuit in *South Ferry*.  The core operations doctrine may be satisfied "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."  Thus, in *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 989 (9th Cir. 2008), the Ninth Circuit found that core operations allegations were sufficient to plead *scienter* where a corporation had categorized a substantial number of government contracts that were subject to "stop work orders" as "backlog," or work that the Company had contracted to do, but had yet to perform. *Id.* at 984. Contrary to defendants' characterizaion, however, "stop work" orders generally terminated the contracts entirely, making them unlikely ever to result in reportable income.  *Id.* at 987. As the individual defendants were "directly responsible for [the company's] day to day operations," it was "hard to believe" that they would not have known about orders that allegedly halted tens of millions of dollars of the Company's work."  *Id.*

Here, Defendants Shacknai and Prygocki consistently discussed the Company's reserve return, revenue recognition and channel flow.  Moreover, the significance of SFAS 48, which the Company admitted was a "critical" accounting policy, renders it

"absurd" to posit that they were not aware of the proper application of the accounting doctrine.   Furthermore, the sheer lack of credibility of the Company's accounting "misinterpretation" also militates in favor of a strong inference of *scienter*.   First, in order to trigger the exemption provided by footnote 3 of SFAS 48, the Company had to deem its customers "ultimate customers," even though the Company's own 10-K's and public filings consistently recognized that their customers were <u>wholesalers</u>, who in turn sold products to retailers and end customers. ¶¶ 7, 41. Indeed, in the six briefs collectively filed by defendants to date, *they have not proffered any explanation whatsoever for deeming its wholesale customers "ultimate customers."*

Moreover, Medicis' treatment of expired, unsalable drugs as "of the same quality, kind and price" as drugs at least 12-15 months from expiration is facially absurd.  That contention is directly contradicted by the testimony of CW1 and CW5 that such expired or nearly expired products were destroyed because "they had no value."   ¶ 43. Defendants attempt to skirt this glaring misrepresentation by arguing that they were merely accounting for returns in a manner that reflected the economic reality of the exchange by reserving for replacement costs. Medicis Mem., at 5. However, regardless of Defendants' misguided conception of "economic reality," Medicis was only permitted to reserve based upon replacement costs if it met the explicit requirements of footnote 3.  In all of their bluster, Defendants have failed to proffer any evidence that it satisfied these dictates.   Similarly, E&Y's contention that it was accounting for exchanges rather than returns is mere sophistry.  E&Y Mem. at 5.  Medicis' returns would only qualify as "exchanges" if it met the direct strictures of footnote 3 of SFAS 48.  That they did not, means that such returns were indeed "returns" under SFAS 48 and therefore required the Company to reserve based upon gross sales -- not replacement costs.

Thus, it is absurd to suggest that Defendants Shacknai and Prygocki and E&Y were unaware of the violations of SFAS 48. *See Institutional Investors*, 564 F.3d at 272 ("the centrality of operating margins to the 'Avaya story,' the magnitude and

pervasiveness of the alleged discounting, and the proximity of the March statements to the end of the quarter . . . all diminish the plausibility of innocent explanations" for misstatements").

### 3.    The Holistic Analysis

Under the holistic analysis, core operations allegations "may be coupled in any form along allegations that, when read together, raise an inference of *scienter* that is cogent and compelling in light of other explanations."  *South Ferry,* 542 F.3d at 785. Thus, "the core operations inference can be one relevant part of a complaint that raises a strong inference of scienter." *Id.*  "Allegations that rely on the core operations inference are among the allegations that may be considered in the complete PSLRA  analysis." *Id.* Thus the core operations can be a plus factor, "adding weight to other allegations and circumstances and giving rise to the necessary level of particularity."  *Id.*

In *South Ferry LP #2*, 2009 U.S. Dist. LEXIS 91174 at *36, the district court found that under the holistic analysis articulated by the Ninth Circuit, confidential witness statements, the CEO's prominent position within the Company, and repeated representations that WaMu was confident about its risk management combined with core operations allegations sufficed to uphold the complaint at the motion to dismiss stage.  In *Backe,* 642 F. Supp. 2d at 1185-86  the Court held that core operations allegations, combined with allegations of channel stuffing, manipulation of revenues, allegations of pushing sales at end of quarter, and restatement of financials combined to sufficiently plead *scienter* under the PSLRA.  *See also*, *Teamsters Local 617*, 633 F. Supp. 2d at 806 (holding that allegations of responsibility for stock option grants coupled with allegations of receipt of backdated options, false Sarbanes-Oxley ("SOX") certifications, falsely certified 10-K's, and misstatement of financial reports adequately pleaded *scienter*).

Here, the detailed allegations of the SAC regarding the centrality of return reserve accounting to the Company's operations, coupled with: 1) numerous CW accounts of the Company's channel stuffing and accounting manipulations in order to manage revenues

(¶¶ 54-66); 2) Dr. Ronen's assessment regarding the Company's faulty accounting practices (¶¶ 44, 50); 3) allegations regarding the accounting practices and/or disclosures of Medicis' competitors (¶¶ 45-49); Medicis' failure to disclose its non-compliance with SFAS 48 (¶¶ 50-53); and 5) Medicis' violation of GAAP for several consecutive years culminating in a restatement of its reported revenues and working capital, in the aggregate, raise a cogent and compelling inference of *scienter*.

## D.    The Allegations Support Ernst & Young's Scienter

E&Y willingly allowed Medicis to utilize the exclusion provided by footnote 3 of SFAS for several years despite the fact that there was no reasonable basis to support the use of this exclusion.   Moreover, E&Y allowed Medicis to intentionally mislead its investors as to its accounting for return reserves by stating throughout the Class Period that its reserves "*were established as a reduction of product sales revenues at the time such revenues are recognized,*"  even though the Company was reducing revenues by the far less substantial replacement costs. ¶ 50.  Further indicative of E&Y's *scienter* is the fact that its own client, Allergen, Inc., properly accounted for its return reserves under SFAS 48.  ¶ 46.

Moreover, CW4 stated that E&Y specifically discussed with the Company the accounting problems triggered by inventory that became expired or short-dated.   ¶ 65. Additionally, prior to CW1's departure, E&Y asked CW1 for reports and evidence of the Company's reserve methodology and reconciliations.   ¶ 66.   CW1, not feeling comfortable with the Company's accounting practices, deferred E&Y to Barley and Songstad. *Id.*

By allowing this flagrant GAAP violation, E&Y violated Generally Accepted Auditing Standards ("GAAS").  As a result of E&Y's reckless conduct, the financials disseminated to the public during the Class Period were materially misleading and/or false.

E&Y would have this Court ignore these glaring GAAP and GAAS violations and

insist that Plaintiffs plead specifics relating to E&Y's audit that are proprietary to E&Y or confidentially maintained by E&Y and Medicis.   Indeed, E&Y argues that they are afforded a privileged position under the securities laws, which requires an even higher pleading standard than that applicable to Medicis and the Individual Defendants.   Recent case law however has firmly laid to rest any notion of privilege under the law.   As the court in *Countrywide* explained:

> Some courts have given outside auditors as a class remarkable deference in part because some courts think outside auditors lack "any rational economic incentive to participate in its client's fraud." *Reiger v. Price Waterhouse Coopers, LLP*, 117 F. Supp. 2d 1003 (S.D. Cal. 2000), *aff'd sub. nom*. *DSAM Global Value Fund v. Altris Software, Inc*., 288 F.3d 385 (9th Cir. 2002).  The Court finds this supposition suspect, at best.  Auditors are hired and retained by insiders.  A few top auditing firms compete for high-profile clients such as Countrywide.   Therefore, they have strong structural incentives to yield to management on close questions.  More to the point, *Tellabs* and *South Ferry* put to rest the misguided idea that courts should create categorical rules and presumptions for different kinds of actors and statements.

*Countrywide*, at 1197.

After *Tellabs* and *South Ferry*, there is no basis to ascribe any heightened status for auditors.   The majority of cases cited by E&Y in support of their claim for a more stringent standard are pre-*Tellabs* decisions.   The Supreme Court put such arguments to rest when it stated the standard for alleging *scienter* under Section 10(b) of the Exchange Act.  It did not state that the standard was only for individuals and corporations, nor did it carve out any higher standard for auditors.   Regardless of whether the defendant is an auditor or a CEO, if a plaintiff alleges facts that support an inference of *scienter* that are "cogent and at least as compelling as any opposing inference of nonfraudulent intent," then *scienter* has been adequately pled.   *Tellabs*, 551 U.S. at 315.  Here, there are a host of allegations that E&Y ignored the clear and obvious application of SFAS 48.  In so doing, one can conclude only that its auditing of revenue for returns amounted to *no audit at all.   DSAM*, 288 F.3d at 390.

Turning a blind eye to the obvious at a minimum supports the allegation that E&Y acted recklessly.  *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (holding that "an egregious refusal to see the obvious" supports an inference of *scienter*).  When combined with the facts that Medicis was channel stuffing, that Medicis deliberately misinformed investors regarding its reserve accounting, and that E&Y had raised questions regarding the accounting implications of expired products early in the Class Period, one can easily infer that E&Y's actions were knowingly deliberate.  The inference that E&Y acted recklessly or intentionally is at least as compelling as the possibility that E&Y innocently misapplied SFAS 48.

**E.**     **The Amended Complaint Adequately Alleges Section 20(a) Liability**

The Amended Complaint alleges that the Company and Individual Defendants committed a primary violation of Section 10(b) of the Exchange Act, and that the Individual Defendants acted as controlling persons of Medicis within the meaning of Section 20(a) of the Exchange Act by virtue of their positions and their power to control public statements about Medicis.  The defendants had the power and ability to control the actions of Medicis and its employees, and Medicis controlled the defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to Section 20(a).  Here the first element is satisfied because, as discussed above, the Amended Complaint has adequately alleged a primary violation by the defendants under Section 10(b) and Rule 10b-5 promulgated thereunder.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request this Court deny defendants' motion to dismiss.

Respectfully submitted this 22nd day of March, 2010.

**MARTIN & BONNETT, P.L.L.C.**

By:_____s/Jennifer Kroll_____
          Susan Martin
          Jennifer Kroll

34

3300 N. Central Avenue, Suite 1720
Phoenix, AZ  85012
Tel:   (602) 240-6900
Fax:  (602) 240-2345

**POMERANTZ HAUDEK**
**  GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
Joshua B. Silverman
Leigh Handelman Smollar
10 South LaSalle Street, Suite 3505
Chicago, Illinois  60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184

*Counsel for Lead Plaintiff Steve Rand*

35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2010 electronically transmitted the attached

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

Notice of Electronic Filing to the following CM/ECF registrants:

Joel P. Hoxie
Joseph G. Adams
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202

Brian E. Pastuszenski
Goodwin Procter LLP
53 State Street
Boston, MA 02109

Blake E. Williams
John D. Cooke
Goodwin Procter LLP
Three Embarcadero Center
San Francisco, CA 94111

Lloyd Winawer
Goodwin Proctor LLP
135 Commonwealth Drive
Menlo Park, CA 94025-1105

Don P. Martin
Nicole France Stanton
Quarles & Brady LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391

JEREMY A. LIEBERMAN *(pro hac vice)*
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
100 Park Avenue, 16th Floor
New York, New York 10017

PATRICK V. DAHLSTROM (*pro hac vice*)
POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603

s/T. Mahabir