**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE MEDICIS PHARMACEUTICAL CORPORATION SECURITIES LITIGATION | Lead Case No. CV-08-1821-PHX-GMS<br><br>Consolidated with:<br>Case No. CV-08-1870-PHX-GMS<br>Case No. CV-08-1964-PHX-GMS<br><br>**ORDER** |

The Defendants in this matter have each filed Motions to Dismiss (Doc. 80–81). For the reasons set forth below, however, both Motions are denied.[1]

**BACKGROUND**

This action arises as a result of a September 24, 2008 Restatement issued by Medicis Pharmaceutical Corporation ("Medicis" or the "Company"). In that Restatement, the Company revised its 2003–2008 financial statements due to a violation of Generally Accepted Accounting Principles ("GAAP"). Specifically, Medicis and its independent auditor, Ernst & Young LLP ("Ernst & Young"), announced that the Company's prior financial statements were incorrect due to a misinterpretation of Statement of Financial Accounting Standards No. 48, *Revenue Recognition When a Right of Return Exists* ("SFAS 48").

---

[1]The parties' requests for oral argument are denied as the Court has determined that oral argument will not aid in its decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

Under SFAS 48, a seller who offers products for sale with a right of return may recognize revenue on a sale only if certain conditions are met. (*See* Doc. 57, Ex. D at ¶ 6). For example, the seller must be able to reasonably estimate the number of likely returns and must exclude the value of those returns from its total revenue. *See id.* SFAS 48 further requires the seller to establish and maintain a reserve based on the *full sales price* of each anticipated return. *See id.* SFAS 48, however, is not without exception. Under Footnote 3 to that provision, a seller *may* recognize revenue on certain products sold with a right of exchange. *See id.* at 10 n. 3. Pursuant to Footnote 3, "Exchanges by ultimate customers of one item for another of the same kind, quality, and price (for example, one color or size for another) are not considered returns for purposes of this Statement." *Id.* Otherwise, SFAS 48 explicitly provides that "exchanges for other products" are to be treated as returns. *Id.* at ¶ 3. Thus, exchanges that are not the same in "kind, quality and price" must be accounted for by reserving the full sales price for these exchanges. *See id.*

The GAAP violation at issue in this case pertains to the way Medicis and Ernst & Young (collectively "Defendants") recognized revenue for pharmaceutical products sold with a right of exchange. As part of the Company's regular business practice, Medicis sold its products to wholesale distributors. But, while these sales were final and non-refundable, Medicis allowed distributors to exchange pharmaceuticals, as they neared expiration, for fresher products. To recognize revenue on the sale of these pharmaceuticals, Medicis was required to estimate the number of likely exchanges and reserve the value of those exchanges from the Company's total revenues. Medicis established the requisite reserve, but in doing so, the Company did not reserve the *full sales price* for estimated exchanges. Instead, relying on Footnote 3's exception to SFAS 48's general provisions, Defendants reduced Medicis's sales revenue by the *cost of replacing* short-dated or expired drugs with fresher pharmaceuticals. (*See* Doc. 57, Ex. D at ¶ 6).

Defendants' interpretation of Footnote 3, however, was misplaced. In 2008, the Public Company Accounting Oversight Board questioned Defendants' methodology, noting that expired drugs cannot be considered to be the same in "kind, quality, and price" as fresh

pharmaceuticals. Hence, though replacement cost accounted for the actual economic impact of the exchanges, the audit indicated that Defendants should have set reserves based on the full sales price of these products under SFAS 48.

The revelation of Defendants' violation of SFAS 48 required Medicis to issue the September 2008 Restatement. The Restatement demonstrates that Medicis's violation of GAAP primarily had an effect on the timing of the Company's revenue recognition. In 2003, for instance, Medicis overstated revenues by $37.2 million, while in 2006, revenues were understated by $44 million. (*See* Doc. 59, Ex. B at 3). The following table reflects the impact of the revised reserve calculations on Medicis's financial statements from 2003–2008:

| *Net Revenue (in millions)* | Fiscal year Ended 12/31/07 | Fiscal year Ended 12/31/06 | Transition Period Ended 12/31/05 | Fiscal year Ended 06/30/05 | Fiscal year Ended 06/30/04 | Fiscal year Ended 06/30/03 |
| --- | --- | --- | --- | --- | --- | --- |
| As Reported | $ 464.7 | $ 349.2 | $ 164.0 | $ 376.9 | $ 303.7 | $ 247.5 |
| Adjustment | – 7.3 | + 44.0 | + 1.3 | – 11.2 | + 11.5 | – 37.2 |
| As Restated | $ 457.4 | $ 393.2 | $ 165.3 | $ 365.7 | $ 315.2 | $ 210.3 |

As these numbers demonstrate, Medicis overstated revenues during some of the restated fiscal periods and understated revenues in others. In the aggregate, the accounting violation resulted in an understatement of net revenues of approximately $1.1 million over the entire six-year period. But while total revenues did not substantially change, the revelation of the accounting violation allegedly caused a substantial drop in Medicis's stock price.

Following the drop in Medicis's stock value, Plaintiffs filed the instant action alleging that Defendants violated § 10(b) of the Securities and Exchange Act of 1934 because Medicis's original financial statements were false or misleading due to the Company's violation of GAAP. According to Plaintiffs, Defendants intentionally, or with deliberate recklessness, manipulated revenues by ignoring SFAS 48. Plaintiffs further allege that several of Medicis's corporate executives contributed to the false or misleading statements and are therefore liable under § 10(b) or § 20(b) of the Exchange Act. These executives include: CEO Johan Shacknai; CFO Richard D. Peterson; and COO Mark A. Prygocki.

This is the second time that Defendants have moved to dismiss this action. In December 2009, the Court dismissed Plaintiffs' First Amended Complaint with leave to amend because Plaintiffs failed to raise a strong inference of scienter as to any of the Defendants. *See In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp.2d 1192 (D. Ariz. 2009). The Second Amended Complaint pleads much more particular allegations and attempts to cure these defects by (1) presenting opinion testimony from an accounting expert[2] regarding Defendants' state of mind; (2) providing excerpts from Medicis's public filings—which allegedly suggest that Medicis disguised the manner in which the Company was accounting for exchanges; and (3) presenting allegations that suggest that Defendants intentionally exploited their improper accounting methodology to create a false impression of consistent company growth. (*See* Doc. 76).

## LEGAL STANDARD

To establish a valid claim pursuant to § 10(b) and Rule 10b-5 promulgated thereto, a plaintiff must satisfy five elements: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys. Inc., Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

To state a claim pursuant to § 10(b), federal securities complaints must satisfy stringent pleading requirements. Of particular relevance in the instant case, the Private Securities Litigation Reform Act ("PSLRA") requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter. 15 U.S.C. § 78u-4(b)(2); *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976). The required state of mind is either that the defendant acted intentionally or with "deliberate recklessness." *Daou Sys.*, 411 F.3d at 1014–15. Because the misconduct must be

---

[2]The parties debate whether expert opinion can be used to support Plaintiffs' allegations of scienter. This dispute, however, need not be resolved at this time because Plaintiffs' allegations give rise to a cogent inference of scienter regardless of whether the statements from this expert are considered.

"deliberate," recklessness does not satisfy the PSLRA's pleading requirements unless it "reflects some degree of intentional or conscious misconduct." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999); *see also DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002) (holding that in order to allege a strong inference of deliberate recklessness, a plaintiff must state "facts that come closer to demonstrating intent, as opposed to mere motive and opportunity") (citations omitted). In short, to plead scienter, a plaintiff must plead "no less than a degree of recklessness that strongly suggests actual intent" by providing "in great detail, facts that constitute strong circumstantial evidence of deliberate recklessness or conscious misconduct. *Silcon Graphics*, 183 F.3d at 973, 979.

To survive a motion to dismiss, the inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The inference of scienter, however, "need not be irrefutable, *i.e.*, of the 'smoking gun' genre or even the 'most plausible of competing inferences.'" *Id.* (citations omitted). In determining the cogency of the allegations at the motion to dismiss stage, federal courts are required to consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* In other words, courts may not rely "exclusively on a segmented analysis of scienter." *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). Instead, courts must "consider the totality of the circumstances[.]" *Id.* at 992 (citing *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)). Thus, in addressing the question of scienter, federal district courts must "conduct a dual inquiry." *Id.* First, courts must "determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient," courts must then "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

**DISCUSSION**

Applying the PSLRA's pleading standard to the facts of this case, the primary issue is whether the Second Amended Complaint, read most favorably to the Plaintiffs, but considering all reasonable inferences, alleges particular facts giving rise to a strong inference that the Defendants made fraudulent representations or omissions, either with knowledge of their falsity or with deliberate recklessness. Though it is a close case, Plaintiffs have adequately pled facts demonstrating the requisite degree of scienter to support their §§ 10(b) and 20(a) claims.[3]

## I. Plaintiffs Have Alleged a Cogent Inference of Deliberate Misconduct Under § 10(b).

Because GAAP requires companies to exercise a measure of judgment when they make accounting decisions, a plaintiff cannot demonstrate scienter simply by pointing to an accounting error and pleading facts that show a defendant was aware of the accounting methods that ultimately turned out to be in violation of GAAP. *See DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) ("[M]ere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of scienter."). Otherwise, almost all accounting errors and GAAP violations would give rise to scienter. Hence, allegations of GAAP violations generally are insufficient to establish scienter unless those allegations are pled "in conjunction with other details establishing that a defendant" acted with the requisite state of mind. *See In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp.2d 1051, 1074 (N.D. Cal. 2002) (citing *In re Nuko Sec. Litig.*, 199 F.R.D. 338, 344 (N.D. Cal. 2000)). As other courts have observed, such

---

[3]The parties have requested consideration of several documents related to the pending claims including SFAS 48 and various SEC filings. None of the parties dispute the authenticity of these documents, and they do not object to their consideration. Thus, to the extent that the relevant documents are incorporated by reference or are subject to judicial notice, the Court has considered them as appropriate in resolving the pending motions. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (discussing the parameters of the incorporation by reference doctrine); *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991) (allowing consideration of items that are properly the subject of judicial notice on a motion to dismiss).

detailed allegations might include: (1) the magnitude, obviousness, and reasonableness of the violation; (2) the omission in public statements of material facts related to the GAAP violation; (3) the defendant's potential motive or reason for using the accounting methods it did; and (4) other statements or conduct indicating that the defendant intentionally or recklessly misapplied GAAP. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004) (holding that an inference of scienter "may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and *so great in magnitude*, that they should have been obvious to a defendant"); *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp.2d 134, 152 (D. Mass. 2001) (holding that the omission of the relevant accounting treatment from public disclosures may give rise to an inference of scienter); *Hypercom Corp. Sec. Litig.*, 2006 WL 726791, at *9 (D. Ariz. Jan. 25, 2006) (observing that [t]he presence of 'motive' . . . may contribute to a strong inference of scienter") (citation omitted); *Zucco Partners*, 552 F.3d at 995 (noting that specific and detailed allegations from confidential witnesses can be used to demonstrate that a statement was made recklessly or with deliberate indifference).

In their Second Amended Complaint, Plaintiffs primarily raise three bases for scienter: (1) the violation of GAAP was so simple and obvious that Defendants must have known of the error (2) Medicis's public disclosures demonstrate that Defendants were concealing the Company's "tenuous" accounting methodology from investors; (3) Defendants exploited its accounting methodology to manipulate the timing of revenue recognition and to create a false impression of Company growth. Considering these allegations in aggregate, Plaintiffs have alleged facts giving rise to a cogent inference of scienter.

**A. The Simplicity or Obviousness of Defendants' Accounting Mistake Gives Rise to At Least Some Inference of Scienter.**

Accounting errors that prove to have a significant impact on core business operations—i.e. cash, revenue, profits, liquidity, or viability of a product, sometimes give rise to a compelling inference of scienter. *See PR Diamonds*, 364 F.3d at 684. This is so because such substantial errors give rise to an inference that the defendant acted recklessly or

intentionally used deceptive accounting principles to disguise serious problems. In *PR Diamonds*, for instance, the Sixth Circuit held that an inference of scienter "may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and *so great in magnitude*, that they should have been obvious to a defendant." *Id.*; *see also In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005) (holding that the "sheer magnitude" of an accounting mistake can give rise to a cogent inference of deliberate misconduct).

The magnitude of the error, however, is not the only consideration. Courts must also weigh the complexity or simplicity of the relevant accounting standard. *See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 792 (11th Cir. 2010) (holding that in conducting its analysis of scienter, a district courts's scienter may consider whether "the GAAP provision at issue [was or] was not a simple accounting policy").Where a provision at issue is subject to competing interpretations that are reasonable and when the error is relatively small in magnitude, the inference of scienter is generally weak. *See In re Taleo Corp. Sec. Litig.*, 2010 WL 597987, at *10 (N.D. Cal. Feb. 17, 2010). Conversely, where GAAP provisions are relatively straightforward or basic and the mistake is pervasive over a long period of time, the inference of scienter may be much stronger. *See, e.g., Backe v. Novatel Wireless, Inc.*, 642 F. Supp.2d 1169, 1185–86 (S.D. Cal. 2009) (finding scienter where defendants were alleged to have shipped products prematurely and, in doing so, violated "basic" accounting principles). Similarly, when the relevant provision pertains to an important company policy and as the nature of the accounting violation becomes more obvious, the "inference of scienter becomes more probable[.]" *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp.2d 620, 637–38 (E.D. Va. 2000). A plaintiff, however, cannot merely point at a GAAP principle and contend that a correct interpretation was simple or obvious. At the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that principal was being interpreted. The plaintiff must then plead facts explaining how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference

of deliberate wrongdoing. *See Medicis*, 689 F. Supp.2d at 1204 (citing *Zucco Partners*, 552 F.3d at 1000; *South Ferry*, 552 F.3d at 785).

This case presents the scenario where the accounting violation was not particularly great in magnitude, but where the relevant violation was relatively straightforward or obvious. As an initial matter, Plaintiffs' have cured any defect pertaining to whether Defendants knew of relevant GAAP principal and were aware of Medicis's interpretation of that provision. In the Second Amended Complaint, Plaintiffs allege that Medicis executives, in particular Peterson and Prygocki, emphasized the importance of the Company's return methodology and stated that the Company was not "booking revenue in advance of future quarters." (Doc. 74 at ¶ 123). More significantly, Medicis's financial statements prior to the Restatement, which were signed by Shacknai and Prygocki, specifically identify the Company's reserve methodology as one of Medicis's most "critical accounting policies." (*Id.* at ¶ 71). Thus, given the importance of reserves to Medicis's business, Plaintiffs have adequately pled particular facts demonstrating that the executive Defendants were all well aware of SFAS 48, which governs revenue recognition where a right of return exists, and the Company's interpretation of that provision. Similarly, because Ernst & Young signed-off on the financial statements as the Company's auditor, there is a strong inference that it too was aware of Medicis's interpretation of SFAS 48. But, while Plaintiffs have alleged facts demonstrating these Defendants' knowledge of the relevant accounting methodology, this answers only half of the question. The next inquiry is whether Defendants' mistaken interpretation of this "critical accounting policy" resulted in an accounting error of significant magnitude or was so obvious that Defendants must have known of their mistake.

As set forth in the Court's previous Order, Defendants' alleged accounting violation does not appear to have been so great in magnitude that Defendants must have known of the mistake. *See Medicis*, 689 F. Supp.2d at 1206. Instead, Medicis's Restatement indicates that the mistake had very little effect on cash, liquidity, or the viability of Medicis's core-business operations. *Id.* Medicis initially overstated revenue because the Company deducted only the replacement cost of pharmaceuticals, rather than the full sales price, in calculating its

reserves. In subsequent accounting periods, the inflated revenue was offset by the fact that the Company did not actually expend the full sales price—since the cost of replacing the expired items was actually less than the full price. *Id.* Thus, in the end, the accounting error's primary effect was to shift the amount of total revenue among different fiscal periods. *Id.* This, without more, does not give rise to an inference of scienter.

But while the GAAP violation does not appear to have been very large in magnitude, the relative simplicity and obviousness of the mistake presents a more difficult issue. On the one hand, the terms of SFAS 48 do not explicitly address the accounting question at issue in this case. Though SFAS 48 clearly requires a company to set reserves based on the full sales price of the estimated number of returns when a company sells products with a general right of return, it does not appear to specifically consider the scenario where a company sells products without any right to return the product for a refund, but merely allows customers to exchange an expired or short-dated product for a fresher unit of the product. (*See* Doc. 57, Ex. D at ¶ 6). Given the lack of explicit guidance, Defendants' accounting methodology, which appears to have captured the economic impact of product exchanges, might have been aggressive, but it was not necessarily unreasonable. *See Medicis*, 689 F. Supp.2d at 1206. On the other hand, however, SFAS 48, and specifically Footnote 3 thereto, provides in a relatively straightforward manner that exchanges should be treated as other returns unless the exchanges are made "by ultimate customers of one item for another of the same kind, quality, and price." (Doc. 57 at 10 n. 3). The idea that expired and fresh pharmaceuticals are of the same "quality" simply seems incorrect. Yet, that is the premise underlying Defendants' alleged interpretation of SFAS 48. Additionally, the exception in Footnote 3 applies only when a defendant is selling products to "ultimate customers." *Id.* SFAS 48 quite clearly distinguishes an "ultimate customer" from "a party who resells the product to others." *Id.* at ¶ 3. Given their apparent familiarity with SFAS 48, Defendants must have at least questioned whether their wholesale distributors fell within the meaning of "ultimate customers." *See id.*

These facts, as pled in the Second Amended Complaint, give rise to at least some inference that Defendants' interpretation of SFAS 48 was intentional or deliberately reckless.

While Defendants' methodology does appear to have taken into account the actual economic costs of product exchanges, SFAS 48 is relatively straightforward and simple. Indeed, courts that have addressed SFAS 48 in other contexts have noted its relative simplicity. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999) (observing that "[v]iolations of GAAP standards such as [S]FAS 48 could provide evidence of scienter" when described with sufficient particularity); *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994) (noting that premature recognition of revenue in violation of SFAS 48 "run[s] afoul of Rule 10b-5"). Furthermore, the notion that an expired pharmaceutical could be considered to be the same in "quality" as fresh product is untenable given that expired drugs cannot be sold to consumers. It appears that Defendants must have appreciated this fact because they allegedly established a special reserve inventory in Medicis's warehouse for expired pharmaceuticals. (Doc. 74 at 65). To be sure, Plaintiffs' allegations also give rise to the competing, and somewhat compelling, inference that the error may have been nothing more than an aggressive interpretation that had only a minor effect on Medicis's core business operations. Nonetheless, given their familiarity with SFAS 48, Defendants must have at least questioned whether their accounting methodology went too far. *See Jabil Circuit*, 594 F.3d at 792 (noting that "a violation of GAAP by a corporation can raise an inference of scienter when the defendants also ignored 'red flags' warning them of the accounting irregularities"). Accordingly, the allegations pertaining to the simplicity and obviousness of SFAS 48 give rise to at least some inference of intentional or deliberate misconduct. *See PR Diamonds*, 364 F.3d at 684. That inference, when viewed in conjunction with Plaintiffs' other allegations, creates a cogent inference of scienter.

**B.      Defendants' Alleged Failure to Disclose its Interpretation of SFAS 48 Gives Rise to an Inference of Scienter.**

Several courts have also noted that an omission in public statements of material facts related to the GAAP violations can also give rise to a strong inference of scienter in certain circumstances. *See Malone*, 26 F.3d at 479; *Focus Enhancements*, 309 F. Supp. at 152 (quoting *Chalverus v. Pegasystems, Inc.*, 59 F. Supp.2d 226, 234 (D. Mass. 1999)). For

instance, in *Malone*, 26 F.3d at 479, a company made public statements regarding its revenue without disclosing that the company had a generous return policy. In finding a strong inference of scienter, the Fourth Circuit noted the company's violations of SFAS 48 combined with the omission of the return policy in the public statements were "more than sufficient to support [an] inference that [the defendants] intended to deceive, manipulate, or defraud investors." *Id.* Hence, when a Defendant knowingly adopts a questionable or tenuous accounting methodology and fails to disclose material facts regarding that methodology to investors, an inference of scienter may arise. *See id.* In contrast, where a defendant fully discloses its accounting methodology in a "transparent manner," and the methodology is later shown to violate GAAP, any inference of scienter will be substantially tempered. *See Taleo Corp.*, 2010 WL 597987, at * 10; *see also In re WatchGaurd Sec. Litig.*, 2006 WL 2038656, at *5–6 (W.D. Wash. Apr. 21, 2006) (finding that the plaintiffs' allegations failed to support a strong inference of scienter where defendants had "consistently disclosed" the accounting error on which a restatement was based because the "blatant error had been committed . . . in open and notorious fashion for years").

Plaintiffs' Second Amended Complaint raises new allegations pertaining to Defendants' failure to disclose material facts about their interpretation of SFAS 48. Significantly, Medicis's public disclosures, which were issued with the advice of the Company's auditor while the accounting violation was still on-going, do not state or imply that Medicis was accounting for exchanges of expired drugs pursuant to an exception to SFAS 48. Instead, the disclosure arguably implied that the Company was accounting for exchanges in the same manner as products sold with a right of return:

> [P]rograms are established as a reduction of product sales revenues at the time such revenues are recognized. These deductions from gross revenue are established by the Company's management as its best estimate at the time of sale based on historical experience adjusted to reflect known changes in the factors that impact such reserves, including but not limited to, prescription data, industry trends, competitive developments and estimated inventory in the distribution channel.

\*\*\*

> Provisions for estimates for product returns and exchanges, sales discounts, chargebacks, managed care and Medicaid rebates and consumer rebate and loyalty programs are established as a reduction of product sales revenues at the time such revenues are recognized.

(Doc. 74 at ¶ 51). Hence, while Medicis revealed that it reserved revenue for exchanges, it did not reveal that it was setting reserves at replacement cost rather than the full sales price of estimated exchanges. Meanwhile, Heska Corporation, the single other pharmaceutical company that consistently accounted for exchanges in the same manner as Medicis, provided in its public filings that it had "record[ed] an accrual for the estimated *cost of replacing* the expired product expected to be returned in the future." (Doc. 74 at ¶ 49 (emphasis added)). Thus, while Medicis was silent about its methodology, a competitor that employed the same interpretation of SFAS 48 transparently disclosed that its reserves were based on replacement cost, rather than the full sales price, of anticipated exchanges.

As set forth in this Order, Defendants considered their reserve accounting methodology to be a "critical" component of Medicis's business. It is also fairly likely that Defendants must have at least questioned the propriety of that methodology with respect to exchanges for expired drugs. Yet, despite the fact that Defendants must have at least had some doubt about their interpretation of SFAS 48, they chose to conceal their replacement cost methodology from investors. This was in sharp contrast to the other major pharmaceutical company that adopted a similar accounting approach. And while Defendants argue that their disclosures were almost identical to those issued by several other pharmaceutical companies, this argument ignores the fact that these other companies were accounting for returns and exchanges in accordance with SFAS 48.

To be sure, there may well be legitimate reasons for Defendants' failure to disclose more facts pertaining to Medicis's violation of GAAP. Nevertheless, the alleged omission of relevant facts pertaining to the accounting methodology at issue gives rise to an inference that Defendants intentionally concealed their tenuous interpretation of SFAS 48 from analysts and investors.

### C. Plaintiffs Have Adequately Alleged that Defendants Were Exploiting the Accounting Methodology to Control the Timing of Revenue Recognition.

Another potential consideration in federal courts' scienter analysis is the alleged motive or purpose underlying the defendants' accounting violation. *See Hypercom Corp.*, 2006 WL 726791, at *9 (observing that "[t]he presence of 'motive' . . . may contribute to a strong inference of scienter") (citing *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp.2d 1248, 1269 (N.D. Cal. 2000)). For instance, when a defendant's violation of accounting principles allows a company to obtain a financial benefit or a competitive advantage, courts generally find at least some inference of scienter. *See Telabs*, 551 U.S. at 325 (holding that "motive can be a relevant consideration" and that "personal financial gain may weigh heavily in favor of a scienter inference"). To be clear, "motive and opportunity *alone* are insufficient to show scienter at the pleading stage[;]" nonetheless, these factors may "still be considered as circumstantial evidence" of the relevant state of mind. *See Howard v. Everex Sys.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (citation omitted). Indeed, allegations of motive or opportunity become more compelling when detailed facts are alleged demonstrating that the defendant actually exploited the accounting violation over a long-period of time to achieve an improper purpose. As the Southern District of New York recently observed in *In re IMAX Sec. Litig.*, 587 F. Supp.2d 471, 483 (S.D. N.Y. 2008), a plaintiff may sufficiently allege scienter when sets forth facts demonstrating that a defendant "underst[ood] . . . the relevant accounting rules," appreciated "the ramifications of selecting certain interpretations of the rules over others," and adopted an "increasingly aggressive accounting of [product] revenue."

Although the facts demonstrating Defendants' alleged motive are not overly compelling, they do at least create an inference that Medicis was using its accounting methodology to create an appearance of sustained Company growth. According to Plaintiffs, Medicis "touted itself as a pharmaceutical company of consistent and reliable growth—which could be counted on to continuously break previously set revenue records." (Doc. 74 at ¶ 148). This image was allegedly maintained by exploiting their flawed interpretation of SFAS 48 to push forward revenues in certain quarters to maintain the illusion of consistent and

steady growth. For example, from 2002 to 2003, the Company reported that its revenues increased from $212 million to $247.52 million, an increase of 16.3%. *Id.* at ¶ 149. In reality, the Company's actual revenues for 2003 were $210.3 million, which represented a decline from the prior year's revenues of $212.8 million. *Id.* Similarly, in November 2007, the Company announced revenues of $120.4 million, compared to the prior quarter's revenue of $108 million. *Id.* at ¶ 148. In reference to these financial results, Shacknai, boasted of "another record revenue quarter" for Medicis. However, the Company's restated figures demonstrate that Medicis's actual revenue for that period was only $110.9 million, approximately $3 million less than the Company's restated revenues of $113 million for the prior quarter. *Id.*

These changes in Medicis's financial statements, while not particularly substantial, do contribute to the inference of scienter. Here, Medicis allegedly exploited its accounting methodology to recognize revenues well in advance of when it should have, and allegedly did so to craft an image of constant growth and expansion. Indeed, if revenue appeared to be somewhat low toward the end of a particular year or quarter, Medicis allegedly used its flawed accounting methodology to send large quantities of short-dated pharmaceutical products to its wholesale distributors, booked revenues on those sales despite knowledge that many of the short-dated products would be returned, and then failed to adequately reserve the full sales value of anticipated returns. Given that some of the products would not be returned or exchanged for years from the time that revenue was recognized, it appears that these are precisely the types of specious accounting activities that GAAP and SFAS 48 are intended to prevent. (*See* Doc. 57, Ex. D at ¶ 15) ("Situations that pose particular problems occur when sales result in significant overstocking by customers acquiring product for resale. In those situations, the recognition of revenue in one period is followed by substantial returns in a later period."). Indeed, much like the defendants in *IMAX*, 587 F. Supp.2d at 483, it appears that Medicis and its auditor understood the relevant accounting provision, appreciated the "ramifications of selecting [a] certain interpretation . . . ," and then employed an "increasingly aggressive accounting of [product] revenue."

These allegations also have some applicability to Ernst & Young. Although the auditing firm likely did not share Medicis's motive or purpose, given the prominence of the accounting provision to Medicis, Ernst & Young would have known how the Company's accounting interpretation might have been exploited. Yet, Ernst & Young allegedly did nothing to prevent Medicis from employing a tenuous accounting method to manipulate revenues. That Medicis employed an accounting methodology that allowed the Company to easily manipulate the timing of revenues should have at least raised red flags regarding the propriety of Medicis's accounting treatment. *See Jabil Circuit*, 594 F.3d at 792 ("[A] violation of GAAP by a corporation can raise an inference of scienter when the defendants also ignored 'red flags' warning them of the accounting irregularities."). And while this alleged purpose standing alone does not create a cogent inference of scienter, when it is considered along with the other allegations in the Second Amended Complaint, it does contribute to the overall inference that Defendants may have acted deliberately.

### D. Plaintiffs' Allegations, When Considered Holistically, Give Rise to a Sufficient Inference of Scienter Under § 10(b).

Plaintiffs' Second Amended Complaint, when considered holistically, gives rise to a sufficient inference that Defendants acted knowingly or with deliberate recklessness in setting its reserves. When considering allegations of scienter, courts must "determine whether the complaint," as a whole, "contains an inference of scienter that is greater than the sum of its parts." *Rubke v. Cap. Bancorp Ltd.*, 551 F.3d 1156, 1165 (2009). Under this "holistic" approach, "federal courts . . . need not close their eyes to circumstances that are probative of scienter [when] viewed [from] a practical and common-sense perspective." *South Ferry*, 542 F.3d at 784.

As set forth in this Order, Plaintiffs' allegations give rise to a cogent inference of scienter for three reasons: (1) Defendants misapplied SFAS 48, even though that provision is relatively simple and straightforward; (2) even though Defendants must have been aware that its interpretation was somewhat tenuous, Defendants failed to disclose their accounting methodology to investors; and (3) Defendants allegedly exploited their accounting

1 methodology to manipulate revenue recognition and create an image of constant growth. Though Plaintiffs' allegations may not be sufficient to give rise to the requisite state of mind if considered in isolation, they do give rise to a cogent inference of scienter when considered collectively.

**II.     Plaintiffs Have Adequately Alleged § 20(b) Liability.**

Section 20(a) of the Exchange Act provides for joint and several liability of persons who control primary violators of the securities laws:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*Id.* As the Ninth Circuit has further explained, "In order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) 'a primary violation of federal securities law' and (2) 'that the defendant exercised actual power or control over the primary violator.'" *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (quoting *Howard*, 228 F.3d at 1065). After a plaintiff sets forth a prima facie case, the burden shifts to the defendant to show that it acted in good faith—i.e. that it lacked scienter or did not directly or indirectly induce the misconduct. *Id.*

In the instant case, Plaintiffs have adequately pled a § 20(b) claim against Shacknai, Peterson, and Prygocki. The first element is satisfied because, as discussed above, the Second Amended Complaint has adequately alleged a primary violation of § 10(b) against Medicis and its executive officers. The second element is also satisfied because Shacknai, Peterson, and Prygocki are alleged to have had the power and ability to control the actions of Medicis and its employees.

**CONCLUSION**

As set forth in this Order, Plaintiffs's Second Amended Complaint cures the defects identified by the Court in its previous Order.

**IT IS THEREFORE ORDERED** that Defendants' Motions to Dismiss (Doc. 80, 81) are **DENIED**.

DATED this 9th day of August, 2010.

*G. Murray Snow*
G. Murray Snow
United States District Judge